## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The National Association for Fixed Annuities,<br><br>Plaintiff,<br><br>vs.<br><br>Thomas E. Perez, in his official capacity as<br>Secretary of the United States Department of<br>Labor<br>Frances Perkins Building<br>200 Constitution Avenue<br>Washington, D.C.  20210<br><br>and<br><br>United States Department of Labor,<br>Frances Perkins Building<br>200 Constitution Avenue<br>Washington, D.C.  20210,<br><br>Defendants. | Civil Action No. 1:16-cv-1035 |

## <u>COMPLAINT</u>

1.      Plaintiff the National Association for Fixed Annuities ("NAFA") seeks declaratory, injunctive, and other appropriate relief against Defendants Thomas E. Perez, in his official capacity as Secretary of the Department of Labor ("the Secretary"), and the Department of Labor (collectively, "Defendants" or the "Department").

2.      This case challenges the authority of the Department to promulgate regulations redefining "investment advice" and "fiduciary" under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Internal Revenue Code ("Code").

3.      Specifically, NAFA files this complaint to challenge and vacate the Department's final regulations, *Definition of the Term ''Fiduciary''; Conflict of Interest Rule—Retirement*

1

*Investment Advice*, 81 Fed. Reg. 20,945-21,002 (Apr. 8, 2016) (to be codified at 29 C.F.R. pt. 2510.3-21) (the "Rule"), and two related exemptions, (1) the *Best Interest Contract Exemption*, 81 Fed. Reg. 21,002-21,089 (the "BICE") and (2) *Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies, and Investment Company Principal Underwriters*, 81 Fed. Reg. 21,147-21,181 (Apr. 8, 2016) ("PTE 84-24") (the BICE and PTE 84-24 are referred to collectively as the "Exemptions").  In substance, this case is a Petition for Review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 604.

4.      Specifically, in promulgating the Rule and the Exemptions, the Department exceeded the authority granted to it by Congress under ERISA, the Code, and Reorganization Plan No. 4 of 1978, 5 U.S.C. App. 1, 92 Stat. 3790.  In addition, the Rule and the Exemptions are arbitrary and capricious, not in accordance with law, impermissibly vague, and otherwise promulgated in violation of federal law.

5.      The "applicability date" of the Rule is April 10, 2017, at which time the requirements of the Rule become operational.  The "effective date" of the Rule was originally set for June 7, 2016, but that date was delayed when Congress passed a Joint Resolution of Disapproval under the Congressional Review Act.  H.J. Res. 88, 114th Cong. (2015-2016).  While the effective date has not yet been established, the applicability date remains April 10, 2017, which gives rise to the causes of action stated herein.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because NAFA's claims arise under the laws of the United States, including under the APA, 5 U.S.C. § 701 *et seq.*, and RFA, 5 U.S.C. § 604.  This Court is authorized to enter a declaratory judgment under

28 U.S.C. § 2201 and 5 U.S.C. § 706 and to grant injunctive relief under 28 U.S.C. § 2202 and 5 U.S.C. §705.

7.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because both Plaintiff NAFA and the Department reside in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## ASSOCIATIONAL STANDING

8.     NAFA has standing to bring this suit on behalf of its members, because some or all of its members would otherwise have standing to sue in their own right.

9.     In addition, NAFA has standing to bring this suit on behalf of its members because the interests it seeks to protect are germane to NAFA's purpose, *i.e.*, to educate and inform state and federal regulators and consumers about fixed annuities and to advocate for its members that create, distribute, and sell fixed annuities.

10.     Neither the claim asserted nor the relief requested requires the participation of individual NAFA members in this lawsuit.

11.     NAFA's members have been adversely affected by the Department's actions in that the Rule and Exemptions will, in many cases, threaten the very existence of their business, result in immediate and unrecoverable losses of market share, and result in unrecoverable economic losses for which no adequate relief can later be granted.

12.     NAFA has standing to bring this action on behalf of its members, because a court order setting aside the Rule and Exemptions under 5 U.S.C. § 706 will redress adverse effects caused by the Department's Rule and Exemptions.

13.     As set forth in greater detail below, NAFA's members face imminent and irreparable harm flowing directly from the Rule and the Exemptions.

## PARTIES

14.     Plaintiff NAFA is a trade association organized under the laws of the State of Wisconsin and with its principal place of business in Washington, D.C.  NAFA's mission is to educate and inform state and federal regulators, legislators, industry personnel, media, and consumers about the value of fixed annuities and their benefits to Americans in financial and retirement planning.   NAFA's membership includes insurance companies (or "carriers"), independent marketing organizations ("IMOs"), and individual insurance agents, representing every aspect of the fixed annuity marketplace and covering 85 percent of fixed annuities sold in the marketplace.

15.     Defendants are the U.S. Department of Labor and Thomas E. Perez, in his official capacity as the Secretary of Labor.  The Department has limited authority to issue "necessary or appropriate" regulations under ERISA.  29 U.S.C. § 1135.  The Department also has limited authority under the Code to issue regulations, rulings, opinions, and exemptions relating to ERISA fiduciaries.  5 U.S.C. App. 1, 92 Stat. 3790 (1978).

## FACTUAL BACKGROUND

### I.     FIXED ANNUITY PRODUCTS

16.     Fixed annuities are a form of insurance.

17.     Fixed annuities are contracts offering guarantees of (1) minimum accumulation value, (2) protection from market risk, and (3) income the owner cannot outlive.  Unlike all other types of retirement investment vehicles, fixed annuities offer two insurance-backed, contractual guarantees:  guaranteed protection of principal and a guaranteed annuitized income payout.

18.     There are two basic types of deferred fixed annuities:  (1) fixed declared rate annuities and (2) fixed indexed annuities, or FIAs.  The difference is the manner in which interest is calculated.

19.     A fixed declared rate annuity guarantees a minimum interest rate set by the insurance company.  The contract may provide a guaranteed interest rate for the life of the annuity or may allow the insurance company to reset the interest rate periodically but no more than once every twelve months.

20.     In contrast, an FIA bases its interest rate on an external market index, such as the S&P 500, with a guarantee that the rate will never fall below zero.  The policyholder does not directly participate in any security investment.   Rather, the insurance carrier assumes the investment risk, guaranteeing the FIA can never lose value based on performance of the equity markets.  The advantage of an FIA over a declared rate annuity is the opportunity to earn higher interest from potentially favorable changes in the applicable market index.  Aside from the manner in which interest is determined and credited, FIAs function in all other respects the same as fixed declared rate annuities, including the predictable stream of lifetime income that is contractually guaranteed by the insurance company.

21.     The sales transaction for a fixed annuity contract is made between the consumer and the insurance company.  Payments made for the purchase of the fixed annuity contract are paid to the insurance company, not the agent or advisor.  The agent does not retain any type of control over the funds.

22.     Insurance products like fixed annuities have no downside market risk and provide state-mandated guarantees to the consumer that investment products cannot provide due to their inherent risk factors.

23.     In contrast, with investment advice the consumer pays the investment advisor to manage his or her money.  The consumer gives the money to the investment advisor who then places it in different investment instruments, moving the money around, reallocating it, buying and

selling different assets such as stocks and bonds, all in accordance with an investment plan that the advisor has developed.  For this service, typically there are ongoing fees that an investor pays to the advisor.

24.     These fixed insurance products—both fixed declared rate annuities and fixed indexed annuities—are meant to be long-term retirement savings vehicles.

25.     Fixed annuity insurance products are not investments, and they are not securities.

26.     Fixed annuity insurance products have long been regulated by state insurance laws and exempted from the federal securities laws.

27.     Fixed annuities, including both declared rate annuities and FIAs, are distinguishable from variable annuities.  Variable annuities earn investment returns based on the performance of segregated investment portfolios known as subaccounts, and return is not guaranteed.  The value of the subaccounts could go up or down, and thus the consumer could make or lose money, with no protection for principal.  Consequently, and in contrast to the FIA, the consumer bears all investment risk attendant to the variable annuity and its subaccounts.  Thus, variable annuities are considered securities and have long been regulated as such under applicable securities laws.

## II.     FIXED ANNUITY DISTRIBUTION

28.     Fixed annuities are distributed and marketed in a wide variety of different distribution models.  There are many different types of salespersons who distribute fixed annuities.  Some of these insurance agents operate as "career agents" of carriers, "captive agents" of a carrier, "independent agents" for one or several carriers, employees of carriers or distribution firms, and the like.  Some of these agents work directly with carriers, while others may be required by contract or practice to sell only certain types of fixed annuities.  Independent insurance agents account for approximately 60% of all FIA sales.  The remaining 40% of fixed annuities are

distributed through bank, wire house, broker-dealer, captive, independent, or other sales channels. In some cases, the consumer may contract directly with the insurance carrier without working with an insurance agent.

29.     IMOs are specialized marketing organizations that distribute life insurance products, including fixed annuities, primarily through independent agents.  IMOs are licensed as insurance agencies wherever required by state insurance law, and the principals are typically licensed as individual insurance agents.   Insurance carriers work closely with IMOs as intermediaries to recruit agents to distribute their products, provide product information and support, and offer other services such as marketing support and coordinating submission of annuity applications and related forms to carriers.  IMOs are an integral part of the independent agent channel, upon which insurance companies rely, usually in lieu of setting up an internal sales or captive agent system.

## III.    STATE REGULATION OF FIXED ANNUITIES

30.     As insurance products, fixed annuities are regulated closely by state insurance departments.  Fixed annuity contracts must be filed with and approved by each state in which the contracts are sold.  State regulation is pervasive over the organization and licensing of insurance companies, content and approval of policies, ongoing financial condition of the insurer, licensing of the insurance agents, the manner in which policies are advertised and sold, and virtually all other facets of the insurance business.

31.     Insurance agents who sell fixed annuities are bound by common-law requirements of agency and must pass tests of both competency and character before being granted a state license.  All states have comprehensive rules and regulations that govern the sales practices, disclosure, training, conduct, and consumer protection standards that ensure fixed annuities are marketed, sold, and distributed to consumers with fairness, transparency, and recourse in mind.

32.     In most states, the agent must also contract with and be appointed by an insurance carrier, prior to selling products on behalf of that insurer.

33.     Insurance agents who sell fixed annuities are bound by common-law requirements of agency and must pass tests of both competency and character before being granted a state license.  Insurance agents need to be licensed in each state in which they operate.  Only state-licensed life insurance agents may sell fixed annuity contracts.

34.     After an agent has secured a license from the state, he or she must also contract with and be appointed by an insurance carrier, prior to selling products on behalf of that insurer. Insurance carriers review each and every application for appointment, and it is not unusual for an agent to be denied the opportunity to contract with that carrier.  This review process occurs each time the agent applies for appointment with a new or additional insurance company.

35.     After being licensed and appointed but prior to selling annuities, agents in most states must complete mandatory product training provided by the carrier and a suitability training course approved by the state.  The suitability training course includes information regarding the types and various classifications of annuities; the uses of annuities; appropriate sales practices, replacement, and disclosure requirements; how product-specific annuity contract provisions affect consumers; the identification of parties to an annuity; and the application of income taxation of qualified and non-qualified annuities.

36.     The suitability training course includes information regarding the types and various classifications of annuities; the uses of annuities; appropriate sales practices, replacement, and disclosure requirements; how product-specific annuity contract provisions affect consumers; the identification of parties to an annuity; and the application of income taxation of qualified and non-qualified annuities.

37.     Once fully qualified, the agent is subject to comprehensive state regulations related to the sale of fixed annuities, and insurance companies have implemented policies to ensure compliance with such regulations, including the following:

- Disclosure.  States require that a written disclosure statement be provided to the purchaser of a fixed annuity contract at the point of sale to both protect consumers and foster consumer education.  The majority of states have adopted the National Association of Insurance Commissioners ("NAIC") Annuity Disclosure Model Regulation (http://www.naic.org/store/free/MDL-245.pdf).

- Suitability.              A        Suitability        Model        Regulation (http://www.naic.org/store/free/MDL-275.pdf) now applies to all fixed annuity transactions.  It establishes a system for state regulators and carriers to supervise recommendations to purchase annuities and sets forth standards and procedures for fixed annuity transactions so that the insurance needs and financial objectives of consumers are appropriately addressed during the transactions.

- "Free Look" (or Right to Return) Requirements.  Most states require that insurance annuity contracts include a "free look" or "right to return" provision, allowing annuity contract purchasers the right to cancel their contract within a certain number of days (typically 10-30 days).

- Unfair Trade Practice Laws.  Most states have adopted the NAIC's Model Unfair Trade Practices Act (http://www.naic.org/store/free/MDL-880.pdf) (or similar regulations) that provide a framework to regulate trade practices in the business of insurance by defining and prohibiting a broad range of conduct and practices that constitute unfair methods of competition or unfair or deceptive practices.

- Market Conduct Exams.  All state departments of insurance have the regulatory authority to investigate carriers and insurance agents to ensure compliance with applicable laws and regulations.  Most states also perform regular market conduct examinations to monitor compliance with applicable state laws.

38.     Accordingly, state insurance departments oversee all aspects of the transaction: from the development and approval of each fixed annuity product sold in the state, to the licensure and sales activities of the individual agents, to the operations and compliance protocols of the insurance companies.  In each instance, the objective is to protect the interests of the fixed annuity purchaser.

39.     The state-based regulatory structure governing the manufacture, distribution, and sale of fixed annuity products is effective—as demonstrated by the minimal number of consumer complaints.   In 2014, for example, consumer complaints involving securities and advisers represented over 97% of combined annuity and securities complaints—but only .03% of total complaints were lodged by owners of fixed annuities.

## IV.    FEDERAL REGULATION OF FIXED ANNUITIES

40.     Congress has determined that fixed annuities, including FIAs, should be regulated by the states as insurance products, rather than under federal securities laws.

41.     Following an attempt by the SEC to regulate FIAs under the securities laws, Congress made its intentions clear in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act").

42.     Through the Dodd-Frank Act, Congress added a clarifying note to Section 77c of the 1933 Act declaring FIAs are exempt from regulation under federal securities laws.  Public Law 111-203, Title IX, Subtitle I, Section 989J (July 21, 2010).   Consequently, FIAs are treated exclusively as insurance products under federal law, and unlike variable annuities, FIAs are not subject to securities regulation.

## RELEVANT STATUTES AND REGULATIONS

## I.    ERISA

43.     Congress enacted ERISA in 1974.  29 U.S.C. § 1001 *et seq.*  Among other reasons for the statute, Congress sought to protect beneficiaries of "employee benefit plans" by "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans."  *Id.* § 1001(a).

44.     ERISA applies to "any employee benefit plan" that is "established or maintained" (1) "by an employer," (2) "by an employee organization," or (3) "by both."  29 U.S.C. § 1003(a).

The definitions of "employee benefit plan" and "plan" also are limited to plans "established or maintained by an employer or by an employee organization." *Id.* § 1002(1)-(3). These are the types of plans subject to ERISA, i.e., "ERISA plans."

45.     Individual retirement accounts ("IRAs") generally do not fall within any of these definitions. *See* 29 C.F.R. § 2510.3(d).

46.     IRAs were first created by the passage of ERISA, which enacted 26 U.S.C. § 408. *See* Pub. L. 93–406, title II, § 2002(b). Nevertheless, Congress chose not to characterize IRAs as ERISA plans, except in very limited circumstances not relevant to this case.

47.     Congress defined three circumstances in Section 3(21) of ERISA in which a person would qualify as a "fiduciary with respect to a plan":

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

48.     ERISA imposes specific fiduciary duties on those who fall within the three categories, including a "prudent man standard of care":

> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

11

matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a)(1).

49.     Plan fiduciaries who violate these duties are "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to other equitable or remedial relief as the court may deem appropriate, including the removal of such fiduciary." *Id.* § 1109. ERISA also contains limited civil enforcement provisions allowing the Department to challenge breaches of fiduciary duty. *Id.* § 1132.

50.     ERISA bars fiduciaries from engaging in certain "prohibited transactions" with an ERISA plan:

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

*Id.* § 1106(b).

51.     ERISA contains a number of statutory exemptions that permit fiduciaries to engage in certain transactions that would otherwise be prohibited, and it authorizes the Department to establish additional prohibited transaction exemptions. *Id.* § 1108.

52.     In 1975, the year after Congress enacted ERISA, the Department promulgated a regulation to establish a "five-part test" to delineate who would be deemed a "fiduciary with respect to a plan" for "rendering investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan":

> (c) Investment advice.  (1) A person shall be deemed to be rendering ''investment advice'' to an employee benefit plan, within the meaning of section 3(21)(A)(ii) of the Employee Retirement Income Security Act of 1974 (the Act) and this paragraph, only if:
>
> (i) Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and
>
> (ii) Such person either directly or indirectly (e.g., through or together with any affiliate)—
>
> (A) Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or
>
> (B) Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21.

## II.     THE CODE

53.     Section 4975 of the Code provides for an excise tax to be paid as a penalty for engaging in certain "prohibited transactions," 26 U.S.C. §§ 4975(a)-(b), defined as follows:

For purposes of this section, the term "prohibited transaction" means any direct or indirect—

(A) sale or exchange, or leasing, of any property between a plan and a disqualified person;

(B) lending of money or other extension of credit between a plan and a disqualified person;

(C) furnishing of goods, services, or facilities between a plan and a disqualified person;

(D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;

(E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interests or for his own account; or

(F) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

26 U.S.C. § 4975(c)(1).  In addition, Section 4975 contains certain enumerated exemptions from these prohibited transaction rules, 26 U.S.C. § 4975(d), and it permits the Department of Treasury to issue exemptions to these prohibited transaction rules, *Id.* § 4975(c)(2).

54.     Unlike ERISA, Section 4975 includes IRAs within the definition of a "plan." *Id.* § 4975(e)(1)(C) ("For purposes of this section, the term 'plan' means – . . . (B) an individual retirement account described in Section 408(a)."); *see also* 26 U.S.C. 408(a) (definition of "individual retirement account").

55.     The term "fiduciary" in Section 4975 of the Code is defined in the same way as it is in ERISA.  Indeed, in 1975, the Secretary of the Treasury promulgated a regulation that contained the same five-part test promulgated by the Department to define the circumstances under which providing "investment advice to a plan" could lead to the imposition of an excise tax for fiduciaries who engage in a prohibited transaction.  26 C.F.R. § 54.4975-9.

56.     The Code does not, however, impose ERISA-type fiduciary duties of prudent conduct with respect to IRAs, and it does not impose the asset diversification and plan document compliance fiduciary duties that Congress placed on ERISA plan fiduciaries.  *Compare* 26 U.S.C. § 4975 *with* 29 U.S.C. § 1104(a).

57.     Reorganization Plan No. 4 of 1978 (the "Reorganization Plan") transferred to the Secretary of Labor "all authority of the Secretary of the Treasury" to issue certain regulations under Code Section 4975, including regulations relating to the definition of "fiduciary" found in Section 4975.  Reorganization Plan, 5 U.S.C. App. 1, 92 Stat. 3790.

## III.   THE NEW RULE AND EXEMPTIONS

### A.   DEFINITION OF "FIDUCIARY"

58.     On April 8, 2016, following a protracted rulemaking process, the Department published the Rule, which redefines the circumstances under which providing "investment advice to a plan" could give rise to "fiduciary" status under ERISA and the Code.

59.     The effective date of the Rule was scheduled for June 7, 2016, but its initial "applicability date" is April 10, 2017, and it comes into full effect on January 1, 2018.  81 Fed. Reg. at 20,946.

60.     The following explanation for the new Rule appears in the preface, as part of the Department's extensive commentary:

> The Department created the five-part test in a very different context and investment advice marketplace.  The 1975 regulation was adopted prior to the existence of participant-directed 401(k) plans, the widespread use of IRAs, and the now commonplace rollover of plan assets from ERISA-protected plans to IRAs.  Today, as a result of the five-part test, many investment professionals, consultants, and advisers have no obligation to adhere to ERISA's fiduciary standards or to the prohibited transaction rules, despite the critical role they play in guiding plan and IRA investments.  Under ERISA and the Code, if these advisers are not fiduciaries, they may operate with conflicts of interest that they need not disclose and have limited liability under federal pension law for any harms resulting from the advice they provide.  Non-fiduciaries may give imprudent and disloyal advice; steer plans

and IRA owners to investments based on their own, rather than their customers' financial interests; and act on conflicts of interest in ways that would be prohibited if the same persons were fiduciaries.  In light of the breadth and intent of ERISA and the Code's statutory definition, the growth of participant-directed investment arrangements and IRAs, and the need for plans and IRA owners to seek out and rely on sophisticated financial advisers to make critical investment decisions in an increasingly complex financial marketplace, the Department believes it is appropriate to revisit its 1975 regulatory definition as well as the Code's virtually identical regulation.

*Id.*  In short, the Department promulgated a new meaning of fiduciary that makes large swaths of people fiduciaries—people who always have been deemed non-fiduciaries—because it purportedly wants to give retirement investors more protection.

61.    In the Rule, the Department abandoned the five-part test that has been in place since 1975, codified in 29 C.F.R. § 2510.3-21 (ERISA) and 26 C.F.R. § 54.4975-9 (the Code).

62.    Instead, the Department promulgated a new and far more expansive rule to determine when providing "investment advice to a plan" triggers fiduciary duties:

(a) Investment advice.  For purposes of section 3(21)(A)(ii) of the Employee Retirement Income Security Act of 1974 (Act) and section 4975(e)(3)(B) of the Internal Revenue Code (Code), except as provided in paragraph (c) of this section, a person shall be deemed to be rendering investment advice with respect to moneys or other property of a plan or IRA described in paragraph (g)(6) of this section if—

(1) Such person provides to a plan, plan fiduciary, plan participant or beneficiary, IRA, or IRA owner the following types of advice for a fee or other compensation, direct or indirect:

(i) A recommendation as to the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property, or a recommendation as to how securities or other investment property should be invested after the securities or other investment property are rolled over, transferred, or distributed from the plan or IRA;

(ii) A recommendation as to the management of securities or other investment property, including, among other things, recommendations on investment policies or strategies, portfolio composition, selection of other persons to provide investment advice or investment management services, selection of investment account arrangements (e.g., brokerage versus advisery); or recommendations with respect to rollovers, transfers, or distributions from a plan or IRA, including

whether, in what amount, in what form, and to what destination such a rollover, transfer, or distribution should be made; and

(2) With respect to the investment advice described in paragraph (a)(1) of this section, the recommendation is made either directly or indirectly (e.g., through or together with any affiliate) by a person who:

(i) Represents or acknowledges that it is acting as a fiduciary within the meaning of the Act or the Code;

(ii) Renders the advice pursuant to a written or verbal agreement, arrangement, or understanding that the advice is based on the particular investment needs of the advice recipient; or

(iii) Directs the advice to a specific advice recipient or recipients regarding the advisability of a particular investment or management decision with respect to securities or other investment property of the plan or IRA.

(b)(1) For purposes of this section, ''recommendation'' means a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action. The determination of whether a ''recommendation'' has been made is an objective rather than subjective inquiry. In addition, the more individually tailored the communication is to a specific advice recipient or recipients about, for example, a security, investment property, or investment strategy, the more likely the communication will be viewed as a recommendation. Providing a selective list of securities to a particular advice recipient as appropriate for that investor would be a recommendation as to the advisability of acquiring securities even if no recommendation is made with respect to any one security. Furthermore, a series of actions, directly or indirectly (e.g., through or together with any affiliate), that may not constitute a recommendation when viewed individually may amount to a recommendation when considered in the aggregate. It also makes no difference whether the communication was initiated by a person or a computer software program.

81 Fed. Reg. at 20,997-21,001. This new definition will replace the five-part test on the April 10, 2017 applicability date. *Id.* at 21,001-21,002.

63. The Department acknowledges that the Rule "casts a wide net in assigning fiduciary responsibility with respect to plan and IRA assets." *Id.* It also acknowledges that the Rule "will cover many investment professionals who did not previously consider themselves to be fiduciaries under ERISA or the Code." *Id.* at 21,006.

64.     Indeed, in the rulemaking, the Department admits it has created fiduciary obligations for relationships "not appropriately regarded as fiduciary in nature and that the Department does not believe Congress intended to cover as fiduciary relationships."

65.     Accordingly, under the new test, the average insurance agent is now an ERISA fiduciary if the agent sells a single fixed annuity contract to an IRA owner.

**B.     THE EXEMPTIONS**

66.     On the same day that it redefined "fiduciary," the Department issued the new Exemptions.  Prohibited transaction exemptions ("PTEs") permit conduct that otherwise would violate the Rule so long as the parameters of the PTE are followed.  Most relevant here are the Department's amendments to PTE 84-24 and its new BICE.

**1.     PTE 84-24**

67.     The amended version of PTE 84-24 provides a PTE for transactions involving fixed declared rate annuities.

68.     The term "fixed rate annuity contract" is defined as follows:

The term ''Fixed Rate Annuity Contract'' means a fixed annuity contract issued by an insurance company that is either an immediate annuity contract or a deferred annuity contract that (i) satisfies applicable state standard nonforfeiture laws at the time of issue, or (ii) in the case of a group fixed annuity, guarantees return of principal net of reasonable compensation and provides a guaranteed declared minimum interest rate in accordance with the rates specified in the standard nonforfeiture laws in that state that are applicable to individual annuities; in either case, the benefits of which do not vary, in part or in whole, based on the investment experience of a separate account or accounts maintained by the insurer or the investment experience of an index or investment model.  A Fixed Rate Annuity Contract does not include a variable annuity or an indexed annuity or similar annuity.

81 Fed. Reg. 21,176-21,177.

69.     The exemption for fixed rate annuity contracts is set forth as follows:

(a) In general.  ERISA and the Code prohibit fiduciary advisers to employee benefit plans and IRAs from self-dealing, including receiving compensation that varies

18

based on their investment advice, and from receiving compensation from third parties in connection with their advice. ERISA and the Code also prohibit fiduciaries and other parties related to plans and IRAs from engaging in purchases and sales of products with the plans and IRAs. This exemption permits certain, specified persons, including specified persons who are fiduciaries due to their provision of investment advice to plans and IRAs, to receive these types of compensation in connection with transactions involving insurance contracts, specified annuity contracts, and investment company securities, as described below.

(b) Exemptions. The restrictions of ERISA section 406(a)(1)(A) through (D) and 406(b) and the taxes imposed by Code section 4975(a) and (b) by reason of Code section 4975(c)(1)(A) through (F), do not apply to any of the following transactions if the conditions set forth in Sections II, III, IV, and V, as applicable, are met:

(1) The receipt, directly or indirectly, by an insurance agent or broker or a pension consultant of an Insurance Commission and related employee benefits from an insurance company in connection with the purchase, with assets of a Plan or IRA, including through a rollover or distribution, of an insurance contract or a Fixed Rate Annuity Contract.

81 Fed. Reg. at 21,174. By its terms, PTE 84-24 does not apply to FIAs or variable annuities.

70. To qualify for this exemption, insurance agents and carriers selling fixed rate annuities must abide by certain "Impartial Conduct Standards":

If the insurance agent or broker, pension consultant, insurance company or investment company Principal Underwriter is a fiduciary within the meaning of ERISA section 3(21)(A)(ii) or Code section 4975(e)(3)(B) with respect to the assets involved in the transaction, the following conditions must be satisfied with respect to the transaction to the extent they are applicable to the fiduciary's actions:

(a) When exercising fiduciary authority described in ERISA section 3(21)(A)(ii) or Code section 4975(e)(3)(B) with respect to the assets involved in the transaction, the insurance agent or broker, pension consultant, insurance company or investment company Principal Underwriter acts in the Best Interest of the Plan or IRA at the time of the transaction; and

(b) The statements by the insurance agent or broker, pension consultant, insurance company or investment company Principal Underwriter about recommended investments, fees, Material Conflicts of Interest, and any other matters relevant to a Plan's or IRA owner's investment decisions, are not materially misleading at the time they are made. For this purpose, the insurance agent's or broker's, pension consultant's, insurance company's or investment company Principal Underwriter's failure to disclose a Material Conflict of Interest relevant to the services it is

providing or other actions it is taking in relation to a Plan's or IRA owner's investment decisions is considered a misleading statement.

*Id.*

71.     There is a "reasonable compensation" requirement to qualify for the exemption:

The combined total of all fees and compensation received by the insurance agent or broker, pension consultant, insurance company or investment company Principal Underwriter for their services does not exceed reasonable compensation within the meaning of ERISA section 408(b)(2) and Code section 4975(d)(2).

*Id.* at 21,174-21,175.

72.     PTE 84-24 also requires the following disclosures in transactions involving the purchase of fixed rate annuities with assets from ERISA plans or IRAs:

(b)(1) With respect to a transaction involving the purchase with Plan or IRA assets of a Fixed Rate Annuity Contract or insurance contract, or the receipt of an Insurance Commission thereon, the insurance agent or broker or pension consultant provides to an independent fiduciary with respect to the Plan, or in the case of an IRA, to the IRA owner, prior to the execution of the transaction the following information in writing and in a form calculated to be understood by a plan fiduciary or IRA owner who has no special expertise in insurance or investment matters:

(A) If the agent, broker, or consultant is an Affiliate of the insurance company whose contract is being recommended, or if the ability of the agent, broker, or consultant to recommend Fixed Rate Annuity Contracts or insurance contracts is limited by any agreement with the insurance company, the nature of the affiliation, limitation, or relationship;

(B) The Insurance Commission, expressed to the extent feasible as an absolute dollar figure, or otherwise, as a percentage of gross annual premium payments, asset accumulation value, or contract value, for the first year and for each of the succeeding renewal years, that will be paid directly or indirectly by the insurance company to the agent, broker, or consultant in connection with the purchase of the recommended contract, including, if applicable, separate identification of the amount of the Insurance Commission that will be paid to any other person as a gross dealer concession, override, or similar payment; and

(C) A statement of any charges, fees, discounts, penalties or adjustments which may be imposed under the recommended contract in connection with the purchase, holding, exchange, termination, or sale of the contract.

(2) Following the receipt of the information required to be disclosed in paragraph (b)(1), and prior to the execution of the transaction, the fiduciary or IRA owner

acknowledges in writing receipt of the information and approves the transaction on behalf of the Plan or IRA.  The fiduciary may be an employer of employees covered by the Plan but may not be an insurance agent or broker, pension consultant, or insurance company involved in the transaction (i.e., an independent fiduciary).  The independent fiduciary may not receive, directly or indirectly (e.g., through an Affiliate), any compensation or other consideration for his or her own personal account from any party dealing with the Plan in connection with the transaction.

*Id.* at 21,175.

73.     In addition, PTE 84-24 imposes recordkeeping requirements.  *Id.* at 21,175-76.

74.     Prior to these amendments, the sale of all annuity products fell with the purview of PTE 84-24.  In its Notice of Proposed Rulemaking ("NOPR"), the Department proposed that variable annuities be removed from PTE 84-24, leaving only fixed annuities and FIAs subject to this exemption.  In the final PTE 84-24, only fixed annuities remain for the exemption, *i.e.*, both variable annuities and FIAs were removed from coverage under 84-24.

## 2.     THE BICE

75.     The purpose of the BICE, according to the Department, is "to facilitate continued provision of advice to such retail investors under conditions designed to safeguard the interest of these investors, [by allowing] investment advice fiduciaries, including investment advisers registered under the Investment Advisers Act of 1940 or state law, broker-dealers, and insurance companies, and their agents and representatives, to receive these various forms of compensation that, in the absence of an exemption, would not be permitted under ERISA and the Code."  *Id.*

76.     The BICE is intended to cover a wide variety of current compensation practices that would otherwise be prohibited under the Rule, including the payment of commissions in connection with the sale of FIAs.

77.     Financial Institutions and Advisers seeking to rely on the exemption are required to adhere to Impartial Conduct Standards; to adopt policies and procedures designed to ensure that their individual Advisers adhere to the Impartial Conduct Standards; to disclose information

relating to fees, compensation and Material Conflicts of Interest; and to retain records demonstrating compliance with the exemption. Lesser conditions are imposed on fiduciaries who receive only a level fee (as opposed to a commission). *Id*. at 21,076.

78.     The Impartial Conduct Standards require that the Financial Institution and Adviser give advice that is in the Retirement Investor's Best Interest, *i.e.*, prudent advice that is based on the investment objectives, risk tolerance, financial circumstances, and needs of the Retirement Investor, without regard to financial or other interests of the Adviser, Financial Institution, or their Affiliates, Related Entities or other parties; charge no more than reasonable compensation; and make no misleading statements about investment transactions, compensation and conflicts of interest. Financial Institutions must also refrain from giving or using incentives for Advisers to act contrary to the customer's best interest. Advisers are required to adhere to the Impartial Conduct Standards when making investment recommendations. *Id.* at 21,007.

79.     Any Financial Institution that relies on the BICE is required to notify the Department in advance of doing so and must retain records that would be available in the event of a Department examination or a request by a Retirement Investor. Retirement Investors include IRA owners, plan participants and beneficiaries. *Id.* at 21,077.

80.     The BICE also mandates that Financial Institutions enter into a best interest contract ("BIC") with the retail investor. Financial Institutions include only banks, insurance companies, broker-dealers and Registered Investment Advisers.

81.     The BICE then endeavors to create a private right of action permitting the investor to sue the Financial Institution for breach of the BIC by its adviser (e.g., an insurance agent). *Id*. at 21,076.

82.     Because the BIC requirements do not apply to transactions involving ERISA plans, the BIC is applicable only with respect to parties to IRA transactions. *Id.* at 21,079.

83.     In the BIC, the Financial Institution must affirmatively state that it and the Adviser act as fiduciaries under ERISA or the Code, or both, with respect to any investment advice that is provided. *Id.*

84.     When providing investment advice, the BICE requires not only that the Financial Institution and the Adviser comply with Impartial Conduct Standards, but also that they completely disregard their own interests and those of any affiliate, related entity or any other party. *Id.*

85.     The BIC must contain affirmative warranties that (1) the Financial Institution has adopted and will comply with written policies and procedures reasonably and prudently designed to ensure that its Advisers adhere to the Impartial Conduct Standards; (2) in formulating its policies and procedures, the Financial Institution specifically identified and documented its Material Conflicts of Interest; (3) the Financial Institution adopted measures reasonably and prudently designed to prevent Material Conflicts of Interest from causing violations of the Impartial Conduct Standards; and (4) a designated person or persons, identified by name, title or function, will be responsible for addressing Material Conflicts of Interest and will be responsible to monitor the Advisers' adherence to the Impartial Conduct Standards. *Id.*

86.     The Financial Institution's policies and procedures must require that neither the Financial Institution nor (to the best of its knowledge) any Affiliate or Related Entity will use or rely upon quotas, appraisals, performance or personnel actions, bonuses, contests, special awards, differential compensation or other actions or incentives that are intended or would reasonably be expected to cause Advisers to make recommendations not in the best interest of the investor. *Id.*

87.     The BICE requires that the Financial Institution "clearly and prominently" state in the BIC (or in a separate document with respect to an ERISA plan):  (1) the Best Interest Standards and how the Retirement Investor will pay for services; (2) a description of Material Conflicts of Interest disclosing all fees imposed upon the Retirement Investor or the account of the Retirement Investor and the types of compensation expected to be received from third parties; (3) that the Retirement Investor has the right to obtain copies of the Financial Institution's written description of its policies and procedures as well as the specific disclosure of costs, fees and compensation and other matters; (4) a link to the Financial Institution's website and informs the Retirement Investor that model contract disclosures are updated as necessary on a quarterly basis maintained on the website and containing the Financial Institution's written description of its policies and procedures adopted in accordance with BICE requirements and maintained on the website; (5) offers of any proprietary products or third party payments received with respect to recommended investments; (6) contact information (telephone and email) for a representative of the Financial Institution; (7) whether or not the Adviser and Financial Institution will monitor the investments and the frequency of doing so; and (8) that the Financial Institution will not fail to satisfy the disclosure requirements or violate any contractual provision based on them solely because it makes an error in omission in disclosing the required information provided that it discloses the correct information as soon as practicable but in no event later than 30 days after it discovers or reasonably should have discovered the error or omission.

## C.     IMPACT ON NAFA'S MEMBERS

88.     In the Department's NOPR, both declared rate fixed annuities and FIAs were included in PTE 84-24.  80 Fed. Reg. 21,960, 21,975 (Apr. 20, 2015).

89.     Without adequate notice as required under the APA, in the final Rule the Department moved FIAs out of PTE 84-24 and into the BICE.  As explained above, all fixed

annuities—including FIAs—have heretofore been treated as insurance products, exempt from federal securities laws and regulated under state insurance laws.

90.     Yet the Department lumped FIAs in with securities products like variable annuities when it promulgated the Rule and the Exemptions.

91.     Because FIAs are an insurance product, the FIA sellers represented by NAFA—including carriers, IMOs, and agents—are ill-equipped to suddenly be subjected to the onerous compliance obligations required by the BICE, which more closely resemble the types of requirements imposed on the securities industry.

92.     The FIA industry was blindsided by this last-minute switch, and the impact will be highliy detrimental to the FIA industry and its clientele.  Insurance carriers will need to restructure their distribution models, because they will not be able to guarantee in a BIC that independent agents selling insurance products from different carriers have acted in the best interest of purchasers.  To avoid this problem, insurers may need to work only with agents registered as broker-dealers.

93.     In the alternative, insurers may need to work only with "captive" agents (i.e., agents that sell products from only a single carrier), eliminating "independent" agents able to offer a variety of different carriers' fixed annuity products to consumers.

94.     Finally, to adapt to the new requirements imposed on them, carriers will likely need to re-design and re-file their fixed annuity products for approval by state regulatory authorities—a costly and time-consuming process that likely will not be completed by the April 10, 2017 Applicability Date, creating a devastating interruption in the sale of fixed annuities.

95.     Insurance agents will face enormous additional compliance costs, including spikes in their errors and omissions insurance premiums, because they will suddenly be classified as "fiduciaries."

96.     In addition, agents will face three different regulatory regimes when selling fixed annuity products, depending on the type of product and the source of the consumer's funds. Specifically, transactions involving (1) any fixed annuities (fixed declared rate annuities or FIAs) purchased with "non-qualified" funds (i.e., not from an ERISA plan or IRA) will be subject to existing state laws, with no fiduciary obligations; (2) fixed declared rate annuities purchased with "qualified" funds (i.e., from an IRA) will be subject to both state law and PTE 84-24, including fiduciary obligations; and (3) FIAs purchased with qualified funds will be subject to the BICE, including fiduciary obligations and a new risk of civil liability.

97.     As a result of the foregoing, as well as the distribution changes made by carriers, an estimated 20,000 independent insurance agents will exit the business of selling fixed annuities.

98.     The consequences for IMOs could be even more devastating.  Two-thirds of FIA sales are conducted through IMOs, accounting for over $35 billion in annual FIA purchases.

99.     Under the BICE, IMOs are not listed among the financial institutions that are eligible to receive commissions for the sale of FIAs.  If IMOs cannot receive such compensation, their revenues are projected to fall by roughly 70 percent, resulting in massive layoffs and the closing of many firms.  Those IMOs that are able to remain in the business will likely face massive spikes in their compliance costs.

100.    The Department gave no visible thought and provided no analysis regarding its last-minute decision to subject FIAs to the BICE, particularly with respect to the impact on the fixed annuity industry.

101.     But the impacts of that decision will be profound.  An entire industry will be turned on its head, and fewer independent agents and fixed annuity products will be available to middle income retirement savers.

102.     The impact on the FIA industry will mean that many lower and middle-class Americans will not be able to obtain affordable advice and products with respect to their retirement savings.  In short, the Rule will hurt the very people the Department is trying to help.

## CLAIMS FOR RELIEF

### COUNT ONE

### APA § 706(2)
### DEFINITION OF "FIDUCIARY"

103.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth below.

104.     The Department exceeded its statutory authority under ERISA and acted in an arbitrary and capricious manner in promulgating its new definitions of "investment advice to a plan" and "fiduciary."

105.     The Rule is a final agency action for purposes of 5 U.S.C. § 706(2).

106.     The Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C).

107.     The Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A).

108.     The Department's redefinition of "fiduciary" based on what constitutes "investment advice to a plan" is contrary to the plain meaning of ERISA and extends the scope of ERISA fiduciary obligations to persons whom Congress never intended to subject such obligations, including insurance agents selling fixed annuity contracts.

109.    Under the existing five-part test promulgated by the Department in 1975, a person who lacks discretionary authority or control over plan investments is deemed to render "investment advice to a plan" only if that person (1) renders advice as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property (2) on a regular basis (3) pursuant to a mutual agreement, arrangement, or understanding with the plan or a plan fiduciary that (4) the advice will serve as a primary basis for investment decisions with respect to plan assets, and that (5) the advice will be individualized based on the particular needs of the plan.

110.    The existing five-part test comports with congressional intent to extend ERISA fiduciary duties only to those who "exercise[ ] discretionary authority or control with respect to the management or administration" of an ERISA plan or who have "some authority or control regarding its assets."  H.R. Conf. Rep. No. 1280, 93d Cong., 2nd Sess. 323, *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 5038, 5103.

111.    Congress has repeatedly ratified the existing five-part test by re-enacting the underlying statute without amending the regulation.

112.    The new Rule is not a reasonable construction of the phrase "investment advice to a plan" under ERISA, because the Department provided no coherent rational for abandoning the five-part test in making an unprecedented shift that will assign fiduciary status to insurance agents selling fixed annuities, and others who have never been thought of as fiduciaries in any context, including under ERISA or the common-law of trusts.

## COUNT TWO

### APA § 706(2)
### EXTENSION OF ERISA FIDUCIARY OBLIGATIONS TO IRAS

113.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth below.

114.    The Department exceeded its limited statutory authority and jurisdiction under Code Section 4975 by promulgating a Rule that imposes ERISA fiduciary duties on parties to transactions involving IRAs.

115.    The Rule is a final agency action for purposes of 5 U.S.C. § 706(2).

116.    The Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C).

117.    The Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A).

118.    ERISA does not permit the Department to impose fiduciary duties on parties involved in IRA transactions.

119.    ERISA applies only to "any employee benefit plan" that is "established or maintained" (1) "by an employer," (2) "by an employee organization," or (3) "by both."  29 U.S.C. § 1003(a).

120.    IRAs generally are not established or maintained by an employer or an employee organization.  As the Department has acknowledged in other rulemaking, ERISA applies only to IRAs maintained by an employer and funded by employer contributions.  29 C.F.R. § 2510.3(d).

121.    Although Congress created IRAs with the passage of ERISA, it did not include IRAs within the scope of ERISA, except in very limited circumstances not relevant here, and it did not impose ERISA fiduciary duties on parties to transactions involving IRAs.

122.     The Department's limited authority under the Reorganization Plan to issue regulations interpreting Code Section 4975 does not authorize it to create a rule imposing ERISA fiduciary duties on parties to transactions involving IRAs.

123.     The Code does not authorize the Department to impose fiduciary duties on parties to transactions involving IRAs because Code section 4975 provides only for an excise tax to be paid as a penalty for engaging in certain prohibited transactions relating to IRAs and does not impose ERISA-type fiduciary duties on IRA advisers.

124.     The term "fiduciary" is defined under the Code solely for the purpose of determining whether or not a party is a "disqualified person" subject to an excise tax.  29 U.S.C. §§ 4975(c)(1) and (e)(2).

125.     The Department's limited authority to issue regulations interpreting Section 4975 does not extend beyond the authority to issue regulations clarifying the circumstances under which an excise tax may be imposed on a disqualified person under Section 4975.

126.     The Department has no other authority to impose fiduciary duties on parties to transactions involving IRAs.  Accordingly, as the Rule purports to impose such fiduciary duties on parties to transactions involving IRAs, it is arbitrary, capricious and otherwise contrary to  law.

## COUNT THREE

### APA § 706(2)
### CREATION OF A PRIVATE CAUSE OF ACTION THROUGH THE BICE

127.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth below.

128.     The Department exceeded its statutory authority under ERISA and the Code by creating a private cause of action through the BICE, which is integral to the Rule.

129.     The Rule and the BICE are a final agency action for purposes of 5 U.S.C. § 706(2).

130.    The Rule and the BICE are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C).

131.    The Rule and the BICE are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A).

132.    A private cause of action must be created by Congress, not an agency. *Alexander v. Sandoval*, 532 U.S. 275 (2001).

133.    ERISA does not authorize the Department to create a private cause of action beyond the limited enforcement provisions included in ERISA.

134.    The Code does not authorize the Department to create a private cause of action for breach of fiduciary duty.

135.    Neither ERISA nor the Code authorizes the Department to create a private cause of action for breach of fiduciary duty in a transaction involving an IRA.

## COUNT FOUR

### THE TERM "REASONABLE COMPENSATION" AS USED IN THE RULE AND EXEMPTIONS IS UNDULY VAGUE AND VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE U.S. CONSTITUTION

136.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth below.

137.    The Department's mandate that fiduciaries under the BICE and PTE 84-24 be paid no more than "reasonable compensation" is so vague as to be without meaning.

138.    The Department acknowledged that many public commenters asked for greater specificity regarding the "reasonable compensation," yet the Department provided no meaningful guidance beyond a bald statement that the essential question is whether the charges are reasonable in relation to what the retirement saver receives.

31

139.     The Department's Rule and Exemptions do not give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he or she may act accordingly.

140.     The Department's Rule and Exemptions do not provide explicit standards for those who will apply them (e.g., state court judges and juries).

141.     The Department's Rule and Exemptions impermissibly delegate basic policy matters to state judges and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications in determining what is meant by "reasonable compensation" in the complete absence of sufficient guidance.

142.     Accordingly, the Rule and its Exemptions are void for vagueness under the Fifth Amendment of the U.S. Constitution.

## COUNT FIVE

### APA § 706(2)
### INCLUSION OF FIXED INDEXED ANNUITIES IN THE BICE

143.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth below.

144.     The Department's last-minute decision to switch FIAs from PTE 84-24 to the BICE, without adequate notice, was arbitrary, capricious, unsupported, and contrary to law.  5 U.S.C. § 706(2).

145.     The Department failed to analyze, discuss, or even acknowledge how moving FIAs into the BICE will affect the FIA industry, including carriers, IMOs, and agents.

146.     The Department's treatment of FIAs as securities is contrary to law, because it conflicts with the Dodd-Frank Act, which clarified that FIAs are to be treated as exempt from regulation under federal securities laws.

147. The Department failed to provide a meaningful rationale or satisfactory explanation for departing from settled law in its treatment of FIAs.

148. The Department's determination that FIAs should be treated like securities is irrational and unworkable.

149. The Department failed to adequately consider costs and benefits when it promulgated the Rule and the Exemptions.

**COUNT SIX**

**REGULATORY FLEXIBILITY ACT § 604**
**FAILURE TO CONSIDER IMPACT ON SMALL BUSINESSES**

150. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth below.

151. The Department concedes that the Rule and Exemptions are likely to have a significant impact on "small entities." 5 U.S.C. § 601; 15 U.S.C. § 632.

152. Yet in promulgating the Rule and the Exemptions, the Department failed to adequately consider the impact on small businesses, particularly IMOs and insurance agents, and failed to make a reasonable or good-faith effort to analyze such impacts.

153. Although significant concerns about the impact on small businesses were raised in comment letters, the Department made no effort to respond to such concerns in its final regulatory flexibility analysis, particularly with respect to IMOs.

154. Consequently, the Rule and its Exemptions violate the Regulatory Flexibility Act.

## PRAYER FOR RELIEF

155.    WHEREFORE, NAFA prays for an order and judgment:

a.    Declaring that the Rule and the Exemptions are not in accordance with ERISA, the Code, the Dodd-Frank Act, and Reorganization Plan No. 4 of 1978, and that their adoption by the Department was not only in excess of statutory authority but also arbitrary and capricious and unsupported by substantial evidence within the meaning of Section 3(21)(A)(ii) of ERISA and 5 U.S.C. § 706(2).

b.    Vacating and setting aside the Rule and the Exemptions in accordance with 5 U.S.C. § 706(2).

c.    Preliminarily and permanently enjoining the DOL and its officers, employees, and agents from effectuating, implementing, applying, or taking any action whatsoever to enforce the Rule and the Exemptions.

d.    Granting such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Philip D. Bartz
Philip D. Bartz (D.C. Bar No. 379603)
philip.bartz@bryancave.com
Jacob A. Kramer (D.C. Bar No. 494050)
jacob.kramer@bryancave.com
BRYAN CAVE LLP
1155 F Street, NW
Washington, DC  20004
Telephone:    (202) 508-6000
Facsimile:    (202) 508-6200

*Attorneys for Plaintiff*

Dated:  June 2, 2016            *The National Association for Fixed Annuities*