**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE NATIONAL ASSOCIATION FOR FIXED ANNUITIES, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>THOMAS E. PEREZ, *et al.*, )<br><br>*Defendants*. ) | Civil Action No. 1:16-1035 (RDM) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT AND
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and 65, together with the Court's June 7, 2016 Minute

Order, the United States Department of Labor and Thomas E. Perez, Secretary of the Department

of Labor (collectively, "Defendants") oppose the National Association for Fixed Annuities'

("NAFA") motion for a preliminary injunction and motion for summary judgment.  Defendants

also cross-move for summary judgment on the same grounds.  Defendants are entitled to

summary judgement on all counts in NAFA's complaint, and no preliminary injunction should

be entered, for the reasons stated in Defendants' attached memorandum.  Defendants have filed a

proposed order with this opposition and cross-motion.

Dated:  July 8, 2016

Of Counsel:

M. PATRICIA SMITH
Solicitor of Labor

G. WILLIAM SCOTT
Associate Solicitor

EDWARD D. SIEGER
Senior Attorney

ELIZABETH HOPKINS
Counsel for Appellate and
Special Litigation

MEGAN HANSEN
Attorney for Regulations
United States Department of Labor
Office of the Solicitor

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JUDRY L. SUBAR
Assistant Director
Civil Division, Federal Programs Branch

*/s/ Galen N. Thorp*
GALEN N. THORP (VA Bar # 75517)
EMILY NEWTON (VA Bar #  80745)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Room 6140
Washington, D.C. 20530
Tel: (202) 514-4781 / Fax: (202) 616-8460
galen.thorp@usdoj.gov
emily.s.newton@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR FIXED ANNUITIES, <br><br> *Plaintiff*, <br><br> v. <br><br> THOMAS E. PEREZ, *et al.*, <br><br> *Defendants*. | Civil Action No. 1:16-1035 (RDM) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

INTRODUCTION.......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 1

I.    Regulation to Protect Retirement Investors ....................................................... 2

    A.    Title I of ERISA: Employee Benefit Plans ............................................. 2

    B.    Title II of ERISA: Tax-Favored Retirement Accounts ........................... 4

    C.    The 1975 Regulation's Interpretation of "Investment Advice" ............. 5

    D.    Providers of Investment Advice .............................................................. 6

II.   Changes in the Retirement Investment Market Since 1975 ............................ 10

    A.    Much Investment Advice Today is Rendered by Advisers Who Are Not
        Subject to Fiduciary Responsibilities Under the 1975 Regulation ...... 10

    B.    Advisers Have Widespread Conflicts of Interest That Harm Retirement
        Investors ............................................................................................... 12

III.  The Current Rulemaking .................................................................................. 15

    A.    The 2010 Proposed Rule ....................................................................... 15

    B.    The 2015 Proposed Rule and Proposed Exemptions ............................ 16

    C.    The 2016 Final Rule and Final Exemptions. ........................................ 20

        1.    Defining investment advice. ...................................................... 20

        2.    The final BIC Exemption. .......................................................... 22

        3.    The final PTE 84-24 amendments ............................................. 27

        4.    The final regulatory impact analysis.......................................... 28

        5.    The effective and applicability dates of the Rule and exemptions .......... 30

IV.   Procedural History............................................................................................ 31

ARGUMENT ............................................................................................................... 32

I.    NAFA Cannot Prevail on the Merits of its Six Claims .................................... 32

    A.    The Department's Reasonable Interpretation of "Investment Advice" Is
        Entitled to *Chevron* Deference............................................................. 33

        1.    Congress's adoption of the broad term "investment advice" leaves
            room for interpretation, but that term cannot be redundant with
            "management" or "administration"............................................. 34

        2.    None of NAFA's arguments compels its interpretation of
            "investment advice" as "ongoing management"....................... 36

3.     The Department's interpretation of "investment advice" comports with the text, legislative history and purposes of ERISA ...... 42

B.     The Department Has Express Authority to Grant Conditional Exemptions, and Its Finding That the BIC Exemption Meets Statutory Requirements for Exemptions is Entitled to Deference ..................................................................... 47

C.     The Department's Provision in a Conditional Administrative Exemption for Contract Terms that Could Be Enforceable Under State Law Does Not "Create a Private Right of Action" ...................................................................... 51

     1.     No right of action has been "created" as the available actions are preexisting ones under state contract law .................................................... 52

     2.     The contract provision is a reasonable exercise of the Department's statutory authority to create administrative exemptions .......................... 54

D.     The Term "Reasonable Compensation" in the BIC Exemption is Not Unconstitutionally Vague ........................................................................ 56

E.     The Department Provided a Reasoned Basis to Require Conflicted FIA Transactions to Satisfy the Conditions of the BIC Exemption ............................ 61

     1.     The Department's determination that conflicted FIA transactions must satisfy the conditions of the BIC Exemption does not impermissibly treat FIAs as securities ...................................................... 62

     2.     The BIC Exemption does not provide unworkable conditions for insurers involved in FIA transactions ........................................................ 64

          a.     Several paths are available to meet financial institution supervisory obligations ................................................................. 64

          b.     The Department provided sufficient notice of the optional contract provisions regarding arbitration clauses and punitive damage waivers and those provisions are not arbitrary ...................................................................................... 67

          c.     The prudent advice requirement does not conflict with the circumscribed role of an insurance agent .................................... 69

     3.     The Department provided sufficient notice for its action and a reasoned basis for requiring conflicted FIA transactions to adhere to the conditions of the BIC Exemption ................................................. 72

F.     The Department Complied with the Regulatory Flexibility Act .......................... 78

**II.**     **For Additional Reasons, NAFA is Not Entitled to a Preliminary Injunction ........... 82**

A.     NAFA Has Not Demonstrated A Likelihood of Success of Any of its Claims ................................................................................................... 83

B.     NAFA Has Not Demonstrated Irreparable Harm from the Department's Carefully Calibrated Rule that Requires Investment Advice to Be in the Best Interest of Retirement Investors ................................................................ 84

1.    NAFA has not established that the Rule and exemptions pose a
      certain and imminent threat to the survival of any of its members........... 86

2.    NAFA has not established that the alleged costs of compliance
      with the Rule and exemptions constitute irreparable harm...................... 91

3.    NAFA has not established that any alleged competitive harm
      constitutes irreparable harm.................................................................... 94

C.    The Balance of Equities and the Public Interest Weigh Against Any
      Injunction in this Case .......................................................................... 96

**CONCLUSION** ..................................................................................................... **98**

## INTRODUCTION

Pursuant to its broad authority under the Employee Retirement Income Security Act ("ERISA") to protect employees' retirement savings, the Department of Labor ("Department" or "DOL") engaged in an open rulemaking process spanning almost six years that focused on conflicts of interest in the market for retirement investment advice.  Based on the extensive public comments and evidence garnered during that process, the Department determined that such conflicts of interest are widespread and could cost investors in individual retirement accounts (in one segment of the market alone) between $95 billion and $189 billion over the next 10 years.  To address this threat to employees' retirement security, the Department promulgated the Conflict of Interest Rule ("the Rule") and related exemptions at issue in this case.  The Rule broadens the category of individuals who must adhere to fiduciary responsibilities.  As the Department explained, this Rule is necessary to safeguard the retirement savings of millions of American consumers.

The National Association for Fixed Annuities ("NAFA") contests both the Rule, which seeks to ensure that those who provide investment advice act in the best interest of their customers, and its related exemptions, which the Department crafted to allow advisers, including NAFA's members, to collect compensation through transactions that would otherwise be prohibited by law.  Given the Department's broad statutory authority, as well as its thorough analysis and reasoned explanation for the regulations, NAFA's six claims and request for a preliminary injunction should be denied.

## STATEMENT OF FACTS

Congress enacted ERISA in 1974 based on its determination that employees' retirement savings were not being adequately protected to the detriment of retirement investors and the country.  Pub. L. No. 93-406, 88 Stat. 829, 898 (1974) (codified at 29 U.S.C. § 1001, *et seq.*); *see*

§ 1001(a).  To help ameliorate this problem, Congress defined as "fiduciaries" those individuals who play an integral role in shaping retirement savings and prohibited them from engaging in transactions Congress deemed fraught with conflicts of interest and potential for abuse.  Among the individuals Congress deemed fiduciaries are those who "render investment advice."

DOL promulgated the Rule to revise its previous regulation, defining what it means to "render investment advice," based on its determination that employees' retirement savings are not being adequately protected in light of today's market realities—contrary to Congress's intent in ERISA.  At the same time, DOL used its express statutory authority to amend and grant administrative exemptions to ensure that if conflicted transactions do proceed, they do so with sufficient safeguards to protect retirement investors.

## I.  REGULATION TO PROTECT RETIREMENT INVESTORS

### A.  Title I of ERISA: Employee Benefit Plans

"[O]wing to the lack of employee information and adequate safeguards concerning the[] operation" of "employee benefit plans,"[1] 29 U.S.C. § 1001(a), Title I of ERISA provides safeguards for such plans, including by imposing stringent fiduciary obligations on individuals who engage in important plan-related activities.  *Id.* § 1104.  In ERISA's definition of "fiduciary," Congress intentionally departed from the common law of trusts by defining "'fiduciary' not in terms of formal trusteeship, but in *functional* terms ... thus expanding the universe of persons subject to fiduciary duties."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262

---

[1] An "employee benefit plan" under ERISA encompasses two subsidiary categories.  *See* 29 U.S.C. § 1002(3).  "Employee pension benefit plans" provide retirement income to employees and include various types of defined benefit pension plans and defined contribution plans (*e.g.*, 401(k) plans in which participants direct investment of retirement savings in their individual accounts).  "Employee welfare benefit plans" provide various other benefits such as medical care, unemployment, and disability.  To be covered by ERISA, the plan must be established or maintained by private sector employers, employee organizations, or by both.  *Id.* § 1003(a).

(1993) (citation omitted).[2]  Under ERISA, "a person is a fiduciary with respect to a plan" if:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

> (ii) *he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan*, or has any authority or responsibility to do so, or

> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added).  A "fiduciary" under ERISA must adhere to duties of prudence and loyalty.  *Id.* § 1104.  The duty of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration.  *Id.* § 1104(a)(1)(A).  The duty of prudence entails acting "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  *Id.* § 1104(a)(1)(B).

Congress sought to protect plans by also prohibiting fiduciaries from engaging in certain transactions Congress deemed fraught with conflicts of interest.  *Id.* § 1106; *see also Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996) (recognizing Congress's goal to bar categorically transactions likely to injure a plan and its beneficiaries).  For example, a fiduciary must not cause the plan to engage in transactions with "part[ies] in interest," *id.* § 1106(a), a term broadly defined to include, among others, persons providing services to the plan, *id.* § 1002(14), and must not "deal with the assets of the plan in his own interest or for his own account" or "receive any consideration for his own personal account from any party dealing with such plan in

---

[2] Hereinafter, internal citations, quotations, and alterations are omitted unless otherwise indicated.

connection with a transaction involving the assets of the plan[,]" *id.* § 1106(b)(1), (3).   The Secretary of Labor ("the Secretary"), fiduciaries, and plan participants and beneficiaries may bring actions to enforce these obligations and prohibitions.  *Id.* § 1132(a)(2)-(3), (5).

Given the breadth of the prohibited transactions, Congress enumerated statutory exemptions from some of the prohibitions.  *Id.* § 1108(b).  Congress also delegated authority to the Secretary to grant "conditional or unconditional" administrative exemptions on a class-wide or individual basis, if the Secretary finds that the exemption is:

> (1) administratively feasible,
> (2) in the interests of the plan and of its participants and beneficiaries, and
> (3) protective of the rights of participants and beneficiaries of such plan.

*Id.* § 1108(a)(1)-(3).

### B.  Title II of ERISA: Tax-Favored Retirement Accounts

In Title II of ERISA, Congress amended the Internal Revenue Code ("the Code"), adopting a definition of "fiduciary" parallel to that in Title I to cover most employee benefit plans covered by ERISA, as well as other tax-favored retirement and savings plans (collectively "IRAs").[3]  *Compare* 26 U.S.C. § 4975(e)(3)(B), *with* 29 U.S.C. § 1002(21)(A)(ii).  While the Code provisions do not subject fiduciaries of an IRA to the obligations of prudence and loyalty, they do, as in Title I, impose prohibitions on specified conflicted transactions.  *See* 26 U.S.C. § 4975(c).  Those who violate the Code's prohibited transaction provisions are subject to excise taxes enforced by the Internal Revenue Service ("IRS").  *Id.* § 4975(a)-(b).  IRA customers may also bring breach of contract and breach of fiduciary duty claims under state law.  *See, e.g.*, *Knox v. Vanguard Group, Inc.*, No. 15-13411, 2016 WL 1735812, at *4-6 (D. Mass. May 2, 2016);

---

[3] Unless otherwise specified, the term "IRA" refers collectively to all plans covered by 26 U.S.C. § 4975, which include employee benefit plans, individual retirement accounts, health savings accounts, Coverdell education savings accounts, and certain other trusts and plans.  *See id.* § 4975(e)(1).

*Abbit v. ING USA Annuity & Life Ins. Co.*, 999 F. Supp. 2d 1189, 1197-99 (S.D. Cal. 2014).  The

Code also authorizes the grant of administrative exemptions on the same terms as in Title I.  *See*

26 U.S.C. § 4975(c)(2)(A)-(C).

The parallel structure of Title I and § 4975 of the Code ensures that the relevant

provisions apply to ERISA-covered employee benefit plans (whether or not they are subject to

§ 4975 of the Code) and to tax-favored retirement vehicles (whether or not they are subject to

Title I of ERISA).  But the parallel structure created redundancy, such as requiring entities to

seek exemptions from both DOL and the Treasury Department.  To eliminate such problems, and

to harmonize administration and interpretation of the parallel provisions in Title I and the Code,

President Carter issued Reorganization Plan No. 4 of 1978 ("Reorganization Plan"), which

Congress ratified in 1984, Pub. L. No. 98-532, 98 Stat. 2705 (codified at 5 U.S.C. App'x 1,

§ 102, 29 U.S.C § 1001, note).  As a result, DOL has interpretive, rulemaking, and exemptive

authority for the fiduciary definition and the prohibited transactions provisions that apply to both

employer-based plans and IRAs.  *See* Reorg. Plan. No. 4, § 102.[4]

### C.  The 1975 Regulation's Interpretation of "Investment Advice"

ERISA delegated to the Secretary broad authority to "prescribe such regulations as he

finds necessary or appropriate to carry out the provisions of [Title I of ERISA]."  29 U.S.C.

§ 1135.  "Among other things, such regulations may define accounting, technical and trade terms

used in such provisions."  *Id.*  Pursuant to that authority, DOL issued a regulation interpreting

when a person "renders investment advice" to meet the definition of a "fiduciary" in ERISA.  40

Fed. Reg. 50842 (Oct. 31, 1975) ("the 1975 regulation").  The 1975 regulation was promulgated

before 401(k) plans existed, and before IRAs were commonplace.  It set forth a five-part test,

---

[4] In pertinent part, § 102 of the Reorganization Plan transferred "all authority of the Secretary of the Treasury to issue [regulations, rulings, opinions, and exemptions under section 4975 of the Code] ... to the Secretary of Labor."

whereby a person was deemed to "render investment advice" under the fiduciary definition when he:  (1) renders advice as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property, (2) on a regular basis, (3) pursuant to a mutual agreement, arrangement or understanding, with the plan or a plan fiduciary that (4) the advice will serve as a primary basis for investment decisions with respect to plan assets, and (5) the advice will be individualized based on the particular needs of the plan.  *See* 29 C.F.R. § 2510.3–21(c)(1) (2015); 26 C.F.R. § 54.4975-9 (2015) (parallel Code provision).  Under the 1975 regulation, an adviser was a fiduciary with respect to investment advice only if he met every element of the five-part test.

### D.  Providers of Investment Advice

Broadly speaking, three different (but overlapping) groups of professionals provide investment advice to the retirement market today—registered investment advisers, broker-dealers, and insurance companies and their agents.  *See* Regulatory Impact Analysis for Final Rule and Exemptions, April 2016 ("RIA") 100.  Different regulatory and supervisory regimes for these professionals, coupled with the wide variety of titles used by them, creates confusion for consumers about what to expect from those they seek out for advice.  *Id.* 101, 121.

A registered investment adviser meets the definition of "investment adviser" in the Investment Advisers Act of 1940 ("the Advisers Act"), 15 U.S.C. § 80b-1 *et seq.*, and generally must register with the Securities and Exchange Commission ("SEC").  A registered investment adviser has fiduciary duties similar to, but by no means coextensive with, ERISA's duties of loyalty and prudence, but is not categorically prohibited from engaging in transactions like those prohibited by ERISA.  *See* RIA 31-33.[5]

---

[5] Under the Advisers Act, registered investment advisers who have conflicts of interest are required to disclose them
(*footnote continued on next page*)

Broker-dealers trade securities on others' behalf and are generally governed by the Exchange Act and rules promulgated by the SEC.  15 U.S.C. § 78c(a)(4); RIA 31.  They are not required to register as investment advisers if their advice is "solely incidental" to the conduct of their business as a broker or dealer and they receive no "special compensation" for advisory services.  15 U.S.C. § 80b-2 (a)(11)(C); RIA 32.  In giving investment advice, broker-dealers are generally subject only to a "suitability" standard set by the Financial Industry Regulatory Authority ("FINRA"),[6] which requires a broker to have a reasonable basis to believe that a recommended transaction or investment strategy involving securities is suitable for the customer, based on the customer's investment profile.  *See* RIA 32-33, 111.

Insurance companies sell annuity contracts as retirement investment options for plan and IRA investors.  There are generally three types of deferred annuities:  fixed, indexed, and variable.  *See Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 168-69 (D.C. Cir. 2009); *see also* RIA 111-12, 122-26 (including comparison chart).[7]  "A traditional fixed annuity is a contract issued by a life insurance company, under which the purchaser makes a series of premium payments to the insurer in exchange for a series of periodic payments from the insurer to the purchaser at agreed upon later dates."  *Am. Equity*, 613 F.3d at 168.  The insurance company bears the investment risk in a fixed annuity because it guarantees that the purchaser will earn a minimum rate of interest.  *Id.*; RIA 118-19, 123.  Fixed-rate annuities are subject to state insurance laws and are not regulated under federal securities laws.  *Am. Equity*, 613 F.3d at 168.  Variable annuities, by contrast, are regulated as securities, and purchasers pay premiums

---

and obtain consent for the transaction, but they are not generally required to mitigate the conflict otherwise.  RIA 29.

[6] FINRA is a self-regulatory organization of the broker-dealer industry.  It is registered with, and operates under the oversight of, the SEC.  *See* RIA 33-34.

[7] This discussion does not concern immediate annuities or the payout phase of deferred annuities.  *See* RIA 122.  Instead, it focuses on the accumulation phase in which the customer is not receiving a payout.

that are invested in common stocks and other equities, such that the investment risk is borne by the contract holder and benefit payments vary with the success of the investment. RIA 111, 123.

Fixed-indexed annuities ("FIAs") are a hybrid. *Am. Equity*, 613 F.3d at 168. Under most state laws, the contract holder is guaranteed 87.5% of premiums paid after any fees or other charges, and then is credited, not with a guaranteed rate of interest, but with a return based on the performance of a specified index or other external reference. RIA 123-24. Similar to variable annuities, some of the investment risk of an FIA is borne by the contract holder because FIA returns can vary widely. *Id.* 123, 168; *Am. Equity*, 613 F.3d at 178 (recognizing that "[i]n FIAs, as in securities, there is a variability in the potential return that results in a risk to the purchaser"). Furthermore, because insurers generally reserve the right in FIAs to do such things as raise the fees and lower the maximum interest rate, FIAs are riskier for investors. RIA 123. FIAs are not currently regulated as securities so long as they satisfy certain suitability standards of the National Association of Insurance Commissioners ("NAIC")[8] and other standards set forth in the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. No. 111-203, § 989J, 124 Stat. 1376, 1949 (2010).

Annuities are sold through different types of distributors, including broker-dealers, banks, independent insurance agents, and career insurance agents. RIA 131. Three groups are generally involved in the sale of fixed annuities through the independent channel: insurance companies, insurance agents, and independent marketing organizations ("IMOs"). Insurance companies, or carriers, create the products and are responsible for establishing systems to supervise the recommendation and sale of annuities. RIA 41. Agents, or producers, are licensed

---

[8] The NAIC is the standard-setting and regulatory support organization created and governed by chief insurance regulators from all 50 states, DC, and five territories. RIA 36. NAIC standards are non-binding models, and state laws often deviate from them in small or large ways. *Id.* 39, 42. The Harkin Amendment to the Dodd-Frank Act, § 989J, establishes rules for FIAs to be exempt securities. *See* 124 Stat. 1376, 1949.

by a state to sell insurance products, *id.* 37, and can be either career agents (devoting more than three-quarters of their time to selling one company's products) or independent agents, selling products from multiple companies, *id.* 101.  IMOs are intermediary agents that act as middlemen between insurance companies and independent agents.  *Id.* 102.

The NAIC has adopted a model rule that sets suitability standards for insurers similar in many respects to FINRA suitability requirements for brokers.  RIA 41.  According to the NAIC, the model rule was adopted to establish a framework under which the insurance company, not just the individual agent or broker, must ensure that the annuity transaction is suitable for the particular customer.  81 Fed. Reg. 21018.  To do so, the model rule requires insurance companies to develop supervisory systems to ensure the insurers' and their agents' compliance with the model rule and suitability requirements.  *Id.*[9]  This includes establishing reasonable policies and procedures to assess the suitability of each product recommendation.  *Id.*  A version of the NAIC suitability standard has been adopted by 35 states and the District of Columbia, but exact requirements vary by state, and one state currently lacks any suitability requirements.  RIA 39, 42.  The Federal Insurance Office ("FIO")[10] has noted that the lack of a uniform standard is particularly concerning for complex products, such as FIAs:  "[a]s unprecedented numbers of seniors reach retirement age with increased longevity, and as life insurers continue to introduce more complex products tailored to consumer demand, the absence of national annuity suitability standards is increasingly problematic."  *Id.* 42.  FINRA and other securities regulators have also expressed concerns that the sales materials associated with FIAs often do not fully and accurately

---

[9] *See* NAIC, Suitability in Annuity Transactions Model Regulation ("NAIC Model Regulation") § 6(F)(2), LH-275-1 (2015), http://www.naic.org/store/free/MDL-275.pdf.

[10] The FIO is the branch within the Treasury Department responsible for overseeing the nationwide insurance market.  RIA 37.

describe the products and could confuse or mislead investors.  *Id.* 43.

## II.  CHANGES IN THE RETIREMENT INVESTMENT MARKET SINCE 1975

### A.  Much Investment Advice Today is Rendered by Advisers Who Are Not Subject to Fiduciary Responsibilities Under the 1975 Regulation

Since DOL adopted the 1975 regulation, the retirement savings market has changed profoundly.  Then, most pension plans were employer-based defined benefit plans.  81 Fed. Reg. 20954; *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008).  In a defined benefit plan, the employee is entitled to a fixed periodic payment upon retirement.  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999).  The employer typically bears the entire investment risk and must cover any underfunding that may result from the plan's investments.  *Id.*  Because of the ongoing need to fund these plans in compliance with detailed minimum funding standards, *see* 29 U.S.C. § 1083; 26 U.S.C. §§ 412, 430, and because these plans are more likely to be large and actively managed, the financial professionals who provide ongoing investment advice often meet the five-part test in the 1975 regulation.  *See* RIA 114.

That paradigm has shifted with the rise in IRAs, created through ERISA in 1974, and 401(k)-type plans, created by Congress in 1978.  Revenue Act of 1978, Pub. L. No. 95-600, § 135(a), 92 Stat 2763 (1978).  A 401(k) plan is a defined contribution plan that allows employees to defer taxes by investing part of their salaries for retirement.  26 U.S.C. § 401(k).  A defined contribution plan "provides for ... benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses[.]"  29 U.S.C. § 1002(34).  Defined contribution plans, including 401(k) plans, have supplanted defined benefit plans as the primary retirement vehicle for private sector employees.  RIA 115, 188 (defined contribution plans grew from 29% to 83% since 1975).

As a result of this shift, plan participants are increasingly responsible for managing their

own retirement assets.  RIA 3; 81 Fed. Reg. 20954.  For example, by 2013, about 63 million of 77 million active participants in defined contribution plans directed at least a portion of the assets in their individual accounts.  RIA 188; 81 Fed. Reg. 20954.  Participants in 401(k) plans have some fiduciary protection for their investment choices because 401(k) fiduciaries are responsible for selecting investment options and managers and monitoring their performance in accordance with fiduciary standards.  81 Fed. Reg. 29,049; 29 C.F.R. 2550.404c-1(f)(8), (9).  Participants, however, still face many choices, such as deciding how to allocate their assets in their individual accounts and often rely on professional advisers for assistance.  RIA 191-197, 201-204. Employers, including small businesses, may also rely on advisers to help select the investment options for defined contribution plans.  RIA 188-191, 200-201.

Participant directed plans have also increased due to the growth of IRAs.  By 2015, more than 40 million households saved for retirement in IRAs (in the narrowly-defined sense), holding $7.3 trillion in assets.  81 Fed. Reg. 20954; RIA 115, 184.  Most IRA assets derive from rollovers from defined contribution plans, and rollovers are expected to approach $2.4 trillion cumulatively from 2016 through 2020.  RIA 3, 100.[11]  Most IRA investors with rollovers consulted a financial professional in some capacity regarding their rollover decision, but IRA investors do not have the same protections as 401(k) plan participants.  *Id.*

Due to these shifts in the market for retirement investment advice, much of that advice is not protected by fiduciary duties and restrictions under the 1975 regulation.  For example, as a result of the "regular basis" requirement in the five-part test, an adviser is not a fiduciary when an individual plan participant or IRA holder seeks "specialized advice on a one-time basis, even if the advice concerns the investment of all or substantially all of the assets held in their account

---

[11] Rollovers primarily occur after job change, layoffs, or termination, but also occur at retirement, or for other reasons. *Id.*

(*e.g.*, as in the case of an annuity purchase or a rollover from a plan to an IRA or from one IRA to another)." 81 Fed. Reg. 20955.  The "regular basis" requirement also means that fiduciary standards may not apply to advice given to a plan fiduciary about a one-time purchase of a group annuity to cover all of a plan's participants for the rest of their lives when a defined benefit plan terminates.  *Id.*  Under the five-part test, investment professionals also frequently avoid fiduciary duties and restrictions by marketing retirement investment services in ways that suggest they are providing tailored, individualized advice, while concurrently disclaiming fiduciary status by stating in fine print a "mutual" understanding that the advice is not intended to be used as the "primary basis" for investment decisions.  *Id.*; *see also* RIA 4.

### B.  Advisers Have Widespread Conflicts of Interest That Harm Retirement Investors

At the same time, compensation arrangements in the retirement investment industry have created incentives for advisers to recommend products that pay them or their firms more money rather than products that are in their clients' best interests.  *See* RIA 21, 128-134 (explaining different forms of conflicted compensation arrangements).   Product providers compensated entirely or primarily on a commission basis have a strong incentive to aggressively maximize sales, and when commissions vary depending on the product, the provider has a further incentive to recommend the product paying the highest commission.  *See* RIA 120-121, 134.  Incentives from varying compensation are compounded by "contingent commissions," or similar arrangements in which an insurer pays agents and brokers a percentage of premiums if they meet certain goals in terms of volume, persistency, and profitability for the insurer.  *Id.* 122.

The compensation structure for insurance agents and brokers gives rise to even more troubling conflicts of interest in the context of annuities.  Commissions for insurance products, such as annuities, generally are much higher than the commissions broker dealers receive for

sales of mutual funds or individual securities.[12]  *See* RIA 131.  The Executive Director of the Indexed Annuity Leadership Council ("IALC") stated that, based on a survey, the typical commission on an FIA sale is "about six to eight percent give or take," Hr'g Tr. 937 (statement of Jim Poolman); *see also* RIA 131; compared with an average commission of 1.37% for brokers selling front-end-load mutual funds, *see* RIA 345.  These problems are further compounded by the use of bonuses given to independent agents or brokers for meeting certain volume or profitability goals.  *Id.* 131-132.  As a result, insurance brokers have financial incentives to steer investors toward particular annuity products regardless of whether these products best serve retirement investors.  *Id.*[13]  Further, annuities sold by intermediaries who receive commissions often include higher surrender charges than those sold directly to customers.  *Id.* 131.  Surrender charges and tax penalties may reduce or eliminate returns on FIAs.  *Id.* 140, 284.

While these kinds of commissions introduce acute conflicts of interest, investors, who often lack the expertise of their advisers, are frequently unaware of the nature and extent of the conflicts.  *Id.* 9, 105, 127, 131-132, 142-43.[14]  Investors are also confronted with myriad choices of how and where to invest, many of which did not exist or were uncommon in 1975.  *See* RIA 3. Advisers may also market themselves with titles giving the impression of specialized advisory

---

[12] These commissions often take the form of sales fees, referred to as "loads" associated with certain investment products.  *See* SEC Fast Answers, Mutual Fund Fees and Expenses, http://www.sec.gov/answers/mffees.htm#salesloads.

[13] *See* Schwarcz, Daniel. "Differential Compensation and the "Race to the Bottom" in Consumer Insurance Markets." Conn. Ins. L. J. 15, no. 2 (2009): 723-754.

[14] The conflicts posed by these compensation practices have been well-documented by regulators and outside groups and acknowledged by the financial services industry.  *See id.* 133.  In an October 2013 report, FINRA used firms' responses to a conflict of interests letter, in-person meetings, and a follow-up compensation questionnaire to identify conflicts that encourage advisers to meet certain production thresholds to obtain large rewards, favor some products over others to enhance firm revenue or profit, and give preference to proprietary products.  *Id.* 134.  A RAND study prepared for the SEC also identified financial conflicts that advisers often operate under when recommending a transaction to a client.  *Id.* 130.  Financial service providers also affirmed the prevalent use of a wide variety of compensation arrangements with the potential for biased investment advice.  *Id.* 133 & n.315.

expertise, including some titles like "financial adviser," that anyone can use. *Id.* 100.

Under these circumstances, DOL found that the predictable result is that conflicts bias investment advisers to the detriment of investors. In its RIA, DOL quantified the extent of harm in the IRA market for front-end-load mutual funds, finding that the impact of conflicts of interest on investment outcomes in that market is large and negative. *See* RIA 158-60; Fig. 3-17. A review of the data suggests that IRA holders receiving conflicted investment advice in that market can expect their investments to underperform by an average of one-half to one percent per year over the next 20 years. RIA 158. This underperformance—for IRA front-end-load mutual fund investments alone—could cost IRA investors between $95 billion and $189 billion over the next 10 years. *Id.*

Based on a wide body of evidence, DOL also concluded that the harm is wide-spread throughout the market and not limited to mutual funds. *Id.* Surveys show that insurance professionals themselves believe that agents sometimes act on conflicts of interest at customers' expense. *Id.* 147. The North American Securities Administrators Association, representing state securities regulators, noted these problems have been particularly acute in the FIA market:

> Equity-indexed annuities are extremely complex investment products that have often been used as instruments of fraud and abuse. For years, they have taken an especially heavy toll on our nation's most vulnerable investors, our senior citizens for whom they are clearly unsuitable.

81 Fed. Reg. 21154. The SEC similarly noted "complaints of abusive sales practices" in the FIA market, including inadequate disclosure to investors and outsized commissions. 74 Fed. Reg. 3138-39 (Jan. 16, 2009). Commenters on the Rule expressed similar concerns. *See* Cmts. 596 (Ron A. Rhoades), 3090 (Professor Bullard for Fund Democracy), 3034 (Committee for the

Fiduciary Standard).[15]

## III. THE CURRENT RULEMAKING

### A. The 2010 Proposed Rule

In 2010, DOL published a notice proposing to amend the 1975 regulation interpreting the "investment advice" prong of the fiduciary definition. *See* 75 Fed. Reg. 65263 (Oct. 22, 2010). DOL proposed to replace its previous five-part test with simpler criteria regarding particular types of advice, while also listing certain activities that would not result in fiduciary status. In the rationale for the rulemaking, DOL expressly noted the profound changes in the market for investment advice since 1975 and explained that the five-part test was not compelled by ERISA's text and was no longer the most effective way to identify those meant to be held accountable as fiduciaries under ERISA. *Id.* 65265.

DOL received over 300 comment letters on the proposed rule and held a two-day public hearing. 81 Fed. Reg. 20957. The transcript of the hearing was made available for additional public comment, and DOL received over sixty additional comment letters. *Id.* In addition, DOL held more than three dozen meetings with interested parties. *Id.* A number of commenters urged DOL to consider other means to attain the objectives of the proposed rule and for additional analysis of the proposal's expected costs and benefits. 80 Fed. Reg. 21932. Others asked DOL to issue new prohibited transaction exemptions to minimize disruption of current compensation practices. *Id.*; *see also* RIA 5. In light of these comments, and because of the significant impact of the rule, DOL decided to withdraw the proposed rule and issue a new proposal. 80 Fed. Reg. 21928, 21956; RIA 5. Thereafter, DOL participated in numerous meetings requested by

---

[15] Per the Court's order, citations to comments and other record material will ultimately use the administrative record's Bates numbers once it is compiled. *See* Minute Order, June 7, 2016. In addition, comments and other record material can be found at https://www.dol.gov/ebsa/regs/conflictsofinterest-proposed.html. All material cited in this brief, other than NAFA's filings, is within the scope of the administrative record.

stakeholders, studied the various issues raised by commenters, and produced a more robust

regulatory impact analysis.  81 Fed. Reg. 20957; RIA 5.

### B.  The 2015 Proposed Rule and Proposed Exemptions

On April 20, 2015, DOL published a new proposed rule interpreting the "investment

advice" prong of ERISA's fiduciary definition.  80 Fed. Reg. 21928.  Drawing from comments

and other input from stakeholders, the 2015 proposal provided that a person rendered investment

advice by:  (1) providing investment or investment management recommendations; and (2)

acknowledging the fiduciary nature of the advice or acting pursuant to an agreement,

arrangement, or understanding that the advice is individualized, or specifically directed, to the

recipient to consider in making investment or investment management decisions.  *Id.* 21929.

Based on comments on the 2010 proposal, DOL specifically included in the definition

recommendations concerning rollovers or other distributions from a plan or IRA.  *Id.* 21954.

The 2015 proposed rule also included an expanded set of "carve-outs" that would not be deemed

investment advice if certain conditions were met.  *Id.* 21936.  DOL explained that it believed

Congress did not intend for such communications to constitute "investment advice" and that such

communications would not ordinarily be viewed as characterized by a relationship of trust or

impartiality.  *Id.* 21941.  The 2015 proposed rule also addressed concerns from the 2010 proposal

by clarifying that those who make general recommendations to the public, including through

newsletters, television commentaries, or conference speeches, are not treated as fiduciaries.  *Id*.

21932.

DOL also responded to the 2010 commenters' requests for additional exemptive relief.

RIA 6.  While the 2015 proposal narrowed and attached new protective conditions to some

existing prohibited transaction exemptions ("PTEs"), it also included new proposed exemptions

that can be used for a broad range of compensation practices.  *Id.*  These exemptions would

16

apply impartial conduct standards across the board so that, at a minimum, advisers would be required to adhere to basic fiduciary standards of fair dealing.  In this way, DOL sought to ensure that, despite the conflicts inherent in the prohibited transactions, the advice is in the best interest of retirement investors and protective of their rights, as statutorily required.  29 U.S.C. § 1108(a); 26 U.S.C. § 4975(c)(2).  Within these protective parameters, DOL also sought to avoid larger and costlier than necessary disruptions to existing business arrangements or constraints on future innovation.  RIA 6.

Best Interest Contract ("BIC") Exemption.  One of the two new exemptions proposed was the BIC Exemption, which would allow fiduciaries rendering investment advice to use a variety of compensation arrangements that would otherwise result in prohibited transactions.  80 Fed. Reg. 21960.  The principal conditions of the proposed exemption were that both the investment adviser and the financial institution with which the adviser is associated would enter into a written contract with the retirement investor, acknowledging the fiduciary status of the adviser and financial institution and committing to adhere to impartial conduct standards when providing advice.  *Id.* 21969.  Adherence to these standards was an independent condition of the proposed exemption, so that a failure to meet the standards would result in loss of the exemption and allow for enforcement of the contract provisions.  *Id.*  These standards included requirements that the adviser and financial institution (1) provide advice in the investor's "best interest," a term defined to mirror the duties of prudence and loyalty in Title I of ERISA, 29 U.S.C. § 1104(a), and (2) charge no more than reasonable compensation for the total services provided to the investor, 80 Fed. Reg. 21970.  The proposed exemption also required financial institutions to make certain contractual warranties and disclosures and included recordkeeping provisions.  *Id.*  The proposed exemption was limited to certain types of investments commonly used by

17

plans and IRAs, including securities and all types of annuity contracts.  *Id.* 21984, 21987.

Amendment of PTE 84-24.  In proposing to make the BIC Exemption available to all annuities, DOL also proposed to amend an existing exemption, PTE 84-24, 80 Fed. Reg. 22010, which had provided an exemption for certain insurers and agents to engage in otherwise prohibited transactions involving insurance and annuity contracts, *see* 71 Fed. Reg. 5887 (Feb. 3, 2006).  DOL proposed to revoke relief for transactions involving IRAs in connection with the purchase of mutual fund shares, variable annuity contracts, and other annuity contracts that are securities under federal securities laws.  80 Fed. Reg. 22012.  DOL believed that the more protective conditions of the proposed BIC Exemption were more appropriate for IRA investors purchasing variable annuities.  *Id.*  As proposed, PTE 84-24 would have remained available for fiduciaries rendering investment advice to receive commissions for IRA and plan purchases of insurance and annuity contracts that are not securities.  *Id.* 21015.

In the proposed amendment to PTE 84-24, DOL made clear that it was seeking comment on whether the line it had drawn between annuities that are securities and those that are not was the right approach to take:

> The Department is not certain that the conditions of the Best Interest Contract Exemption, including some of the disclosure requirements, would be readily applicable to insurance and annuity contracts that are not securities, or that the distribution methods and channels of insurance products that are not securities would fit within the exemption's framework. While the Best Interest Contract Exemption will be available for such products, the Department is seeking comment in that proposal on a number of issues related to use of that exemption for such insurance and annuity products.
>
> The Department requests comment on this approach. *In particular, the Department requests comment on whether the proposal to revoke relief for securities transactions involving IRAs (i.e., annuities that are securities and mutual funds) but leave in place relief for IRA transactions involving insurance and annuity contracts that are not securities strikes the appropriate balance and is protective of the interests of the IRAs*.

*Id.* 22015 (emphasis added).  Likewise DOL requested "comment on this approach" in the

proposed BIC Exemption:

> In particular, we ask *whether we have drawn the correct lines between insurance and annuity products that are securities and those that are not*, in terms of our decision to continue to allow IRA transactions involving non-security insurance and annuity contracts to occur under the conditions of PTE 84–24 while requiring IRA transactions involving securities to occur under the conditions of this proposed Best Interest Contract Exemption.

80 Fed. Reg. 21975 (emphasis added).

Preliminary regulatory impact analysis.  In conjunction with the 2015 proposal, DOL made available on its website a detailed regulatory impact analysis, which contained an in-depth economic assessment of the market for retirement investment advice.  *See* DOL, Fiduciary Investment Advice:  Regulatory Impact Analysis (April 14, 2015) ("Prelim. RIA").  In conducting its analysis, DOL reviewed a wide body of economic evidence including statistical analyses of investor results in conflicted investment channels, experimental studies, government reports documenting abuse, and economic theory on the dangers posed by conflicts of interest. *Id.* 75-94, 137, 140.  The analysis provided detailed responses to comments received on the 2010 proposal.[16]  The analysis concluded that widespread conflicts of interest were causing serious harm to retirement investors.  *Id.*  The analysis also addressed the costs of compliance, including the cost incurred by new fiduciary advisers to satisfy exemption conditions.  *Id.* 157-179.  It further concluded that the 2015 proposal would produce large financial gains for IRA and plan investors, which would easily justify the compliance costs.  *Id.* 8-9, 99-100, 235-236.

Comments and hearings.  DOL initially provided a 75-day comment period, ending July 6, 2015, but extended the comment period for two weeks in response to stakeholder requests.  81 Fed. Reg. 20958.  In August 2015, DOL held a four-day public hearing on the proposal, at which

---

[16] *See, e.g.*, Prelim. RIA 216-233, 223 n.343 (responding to comments, including reports predicting that the 2010 proposal would have highly negative impacts on the IRA market and small investors, by among other things, commissioning RAND to provide an independent review of two such comments).

over 75 speakers testified.  *Id.*  DOL made the hearing transcript available on its website on

September 8, 2015, and provided the opportunity to comment on the proposed regulation,

exemptions, and hearing transcript until September 24, 2015.  *Id.*  In total, DOL received over

3,000 individual comment letters and 30 petitions with over 300,000 signatories on the proposal.

DOL also held numerous meetings with interested stakeholders, including meetings discussing

the RIA.  RIA 7.

Financial services companies supported a best interest standard and claimed already to be

acting in the best interest of their customers.  *See, e.g.,* Hr'g Tr. 903 (Jim Poolman, IALC), 999-

1000 (Michael Hadley, Committee of Annuity Insurers).  Groups representing FIA providers

urged DOL to retain annuity transactions in PTE 84-24 while criticizing parts of the proposed

BIC Exemption.  *See* Cmts. 3124 (IALC letter), 762, 3111 (NAFA letter).  Other commenters

urged DOL to remove FIAs from PTE 84-24.  Cmts. 577 (University of Miami Investor Rights

Center) (arguing all annuities should come within the BIC Exemption), 596 (Ron Rhoades),

3090 (Fund Democracy).

### C.  The 2016 Final Rule and Final Exemptions.

#### 1.  *Defining investment advice.*

After carefully evaluating the extensive record developed on the 2015 Proposal, DOL

published its final rule on April 8, 2016.  81 Fed. Reg. 20946.  The Rule defines "investment

advice" in terms of specified "recommendations" to a particular advisee regarding, *inter alia*,

"the advisability of acquiring, holding, disposing of, or exchanging," or "the management of,"

"securities or other investment property," including how the securities should be invested after

they are rolled over, transferred or distributed from the plan.  29 C.F.R. § 2510.3–21(a)(1)(i)-

(ii).[17]   The Rule further defines "recommendation" as "a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that the advisee engage in or refrain from taking a particular course of action."   § 2510.3–21(b)(1).   The definition of a recommendation is based on FINRA's approach to regulating investment advice in the broker-dealer context and also tracks SEC guidance.   81 Fed. Reg. 20971-72.

In response to comments on the 2015 proposal, DOL concluded in the Rule that certain categories of advice, including investment education, which had been listed as "carve-outs" in the 2015 proposal, were not investment advice that came within the new definition because they were not recommendations.   *Id.* 20948, 20971.   Separately, DOL specifically excluded from the definition three categories of activities that could have been considered "recommendations" on the ground that it did not believe Congress intended to cover them as fiduciary relationships:   (1)

---

[17]  Specifically, under the final rule, a person renders fiduciary investment advice with respect to moneys or other property of an employee benefit plan or IRA if such person provides to a plan fiduciary, plan participant or beneficiary, IRA, or IRA owner the following types of advice, for a fee or other compensation, direct or indirect:

(i) A recommendation as to the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property, or a recommendation as to how securities or other investment property should be invested after the securities or other investment property are rolled over, transferred, or [otherwise] distributed from the plan or IRA;

(ii) A recommendation as to the management of securities or other investment property, including, among other things, recommendations on investment policies or strategies, portfolio composition, selection of other persons to provide investment advice or investment management services, selection of investment account arrangements (e.g., brokerage versus advisory); or recommendations with respect to rollovers, transfers, or distributions from a plan or IRA, including whether, in what amounts, in what form, and to what destination such a rollover, transfer, or distribution should be made[.]

81 Fed. Reg. 20997 (new 29 C.F.R. 2510.3–21(a)(1)).   In addition, a recommendation described above must be made by a person who—

(i) represents or acknowledges that that it is acting as a fiduciary within the meaning of [ERISA] of the [IRC];

(ii) renders the advice pursuant to a written or verbal agreement, arrangement, or understanding that the advice is based on the particular investment needs of the advice recipient; or

(iii) directs the advice to a specific advice recipient or recipients regarding the advisability of a particular investment or management decision with respect to securities or other investment property of the plan or IRA.

*Id.* (new 29 C.F.R. 2510.3–21(a)(2)).

transactions with certain plan fiduciaries who are licensed financial professionals; (2) swap transactions; and (3) certain advice provided by plan sponsor employees. *Id*. 20948.

### 2. *The final BIC Exemption.*

On the same day it published the Rule, DOL also published the final BIC Exemption.[18] 81 Fed. Reg. 21002.  The exemption provides broad prohibited transaction relief for a range of compensation practices that ERISA and the Code would otherwise prohibit, so long as advisers and financial institutions adhere to basic fiduciary standards and take certain specified steps to mitigate the impact of conflicts of interest.  *Id*. 21003.  In particular, to rely on the exemption, financial institutions must:

- acknowledge fiduciary status with respect to investment advice to the investors;
- adhere to "impartial conduct standards" requiring them to:
  - give advice in the retirement investor's best interest (i.e., prudent advice based on the investment objectives, risk tolerance, financial circumstances, and needs of the investor, without regard to financial or other interests of the adviser or financial institution);
  - charge no more than reasonable compensation; and
  - make no misleading statements about investment transactions, compensation, and conflicts of interest.
- implement policies and procedures reasonably and prudently designed to prevent violations of the impartial conduct standards;
- fairly disclose the fees, compensation, and material conflicts of interest associated with their recommendations;
- refrain from giving or using incentives for advisers to act contrary to the customer's best interest.[19]

81 Fed. Reg. 21007.[20]  For fiduciary advice to non-Title I plans and IRAs, the first four

---

[18] The BIC Exemption is set to be republished on July 11, 2016, after a technical correction the primary purpose of which will be to confirm insurers' broad eligibility to rely on the exemption, consistent with the exemption's intended scope and the analysis and data relied upon in the Department's final RIA.  *See* https://www.federalregister.gov/articles/2016/07/11/2016-16355/prohibited-transaction-exemptions-best-interest-contract-exemption-correction.

[19] The Department provided specific, non-exclusive examples of ways financial institutions can manage adviser incentives.  81 Fed. Reg. 21038-40.

[20] In addition to the BIC Exemption, the impartial conduct standards also apply to the newly granted Class
(*footnote continued on next page*)

requirements must be contained in a contract between the financial institution and the retirement investor. *Id.* 21020. The contract must also describe whether the financial institution or adviser will monitor the customer's investments, and if so, the frequency and situations in which the investor will be alerted.

In response to comments asking DOL to provide certainty as to the treatment of proprietary products, the exemption clarifies that financial institutions that restrict their advisers' recommendations to proprietary products or products that generate third party payments may rely on the exemption and provides specific provisions for such transactions. *Id.* 21052.[21] In the case of proprietary products or third party payments, financial institutions and advisers must ensure that the recommendation is prudent, the fees are reasonable, the conflicts are disclosed (including disclosure of how product recommendations are limited), and policies and procedures are in place to ensure the adviser's focus is on the customer's best interest. BIC Exemption § IV; 81 Fed. Reg. 21029, 21080-81.

The exemption expressly provides that it does not ban differential compensation such as commissions based on customers' investment decisions, as long as the policies, procedures, and incentive practices, when viewed as a whole, are reasonably and prudently designed to avoid misalignment of the adviser's interests and those of the retirement investor. BIC Exemption § II(d)(3); 81 Fed. Reg. 21077. DOL's intent in the exemption was to hold financial institutions and their advisers responsible for adhering to fundamental fiduciary standards, while leaving

---

Exemption for Principal Transactions in Certain Assets Between Investment Advice Fiduciaries and Employee Benefit Plans and IRAs ("Principal Transactions Exemption"), 80 Fed. Reg. 21989 (Apr. 20, 2015), as well as Prohibited Transaction Exemptions (PTEs) 75–1; 77–4; 80–83; 83–1; 84–24; and 86–128, which were amended along with the rulemaking. *See* 81 Fed. Reg. 21007.

[21] Proprietary products are defined in the exemption as products that are managed, issued, or sponsored by the financial institution, and third party payments are defined to include sales charges that are not paid directly by the plan or investor, as well as revenue sharing payments and 12b-1 fees, among other payments. BIC Exemption § VIII (l), (q); 81 Fed. Reg. 21068, 21084.

them the flexibility and discretion to determine how best to satisfy these basic standards in light of the unique attributes of their businesses.  81 Fed. Reg. 21007.

The final BIC Exemption reflects many changes made in response to comments to make its conditions less costly and more readily complied with by financial institutions, including insurance companies and distributors of insurance products.  81 Fed. Reg. 21018; *see also* RIA 251-52 (chart comparing proposed and final BIC Exemptions).  In response to comments, under the final exemption, only the financial institution must execute the contract with the investor (electronically or in writing), rather than each of the advisers from whom the investor receives advice, and the contract need not be executed until the recommended investment transaction is made, rather than when advice is first given.  81 Fed. Reg. 21023-24.  The final exemption also adds a provision so that errors or omissions with respect to the disclosure requirements will not result in loss of the exemption if the financial institution acts in good faith and promptly discloses the correct information after discovery of any error.  *Id.* 21008.

The final exemption also reduces compliance costs by eliminating and substantially modifying certain data collection and disclosure requirements.  Namely, DOL eliminated an extensive data retention requirement that would have required financial institutions to collect and maintain detailed data for six years from the date of the applicable transactions and report such data to DOL upon request.  *Id.* 21056 (now requiring financial institutions to maintain only records necessary to determine whether the conditions of the exemption have been met).  It also eliminated a proposed pre-transaction disclosure that would have required a retirement investor to receive a chart illustrating the total cost of the recommended investment for 1-, 5-, and 10-year periods expressed as a dollar amount.  *Id.* 21008, 21048-49 (now requiring a disclosure focusing on the financial institution's material conflicts of interest with more specific information to be

provided upon request).  DOL also eliminated the proposal's annual disclosure requirement and substantially modified the website disclosure by minimizing the specificity of the information required.  *Id.* 21011, 21050.  DOL determined that these responsive changes further minimize any risk of unintended negative impact on small investors' access to affordable advice.  *Id.* 21009.

Many of the changes, including some of those noted above, were made in response to concerns raised by the insurance industry and will result in reduced costs to the industry.  *Id.* 21018; *see also* RIA 283.  To address comments from the industry, DOL also revised the "reasonable compensation" standard throughout the exemption to match what is already required under ERISA and the Code.  81 Fed. Reg. 21018.  It explained that the "reasonable compensation" obligation is deeply rooted in ERISA and the common law of agency and trusts.  *Id.* 21026, 21029-31.  At bottom, "the standard simply requires that compensation not be excessive, as measured by the market value of the particular services, rights, and benefits the Adviser and Financial Institution are delivering to the Retirement Investor."  *Id.* 21029.  To address concern that certain features of insurance products would be undervalued by this standard, DOL explained that "it is appropriate to consider the value of the guarantees and benefits in assessing the reasonableness of the arrangement, as well as the value of the services."  *Id.* 21031.

DOL also considered and rejected the suggestion that the definition of "financial institution" be expanded to include insurance marketing organizations ("IMOs").  *Id.* 21067.  DOL concluded that the definition, which determines the types of firms that can execute a best interest contract, should be limited to entities that are subject to well-established regulatory conditions and oversight.  *Id.*  DOL stated, however, that entities could be added to the definition

through individual exemptions:

> If parties wish to expand the definition of Financial Institution to include marketing intermediaries or other entities, they can submit an application to the Department for an individual exemption, with information regarding their role in the distribution of financial products, the regulatory oversight of such entities, and their ability to effectively supervise individual Advisers' compliance with the terms of this exemption.

*Id.*[22]   Moreover, the exemption would not prevent an insurance company from continuing to contract with IMOs or similar organizations to take on the supervisory responsibility required of financial institutions.  *See* 81 Fed. Reg. 21034 (final exemption was intentionally designed to allow flexibility so that financial institutions could design oversight procedures "that are effective for their particular business models").  Moreover, the NAIC model regulation, which many states have adopted, provides for insurers to contract with IMOs.  *See* RIA 41; NAIC Model Regulation § 6(F)(2).

DOL also recognized that insurance is sometimes sold by independent, state-licensed agents who represent multiple insurance companies.  DOL required the responsible financial institution under the contract to assume responsibility for the advice of such agents, to ensure adherence to the standards.  *See* 81 Fed. Reg. 21039.  Thus, if an insurance company executed the contract with a retirement investor, it would be responsible for adopting appropriate policies and procedures to ensure that the adviser's recommendations were in the investor's best interest and satisfied the other standards set out in the contract.  Because the NAIC Model Regulation places the responsibility for overseeing suitability requirements, directly on the insurance company, DOL concluded that the exemption would work well with state insurance regulations.  *Id.* 21018-19.  Like the proposal, the final BIC Exemption is available for recommendations on

---

[22] Other IMOs may also rely on this exemption provided they meet the same conditions.  *See* BIC Exemption § VIII(e)(5); 81 Fed. Reg. 21083.

all annuities.  *Id.* 21017.

### 3.  The final PTE 84-24 amendments

After carefully considering feedback received in response to its request for comments, DOL determined that PTE 84-24 should be available for the receipt of commissions only in connection with recommendations concerning "fixed rate annuity contracts" as defined in the exemption.  PTE 84-24 § VI(k), 81 Fed. Reg. 21176.  This definition does not include variable annuities, FIAs, or similar annuities; as a result, fiduciaries advising on these products can no longer rely on PTE 84-24 but must instead use the BIC Exemption if they wish to be exempted from the prohibited transaction provisions that would otherwise apply.  81 Fed. Reg. 21147.

DOL explained that it reserved PTE 84-24 for simpler annuities that "provide payments that are the subject of insurance companies' contractual guarantees and that are predictable" and that have "terms that are more understandable to consumers."  81 Fed. Reg. 21152.  By contrast, "[g]iven the complexity, investment risks, and conflicted sales practices associated with [variable annuities and FIAs], the Department ... determined that recommendations to purchase such annuities should be subject to the greater protections of the [BIC] Exemption."  *Id.* 21153.  FIAs are "complex products requiring careful consideration of their terms and risks," and as a result of their complexity, "[r]etirement [i]nvestors are acutely dependent on sound advice that is untainted by the conflicts of interest posed by [a]dvisers' incentives to secure the annuity purchase, which can be quite substantial."  81 Fed. Reg. 21018.  DOL further explained that "[b]oth categories of annuities, variable and indexed annuities, are susceptible to abuse, and [r]etirement [i]nvestors would equally benefit in both cases from the protections of [the BIC Exemption], including the conditions that clearly establish the enforceable standards of fiduciary conduct and fair dealing."  *Id.*  Consistent with comments from some sellers of variable annuities, who strenuously argued that they should be treated the same as FIAs and indexed

annuities, DOL explained that, by limiting the application of PTE 84-24, it was creating a level playing field for variable annuities, FIAs, and mutual funds and avoiding a regulatory incentive for advisers to preferentially recommend FIAs. *Id.*

### 4. The final regulatory impact analysis

DOL also produced its final regulatory impact analysis of the Rule and exemptions in April 2016. The analysis found that conflicted advice is widespread, causing serious harm to plan and IRA investors, and that disclosing conflicts alone would fail to adequately mitigate the conflicts or remedy the harm. RIA 8. For example, the RIA found that IRA holders receiving conflicted investment advice can expect their investments to underperform by an average of one-half to one percent per year over the next 20 years. *Id.* 9. The underperformance associated with conflicts of interest—in the mutual funds segment alone—could cost IRA investors between $95 billion and $189 billion over the next 10 years. *Id.* The RIA further noted that while these expected losses are large, they represent only a portion of what retirement investors stand to lose as a result of adviser conflicts. *See id.*

By extending fiduciary status to more advice and providing flexible and protective exemptions that apply to an array of compensation arrangements, the RIA concluded that the final rule and exemptions will mitigate conflicts, support consumer choice, and deliver substantial gains for retirement investors and economic benefits that more than justify the costs. *Id.* 7; *id.* 167-78 ("Gains to Investors"). The RIA estimated that in the front-end-load mutual fund segment alone, investors could gain between $33 billion and $36 billion over 10 years. *Id.* 97, 167. DOL concluded that these gains alone outweighed all of the expected costs of the Rule and exemptions. *Id.* 97, 168. With regard to annuities in particular, DOL found the data insufficient to quantify the gains to investors but expected the Rule to create substantial net benefits. *Id.* 168. DOL reasoned that conflicts of interest in the annuity market are likely to be

more pronounced than in the mutual fund market due to generally higher annuity commissions that incentivize insurance agents to steer consumers toward certain products that are not in their best interest. *Id.*

Based on the available data and considering cost-saving revisions to the final BIC Exemption, DOL concluded that the total costs to industry to comply with the Rule and exemptions would be between $10 billion and $31.5 billion over 10 years with a primary estimate of $16.1 billion. *See id.* 10, 219-52. On several occasions, DOL requested data from the regulated community that would allow it to quantify the costs of complying with the Rule and exemptions. *Id.* 206. The financial services industry, namely the Securities Industry and Financial Markets Association ("SIFMA"), and the Financial Services Institute ("FSI"), provided largely unverifiable cost estimates. *See id.* 206-10. DOL nevertheless considered this data, along with estimated start-up costs to complying with the Rule and exemptions provided by two insurers, TIAA-CREF and Northwestern Mutual, while noting that SIFMA reports both firms and other insurers as members and could have included their costs in the SIFMA estimates. RIA 220 n.506, 237. By giving the industry commenters the benefit of the doubt on their cost estimates, DOL likely considerably overestimated the costs associated with the Rule and exemptions. *Id.* 10, 206-10, 307, 318-24. By largely deferring to industry cost estimates and not considering the benefits to consumers of mitigating conflicts of interest with respect to other investment products, or conflicts other than those associated with up-front fees, DOL took an extremely conservative approach in its cost-benefit analysis. *See id.* 9.

In response to comments that costs to the insurance industry could be high, DOL attempted to quantify them, even though the industry had not provided much usable data. RIA 211. Using publicly available sources of information, DOL estimated the number of affected

insurance companies and also determined which ones sold certain kinds of annuities.  *Id.* 104.  It also analyzed annuity sales by type of agent, and the role of IMOs and other intermediaries.  *Id.* 102.  It applied the cost data from broker-dealers because insurers will have to perform similar tasks to comply with the Rule and exemptions, even though the products they sell may vary.  *Id.* 237.  It concluded that the total costs for insurers to comply with the Rule and all of the new and amended exemptions, including the BIC Exemption, ranged from $1.1 billion to $1.3 billion over a ten year period.  *Id.* 238 Figure 5-11; *see also id.* 248-50 (summaries for insurers and others using discount rates and various assumptions).

DOL also analyzed the impact of the Rule and exemptions on affected small businesses as required by the Regulatory Flexibility Act.  RIA 254-60.  Treating 99.3% of insurers as small entities based on the Small Business Administration's definition, it analyzed the costs they would incur and discussed changes made in the rulemaking to reduce costs to large and small firms. RIA 255-260.  It noted the possibility that some small service providers may find that the increased costs associated with ERISA fiduciary status outweigh the benefit of continuing to service the ERISA plan or IRA markets.  RIA 258.  DOL did not believe that this outcome would be widespread or result in a diminution of the amount or quality of advice available to small or other retirement investors, as firms would fill the void for those markets.  RIA 258.  DOL also noted anecdotal evidence that small entities do not have as many business arrangements that give rise to conflicts of interest.  *Id.*

### 5.  *The effective and applicability dates of the Rule and exemptions*

The 2015 proposed rule had provided that the Rule would be effective 60 days after publication but that its requirements would not become applicable until eight months after publication.  80 Fed. Reg. 21950.  Many commenters expressed concern that eight months would be inadequate to make the necessary changes to information systems, compliance processes, and

compensation structures and suggested that the applicability date should be extended.  *See* RIA 291.  The public comments requesting a longer period for compliance generally expressed concerns with meeting the conditions of the new and amended exemptions rather than with the definition of investment advice in the Rule.  *Id.* 292.

After carefully considering these comments and suggested alternatives, DOL retained the sixty-day effective date; however, in light of comments regarding the feasibility of the applicability date, DOL lengthened the period from eight months to one year after final publication, or until April 10, 2017.  81 Fed. Reg. 20992-93.  DOL also agreed that it would be appropriate to provide transitional relief for satisfaction of all of the new exemption conditions. RIA 292.  Balancing the numerous revisions in the final exemptions to enable financial institutions to comply with the conditions more readily, *see, e.g.*, 81 Fed. Reg. 21081, and the ongoing harm to investors, DOL determined that an additional nine-month transition period, until January 1, 2018, would be appropriate. RIA 292; 81 Fed. Reg. 20993.

During the transition period, financial institutions and advisers will be able to rely on the BIC Exemption subject to more limited conditions.  *See* BIC Exemption § IX, 81 Fed. Reg. 21069, 21084.  Namely, they will not be required to enter into the best interest contract or affirmatively warrant that they have adopted and will comply with written policies and procedures reasonably and prudently designed to ensure that advisers adhere to the impartial conduct standards and provide required disclosures.  *Id.* 21084-85.

## IV. PROCEDURAL HISTORY

On June 2, 2016, NAFA filed a complaint and a motion for preliminary injunction challenging, and seeking vacatur of, the Rule, the BIC Exemption, and the amendment to PTE

84-24.[23]  *See* Compl., ECF No. 1; Mem. in Supp. of Pl.'s Appl. for Prelim. Inj. ("Pl.'s Br."), ECF

No. 5-1.  After a status conference on June 6, 2016, the Court deemed NAFA's motion to include

a motion for summary judgment and set a schedule for simultaneous briefing of summary

judgment and the preliminary injunction motion.  *See* Minute Order, Jun. 7, 2016.

## ARGUMENT

## I.   NAFA CANNOT PREVAIL ON THE MERITS OF ITS SIX CLAIMS

The Rule and exemptions seek to ensure that retirement investors receive impartial

investment advice and to mitigate the inherent conflicts in the forms of compensation regularly

received by advisers who sell products, such as FIAs.  DOL acted well within its authority in

putting these protections in place and provided a reasoned explanation for its decision to do so.

For these reasons, and those below, there is no legal basis for NAFA's requested relief, and

Defendants are entitled to summary judgment on all of NAFA's claims.

Although "[s]ummary judgment is the proper mechanism for deciding, as a matter of law,

whether an agency action is supported by the administrative record and consistent with the APA

standard of review[,] ... the typical ... standards set forth in Federal Rule of Civil Procedure 56

are not applicable."  *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 77

(D.D.C. 2013).  Rather, "when a party seeks review of agency action under the APA, the district

judge sits as an appellate tribunal.  The 'entire case' on review is a question of law."  *Am.*

*Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "[T]he function of the

district court is to determine whether or not as a matter of law the evidence in the administrative

---

[23]  Four other cases have been filed challenging the Conflict of Interest Rule and/or these exemptions.  *See* Compl., *Chamber of Commerce v. Perez*, No. 3:16-01476-M (N.D. Tex. Jun. 1, 2016); Compl., *American Council of Life Insurers v. Dep't of Labor*, No. 3:16-01530-C (N.D. Tex. Jun. 8, 2016); Compl., *Indexed Annuity Leadership Council v. Perez*, No. 3:16-1537-N (N.D. Tex. Jun. 8, 2016); Compl., *Market Synergy Group, Inc. v. U.S. Dep't of Labor*, No. 5:16-4083 (D. Kan. Jun. 8, 2016).

record permitted the agency to make the decision it did."  *Styrene*, 944 F. Supp. 2d at 77.

**A.     The Department's Reasonable Interpretation of "Investment Advice" Is Entitled to *Chevron* Deference**

In enacting ERISA, Congress gave DOL broad administrative and interpretive power to "prescribe such regulations as ... necessary or appropriate to carry out the [relevant] provisions," including to "define accounting, technical and trade terms used in" the Act.  29 U.S.C. § 1135. In exercising that authority, DOL promulgated a reasonable interpretation of "investment advice" in light of the text, legislative history, and purposes of ERISA.   Where Congress did not specifically define "investment advice," but entrusted DOL with broad discretion to interpret that language in light of its expertise and competing policy concerns, *see e.g.*, *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 515 (1981) (recognizing ERISA's "primary goal of benefiting employees and ...  subsidiary goal of containing pension costs"), DOL's reasonable interpretation is entitled to deference, *see Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 708 (1995) ("When Congress has entrusted the Secretary with broad discretion, we are especially reluctant to substitute our views of wise policy for his." (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865-66 (1984))).

While NAFA does not contest that the *Chevron* framework applies to the rulemaking here, *see* Pl.'s Br. 25, NAFA contends that the agency's interpretation of "investment advice" fails at *Chevron* step one because "Congress intended ERISA fiduciary duties to apply only to those who participate in ongoing management of a plan or its assets," *id.* 28.  But it is NAFA's interpretation that runs afoul of the statutory text and case law regarding ERISA fiduciaries, and NAFA's alternative sources of authority do not compel its narrow interpretation.   The text, legislative history, and purposes of ERISA support the agency's reasonable interpretation of "investment advice," and that interpretation is entitled to deference.

###### 1. *Congress's adoption of the broad term "investment advice" leaves room for interpretation, but that term cannot be redundant with "management" or "administration"*

If a statute is "silent or ambiguous with respect to the specific issue," deference is appropriate, *Chevron*, 467 U.S. at 843, and courts "may not disturb an agency rule unless it is arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011). *Chevron* deference applies, moreover, even where an agency revises its previous interpretation, so long as the agency "displays awareness that it *is* changing position, and shows that there are good reasons for the new policy." *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1094-95 (D.C. Cir. 2015), *cert. denied*, 2016 WL 3461581 (June 27, 2016). "[B]eyond that, the APA imposes no special burden when an agency elects to change course." *Id.* at 1095.

Here, Congress cast a wide net in assigning fiduciary status to persons involved in three functions—management, investment advice, and administration—related to retirement plans:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises *any* discretionary authority or discretionary control respecting management of such plan or exercises *any* authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to *any* moneys or other property of such plan, or has *any* authority or responsibility to do so, or (iii) he has *any* discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added); 26 U.S.C. § 4975(e)(3) (largely same). Congress emphasized the breadth of the statutory purpose by repeating the word "any" in each prong. By using such broad language, "Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 96 (1993).

Moreover, as NAFA concedes, Congress did not provide a precise definition of "investment advice," *see* Pl.'s Br. 27, but, instead, adopted broad language, the ordinary

understanding of which is susceptible to multiple reasonable interpretations.  The dictionary definition of *advice* is "an opinion or recommendation offered as a guide to action, conduct, etc.," and *investment* is "the investing of money or capital in order to gain profitable returns." *The Random House Dictionary of the English Language* (2d ed. 1987).  While an ordinary understanding does not dictate one precise definition, the context of the statutory phrase makes clear that "investment advice" must have a meaning distinct from the other prongs of ERISA's definition of fiduciary.  *See Dolan v. U.S. Postal Serv.,* 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute.").  While all three prongs speak of functions as they relate to a plan, the first speaks in terms of "management," the second of "investment advice," and the third of "administration."  29 U.S.C. § 1002(21)(A)(i)-(iii).  The enumeration of three independent functions—linked by the disjunctive "or"—suggests that Congress meant for each prong of the definition to have independent meaning.  *See Babbitt*, 515 U.S. at 702 (rejecting an interpretation that would give the term "essentially the same function as other words in the definition, thereby denying it independent meaning").  The conference report accompanying ERISA confirms that this was Congress's intent:

> The substitute defines 'fiduciary' as any person who exercises any discretionary authority or control respecting management of a plan, exercises any authority or control respecting the management or disposition of its assets *or* has any discretionary authority or responsibility in the administration of the plan....  *The term 'fiduciary' also includes any person who renders investment advice for a fee* and includes persons to whom 'discretionary' duties have been delegated by named fiduciaries.

H.R. Rep. No. 93-1280 (1974) (Conf. Rep.), as reprinted in 1974 U.S.C.C.A.N. 5038, 5103 (emphasis added).  Thus, the text, including context, and legislative history support the view that Congress allowed for a broad interpretation of "investment advice" and not one limited to those involved in plan management or administration.

Within those capacious outer boundaries, DOL adopted an interpretation that comports with an ordinary understanding of the text.  The Rule defines "investment advice" in terms of specified "recommendations" to a particular advisee as to, *inter alia*, "the advisability of acquiring, holding, disposing of, or exchanging," or "the management of," "securities or other investment property."   29 C.F.R. § 2510.3–21(a)(1)(i)-(ii).   The Rule further defines "recommendation" as "a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that the advisee engage in or refrain from taking a particular course of action."  § 2510.3–21(b)(1).  Finally, consistent with the statutory language, the Rule cabins its application to advice resulting in "compensation" and concerning "property of [a] plan."  § 2510.3–21(a).  A suggestion to an advisee to take a particular course of action with respect to his or her investment property (all of which actions would presumably affect the property's income or profit) comports both with an ordinary understanding of what it means to render "investment advice" and with the statutory context's requirement that the term not be coextensive with "management" or "administration."   As discussed more fully below, DOL's reasonable interpretation is entitled to deference and should be upheld.

### 2.    *None of NAFA's arguments compels its interpretation of "investment advice" as "ongoing management"*

NAFA submits that the second prong of the fiduciary definition covers only fiduciaries "who participate in [the] ongoing management of a plan or its assets."  Pl.'s Br. 28.  In support of its position, NAFA relies heavily on the five-part test in DOL's previous regulation.  29 C.F.R. § 2510.3–21(c)(1).   That test, NAFA argues, "precis[ely] … implement[ed] congressional intent," by requiring, among other things, that investment advice be rendered "on a regular basis," 29 C.F.R. § 2510.3–21(c)(1).  Pl.'s Br. 27.  But NAFA confuses an interpretation that the statute *permits* with an interpretation that the statutory language *requires*.  Nothing in the text of

§ 1002(21)(A) mandates such a requirement, and NAFA provides no evidence to necessitate reading one into it. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010) (placing a limitation in a statute that is "conspicuously absent more closely resembles inventing a statute rather than interpreting one").

While NAFA acknowledges the "traditional tools of statutory construction," Pl.'s Br. 29, it does not rely for its interpretation on those tools—not even attempting to grapple with the relevant statutory text. But NAFA's insistence that fiduciary status is limited to persons involved in "plan management and administration," *see* Pl.'s Br. 31, would essentially read the second prong out of the statute altogether and give it no significance at all, independent or otherwise. It is well-settled that courts "should disfavor interpretations of statutes that render language superfluous," as NAFA's interpretation would. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992). This reason alone forecloses NAFA's position that "investment advice" must be limited to those involved in plan management and administration.

Having disregarded the traditional tools of statutory construction, NAFA relies on three alternatives: the common law definition of "fiduciary," the definition of "investment adviser" under the Adviser's Act, and implied congressional approval of DOL's previous five-part test. None of these bases compels NAFA's interpretation.

First, NAFA argues that the "plain meaning of 'fiduciary' [under] the common law" of trusts limits fiduciaries to persons involved in "ongoing management of a plan or its assets." Pl.'s Br. 28-30. But the term to be interpreted here is not "fiduciary"—ERISA already provides a definition of fiduciary to include a person who "renders investment advice"—and the courts have roundly rejected the argument that fiduciary status is limited to that under the common law of trusts. Indeed, "[t]he D.C. Circuit has addressed the precise question of whether the common

law of trusts or ERISA governs in determining whether a party acts as a fiduciary," and "look[s] only to [29 U.S.C. § 1002(21)(A)] and [§§ 1101-1104] to" make that determination.  *Hartline v. Sheet Metal Workers' Nat. Pension Fund*, 134 F. Supp. 2d 1, 10-11 (D.D.C. 2000).

Congress purposefully departed from the common law of trusts and adopted a broad, functional definition that "expand[ed] the universe of persons subject to fiduciary duties." *Mertens*, 508 U.S. at 262.[24]  Setting aside whether fiduciaries under trust law would be confined to those involved in "ongoing management of a plan or its assets," ERISA explicitly expands the scope to include those who "render[] investment advice for a fee or other compensation."  29 U.S.C. § 1002(21)(A).  While trust law may offer a "starting point" for analysis in some situations, it must give way if inconsistent with "the language of the statute, its structure, or its purposes." *Varity Corp.,* 516 U.S. at 497; *see also Sys. Council EM-3 v. AT&T Corp.*, 159 F.3d 1376, 1379 (D.C. Cir. 1998) ("Supreme Court has held that ERISA constitutes a comprehensive statutory scheme that preempts the common law of trusts where the two bodies of law conflict.").[25]

Second, NAFA defends its reading by positing that Congress adopted a definition of "investment advice" in ERISA "[s]imilar to" the definition of "investment adviser" in the Adviser's Act, the latter of which distinguishes "between persons engaged in rendering investment advice for compensation and those persons ... merely ... selling products."  Pl.'s Br.

---

[24] *See also Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 418 n.3 (4th Cir.1993) (ERISA's definition of fiduciary is "broader than the common law concept of a trustee"); *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999) ("[T]he definition of a fiduciary under ERISA is a functional one ... and does not turn on formal designations such as who is the trustee."); *Varity Corp. v. Howe*, 516 U.S. 489, 527-28 (1996) (recognizing that ERISA defined a fiduciary not in terms of formal trusteeship but in functional terms).

[25] In any event, it is far from clear that the types of relationships encompassed by the Rule would not fall within the common law definitions of fiduciary that NAFA cites.  *See* Pl.'s Br. 31.  Indeed, it is because retirement investors "repose[] special confidence and reliance," *id.*, in those rendering investment advice that the Department sought to ensure that such advisers adhere to fiduciary standards.  *See* 81 Fed. Reg. 20949.

32.[26]  Given that Congress was aware of this distinction when it enacted ERISA in 1974, NAFA

posits that Congress "incorporated those very concepts into ERISA," such that fiduciary status

would not apply to "salespersons compensated only for their sales."  *Id.*  NAFA's argument

again misses the mark.  Tellingly, to create the distinction that NAFA identifies, Congress in the

Adviser's Act "define[d] 'investment adviser' broadly *and* create[d] ... a precise exemption for

broker-dealers."  *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 489 (D.C. Cir. 2007) (emphasis

added); *see* 15 U.S.C. § 80b-2(a)(11).  Had Congress intended to adopt the same distinction in

ERISA, presumably it would have done so expressly, as it did in the Advisers Act, by including a

similar exemption.  *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003)

("[W]here Congress has intended to provide regulatory exceptions to provisions ... it has done so

clearly and expressly.").  As there is no such exemption in ERISA, one can presume that

Congress did not mean to limit investment advice under ERISA in the way NAFA suggests.  *See*

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) ("We normally presume that,

where words differ as they differ here, Congress acts intentionally and purposely in the disparate

inclusion or exclusion.").  In enacting ERISA, Congress specifically referred to the Adviser's

Act when it created an exception to the requirement that plan trustees have exclusive authority

and control over plan assets.  29 U.S.C. §§ 1002(38)(B), 1103(a)(2).  Yet, it did not reference the

Adviser's Act when it defined a fiduciary as someone who renders investment advice for a fee.

This underscores that while Congress understood the securities law backdrop, it chose not to

---

[26] The Adviser's Act defines "investment adviser" as "any person who, for compensation, engages in the business of advising others ... as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues ... reports concerning securities."  15 U.S.C. § 806b–2(a)(11).  The definition explicitly excludes, *inter alia*, broker-dealers "whose performance of such services is solely incidental" to their regular business and "receive[] no special compensation."  *Id.*

limit fiduciaries in ERISA to those covered by the Adviser's Act.[27]

Third, NAFA contends that where Congress amended ERISA and the Code after DOL's adoption of the 1975 regulation without amending the definition of investment advice, Congress implicitly ratified the agency's initial interpretation of the term. *See* Pl.'s Br. 33-37. That contention relies on a misapprehension of how congressional acquiescence works and an erroneous perspective of how it might work here. While courts "have recognized congressional acquiescence to administrative interpretations of a statute in some situations, [they] have done so with extreme care." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 169 (2001). "As a general matter, ... [such] arguments deserve little weight in the interpretive process." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994). This is particularly so where, as here, Congress has neither re-enacted the entirety of ERISA nor amended § 1002 but has simply enacted a series of isolated amendments to other provisions. *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 153 (D.D.C. 2015) ("[T]he ratification canon is of 'little assistance' where Congress has not re-enacted the entire statute at issue or significantly amended the relevant provision." (quoting *Public Citizen, Inc. v. Dep't of Health and Human Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003))).

Moreover, even if some form of congressional acquiescence could be implied, congressional silence cannot be equated with a clear statement that the agency's existing regulations represent the outer boundary of the agency's rulemaking authority. *See AFL-CIO v.*

---

[27] In addition, NAFA mischaracterizes the Rule as covering "salespersons compensated only for their sales." Pl.'s Br. 32. A sale does not inherently qualify as rendering investment advice under the Rule. The threshold inquiry is whether a person provides a "recommendation" regarding the handling or management of "securities or other investment property." 29 C.F.R. § 2510.3–21(a)(1)(i)-(ii). This is an objective inquiry, determined by asking whether, based on its content, context, and presentation, it would be reasonably viewed as a suggestion to a retirement investor to take a particular course of action with regard to investment property. *Id.* § 2510.3–21(b)(1). Once a person crosses that line, he is no longer "simply selling a product," as NAFA suggests, Pl.'s Br. 33; he is rendering investment advice.

*Brock*, 835 F.2d 912, 916 n.6 (D.C. Cir. 1987) ("[N]o case has rested on" the legislative re-enactment doctrine "alone as a basis for holding that the statute *required* that interpretation") (emphasis altered).   Nor would any discernable congressional approval of the agency's prior interpretation preclude the agency from changing it.   *See id.* at 916 ("[T]he Supreme Court has stated that such legislative approval of an agency's policy does not necessarily preclude the agency from subsequently changing that policy.").   Rather, "[t]o freeze an agency interpretation, Congress must give a strong affirmative indication that it wishes the present interpretation to remain in place." *Id.*   There is no such indication here.

NAFA also attempts to find support in case law for its view that fiduciary status is limited to those involved in plan management and administration, but the weakness of NAFA's position is apparent from its reliance on cases that do not even apply or analyze the second prong of the fiduciary definition.   *See* Pl.'s Br. 31.   Neither of the cases on which NAFA relies—*Hartline*, 134 F. Supp. 2d at 10, or *Chao v. Day*, 436 F.3d 234, 235-38 (D.C. Cir. 2006)—implicated the second prong of § 1002(21)(A), but instead involved the first and third prongs, which pertain to plan management and administration.[28]   Indeed, in both cases, the courts made clear that they were analyzing, and relying on cases that analyzed, the first (management) and third (administration) prongs of the fiduciary definition—not the second (investment advice).   *See Hartline*, 134 F. Supp. 2d at 9 (citing *Varity Corp.*, 516 U.S. at 498, which in turn cited § 1002(21)(A)(i) and (iii)); *see also Varity Corp.*, 516 U.S. at 527 n.7 (Thomas, J., dissenting) ("In this case, the parties agree that Varity's status as a fiduciary turns on an interpretation of the statute's third category, which relates to plan administration."); *Chao*, 436 F.3d at 235 (citing as

---

[28] *Hartline* addressed whether "modifying or amending (as opposed to administering) an ERISA plan" were fiduciary acts.   134 F.2d at 13.   And *Chao* addressed whether the president of an insurance company exercised "'authority or control' over the 'disposition of [the plans'] assets,'" where he misappropriated funds from employee benefit plans and provided the plans with fake insurance policies.   436 F.3d at 234-35.

the "relevant section of ERISA" the first and third prongs of the fiduciary definition).  It is thus unremarkable that those cases indicate that fiduciaries are persons involved in plan management and administration.  They do not support NAFA's contention that fiduciary status under ERISA is necessarily and clearly limited to those persons, or, in particular, exclude persons who render episodic investment advice.

### 3.    The Department's interpretation of "investment advice" comports with the text, legislative history and purposes of ERISA

Where NAFA fails to demonstrate that its interpretation is compelled by the statute, and because the relevant statutory text is ambiguous, the agency's interpretation is entitled to deference so long as it is reasonable.  *Chevron*, 467 U.S. at 843.  In light of the text, legislative history, and purposes of ERISA, the Rule's interpretation of "investment advice" easily meets this standard.

As explained, Congress purposefully departed from the common law of trusts, applying fiduciary status more broadly to those involved in various functions, including those who render "investment advice."  Congress did not, however, provide a precise definition of "investment advice"; rather, it adopted a term susceptible to multiple interpretations but, consistent with the remedial purposes of ERISA, broad enough to cover a range of adviser-advisee relationships.  As explained above, given this backdrop, DOL adopted a reasonable interpretation of "investment advice" consistent with an ordinary understanding of that phrase, the statutory context, and the legislative history.

In addition, DOL's interpretation of "investment advice" in the Rule serves the broad remedial purposes of ERISA by protecting against activities that pose the precise harms Congress enacted the statute to avoid.  *See, e.g.*, *John Hancock Mut. Life Ins. Co.*, 510 U.S. at 86 (noting ERISA's "broad purpose of protecting retirement benefits"); *Belland v. Pension Ben.*

*Guar. Corp.*, 726 F.2d 839, 848 (D.C. Cir. 1984) (same).   In light of the changes in the marketplace for retirement advice since ERISA was enacted in 1974, the Rule's revisions ensure that the fiduciary definition extends to those who are now largely responsible for providing investment advice to retirement investors.   Instead of relying on ERISA-covered defined benefit plans, "where their employer has both the incentive and fiduciary duty to facilitate sound investment choices," most investors are now covered by individual account-based plans for which individuals make their own choices and rely on advisers in a market where "both good and bad investment choices are myriad and [conflicted] advice ... is commonplace."   80 Fed. Reg. 21932. Thus, contrary to NAFA's contention that the Rule improperly expands the universe of fiduciaries, *see* Pl.'s Br. 27, the Rule instead aligns the definition of investment advice with today's marketplace realties and ensures, consistent with congressional intent, that fiduciary status applies to "persons whose actions affect the amount of benefits retirement plan participants will receive."  *John Hancock Mut. Life Ins. Co.*, 510 U.S. at 96.

In the preamble to the Rule, the Department—which has the relevant authority and expertise to account for these considerations—explains in detail how the "regular basis" requirement in the 1975 regulation, in particular, no longer aligns with congressional intent in light of today's market realities.  *See* 81 Fed. Reg. 20955.  As just one example:

> [I]f a small plan hires an investment professional on a one-time basis for an investment recommendation on a large, complex investment, the adviser has no fiduciary obligation to the plan under [the 1975 regulation].  Even if the plan is considering investing all or substantially all of the plan's assets, lacks the specialized expertise necessary to evaluate the complex transaction on its own, and the consultant fully understands the plan's dependence on his professional judgment, the consultant is not a fiduciary because he does not advise the plan on a "regular basis."  The plan could be investing hundreds of millions of dollars in plan assets, and it could be the most critical investment decision the plan ever makes, but the adviser would have no fiduciary responsibility under the 1975 regulation. While a consultant who regularly makes less significant investment recommendations to the plan would be a fiduciary if he satisfies the other four

43

> prongs of the regulatory test, the onetime consultant on an enormous transaction
> has no fiduciary responsibility.

*Id.*  Such a result is also at odds with congressional intent, as evidenced by the broad definition of fiduciary adopted by Congress in ERISA, which was meant to ensure that those having such influence over, and responsibility for, retirement investment decisions are acting in the interest of advisees and held accountable for their advice.  *See, e.g.*, *Greater Washington Bd. of Trade v. Dist. of Columbia*, 948 F.2d 1317, 1319 (D.C. Cir. 1991), *aff'd*, 506 U.S. 125 (1992) (recognizing that primary purpose of ERISA was to protect retirement plans and their beneficiaries by, *inter alia*, "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans[] and ... providing for appropriate remedies, sanctions, and ready access to the Federal courts").  While the provision of advice on a regular basis could be evidence of a relationship of trust between an adviser and an advisee, it is far from the only basis for such a relationship, and nothing in the statutory text makes advice on a "regular basis" a prerequisite of fiduciary status.  Moreover, DOL has provided more than sufficient justification that omission of such a requirement better effects legislative intent in today's financial environment.  *See Fox Television Stations*, 556 U.S. at 515 (an agency need only show that "the new policy is permissible under the statute [and] that there are good reasons for it").  For all of these reasons, DOL's interpretation of investment advice is a reasonable interpretation entitled to *Chevron* deference.

In arguing to the contrary, NAFA relies on two cases that are easily distinguishable. NAFA first points to *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006), as support for the truism that "an agency's perceived need to regulate does not mean that it can distort statutory meaning simply to achieve regulatory ends."  Pl.'s Br. 39.  But in *Goldstein*, the court found that the SEC's interpretation of the word "client" came "close to violating the plain language of the

statute," was "[a]t best ... counterintuitive," and would have required the court to give the same words different meanings within the same statute without justification.  451 F.3d at 881-84. Here, rather than distorting the statutory language, DOL's interpretation comports with an ordinary understanding of it.  And rather than leading to counterintuitive and arbitrary results, DOL's interpretation leads to the logical result, consistent with ERISA's remedial purposes, that those who render investment advice with respect to the predominant form of retirement plans today are subject to fiduciary duties.  *See* 81 Fed. Reg. 20954-55.  In fact, *Goldstein* actually undermines NAFA's position.  There, the court took pains to note that the challenged rule "might be more understandable if, over the years, the advisory relationship between hedge fund advisers and investors had changed."  451 F.3d at 882.  But because the SEC had not justified its regulation "by reference to any change in the nature of investment adviser-client relationships since" adopting its previous interpretation, its new rule "appear[ed] completely arbitrary."  *Id.* at 883.  In stark contrast here, DOL has explained that the change in the investment adviser-advisee relationship is *precisely* what led it to conclude that its previous interpretation of § 1002(A)(ii) was no longer sufficiently protective of retirement investors in light of ERISA's purposes.  *See* 81 Fed. Reg. 20991.

NAFA's reliance on *Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499 (D.C. Cir. 2013), is similarly misplaced.  In that case, the agency promulgated a definition under its statutory authority to regulate "direct heat" equipment that encompassed decorative fireplaces, a class of products Congress unambiguously did *not* intend to qualify as direct heat equipment.  *Id.* at 504-05.  The agency's rule provided decorative fireplaces a safe harbor from energy efficiency standards otherwise applicable to direct heat equipment but did not exclude them from the definition.  *Id.*  The court held that such a safe harbor could not save a definition

that contravened the language, context, and history of the relevant statute. *Id.* at 506. Here, as shown above, the text, legislative history, and purpose of ERISA demonstrate that the Rule is consistent with congressional intent. NAFA erroneously claims that three exclusions from the definition of "investment advice", *see* 29 C.F.R. § 2510.3–21(c)(1)-(3), create the same sort of problem present in *Hearth, Patio*. Distorting DOL's observation that the three exclusions in involve "relationships that are not appropriately regarded as fiduciary in nature and that the Department does not believe Congress intended to cover as fiduciary relationships," 81 Fed. Reg. 20948, NAFA asserts that "the Department admits it has deliberately created fiduciary status" for some non-fiduciary relationships. Pl.'s Br. 39-40. To the contrary, DOL explicitly disclaimed fiduciary status in those instances. *See* 81 Fed. Reg. 20949 (stating that the general definition together with the exclusions in paragraph (c) and some unchallenged clarifications in paragraph (b) provide a "structure [that] is faithful to the remedial purpose of the statute, but avoids burdening activities that do not implicate relationships of trust"); *see also* 29 C.F.R. § 2510.3–21(b), (c). Thus, unlike in *Hearth, Patio*, DOL acted to effectuate congressional intent, not evade it. Nor as was the case in *Hearth, Patio* is NAFA challenging any of the exclusions or arguing they should be covered by the Rule.[29] Finally, to the extent that NAFA asserts that a regulation can never define a term generally while providing exceptions or exemptions, it is flatly wrong. Agencies promulgate definitions with exceptions—and courts uphold those definitions with exceptions—regularly. *See, e.g.*, *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242-45 (2004) (upholding Federal Reserve Board's definition of statutory term "finance charge" that "specifically excludes" eight types of charges); *Am. Petroleum Inst. v.*

---

[29] In fact, NAFA submitted a comment letter, in which it specifically supported the idea of exceptions from the fiduciary definition. *See* Cmt. 762 at 12 ("A fiduciary-only standard, without workable exceptions, will ultimately harm the consumers it was intended to protect.").

*EPA*, 216 F.3d 50, 58-59 (D.C. Cir. 2000) (upholding EPA regulation "excluding [specified] oil from the definition of solid waste, provided that certain conditions are met").

As NAFA provides no basis to question the Department's reasonable interpretation, which comports with the statutory text and context and is supported by the legislative history and purposes of ERISA, the Department is entitled to summary judgment on Count I.

**B.   The Department Has Express Authority to Grant Conditional Exemptions, and Its Finding That the BIC Exemption Meets Statutory Requirements for Exemptions is Entitled to Deference**

"Where Congress *delegates,* explicitly or implicitly, to an administrative agency the authority to give meaning to a statutory term or to promulgate standards or classifications, the regulations adopted in the exercise of that authority enjoy 'legislative effect,' [and] are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *AFL-CIO v. Donovan*, 757 F.2d 330, 341 (D.C. Cir. 1985).   In particular, where an agency "is expressly delegated the authority to grant [an] exemption and is required to make certain other determinations in order to do so ... [t]hat grant and those determinations ... are ... entitled to great deference under the 'arbitrary and capricious standard.'"   *Id.* at 343.

Here, by virtue of the Reorganization Plan, DOL was expressly given broad authority to grant "conditional or unconditional" administrative exemptions to the prohibited transaction provisions in the Code.   5 U.S.C. App. 1, § 102; 26 U.S.C. § 4975(c)(2).   Moreover, Congress expressly delegated to DOL the authority to grant exemptions only on its determination, in accordance with DOL's expertise and competing policy concerns, that an exemption would be administratively feasible and in the interests of retirement investors and protective of their rights. 26 U.S.C. § 4975(c)(2)(A)-(C).   Pursuant to this broad delegation of authority, and upon making such findings, 81 Fed. Reg. 21070, DOL promulgated the BIC Exemption, requiring, *inter alia*, that fiduciaries relying on the BIC Exemption comply with impartial conduct standards, meant to

47

ensure that fiduciaries act in their clients' best interest.  *See* 81 Fed. Reg. 21082-83; *supra* Stmt. of Facts § III(C)(2).  As DOL explained in the preamble to the BIC Exemption, the impartial conduct standards constitute "baseline standards of fundamental fair dealing that must be present when fiduciaries make conflicted investment recommendations to Retirement Investors" because the standards "are necessary to ensure that Advisers' recommendations reflect the best interest of their Retirement Investor customers, rather than the conflicting financial interests of the Advisers and their Financial Institutions."  81 Fed. Reg. 21060.  Given Congress's broad delegation of authority to DOL, as well as the requirement that any exemptions serve the interests, and protect the rights, of retirement investors, DOL's determination to condition use of the BIC Exemption on compliance with "baseline standards of fundamental fair dealing," *id.*, is entirely reasonable and "entitled to great deference."  *AFL-CIO*, 757 F.2d at 343.

Although NAFA concedes that DOL has authority to create such conditional exemptions, *see* Compl. ¶¶ 53, 57; Pl.'s Br. 44 n.21, NAFA nonetheless argues that DOL exceeded its authority by "impos[ing] ERISA fiduciary obligations on parties to transactions involving IRAs." Pl.'s Br. 41, 45.  NAFA's argument misses the mark for several reasons.  To begin, NAFA's first contention—that "ERISA does not permit the Department to impose ERISA fiduciary obligations on any fiduciaries involved in IRA transactions," Pl.'s Br. 43—is a red herring.  As noted, NAFA concedes that the Department did *not* rely on ERISA to apply the revised definition of fiduciary or the BIC Exemption to fiduciaries to IRAs.  *See* Compl. ¶ 122; Pl.'s Br. 44 n.21.  Instead, DOL relied on its interpretive and rulemaking authority under the Code, including its authority to grant conditional exemptions, transferred to it pursuant to the Reorganization Plan.  *See* 81 Fed. Reg. 20991, 20953, 21003.

Moreover, in revising the definition of fiduciary investment advice and granting the BIC

Exemption, the Department did not "impose ERISA fiduciary obligations" on fiduciaries to IRAs, as NAFA contends.  Pl.'s Br. 41.  As was the case prior to promulgation of the Rule, those who qualify as fiduciaries *with respect to employer-based plans* are required under ERISA to adhere to fiduciary duties and to refrain from specified prohibited transactions, absent an applicable exemption, 29 U.S.C. § 1104, whereas, those who qualify as fiduciaries *with respect to IRAs* are not subject to fiduciary duties under ERISA but are subject only to the parallel prohibited transaction provisions in the Code.  26 U.S.C. § 4975.

In arguing to the contrary, NAFA emphasizes that while ERISA requires fiduciaries to adhere to fiduciary obligations, the Code contains no parallel provisions for fiduciaries to IRAs. Pl.'s Br. 44.  While that may be the case, all that can be inferred is that Congress did not intend to *mandate* such obligations for fiduciaries to IRAs.  But nothing in the Code or ERISA suggests that, in exercising its discretion to fashion appropriate exemptions, DOL could not, as it did, condition an exemption on adherence to the impartial conduct standards, including fiduciary standards of prudence and loyalty.  To the contrary, when considered in context, the Code connotes just the opposite.  Notably, under the prohibited transaction provisions, the default is that transactions must be free from conflicted advice, or else the transaction cannot proceed at all.  *See* 29 U.S.C. § 1106; 26 U.S.C. § 4975(c)(2)(A)-(C).  In other words, Congress deemed such transactions so fraught with conflict and the potential for abuse that it prohibited them altogether in both ERISA and the Code.  *See, e.g.*, *Donovan v. Cunningham*, 716 F.2d 1455, 1464-65 (5th Cir. 1983) ("The object of [29 U.S.C. § 1106] was to make illegal per se the types of transactions that experience had shown to entail a high potential for abuse.").[30]  Congress

---

[30] NAFA contends that it is "an absurd and irrational result" that some IRA fiduciaries, by virtue of relying on the BIC Exemption, will be subject to the impartial conduct standards while others will not.  Pl.'s Br. 45 n.22.  But as NAFA concedes, advisers who seek to rely on the BIC Exemption are subject to the impartial conduct standards

(*footnote continued on next page*)

permitted such transactions by way of exemptions *only* if *the Secretary* determined that protections could be put in place, such that, despite the conflicts, the transaction would be in the interest of, and protect the rights of, the retirement investor.  26 U.S.C. § 4975(c)(2)(B)-(C).

That is exactly what the impartial conduct standards aim to do.  In accordance with § 4975, DOL determined that those standards formed the baseline protections that would allow it to grant a broader and more flexible exemption in the BIC Exemption than had previously been granted.  81 Fed. Reg. 21061 ("If the Department were unable to rely on contract conditions and trust-law principles, it would be unable to grant broad relief under this exemption from the rigid application of the prohibited transaction rules.")  By giving DOL discretion to craft exemptions as needed to protect participants and beneficiaries, Congress intended to delegate to DOL the authority to determine what obligations should apply to fiduciaries to IRAs.  Given the statutory requirement for granting an administrative exemption—*i.e.*, that the exemption be in the interest of retirement investors—DOL appropriately exercised its discretion by granting the BIC Exemption on the condition that fiduciaries to IRAs agree in writing to adhere to fiduciary obligations that put investors' interests first.  At the same time, rather than mandate highly prescriptive conditions for the variety of fee practices and investment products (including innovative practices yet to come), DOL relied, in part, on fiduciary standards that have existed for hundreds of years and already apply in the ERISA context to similar transactions.[31]  *See* 81

---

only because their compensation is considered conflicted, *i.e.*, only because they are participating in a prohibited transaction under the Code in the first place.  Where Congress has determined that such transactions are inherently fraught with conflict, it is neither absurd nor irrational to require advisers who wish to engage in such transactions to abide by the impartial conduct standards, while not subjecting to the standards those who refrain from doing so.

[31] Congress took a similar approach when it created a new statutory exemption in the Pension Protection Act of 2006, that allows fiduciaries giving investment advice to individuals (pension plan participants, beneficiaries, and IRA owners) to receive compensation from investment vehicles that they  recommend in certain circumstances.  29 U.S.C. § 1108(b)(14); 26 U.S.C. § 4975(d)(17).  Recognizing the risks presented when advisers receive fees from the investments they recommend, Congress provided constraints that are calibrated to limit the potential for abuse and self-dealing, including requirements for fee-leveling or the use of independently certified computer models.

Fed. Reg. 21026 (noting that application of the same standards promotes uniformity, which aids compliance and avoids investor confusion).

Importantly, nothing in the Rule or related exemptions requires fiduciaries to IRAs to use exemptions, including the BIC Exemption.[32]  Exemptions simply provide a means to engage in IRA transactions otherwise prohibited by § 4975 of the Code.  If fiduciaries to IRAs seek to participate in prohibited transactions, Congress required them to rely on an exemption that mitigates the inherent conflicts of interest and sufficiently protects retirement investors.  In the case of the BIC Exemption, DOL determined, in accordance with statutory requirements, that adherence to the impartial conduct standards is required to meet these congressional aims.  That reasonable determination should be afforded deference, and NAFA's claim challenging the Department's authority should therefore be dismissed.[33]

## C. The Department's Provision in a Conditional Administrative Exemption for Contract Terms that Could Be Enforceable Under State Law Does Not "Create a Private Right of Action"

NAFA's third claim is that DOL, in requiring contracts for entities wishing to rely on the BIC Exemption to advise IRA holders, improperly "creates a private cause of action" not provided by Congress.  *See* Pl.'s Br. 47.  But NAFA mischaracterizes what DOL has done.  The exemption simply provides that a fiduciary who wishes to engage in a transaction otherwise prohibited by ERISA and the Code can do so only if it makes a written commitment to the customer to adhere to the impartial conduct standards, provide basic disclosures, and be subject

---

[32] Fiduciaries to IRAs could avoid having to adhere to all of the conditions of the BIC Exemption by, *inter alia*, applying for individual exemptions tailored to their particular situations.  *See, e.g.*, 81 Fed. Reg. 21061.

[33] There is no basis for NAFA's passing claim that the Rule and exemptions "purport to override state insurance law suitability standards and replace them with new fiduciary standards."  Pl.'s Br. 46 n.24.  As the Department explained, it "crafted the exemption so that it will work with, and complement, state insurance regulations" and it is not the Department's "intent to preempt or supersede state insurance law and enforcement, and that state insurance laws remain subject to the [29 U.S.C. § 1144 (b)(2)(A)] savings clause."  81 Fed. Reg. 21019.

to oversight by a financial institution that does not incentivize the adviser to violate these standards.  In other words, both the firm and the adviser must bind themselves not to let any conflicts of interest taint their advice if they wish to engage in transactions that would otherwise be prohibited.  A contract executed under the exemption will only expose the adviser to whatever causes of action exist under the laws already in existence governing such contracts.  Because the Department has not, in fact, created any new private right of action, this claim fails.[34]

### 1.  No right of action has been "created" as the available actions are preexisting ones under state contract law

Although the courts have recognized limits under which a private right of action may be inferred by the judicial or executive branches, those limits have nothing to do with this case.  *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("[P]rivate rights of action to enforce federal law must be created by Congress."); *id.* (testing Congress's intent by whether the statute "displays an intent to create not just a private right but also a private remedy").  ERISA provides a "detailed enforcement scheme," and the Supreme Court is generally "unwilling[] to infer causes of action in the ERISA context."  *Mertens*, 508 U.S. at 254.  These principles are irrelevant here, however, because DOL has neither "created" a private right nor required an "action to enforce federal law."

To the contrary, DOL has expressly disclaimed any new cause of action.  *See* 81 Fed. Reg. 21060 ("[T]his exemption does not create a cause of action for plan fiduciaries, participants or IRA owners to directly enforce the prohibited transaction provisions of ERISA and the Code

---

[34]  This claim relates only to the portions of the BIC Exemption requiring contracts for transactions involving IRAs. *See* BIC Exemption § II(a).  NAFA does not dispute that fiduciaries to employee benefit plans are already subject to statutory private rights of action.  *See* 29 U.S.C. § 1132(a)(2), (3); BIC Exemption § II(g) (requiring written statements but no contracts for transactions involving employee benefit plans); 81 Fed. Reg. 21020-21 (explaining same).  Accordingly, even if the Court agreed with NAFA on this claim, vacating the contract provision for IRA transactions would not affect rights of action related to employee benefit plans.

in a federal or state-law contract action."). Instead, DOL has simply specified the minimum contract terms for a financial institution to qualify for the BIC Exemption for IRA transactions. *See supra* Stmt. of Facts § III(C)(2); BIC Exemption § II(a), 81 Fed. Reg. 21076-77.[35]

None of these terms has independent operation or enforceability by IRA holders through the Rule or the BIC Exemption. Instead, the terms become enforceable only pursuant to the contract that the financial institution may choose to enter into with the IRA holder. With some regularity, federal agencies specify terms for the private contracts of regulated entities. *See, e.g.*, 14 C.F.R. § 212.3(c) (regulating charter flight providers by requiring written contracts with specific terms to be signed prior to the operation of a flight). But such regulations do not create a private right of action; the only causes of action in all such cases are whatever existing actions are available for violations of those agreements. Indeed, NAFA points to no similar regulation that has been found to create—permissibly or not—a private right of action.

Further evidence that the *Sandoval* standard is not implicated here is the fact that, as even NAFA concedes, the only rights of action at issue in this case are contract claims under state law. *Compare* Pl.'s Br. 47 ("cause of action ... under state law"); *with Sandoval*, 532 U.S. at 286 ("action to enforce *federal* law" (emphasis added)). NAFA simply errs in asserting that the contract provision of the BIC Exemption creates litigation rights "where none currently exist." Pl.'s Br. 20 n.6. Instead, this exemption does not fundamentally alter the existing legal regime or

---

[35] As relevant, a qualifying contract:

- Must state that the financial institution and adviser are fiduciaries with respect to investment advice provided under the contract;
- Must state that the financial institution and adviser will adhere to the impartial conduct standards;
- Must disclose various items, including the types of compensation they expect to receive from third parties;
- May include individual arbitration agreements (with certain limits);
- May restrict punitive damages if permissible under other law; and
- Must not waive or qualify the investor's ability to participate in a class action or other representative action in court.

*See* BIC Exemption § II(a)-(f), 81 Fed. Reg. 21076-79.

the availability of a state law private right of action.

As long as there have been IRA transactions, there have been state law contract claims regarding those transactions. *See, e.g.*, *Knox*, 2016 WL 1735812, at \*4-6; *Abbit*, 999 F. Supp. 2d at 1197-99. Even the cases cited by NAFA—for the proposition that there is no private *federal* cause of action for IRA holders—in turn address *state law* contract claims for those retirement investors. *See Burns v. Del. Charter Guar. & Trust Co.*, 805 F. Supp. 2d 12, 22-25 (S.D.N.Y. 2011) (addressing claim that trust agreement was breached); *Hines v. FiServ, Inc.*, No. 8:08-2569, 2010 WL 1249838, at \*5-6 (M.D. Fla. 2010) (addressing claims for breach of IRA contact). The availability of state law claims flows from the fact that annuities and many other sales transactions, *see* 26 U.S.C. § 4975(c)(1), would generally meet the requirements for a contract. *See* RIA 39 ("An annuity is a contract[.]"); *cf. Henke v. Dep't of Commerce*, 83 F.3d 1445, 1450 (D.C. Cir. 1996) (describing the "essential elements" of a contract). Contracting parties are entitled to bring breach of contract claims under applicable state law, independent of the federal regulatory regime under which the contracts were created—at least unless preempted by federal law. *See, e.g.*, *Nat'l Rehabilitation Hosp. v. Manpower Int'l, Inc.*, 3 F. Supp. 2d 1457, 1459-60 (D.D.C. 1998) (analyzing ERISA preemption and permitting breach of contract claim to proceed against ERISA covered plan by non-plan participant). Thus, DOL's specification of minimum contractual terms to meet the statutory criteria for an exemption, *see* 81 Fed. Reg. 21060, does not subject financial institutions to a new cause of action, let alone a federal one.

### 2. *The contract provision is a reasonable exercise of the Department's statutory authority to create administrative exemptions*

As discussed in the preceding section, DOL is well within its authority to dictate the terms of a "conditional" exemption to the prohibited transaction provisions. *See supra* Arg. § I(B). This broad authority reasonably includes consideration of what contractual terms would

meet the statutory criteria for an exemption, including being "in the interest of ... and protective of" IRA holders and beneficiaries. 26 U.S.C. § 4975(c)(2). DOL explained its action on that basis. *See* 81 Fed. Reg. 21060 ("determin[ing] that the contract requirement ... serves a critical protective function"); *id.* (potential "liability ... [for] fail[ure] to provide advice that is prudent or otherwise in violation of the standards ... [is] a significant deterrent to violations of important conditions under an exemption that accommodates a wide variety of potentially dangerous compensation practices").

Having admitted that "[t]he Department has the right to set conditions for its exemptions," Pl.'s Br. 50, NAFA cannot explain why contract terms are impermissible conditions.[36] Indeed, other exemptions under ERISA and the Code require written agreements. *See* 81 Fed. Reg. 21060 (describing written management agreement required under PTE 84-14, and written instrument setting compensation terms under PTE 2006-16). Moreover, it is not uncommon for federal agencies to provide for private contracts in the process of implementing federal statutes, even where those contracts are not specifically contemplated by the statute.[37]

NAFA has fallen far short of its burden to demonstrate that DOL's exercise of its express authority to issue exemptions becomes impermissible simply because it sets out terms for private contracts. NAFA argues that "the Department's improperly wide definition of 'fiduciary'"

---

[36] NAFA leans far too heavily on congressional silence. It appears to suggest that the governmental enforcement mechanisms Congress created somehow preclude contractual provisions within the administrative exemptions. *See* Pl.'s Br. 49. As discussed above, congressional silence is a thin reed upon which to rely. *See supra* Arg. § I(B). And here, where the Department has express authority to grant administrative exemptions, and where state law regarding insurance is not preempted, *see* 26 U.S.C. § 4975(c)(2); 29 U.S.C. § 1144(b)(2)(A), NAFAs cannot make silence into a dispositive standard.

[37] *See, e.g.,* 47 C.F.R. § 24.238(c); *cf.* 47 U.S.C. §§ 301, 307(FCC's broadband licensing regime restricts certain emissions but permits alternative limits "pursuant to a private contractual agreement of all affected licensees and applicants"); 7 C.F.R. § 1499.11(g); *cf.* 7 U.S.C. § 1736(o) (USDA's Food for Progress Program requires participants to "enter into a contract with each provider of goods, services, or construction work"); 7 C.F.R. § 1493.70(a); *id.* § 7 C.F.R. § 1493.20; *cf.* 7 U.S.C. § 5622 (UUSDA's Export Credit Guarantee Program requires a written sales contract before an exporter can apply for a payment guarantee).

makes the BIC Exemption "the essential exemption needed to sell FIAs." Pl.'s Br. 50. This argument, however, collapses into NAFA's first and second claims about the definition of "investment advice" and the Department's authority to regulate under the Code, both of which have been refuted above. *See supra* Arg. §§ I(A), (B). This claim must be dismissed.

### D. The Term "Reasonable Compensation" in the BIC Exemption is Not Unconstitutionally Vague

NAFA cannot succeed on its fourth claim—that the term "reasonable compensation" in the BIC Exemption violates the Fifth Amendment's Due Process Clause as void for vagueness. Pl.'s Br. 51-53. This provision addresses the evidence of widespread financial incentives that have led financial institutions and advisers, in many instances, to collect higher commissions and other fees than are justified by the benefits provided to retirement investors and to steer such investors to investment products that do not perform as well. *See supra* Stmt. of Facts § II; 81 Fed. Reg. 21029. In light of the statutory basis for the term, the guidance provided by the agency, and the pervasive use of reasonableness in legal standards, it defies common sense that sophisticated outfits such as insurance companies "will be incapacitated" and "at an absolute loss on how to administer" a reasonableness requirement. *See* Pl.'s Br. 53.

A law is not void for vagueness if it "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *id.* at 110 (upholding ordinance where "clear what the [regulation] as a whole prohibits"). *See also Black v. Pritzker*, 121 F. Supp. 3d 63, 85 (D.D.C. 2015) ("A vague rule denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions." (quoting *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993))). Civil statutes are held to a less demanding vagueness standard than criminal statutes. *U.S. Tel. Ass'n v. FCC*, _ F.3d _, 2016

WL 3251234, at *39 (D.C. Cir. June 14, 2016).  Where the challenged rule "regulates business conduct and imposes civil penalties" it "will be found to satisfy due process so long as [it is] sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require."  *U.S. Tel. Ass'n*, 2016 WL 3251234, at *39; *Black*, 121 F. Supp. 2d at 85 ("greater leeway for regulations ... governing business activities").

As an initial matter, it is a tall order for NAFA to show that the use of the adjective "reasonable," which is pervasive in legal and judicial standards, is impermissibly vague. Reasonableness even undergirds the standard for determining constitutional vagueness on which NAFA itself relies.  *See* Pl.'s Br. 52; *Grayned*, 408 U.S. at 108-09 (1972) ("*reasonable* opportunity to know what is prohibited" (emphasis added)).  Courts have ruled that variations of the term "reasonable" are not impermissibly vague in a wide variety of statutes or regulations. *See, e.g.*, *Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 796 F.3d 18, 28 (D.C. Cir. 2015) (holding that definition of "mine fire" to include "smoldering combustion that 'reasonably' might ignite" would enable those "experienced in the industry" to comply); *United States v. Krumei*, 258 F.3d 535, 538 (6th Cir. 2001) ("[A] statute is not void for vagueness merely because it uses the word 'reasonable' or 'unreasonable.'").[38]

The roots of the term "reasonable compensation" go back to the common law.  *See, e.g.*, *Munn v. Illinois*, 94 U.S. 113 (1876) (discussing "reasonable compensation" for common carriers).  It has a longstanding place in the trust law that informs ERISA, and has been in Title I

---

[38] *See also Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*, 613 F.3d 206, 218 (D.C. Cir. 2010); *Groome Res. Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000); *Karlin v. Foust*, 188 F.3d 446, 468 (7th Cir. 1999); *Bristol-Myers Co. v. FTC*, 738 F.2d 554, 560 (2d Cir. 1984); *Taylor v. Housing Auth.*, 267 F.R.D. 36, 45 (D. Conn. 2010); *Sharkey's, Inc. v. City of Waukesha*, 265 F. Supp. 2d 984, 992 (E.D. Wis. 2003); *Pinnock v. Int'l House of Pancakes Franchisee*, 844 F. Supp. 574, 582 (S.D. Cal. 1993).

of ERISA since its passage.  The Uniform Trust Code states that unless the trust specifies otherwise, "a trustee is entitled to compensation that is *reasonable* under the circumstances." Uniform Trust Code § 708(a) (emphasis added); *see also* Restatement 3d of Trusts § 38(1) (2003) ("A trustee is entitled to *reasonable compensation* out of the trust estate for services as trustee" unless the trust specifies otherwise (emphasis added)).[39]  As a result, the term has been widely used by Congress, including in connection with insurance.  For example, the term limits the commissions payable to insurance producers under the National Flood Insurance Program. *See* 42 U.S.C. § 4018(b)(1)(B).  It also limits compensation paid to an underwriting agent servicing aviation insurance for the federal government. *See* 49 U.S.C. § 44308(c)(2).[40]  Indeed, at least one court has specifically upheld the term "reasonable compensation" in the face of a vagueness challenge.  *See, e.g.*, *Asmoro v. Rigstaff Texas LLC*, No. 1:10-1235, 2012 WL 12544554 (D.N.M. Mar. 29, 2012) (state laborer statute).

Turning to DOL's regulation, the BIC Exemption's use of "reasonable compensation" is sufficiently clear for three reasons:  1) it incorporates the longstanding statutory meaning, 2) the exemption's preamble provides relevant factors to consider, and 3) the richness of general usage of the term, described above, confirms its meaningful scope.  The term is at the heart of one of the impartial conduct standards for financial institutions and advisers:

The recommended transaction will not cause the Financial Institution, Adviser or

---

[39] The Restatement lists factors to consider: "trustee's experience, skill, and facilities"; "[l]ocal custom"; "the time devoted to trust duties; the amount and character of the trust property; the degree of difficulty, responsibility, and risk assumed in administering the trust, including in making discretionary distributions; the nature and costs of services rendered by others; and the quality of the trustee's performance." *Id.* § 38 cmt. a, c(1).

[40] The term is used as an exception to the prohibition of self-dealing for officers and employees of national corporations. *See, e.g.*, 36 U.S.C. 170106(d) (limiting distribution of Paralyzed Veterans of America assets to officers and employees of the corporation, but not "prevent[ing] the payment of reasonable compensation to an officer"); 42 U.S.C. § 2996d (similar provision for Legal Services Corporation). *Also see, e.g.*, Internal Revenue Code, 26 U.S.C. §§ 280G, 704, 1366, 4975; and the bankruptcy code, 11 U.S.C. §§ 326-30, 503, 543; *Baker Botts LLP v. ASARCO LLC*, 135 S. Ct. 2158, 2165 & n.2 (2015) (applying "reasonable compensation" standard to attorney's fees in bankruptcy case).

their Affiliates or Related Entities to receive, directly or indirectly, compensation for their services that is in excess of reasonable compensation within the meaning of [29 U.S.C. § 1108(b)(2)] and Code section 4975(d)(2).

BIC Exemption § II(c)(2), 81 Fed. Reg. 21077; *id.* §§ IV(b)(3), (5); VI(c)(2), VII(b)(4).

First, the term is expressly borrowed from longstanding ERISA and Code provisions—unchallenged by NAFA—that have been applied to financial institutions. *See* 29 U.S.C. § 1108(b)(2) (permitting "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor"); 26 U.S.C. § 4975(d)(2) (essentially same).[41]  NAFA cannot demonstrate that a term plain enough for use throughout ERISA becomes unintelligible when included in a private contract.

Second, DOL provided relevant factors to consider in applying the term.  It explained that "[a]t bottom, the standard simply requires that compensation not be excessive, as measured by the market value of the particular services, rights, and benefits the Adviser and Financial Institution are delivering to the Retirement Investor."  81 Fed. Reg. 21029; *id.* 21030 ("[T]he essential question is whether the charges are reasonable in relation to what the investor receives.").  DOL identified "[s]everal factors [that] inform whether compensation is reasonable including, inter alia, the market pricing of service(s) provided and the underlying asset(s), the scope of monitoring, and the complexity of the product."  *Id.* 21030.[42]  Finally, DOL clarified

---

[41] Numerous other ERISA provisions employ the same or a similar standard.  *See* 29 U.S.C. § 1108(b)(6); *id.* § 1108(b)(8); *id.* § 1108(c)(2).  *See also* 29 U.S.C. § 1103(c) ("defraying reasonable expenses"); *id.* § 1108(b)(1), (3), (4) ("reasonable interest rate"); PTE 2006-06, 71 Fed. Reg. 20856, 20861 (April 21, 2006) (exemption for Abandoned Plan Program permits qualified termination administrators to charge accounts certain fees "not in excess of reasonable compensation within the meaning of section 4975(d)(2) of the Code").

[42] This approach is comparable to what other agencies routinely do in defining terms using a list of non-exclusive factors.  *See, e.g.,* 12 C.F.R. § 1230.2 (Federal Housing Finance Agency defining "reasonable and comparable" executive compensation as "appropriate for the position and based on a review of relevant factors including, but not limited to [three sets of factors]").

that the standard does not depend on the ultimate success or failure of the investment, but instead the "on the particular facts and circumstances at the time of the recommendation." *Id.* Taken together with this guidance, the standard provides sufficient "fair warning" to overcome a vagueness objection. *See U.S. Tel. Ass'n*, 2016 WL 3251234, at *39.

NAFA claims it is contradictory that DOL states on the one hand that the term "is a market based standard" but on the other that DOL rejected use of the word "customary" because it "is unwilling to condone all 'customary' compensation arrangements." Pl.'s Br. 52. But there is no contradiction in making clear that while reasonableness will be determined with general reference to the market, not all existing compensation schemes will get a free pass. Although one would generally look to the market to get a sense of what people pay for a particular service, there are other ways in which the fee can be "unreasonable," for instance, if it is for a service that was wholly unnecessary for the particular customer or if obtained through fraud. *See, e.g.*, *Weisler v. Metal Polishers Union & Metal Prod. & Novelty Workers Union 8A-28A*, 533 F. Supp. 209, 216-17 (S.D.N.Y 1982) (upholding arbitrator's decision that compensation was unreasonable when plaintiff paid himself a higher salary after misleading trustees to think he was no longer receiving any salary). This is simply another way of emphasizing that the touchstone is "what the investor receives," 81 Fed. Reg. 21030, not what financial institutions might have successfully charged. While this may not be the "precise guidance" NAFA wishes for, there is no lack of "fair warning" sufficient to prevail on a vagueness challenge. *U.S. Tel. Ass'n*, 2016 WL 3251234, at *39; *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 203 (D.D.C. 2015) ("[T]he vagueness doctrine does not require perfect clarity and precise guidance."); *see also Am. Coal Co.*, 796 F.3d at 28 (upholding regulation even though agency only "provided limited direction" because "an interpretation need not be prolix to avoid

impermissible vagueness").

Finally, in light of the pervasive use of the term, especially in fiduciary relationships in the legal, insurance, and corporate spheres, neither NAFA nor its members can credibly claim that they cannot understand what the term permits and prohibits.  Like the individuals and entities governed by the provisions cited above, and like ordinary people who are governed by a "reasonable person" standard in so many other contexts,[43] NAFAs' members know well how to avoid liability by acting reasonably.  DOL is entitled to summary judgment on this claim.

### E.  The Department Provided a Reasoned Basis to Require Conflicted FIA Transactions to Satisfy the Conditions of the BIC Exemption

NAFA's fifth claim fails because DOL's decision that conflicted FIA transactions must meet the more protective conditions of the BIC Exemption if they are to proceed is based on careful reasoning, reflected in the final rulemaking documents.

Whereas NAFA's first three claims primarily asserted that DOL lacked statutory authority for its action, and the fourth addressed a constitutional claim, this APA claim exclusively alleges that DOL's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Regents of the Univ. of California v. Burwell*, _ F. Supp. 3d _, 2016 WL 706170, at *10 (D.D.C. Feb. 22, 2016).  The court "presume[s] the validity of the agency's action," which a plaintiff "can overcome only by demonstrating that the [action] constitutes a clear error of judgment."  *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002)).  The standard "usually

---

[43] *See, e.g.*, *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627-28 (D.C. Cir. 2001) (invasion of privacy claim); *In re Beltway Law Grp., LLP*, 2015 WL 4456217, at *3 (Bankr. D.D.C. July 20, 2015) (bad faith); *Feirson v. Dist. of Columbia*, 315 F. Supp. 2d 52, (D.D.C. 2004) (Fourth Amendment seizure); *Perez v. Goldin*, 360 F. Supp. 2d 12, 16 (D.D.C. 2003) (disputed contract terms).

boils down to the question of whether the agency action at issue was reasonable and reasonably explained." *Stovic v. R.R. Ret. Bd.*, _ F.3d _, 2016 WL 3457645, at *5 (D.C. Cir. June 24, 2016). "The Court must satisfy itself ... that the agency has "examined the relevant data and has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Regents*, 2016 WL 706170, at *10.  DOL's decision to require conflicted FIA transactions, if they are to proceed, to meet the more protective terms of the BIC Exemption easily meets this standard.

### 1. The Department's determination that conflicted FIA transactions must satisfy the conditions of the BIC Exemption does not impermissibly treat FIAs as securities

NAFA's claim that the BIC Exemption treats FIAs as securities can be quickly dispatched.  The Department did not in fact treat FIAs as securities and violated no federal law in providing for FIA transactions in the BIC Exemption and excluding them from PTE 84-24.

As an initial matter, whether or not FIAs are securities is irrelevant because neither the fiduciary definition in ERISA and the Code, nor the prohibited transaction provisions, turn, in any way, on whether the investment at issue is a security.  In any event, inclusion of FIAs in the BIC Exemption does *not* "effectively classif[y them] ... as securities."  Pl.'s Br. 55.  The BIC Exemption—both as proposed and as finalized—is available for use with a wide variety of products, including those that are not securities.  *See* 81 Fed. Reg. 21014-15 (explaining that the final exemption did not limit the products it could be used for, and the proposal had specifically included "insurance and annuity contracts" along with other products such as "[b]ank deposits, certificates of deposit").  Indeed, DOL observed that FIAs are not generally regulated as securities and did not purport to regulate them as such.  *See* 81 Fed. Reg. 21156.

DOL reached its decision regarding FIAs based on "significant concerns about [their] complexity, risk, and conflicts of interest associated with recommendations," which made FIAs

similar to variable annuities and securities in relevant ways.   81 Fed. Reg. 21157-58.   This decision is supported by case law, which notes that an FIA "is a hybrid financial product that combines some of the benefits of fixed annuities with the added earning potential of a security." *Am. Equity*, 613 F.3d at 168.[44]   For a variety of reasons, FIAs "involve considerations of investment not present in the conventional contract of insurance."   *Id.* at 174.   These include "a variability in the potential return that results in a risk to the purchaser," and an "appeal to the purchaser not on the usual insurance basis of stability and security but on the prospect of 'growth' through sound investment management." *Id.*   Accordingly, after reviewing the public comments, DOL concluded that PTE 84-24 was not sufficiently protective of retirement investors in the case of FIA transactions and that the BIC Exemption could be adapted to better accommodate FIAs.   81 Fed. Reg. 21158.

Moreover, Congressional action regarding securities laws does not impact DOL's authority under ERISA and the Code to regulate retirement investment advice by fiduciaries to tax-favored retirement vehicles.   Congress decided that investment advice to IRA and plan investors regarding both securities and non-securities should be subject to the prohibited transaction rules under both statutes.   *See* 29 U.S.C. § 1106; 26 U.S.C. § 4975.   The provision of the Dodd-Frank Act directing the SEC to treat FIAs meeting certain criteria as exempt from *federal securities laws* has no bearing on DOL's authority to determine under what conditions transactions involving FIAs should be exempt from the *prohibited transaction provisions* of Title I of ERISA and the Code.   Accordingly, NAFA cannot point to any way in which DOL's action "conflicts with another federal law."   *NextWave Pers. Commc'ns Inc. v. FCC*, 254 F.3d 130, 149

---

[44]   The SEC issued a final rule that would have subjected FIAs to additional requirements under the Securities Act of 1933, and the D.C. Circuit upheld the reasonableness of the SEC's rationale for doing so, which included FIAs' appeal and risk to the purchaser.   The Court struck down the rule for failure to sufficiently analyze "efficiency, competition, and capital formation" as required by the Securities Act.   *See id.* at 179.

(D.C. Cir. 2001), *aff'd* 537 U.S. 293 (2003).  While NAFA cites *NextWave*, DOL's action here is a far cry from that agency's cancelling of a broadband license in direct violation of a provision in the Bankruptcy Code.  254 F.3d at 149.  NAFA can identify no "clear command" that DOL has violated.  *Id.* at 155-56.  The fact that a given financial product may be grouped with one set of products under one regulatory regime, and grouped with another set of products under another regulatory regime means no more than that one entity can have two legal obligations at once—a reality that ordinary people confront every day—and hardly rises to the level of an APA violation.

### 2.  *The BIC Exemption does not provide unworkable conditions for insurers involved in FIA transactions*

In attempting to prove that DOL's action is "arbitrary and capricious," NAFA proposes three hurdles that allegedly make "unworkable" the sale of FIAs under the BIC Exemption:  1) that insurers cannot meet the supervisory obligations, 2) that insurers did not receive sufficient notice and may be at a competitive disadvantage if other institutions are permitted to use arbitration clauses or punitive damage waivers, and 3) that insurance agents will have to become registered investment advisers under securities law.  *See* Pl.'s Br. 59-70.  Contrary to NAFA's characterizations, DOL "examined the relevant data and has articulated a satisfactory explanation for its action" in regard to all three issues.  *Regents*, 2016 WL 706170, at *10.

### a.  **Several paths are available to meet financial institution supervisory obligations**

NAFA erroneously asserts that insurance carriers will be unable to supervise "independent insurance-only agents."  Pl.'s Br. 60.  NAFA singles out two BIC Exemption provisions: 1) the financial institution's affirmative statement that it and its adviser will adhere to the impartial conduct standards, and 2) the financial institution's warranty that its procedures are "prudently designed" to ensure such adherence.  *See* BIC Exemption § II(c)(1), (d)(1).  NAFA

claims that no insurance carrier could "ensure that the agent satisfied the Best Interest standard" in part because it would seem to require the carrier to evaluate "every product and all compensation arrangements for all those products" created by other insurance companies but sold by the agents.  Pl.'s Br. 61-62.

This critique is misguided for several reasons.  First, contrary to NAFA's suggestion, nothing in the best interest standard requires the insurance company to scour the market to find the best possible investment option for each customer.  *See* 81 Fed. Reg. 21029.  Instead, what this standard does require is what is required of even common law fiduciaries:  that they act *prudently*, by making recommendations that a knowledgeable investment professional would make and that are in the best interests of the plan participants and IRA holders, and *loyally*, by not prioritizing their own competing financial interests.  NAFA admits that many insurers have supervisory obligations under some state laws, even over independent agents.  *See* Pl.'s Br. 7 ("The NAIC model suitability law ... establishes a system for insurance companies to supervise recommendations to purchase annuities[.]"); *see also* 81 Fed. Reg. 21018 & n.30 (discussing NAIC Model Regulation § 6(F)(1)'s requirement that insurers "establish a supervision system" and "maintain procedures for review of each recommendation prior to issuance").  Yet NAFA disavows any means for its members to ensure that agents exercise prudence and loyalty—to act in the investor's best interest.  If that is correct, then neither investors nor regulators should rely on existing insurer supervision, further supporting DOL's conclusion that the market needs to fundamentally adjust to better serve investors.  *See, e.g.*, 81 Fed. Reg. 20954-56; RIA 105-82.

Second, the supervision that is required is far from unworkable or irrational.  Indeed, NAFA undercuts its own argument that the exemption is "unworkable" by identifying two ways that insurers could adapt—by switching from independent agents to in-house or "captive" agents,

or by working with agents that are both licensed to handle securities and affiliated with a broker or registered investment adviser.   Pl.' Br. 62; Marrion Aff. ¶¶ 32-33, ECF No. 5-3.   These proposals could satisfy the terms of the BIC Exemption.[45]   And NAFA has not proven that "these are not practical solutions."   Pl.'s Br. 62.   There are other possibilities as well.   For example, nothing would prevent the insurer from contracting with a third party, such as an IMO, to take on much or all of the oversight work.   *See* 81 Fed. Reg. 21034.   Alternatively, such IMOs may seek exemptions to become "financial institutions" separately charged with duties under the exemption.   BIC Exemption § VIII(c)(5) (permitting entities to apply for an individual exemption, and creating a mechanism for other entities that meet the same conditions to rely on the new exemption).

Third, DOL anticipated that some current market participants may exit the market or take another role.   *See* 81 Fed. Reg. 21075; RIA 307-312.   But such market adjustments happen even without new regulation.   RIA 309 ("[T]he markets for financial advice, financial products and other financial services are highly dynamic. They are characterized by innovation in both product lines and business models, and by large ongoing shifts in labor and other resources across product and service vendors and business models.").   DOL concluded based on the evidence that most advisers will remain.   *See, e.g.*, RIA 77-78 (reforms in the United Kingdom "did not cause a large exit of advisers" and "some of those that left have since returned").   And, DOL concluded that some disruption of current practices was not only anticipated but necessary given DOL's conclusions, reached after an extended and open rulemaking process, that plan participants and IRA holders are being harmed each and every day by conflicted advice.   *See id.* 166-68.   Some

---

[45] For example, by available estimates, about 60% of the agents are also registered to handle securities.   *See* RIA 103 (survey that 63% of licensed agents are also brokers or registered investment advisers); *cf.* Marrion Aff. ¶ 32, ECF No. 5-3 (survey that "over 40%" of independent agents are not).

additional contraction in the independent distribution channel would not harm investors, especially if offset by better rates and less conflicted advice. *See id.* 169 & n.384; *id.* 102, Fig. 3-4 (noting that independent agents handle only about 18% of the total annuity market, although a larger share of the FIA portion of that market). Thus, the mere fact that some agents might exit the retirement advice market or take another role does not make the rule irrational.

> **b. The Department provided sufficient notice of the optional contract provisions regarding arbitration clauses and punitive damage waivers and those provisions are not arbitrary**

Next, NAFA challenges two contract terms the exemption permits but does not require: arbitration clauses[46] and waiver of punitive damages or rescission.[47]  NAFA complains that, due to the operation of state law, insurers may be unable to include individual arbitration clauses or punitive damages or rescission clauses in their contracts.[48]  Pl.'s Br. 64.  As a result, NAFA speculates that this provision "will likely place [FIAs] at a competitive disadvantage versus securities products."  Pl.'s Br. 65.  This claim is meritless for several reasons.

Most significantly, NAFA's unsupported speculation that insurers could be placed at a "competitive disadvantage"—without even any evidence that its characterization of state law is accurate—does not demonstrate that the BIC Exemption is "unworkable," let alone rise to the level of evidence that DOL's action was irrational.  *See Regents*, 2016 WL 706170, at *13-14. Moreover, that alleged disadvantage would exist regardless of DOL's actions because, on

---

[46]  *See* BIC Exemption § II(f)(3) (prohibiting "[a]greements to arbitrate or mediate individual claims" only to the extent they are "in venues that are distant or that otherwise unreasonably limit the ability of the Retirement Investors to assert the claims safeguarded by this exemption").

[47]  *See* BIC Exemption § II(f)(2) (prohibiting class action waivers or liquidated damages clauses but providing "that, the parties may knowingly agree to waive the Retirement Investor's right to obtain punitive damages or rescission of recommended transactions to the extent such a waiver is permissible under applicable state or federal law").

[48]  NAFA also complains that the BIC Exemption contracts "must be filed for approval with state insurance departments."  Pl.'s Br. 63.  The Department acknowledged comments regarding these possible obligations, and deferred the formal contract requirement to January 2018 to provide additional compliance time.  *See* 81 Fed. Reg. 21070.

NAFA's telling, securities contracts can include these terms and insurance contracts cannot. DOL acknowledged that the law may vary on these matters, *see* BIC Exemption § II(f)(2) ("to the extent such a waiver is permissible under applicable state or federal law"), but it reasonably concluded that where other law permits these provisions they would serve the interest of investors. *See* 81 Fed. Reg. 21042-45; RIA 279-81.

Nor does NAFA have a viable procedural claim that there was a lack of opportunity for public comment. Pl.'s Br. 65. Under the APA an agency must publish a notice of proposed rulemaking that "provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *U.S. Tel. Ass'n*, 2016 WL 3251234, at *10. "The final rule ... need not be the one proposed in the [notice]" but instead "need only be a logical outgrowth of its notice." *Id.* "A final rule is a logical outgrowth if affected parties should have anticipated that the relevant modification was possible." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107 (D.C. Cir. 2014).

With regard to arbitration, the final exemption is, in relevant part, unchanged from the proposal, which had specifically noted that it "would not affect the ability of a Financial Institution or Adviser, and a Retirement Investor, to enter into a pre-dispute binding arbitration agreement with respect to individual contract claims." 80 Fed. Reg. 21973; *see also id.* (stating DOL's expectation that most arbitrations would proceed under FINRA's arbitration procedures and inviting comments regarding "procedures and/or consumer protections that it should adopt" for disputes not covered by FINRA); *see also* Hr'g Tr. 99, 160 (Department inviting discussion of arbitration in the insurance context). NAFA cannot claim lack of notice. Indeed, some insurers submitted comments favoring arbitration. *See* Cmts. 3030 (MetLife), 3058 (State Farm).

The optional punitive damages or rescission waiver readily comes within the logical

outgrowth of the proposed exemption, which generally prohibited waivers of liability.  *See* 80 Fed. Reg. 21985.  Public comments requested clarification that these clauses were permitted, and NAFA was aware of those comments.  *See* Pl.'s Br. 64 (acknowledging SIFMA and FINRA comments).  *See, e.g.*, *Neighborhood Assistance Corp. v. CFPB*, 907 F. Supp. 2d 112, 125 (D.D.C. 2012) (upholding rule where "interested parties ... read the proposed rule, saw the possibility of new exemptions, and wrote to the agency requesting them" but plaintiff "did not provide a comment advocating for an exemption on its own behalf").  The final exemption reduced the scope of that prohibition by providing that such waivers were prohibited only to the extent that other laws prohibited them, thus ensuring that DOL's exemptions worked with and complemented other consumer protection laws.  Regardless, where commenters addressed the issue, any defective notice was at most harmless error.  *See Allina Health Servs.*, 746 F.3d at 1110 ("Even if a final rule were regarded objectively as an abrupt departure from a proposed rule, if parties directed comments to such a denouement, it might well be properly regarded as a harmless error[.]").

### c.  The prudent advice requirement does not conflict with the circumscribed role of an insurance agent

NAFA's final workability argument again singles out insurance-only agents.  NAFA proposes that the prudence requirement of the best interest standard could entail more comparative investment advice than is permitted under some states' laws for agents who are not also registered to sell securities.  Pl.'s Br. 68-69.  NAFA suggests that this may require all insurers and independent agents to register to be able to sell securities.  *Id.*  This argument misapprehends both the scope of the prudence requirement and state law.  Properly considered,

there is no conflict between the standards.[49]

As an initial matter, DOL has made clear that the fiduciary role under ERISA and the Code is distinct from fiduciary status under federal or state securities law.  *See* 81 Fed. Reg. 21026 ("The Department does not ... require the Adviser or Financial Institution to acknowledge fiduciary status under the securities laws, but rather under ERISA or the Code or both").  Accordingly, for insurance agents to hold themselves out as fiduciaries under the ERISA and Code provisions should not, of itself, subject them to additional regulation under state law.  Nor does the Rule or exemptions "preempt or supersede state insurance law and enforcement."  81 Fed. Reg. 21019; *cf.* 29 U.S.C. § 1144 (b)(2)(A).

Likewise, the best interest standard is not "unattainable" for the agent or financial institution.  The prudence prong requires the adviser to:

> act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, based on the investment objectives, risk tolerance, financial circumstances, and needs of the Retirement Investor.

BIC Exemption § VIII(d); 81 Fed. Reg. 21083.  DOL made clear that this does not require the agent to "somehow identify the single 'best' investment for the retirement investor out of all the investments in the national or international marketplace, assuming such advice were even possible."  81 Fed. Reg. 21029.  Instead, in a nutshell, "the advice fiduciary's obligation under the Best Interest standard is to give advice that adheres to professional standards of prudence, and to put the Retirement Investor's financial interests in the driver's seat, rather than the

---

[49]  NAFA also attacks the revised PTE 84-24 in a footnote and seeks its vacatur on the same grounds.  Pl.'s Br. 70.  This alternative claim does not appear in NAFA's complaint and should be considered waived.  *See Montanans For Multiple Use v. Barbouletos*, 568 F.3d 225, 229 n.1 (D.C. Cir. 2009).  Moreover, a terse footnote does not provide a sufficient basis to challenge a separate regulatory action, especially where that action is an exemption on which NAFA otherwise professes a desire to rely.  *See Nat'l Oilseed Processors Ass'n v. OSHA*, 769 F.3d 1173, 1184 (D.C. Cir. 2014); *Vasser v. McDonald*, 72 F. Supp. 3d 269, 283 (D.D.C. 2014).

competing interests of the Adviser or other parties." *Id.* An insurance agent remains free to advise about and sell only insurance, provided that professional standards of prudence are met. *See* 81 Fed. Reg. 21028-29 ("[T]he prudence standard ... is an objective standard of care that requires investment advice fiduciaries to investigate and evaluate investments, make recommendations, and exercise sound judgment in the same way that knowledgeable and impartial professionals would."). Indeed, DOL has even provided for an agent to recommend exclusively "proprietary products," so long as certain additional conditions are met. *See* BIC Exemption § IV, 81 Fed. Reg. 21081; *id.* § VIII(l) (defining such products to mean those "managed, issued, or sponsored by the Financial Institution or any of its Affiliates"). In sum, "the Department has crafted the exemption so that it will work with, and complement, state insurance regulations," to which the financial institution and agent are already required to adhere. 81 Fed. Reg. 21019.

NAFA points to an advisory bulletin issued by the Iowa Commissioner of Insurance in support of its position that the conditions of the BIC Exemption will conflict with state law requirements. This document is of limited utility.[50] And even if the bulletin could be assumed to both accurately reflect Iowa law and be representative of other laws nationwide, its prohibitions do not conflict with the prudence standard. The standards quoted by NAFA emphasize that "specific" advice regarding securities crosses the line. *See* Pl.'s Br. 68 ("comparing the consumer's *specific* securities ... with other financial products," "recommending *specific*

---

[50] *See* Pl.'s Br. 68 (citing Iowa Securities Bulletin 11-S-1 (June 24, 2011)). This document does not appear to be in the administrative record. Because NAFA relies on it to challenge the reasonableness of the Department's action, it should not be considered unless it meets the standard for extra-record materials, which it does not. *See Banner Health v. Burwell*, 126 F. Supp.3d 28, 61 (D.D.C. 2015). Moreover, insurance bulletins generally do not have the force of law. *See, e.g.*, Mo. Rev. Stat. § 374.015.4 (2015) (insurance "[b]ulletins do not have the force or effect of law and shall not be considered statements of general applicability that would require promulgation by rule"); *Am. Tr. Admins., Inc. v. Sebelius*, 44 P.3d 1253, 1259-60 (Kan. 2002) (treating insurance bulletins as lacking force of law).

allocations ... between insurance and securities products" (emphasis added)).  And nothing in the prudence standard requires that an insurance agent provide specific advice about securities.  It simply requires an adviser to act like a prudent person "acting in a like capacity and familiar with such matters" would.  *Id.* 67.  In the case of an insurance-only agent, it would hardly be prudent for him to advise on securities matters for which he is not even licensed, and, as discussed above, the best interest standard does not require him to do so.  Rather, an insurance-only agent would need to be clear with the consumer about the restricted scope of the recommendation and make a prudent recommendation regarding an insurance product in the context of the consumer's overall portfolio, investment needs and objectives.  Such obligations can clearly be satisfied within the contours of the "permitted activities for an insurance-only person" described in the bulletin.[51] This exemption has not made it "impossible" to remain an insurance-only agent.  Pl.'s Br. 60.

### 3. *The Department provided sufficient notice for its action and a reasoned basis for requiring conflicted FIA transactions to adhere to the conditions of the BIC Exemption*

Woven throughout NAFA's arguments is the notion that, despite the extended and open process it employed, the Department failed to provide sufficient notice or a reasoned basis for excluding FIAs from PTE 84-24.  *See* Pl.'s Br. 58-60, 62, 65-66, 70.  But FIAs' eligibility for the BIC Exemption was never in doubt.  *See* 80 Fed. Reg. 21975.  And the Department both sought comment on the balance to strike in applying PTE 84-24 and the BIC Exemption respectively and explained the basis for its ultimate decision.  Accordingly, this claim fails.

---

[51]  NAFA also suggests that a 2015 DOL Bulletin on "economically targeted investments" (29 C.F.R. 2509.2015-01) demonstrates that more is demanded of insurance agents than state law permits.  As an initial matter, that Interpretative Bulletin is not directly applicable because it concerns management fiduciaries, a different prong of the fiduciary standard.  Regardless, the Bulletin does not support NAFA's posited conundrum.  It addresses prudence in the particular context of a management fiduciary selecting among otherwise equal investments based on economic benefits apart from their investment return to the plan.  Nothing in the Bulletin or in § 1104's prudence standard requires a fiduciary who only has responsibility over a certain portion of a plan's portfolio to engage in an inquiry of investments alternatives outside purview of its responsibilities.

The Department provided adequate notice.  DOL's 2015 proposal, which tentatively drew the line for products that could continue to use PTE 84-24 between variable and fixed annuities, expressly invited comment regarding whether the BIC Exemption was feasible for "insurance and annuity contracts that are not securities" and whether shifting variable annuities out of PTE 84-24 "strikes the appropriate balance."  80 Fed. Reg. 22015; *see also id.* 21975 ("[W]e ask whether we have drawn the correct lines between insurance and annuity products that are securities and those that are not[.]").  And NAFA and other market participants demonstrated their awareness of the possibility that the Department might shift FIAs out of PTE 84-24 when they used their comments to recommend for and against such an action.  *See* Cmts. 762, 3111 (NAFA); *see also* Cmts. 180, 718, 774, 3124.  Accordingly, NAFA was on notice and DOL's treatment of FIAs is well within the logical outgrowth of the proposals.  *See Allina Health Serv.*, 746 F.3d at 1110 (noting that "if parties directed comments to such a denouement, it might well be properly regarded as a harmless error" and especially "[i]f the petitioner itself made such a comment, it would presumably be hoist on its own petard"); *id.* ("[T]he concepts of logical outgrowth and harmless error merge if the final rule is, in fact, anticipated, whether or not that anticipation was objectively foreseeable."); *see also Select Specialty Hosp.-Akron v. Sebelius*, 820 F. Supp. 2d 13, 23 (D.D.C. 2011) ("The whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different—and improved—from the rules originally proposed by the agency.").  This is far from the situation where "the final rule was surprisingly distant from the proposed rule" such that "interested parties would have had to divine the agency's unspoken thoughts."  *Agape Church, Inc. v. FCC*, 738 F.3d 397, 411 (D.C. Cir. 2013).

Moreover, DOL provided a well-reasoned basis for requiring FIA transactions to adhere

to the conditions in the BIC Exemption.  DOL concluded that the risks and complexities of FIAs are sufficiently similar to variable annuities, mutual funds, and other investments to make the same safeguards appropriate.  81 Fed. Reg. 21018.  DOL also concluded that the conflicts of interest in FIA sales are greater than those for the comparatively simpler fixed annuities.  *See* 81 Fed. Reg. 21017-18; RIA 283-86.  DOL determined that a level playing field for variable annuities, indexed annuities, and mutual funds was important to "avoid[] creating a regulatory incentive to preferentially recommend indexed annuities."  81 Fed. Reg. 21018.  And finally, DOL took into account the numerous public comments and adapted the BIC Exemption to address concerns about its workability for insurance products, including FIAs.  *See supra* Stmt. of Facts § III(C)(2), (3); 81 Fed. Reg. 21018; RIA 224-231, 251-252 (Figure 5-17).

DOL's conclusions are well-justified.  DOL explained in detail the ways in which FIAs "are complex products requiring careful consideration of their terms and risks," listing the host of relevant considerations,[52] and concluding that customers can easily misunderstand, overestimate, or underestimate many of these issues.  81 Fed. Reg. 21018; *id.* 21017 (quoting FINRA publication stating that FIAs "are anything but easy to understand"); *see also* RIA 117-119, 122-126, 138-140.  In sum, retirement investors "are acutely dependent on sound advice that is untainted by the conflicts of interest posed by Advisers' incentives to secure the annuity

---

[52] Specifically, the Department explained that one would need to understand:

> surrender terms and charges; interest rate caps; the particular market index or indexes to which the annuity is linked; the scope of any downside risk; associated administrative and other charges; the insurer's authority to revise terms and charges over the life of the investment; the specific methodology used to compute the index-linked interest rate; and any optional benefits that may be offered, such as living benefits and death benefits. In operation, the index-linked interest rate can be affected by participation rates; spread, margin or asset fees; interest rate caps; the particular method for determining the change in the relevant index over the annuity's period (annual, high water mark, or point-to-point); and the method for calculating interest earned during the annuity's term (e.g., simple or compounded interest).

81 Fed. Reg. 21018.

purchase, which can be quite substantial." *Id.* 21018.

As for risk, NAFA incorrectly understates the risks involved in FIAs. Principal can be lost if the annuity is cancelled early, due to surrender charges and tax penalties. *See* 81 Fed. Reg. 21017-18. And insurers' guarantee that "the rate [of return] will never fall below zero," Pl.'s Br. 4, does not preclude loss of value due to inflation. Indeed, the D.C. Circuit recognized that "[i]n FIAs, as in securities, there is a variability in the potential return that results in a risk to the purchaser." *Am. Equity*, 613 F.3d at 174; *see also* RIA 123. Furthermore, contrary to NAFA's claim, FIAs do not "function in all ... respects the same as fixed declared rate annuities" "[a]side from the manner in which interest is determined and credited." Pl.'s Br. 5. In practice, FIAs tend to have more varied and complex features and are more likely to be marketed in competition with investments such as mutual funds, rather than as guaranteed investment streams. *See* RIA 124-26, 282-286; 81 Fed. Reg. 21086-88 (comparing different types of deferred annuities). The complexity of FIAs exacerbates their risks because consumers more often misapprehend the degree to which they are taking on risk.

Several other factors support DOL's action. DOL was concerned about inconsistent regulation of FIAs. *See* 81 Fed. Reg. 21018; RIA 285. While NAFA trumpets the NAIC standards, not all states have adopted them, and state insurance laws are not uniform or consistent, leaving consumers facing uneven protections and confusion. *See* RIA 35, 41-42, 111; *see also* 81 Fed. Reg. 21156 (noting comment that "IRA owners need greater protections when investing in indexed annuities precisely because such products are not regulated as securities"). By raising FIA sales in connection with plans and IRAs to a uniform standard, DOL leveled the playing field for variable annuities, FIAs, and mutual funds. *See* RIA 285. And as discussed extensively above, the entire regulatory effort in this regard is driven by the extensive conflicts

of interest at work in the FIA distribution channel, which are directly harming retirement investors. *See, e.g.*, RIA 121-123, 130-132, 138-140, 282-286, 302. These pervasive conflicts are the reason that the contract provisions of the BIC Exemption offer investors significantly more protection than the lesser protections of PTE 84-24. RIA 282-286.

Finally, DOL provided an extensive explanation of the changes it made to the proposed BIC Exemption, many of them in order to better accommodate insurance products. *See supra* Stmt. of Facts § III(C)(2). DOL eliminated certain disclosure and recordkeeping requirements, revised the definition of "reasonable compensation," clarified that the contract terms could appear in the insurance application or insurance contract, crafted provisions ensuring that providers of proprietary products can rely on the exemption and provided a special best interest test for those providers, and provided a number of clarifications in the preamble to address concerns raised by insurers. *See id.* On the basis of these and other changes, DOL concluded that it had addressed the principal concerns of the insurance industry regarding the exemption.[53]

DOL's extensive and careful consideration of the many facets of the Rule stands in marked contrast to the situation in the case upon which NAFA primarily relies. In *Association of Private Sector Colleges & Universities*, the agency eliminated an existing compensation "safe harbor" based on a single sentence describing the problem and its conclusion that the provision "could be exploited," without citation to evidence in the record. *See* 681 F.3d at 448 ("[T]he [agency] points to nothing in the record to support these assertions."); 75 Fed. Reg. 66832,

---

[53] NAFA complains that the Department did not specifically analyze "how the distribution methods and channels relating to FIAs would fit within" the BIC Exemption or how the inclusion of FIAs "would impact the FIA industry." Pl.'s Br. 58. But the Department actually did take the circumstances of the insurance industry into account. *See, e.g.*, RIA 285 (comparing the industry's cost under PTE 84-24 versus the BIC Exemption); 81 Fed. Reg. 21067 (considering options for marketing intermediaries); *id.* 21018 (explaining revisions made to ensure "the conditions ... are less burdensome and more readily complied with by ... insurance companies and distributors of insurance products"); *id.* 21030 (discussing the standard for proprietary products "particularly insurance and annuity contracts"). *see also supra* Stmt. of Facts § III(C)(2).

66874 (Oct. 29, 2010).[54]  But here, there is ample record support for DOL's conclusions.  *See*

*supra* Stmt. of Facts § III(C).  Moreover, as set out in this section, the decision to exclude FIAs

from PTE 84-24 has received far more than a "brief explanation."  *See* 681 F.3d at 448.

NAFA's criticism of the cost benefit analysis is similarly misplaced.  DOL considered

and acknowledged that "[a]dvisory firms' responses to the final rule and exemptions (and to

related changes in consumer demand and competition) ... may involve frictional costs and have

distributional effects."  RIA 311.  DOL determined, however, that "any frictional cost ... will be

justified by the rule's intended long-term effects of greater market efficiency and a distributional

outcome that favors retirement investors over the financial industry."  *Id.* 309.  NAFA cites no

authority demonstrating that DOL's analysis is inadequate.[55]  Given that DOL asked the

insurance industry for statistical information that the industry was unable or unwilling to provide,

DOL can hardly be faulted for failing to make precise calculations concerning the effect of

various alternatives on FIAs.  *See* RIA 169 n.385, 237-38.  NAFA does point the Court to the

observation that "[n]o regulation is 'appropriate' if it does significantly more harm than good."

Pl.'s Br. 70 (quoting *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015)).[56]  Here, DOL has

demonstrated that the Rule and exemptions will substantially benefit investors and that these

---

[54]   The D.C. Circuit remanded the rule to the agency without vacating it "to allow it to explain its decision to eliminate this specific safe harbor."  681 F.3d at 448.

[55]  NAFA cites *American Equity* for the notion that a thorough impact analysis is required.  Pl.'s Br. 60.  *American Equity* has no direct relevance to this claim because that case turned on the SEC's unique statutory obligations which are not present here.  *See* 613 F.3d at 177-79; *cf. Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 447-48.  Regardless, the Department conducted a thorough impact analysis.  *See generally* RIA.

[56]  While the proposition cited is commonsensical, *Michigan* has no direct application here.  In that case, the EPA relied on a statute permitting regulations only if it was "appropriate and necessary after considering the results of the study."  *See* 42 U.S.C. § 7412(n); 135 S. Ct. at 2705.  But here, the Department relies on direct statutory authority to create administrative exemptions provided they meet certain criteria.  *See* 29 U.S.C. § 1108(a)(1)-(3); 26 U.S.C. § 4975(c)(2).  Thus, unlike *Michigan*, the Department has no judicially enforceable obligation rooted in the statutory scheme to conduct a cost benefit analysis.  The analysis the Department conducted complied with the Regulatory Flexibility Act, see infra Arg. § I(F), and Executive Order 12866.  *See* 81 Fed. Reg. 20993.

benefits far outweigh the cost to the financial industry, including the insurance industry. *See* RIA 326-328. In sum, DOL's actions are neither arbitrary nor capricious nor violative of the APA's notice-and-comment requirements, and this claim should be denied. *See City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) ("We must uphold an agency's action where it has considered the relevant factors and articulated a rational connection between the facts found and the choice made.").

## F.  The Department Complied with the Regulatory Flexibility Act

The sixth count of NAFA's complaint alleges that Department did not comply with the Regulatory Flexibility Act, 5 U.S.C. §§ 601 *et seq.* ("RFA"), by failing to adequately consider the economic burden of the Rule on "small businesses, particularly IMOs and insurance agents." Compl. ¶¶ 151-154. This claim lacks merit and should be dismissed.

The RFA requires agencies to "assess the impact of their regulations on small businesses." *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001). Among other things, the RFA requires that, when a Rule is promulgated after a mandatory notice of proposed rulemaking, "the agency shall prepare a final regulatory flexibility analysis" with descriptions of specific aspects of the rule, the compliance requirements, and the steps the agency has taken to minimize the impact on small entities. 5 U.S.C. § 604(a); *see, e.g.*, *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). Judicial review is "highly deferential, particularly with regard to an agency's predictive judgments about the likely economic effects of a rule." *Helicopter Ass'n Int'l v. FAA*, 722 F.3d 430, 438 (D.C. Cir. 2013). The Court reviews agency compliance with the RFA "only to determine whether an agency has made a reasonable, good-faith effort to carry out [the RFA's] mandate," which "is a procedural rather than substantive agency mandate." *Alenco Commc'ns v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000).

DOL performed a complete analysis and thus met the RFA's requirements. That analysis

is summarized in the preambles to the Rule and the BIC Exemption, and laid out in more detail in Chapters 5 and 6 of the final RIA, with cross-references to other portions of the RIA.  *See* 81 Fed. Reg. 20993-94, 21002, 21074-75; RIA § 6.  It is undisputed that DOL met the requirements of § 604(a)(1), (3) and (4) by stating the need for the Rule, addressing comments filed by the Small Business Administration (SBA), and estimating the number of small entities to which the Rule would apply.  *See* RIA §§ 6.1, 6.2, 6.4.  Because almost all of the entities affected by the rule meet the SBA's "small entities" definition, *see id.* § 6.2, much of the discussion throughout the RIA is relevant to the RFA analysis.  Contrary to plaintiff's claim, DOL satisfied § 604(a)(2) by identifying the significant issues raised in public comments and cross-referencing its discussions of those comments and changes made as a result.  *See* RIA § 6.3.  DOL satisfied § 604(a)(5) by describing the recordkeeping, reporting, and compliance requirements.  *See* RIA § 6.5.  And finally, DOL satisfied § 604(a)(6) by cross-referencing its prior discussion of the actions taken to minimize the economic impact on small entities through changes to the proposal and by discussing why significant alternatives were rejected in favor of the Rule.  *See* RIA §§ 5.3.1, 6.6, 7.  By addressing each aspect of the RFA criteria, DOL has met its RFA obligations.  *See Nat'l Tel. Coop. Ass'n*, 563 F.3d at 540 (noting that "the Act's requirements are purely procedural" and merely "requires agencies to publish analyses that address certain legally delineated topics" (citations and alterations omitted)).  "If an agency makes a 'reasonable, good-faith effort to carry out RFA's mandate,' then its decision will stand."  *Fla. Bankers Ass'n v. Dep't of Treasury*, 19 F. Supp. 3d 111 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015) (quoting *U.S. Cellular Corp.*, 254 F.3d at 88).

NAFA claims that DOL failed to comply with three aspects of the RFA requirements.  First, it claims that DOL did not provide a "statement of the assessment of the agency" of the

"significant issues raised by the public comments in response to the initial regulatory flexibility analysis." Pl.'s Br. 72 (quoting § 604(a)(2)).[57] This is incorrect. DOL identified three significant issues raised by organizations representing small businesses and cross-referenced its prior discussion of those comments and changes made as a result. *See* RIA §§ 2.9.1, 2.9.2.1, 6.3. In addition, other portions of the RIA provide extensive assessments of relevant comments. *See, e.g.*, *id.* §§ 7.4, 7.5, 7.7-7.10, 7.12 (assessing comments regarding BIC Exemption in discussion of alternatives).[58] Accordingly, DOL's assessment meets the RFA criteria. *Cf. Little Bay Lobster Co. v. Evans*, No. 00-007, 2002 WL 1005105, at *30 (D.N.H. May 16, 2002) (upholding analysis that provided "adequate responses" to public comments).

Second, plaintiff claims that DOL did not specifically describe compliance requirements "for agents and IMOs that sell FIAs." Pl.'s Br. 72. NAFA misreads the RFA in proposing that the description of compliance requirements must be tailored to each variety of small entity. Instead, this RFA provision is satisfied by (1) providing a general "description of the projected reporting, recordkeeping and other compliance requirements of the rule" and (2) including an estimate of "the classes of small entities that will be subject to the requirement[s]." 5 U.S.C. § 604(a)(5).[59] Here, plaintiff does not dispute that DOL described the disclosure and reporting requirements for each aspect of the Rule and exemptions. *See* RIA § 6.5. And DOL had already

---

[57] In full, this provision requires "a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments." 5 U.S.C. § 604(a)(2).

[58] The RFA does not require the analysis to follow the regulation step-by-step or to be complete in isolation from other required analyses. *See* 5 U.S.C. § 605(a) (RFA's requirements can be met "in conjunction with or as a part of any other ... analysis required by any other law"); *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 96 (D.D.C. 2007) (upholding as "reasonable, good faith effort" an agency's "attempt at almost step-by-step compliance with the statute"); *Assoc. Fisheries of Maine v. Daley*, 127 F.3d 104, 115 (1st Cir. 1997) (refusing to "disregard [an] otherwise compliant analysis simply because it is not ensconced in a specific format").

[59] "[A] description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record." 5 U.S.C. § 604(a)(5).

concluded that almost all entities affected came within the "small entity" category. *See* RIA § 6.2. Finally, DOL satisfied the class estimate requirement by identifying "insurance companies and agents" as entities subject to the requirements, *see* RIA § 6.2 at 254 ("[s]mall service providers affected by this rule include ... insurance companies and agents, ... and others providing investment advice to plan and IRA investors"); *id.* § 6.5 at 258 ("anticipat[ing] that BDs and insurers will be most impacted by the final rule and exemptions"); *id.* §§ 5.2.3, 5.2.4, and observing that each entity was likely to either forgo conflicted fee structures or take advantage of one of the exemptions. *Id.* § 6.5 at 258. Taken in combination with its explanation of the overall compliance requirements, this satisfies § 604(a)(5)'s requirements. *Cf. Nat'l Ass'n of Mortgage Brokers v. Bd. of Governors of Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 179 (D.D.C. 2011) (finding RFA satisfied where agency "addressed the effects of all of the Rule's prohibitions ... collectively" without singling out the provision challenged by plaintiff); *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 95 ("What is required of the agency is not perfection, but rather a reasonable, good-faith effort to take those steps[.]").

Finally, plaintiff claims that DOL did not meet § 604(a)(6)'s requirement that an agency describe the steps "taken to minimize the significant economic impact on small entities consistent with the stated objectives of the applicable statutes," including the "reasons for selecting the alternative adopted in the final rule."[60] *See* Pl.'s Br. 72. With regard to alternatives, plaintiff appears to disregard the entire section of the RIA dedicated to assessing the alternatives. *See generally* RIA § 7.[61] As for the steps taken to minimize impact on small

---

[60] "[A] description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected[.]"  5 U.S.C. § 604(a)(6).

[61] *See, e.g., id.* § 7.4 at 268-71 (discussing disclosure alternative); *id.* § 7.7 at 273-79 (discussing cost savings from
(*footnote continued on next page*)

entities, DOL specifically cross-referenced the discussion of the changes made to the proposed rule. *See* RIA § 6.6 (citing § 5.3.1). Taken together, the discussion of alternatives and the explanation for the changes made to the proposed rule, along with the discussion throughout the RIA of how this Rule and these exemptions meet the "stated objectives of the applicable statutes," amply satisfy § 604(a)(6)'s requirements. *Cf. Nat'l Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 143 (D.D.C. 2002) (RFA satisfied where the administrative record "shows that [the agency] gave explicit consideration to ... alternatives that were less onerous *and* more onerous than the final ... Rule"); *Blue Water Fisherman's Ass'n v. Mineta*, 122 F. Supp. 2d 150, 178 (D.D.C. 2000) (RFA satisfied even though agency "did not give in depth consideration to every alternative" because "the RFA requires only that agencies consider alternatives that would accomplish the stated objectives" of the relevant statute).

In sum, the Department "addressed all of the legally mandated subject areas." *Nat'l Tel. Coop Ass'n*, 563 F.3d at 540. "The RFA requires no more." *Alenco Commc'ns*, 201 F.3d at 625. Count VI of plaintiff's complaint should therefore be dismissed.

## II. FOR ADDITIONAL REASONS, NAFA IS NOT ENTITLED TO A PRELIMINARY INJUNCTION

"[P]reliminary injunctions constitute extraordinary remed[ies] that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (power to issue injunctive relief "should be 'sparingly exercised'"). To obtain injunctive relief, the moving party must establish: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if

---

modification of contract exemption); *id.* § 7.10 at 282-86 (discussing alternative of leaving FIAs in PTE 84-24).

the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction. *Chaplaincy,* 454 F.3d at 297.  Although courts have "long evaluated these factors on a sliding scale," this Court has noted that the Supreme Court's decision in *Winter v. Nat'l Resources Defense Council, Inc.*, 555 U.S. 7 (2008), might impose a "'more demanding burden' under which 'a likelihood of success is an independent, freestanding requirement for a preliminary injunction.'" *Ass'n of Reptile Keepers*, 103 F. Supp. 3d at 140-41 (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011)).[62]

### A.  NAFA Has Not Demonstrated A Likelihood of Success of Any of its Claims

For the reasons discussed above, NAFA cannot prevail on the merits of the six claims asserted in its complaint, and the Department is entitled to summary judgment.   In the preliminary injunction portion of its brief, NAFA asserts a claim not present in its complaint, that "the applicability date itself is arbitrary."  Pl.'s Br. 86.  The Court should not reach this claim. *See Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36 (D.C. Cir. 2016) (APA argument not raised in complaint was waived).[63]  To the extent the Court does, the claim fails.  As explained above, *supra* Stmt. of Facts § III(C)(5), the public comments requesting a longer period for

---

[62] Even in the unlikely event that NAFA could obtain an injunction as to its own compliance with any provisions of the Rule or exemptions, NAFA would not be entitled to an injunction concerning anyone else, much less the broad injunction it seeks to preclude DOL from implementing the Rule and exemptions altogether.  *See* Compl. ¶ 155. The APA preserves all of the ordinary principles of equity, 5 U.S.C. § 702(1), and one such principle is that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2760 & n.5 (2010).  Thus, any injunction in this case could be no broader than what would be needed to address NAFA's particular injuries in this case.  Nor would a permanent injunction be appropriate even if NAFA were to succeed on the merits.  *See Winter*, 555 U.S. at 33.  That standard mirrors that for a preliminary injunction except that actual success on the merits is required, not likelihood of success.  *Id.*

[63] *See also Montanans For Multiple Use v. Barbouletos*, 568 F.3d 225, 229 n.1 (D.C. Cir. 2009) (refusing to consider "arbitrary and capricious" argument where "plaintiffs did not develop that argument in their brief, and the complaint does not include such a cause of action"); *Veloxis Pharm., Inc. v. FDA*, 109 F. Supp. 3d 104, 122 (D.D.C. 2015) (holding claim not "even alluded to in the plaintiff's complaint" or raised with agency was waived); *Morrison v. Sec'y of Defense*, 802 F. Supp. 2d 6, 12 n.3 (D.D.C. 2011) (claim not raised in complaint was waived).

compliance generally expressed concerns with meeting the conditions of the new and amended prohibited transaction exemptions rather than with the final rule itself.  RIA 292; *see also* 81 Fed. Reg. 20992-93.  DOL therefore determined, in light of competing policy concerns, that a year from the date of publication provided adequate time for affected entities to adjust to the basic change from non-fiduciary to fiduciary status and that the additional nine-month transition period would provide sufficient time for the industry to come into full compliance with the additional conditions in the exemptions.  RIA 292.  Given DOL's considered and reasoned determination, there is no basis for NAFA's claim that the applicability dates were arbitrarily selected.[64]

Because NAFA cannot demonstrate likelihood of success on the merits, its motion for a preliminary injunction must fail.  *See Ass'n of Reptile Keepers*, 103 F. Supp. 3d at 141 (even if this prong is not "an independent, free-standing requirement for a preliminary injunction," it is at least "a key issue and often the dispositive one").  Even if NAFA could establish a substantial likelihood of success on the merits, NAFA's motion for a preliminary injunction should also be denied because NAFA does not meet the other requirements for a preliminary injunction.

## B.  NAFA Has Not Demonstrated Irreparable Harm from the Department's Carefully Calibrated Rule that Requires Investment Advice to Be in the Best Interest of Retirement Investors

Because NAFA has "fail[ed] to demonstrate a likelihood of success on the merits of its claims, to obtain a preliminary injunction[,] [NAFA] must provide an overwhelming showing that it will suffer irreparable harm absent immediate court intervention."  *LG Elecs. U.S.A., Inc.*

---

[64] NAFA asks the Court to look to the two year period adopted by the SEC in its 2009 rulemaking regarding whether FIAs should be regulated as securities rather than exempted from such regulation as "annuity contracts."  Pl.'s Br. 86.  Aside from the fact that it is not apparent that the SEC's rulemaking is necessarily analogous to DOL's here, the SEC's period was justified by securities considerations not present here, *e.g.*, "preparing registration statements," and the SEC also planned to use the period to issue additional regulations and guidance.  *See* 74 Fed. Reg. 3158 (Jan. 16, 2009).  Regardless, the Department is entitled to conduct its own balancing of the burden on financial institutions and the harm to consumers.

*v. Dep't of Energy*, 679 F. Supp. 2d 18, 35 (D.D.C. 2010).  The preliminary relief NAFA requests, however, will have no immediate effect because NAFA asks the Court to "stay[] applicability of the Rule until this litigation is concluded," Pl.'s Br. 88, but the Rule does not apply until April 2017, and there is no reason to believe this litigation will not be concluded before that date.[65]  For that reason alone, NAFA's motion for a preliminary injunction should be denied.  Moreover, where NAFA's allegations consist solely of economic harm—a type of harm rarely sufficient for preliminary injunctive relief—that is also speculative and remote, NAFA has failed to carry its burden of establishing irreparable harm.

The D.C. Circuit "has set a high standard for irreparable injury."  *Chaplaincy,* 454 F.3d at 297.  The movant must prove that the harm is "*certain, great and actual*—not theoretical—and *imminent,* creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt,* 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (emphasis in original). "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur."  *Wis. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir.1985) (same). Accordingly, "[t]he movant must provide proof ... indicating that the harm is certain to occur in the future ... [and] that the alleged harm will directly result from the action which the movant seeks to enjoin."  *Id.*  In light of this "high bar," *Coal. For Common Sense In Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008), the "general rule [is] that economic harm does not constitute irreparable injury," *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1295 (D.C. Cir. 2009).  "[O]nly economic loss that threatens the survival of the movant's

---

[65] NAFA also asks the Court to set a new applicability date, "[i]f the Department prevails *in toto* on the merits," Pl.'s Br. 88, relying on the D.C. Circuit's decision in *American Equity*.  But if the Department prevails on the merits, the Court would have no basis on which to do so, and *American Equity* does not hold otherwise.  There, the Court vacated the rule at issue but only after holding that the agency's analysis of the rule's efficiency, competition, and capital formation effects was arbitrary and capricious.  613 F.3d at 177.  Absent a ruling against the Department, this Court would have no basis on which to grant NAFA's requested relief.

business amounts to irreparable harm." *Power Mobility Coal.*, 404 F. Supp. 2d at 204. Even

then, economic harm warrants injunctive relief only when it is "certain to occur in the near future

as a direct result of the threatened action." *Id.*

> ### 1. NAFA has not established that the Rule and exemptions pose a certain and imminent threat to the survival of any of its members

It is not disputed that the threatened injury NAFA alleges is solely economic. *See* Pl.'s

Br. 82. NAFA attempts to meet the high bar for economic harm by asserting that "the fixed

annuity industry will be forced to change its products and distribution system immediately

because of the Rule," resulting in "roughly 20,000 annuity agents ... exit[ing] the business," and

reducing the revenues of "many businesses ... to a small fraction of their current levels." *Id.* As

a result, NAFA predicts the "loss of businesses." *Id.* But NAFA's rough estimates fall well

short of meeting its considerable burden of establishing irreparable harm, as it has not shown that

the harms it alleges are certain, great, actual, or imminent.

The possibility that a subset of fixed annuity providers will need to restructure their

distribution systems and re-design their products, *see* Pl.'s Br. 76-77, to be able to provide

impartial advice to consumers looking for financial advisers to safely protect the tax-favored

assets they have saved for retirement is flatly insufficient to warrant enjoining a Rule that

regulates investment advice. Likewise, the possibility that independent agents will decide to sell

other products or "become affiliated with a broker-dealer, advisory firm, or captive agency," *id.*

79, does not equate to the "loss of businesses," *id.* 82, and agents' self-interested economic

decisions cannot be attributed to the Rule. And even if the Court were willing to assume that

such harms could possibly justify injunction of a Rule that does not apply until April 2017,

NAFA has still failed to carry its burden for a number of specific reasons.

First, the alleged harms to NAFA's members are not clearly certain or imminent.

NAFA's allegations are riddled with uncertainties about what "may" happen as the industry determines "whether and how they will continue to do business through IMOs and independent agents."  Pl.'s Br. 76, ("carriers *may* begin exiting the independent agent channel altogether"; "carriers *may* need to restructure or eliminate parts of their ... rel[iance] on IMOs") (citing Marrion Aff. ¶¶ 32-33, 40), 83 ("there will *almost* certainly be an interruption in the sale of FIAs") (emphasis added).  But "bare allegations of what is likely to occur ... are of no value since the court must decide whether the harm will *in fact* occur."  *Sterling Commercial Credit—Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 14 (D.D.C. 2011) (emphasis in original); *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 78-79 (D.D.C. 2013), *aff'd,* 746 F.3d 1065 (D.C. Cir. 2014), *reh'g en banc granted, opinion vacated,* 35 ITRD 2763 (D.C. Cir. 2014), and *judgment reinstated,* 760 F.3d 18 (D.C. Cir. 2014) (declarants' statements about "what they truly 'expect' to happen in the marketplace; what their customers are 'likely' to demand; and what 'could' happen to their businesses if they [we]re made subject to the Final Rule" were speculative and not certain or actual harm).

Further, NAFA's claim that "[i]f IMOs cannot receive compensation under the BIC Exemption, there will be massive layoffs and the closing of many IMOs" is based on a faulty premise and is likewise purely speculative.  Pl.'s Br. 78 (citing Marrion Aff. ¶ 41).  The BIC Exemption specifically provides for related entities, such as IMOs, to receive compensation so long as the requirements of the exemption are fulfilled by the financial institution and adviser. *See* BIC Exemption §§ II(J)(7), VIII(m); 81 Fed. Reg. 21068-69, 21010.  IMOs can therefore continue to serve independent agents, and receive compensation for doing so, by contracting with an insurance carrier, which would serve as the financial institution.  81 Fed. Reg. 21072. There is thus no reason to conjecture about what would happen *if* IMOs could not receive

compensation under the BIC Exemption—they can.

Moreover, as NAFA recognizes, *see* Pl.'s Br. 78; Marrion Aff. ¶ 43, IMOs can alternatively seek individual exemptions to become financial institutions themselves, *see* 81 Fed. Reg. 21067, and four similar such organizations have already done so.  In light of this possibility, NAFA's claims, apparently based on the presumption that IMOs will not be granted individual exemptions, are too speculative to constitute irreparable harm.  *See Power Mobility Coal.*, 404 F. Supp. 2d at 205 (harm remote and speculative where plaintiffs "basically predict[ed] that many of their claims for reimbursement" would be denied); *Varicon Int'l v. OPM*, 934 F. Supp. 440, 447 (D.D.C. 1996) (no irreparable harm for plaintiffs' assumption that agency would refuse to delegate authority to contract for background investigations).

Even if the alleged harms to IMOs were not speculative, they certainly are not imminent. NAFA's prediction of "massive layoffs" and "the closing of many firms," is based on the unsupported prediction that the Rule will "*eventually* reduce the annual revenues to the annuity IMOs."  Marrion Aff. ¶ 42 (emphasis added).  But claims about what *may* happen *eventually* are "at best, remote and speculative."  *Power Mobility Coal.*, 404 F. Supp. 2d at 205.

Also remote and speculative is NAFA's claim that because of the Rule and BIC Exemption, carriers will experience an "interruption in business" and "enormous" competitive harm because they will not be able to design new products, file those products for approval by state regulators, and gain regulators' approval to sell them by the April 10, 2017 deadline.  Pl.'s Br. 77.  It is far from clear, and certainly an exaggeration, to say that the BIC Exemption requires all carriers to re-file and gain approval of new products in all fifty states, as Plaintiff does.  *See id.*[66]  Instead of a "one size fits all response, carriers will take different, individualized

---

[66] For example, the Interstate Insurance Compact Regulatory Commission ("IICRC") has been adopted in 43 states
(*footnote continued on next page*)

approaches to selling FIAs under the Rule.  They will decide whether, and to what extent, to change their product offerings based on a range of factors that will vary widely from carrier to carrier, such as the design and features of their existing products, profitability targets, distribution relationships, sales and marketing goals, and business strategy.  *See* RIA 307-11. Moreover, even if such a process is necessary, the entire industry of financial advisers is undergoing transition, a fact NAFA's members should have been planning for since at least April 2016 when the Rule was published, if not before.  *See* RIA 114-126, 318-324 (industry has been undergoing change for decades and more recently both in response to DOL's initiative and based on changes in demand and technological innovation).

One year from the Rule's publication, financial institutions and agents need only be in a position to acknowledge fiduciary status, make fairly minimal disclosures, and give advice that is prudent, loyal, not unreasonably priced, and not subject to misrepresentations.  NAFA's members have a full twenty months to comply with additional conditions, including the contract requirement, in the BIC Exemption.  Even by NAFA's estimates, DOL provided sufficient time to meet the BIC conditions.  Pl.'s Br. 77; *see* Marrion Aff. ¶ 36 (estimating that the overall process for creating and introducing new products is likely to take a minimum of eighteen months).  In any event, the potential "interruption in business" alleged by NAFA is certainly not imminent, given that the deadline for compliance is still at least nine months away and, in the case of the BIC Exemption, 18 months away for full compliance.

Second, NAFA has not demonstrated that the Rule will directly cause the harms that it alleges.  With regard to its claim that carriers will be unable to redesign and gain approval of

---

and includes standards for fixed annuities provides for expedited product filing.  *See* http://www.insurancecompact.org/rulemaking_records/adopted_uniform_standards.pdf; *see also* http://www.insurancecompact.org/about.htm.

new products by the applicability dates, NAFA forgets that the Rule does not directly regulate the design or manufacture of insurance products or affect state insurance regulators' filing and approval procedures. RIA 311. The lengthy design and approval process about which NAFA complains, therefore, cannot be attributable to the Rule, because under state insurance laws, decisions regarding the design and approval of new products rest with carriers and state regulators, respectively, the latter of which could accelerate or delay product approval for any number of reasons not attributable to the Rule.

Likewise, NAFA complains that because of the Rule, insurance carriers may no longer rely on IMOs and independent insurance agents, resulting in large revenue losses for IMOs and independent agents exiting the business. *See* Pl.'s Br. 76, 79, 82. While firms currently operating with acute advisory conflicts will need to revise their distribution practices to comply with the Rule, that insurance carriers may opt to no longer work with IMOs or independent agents to do so is an independent decision of those carriers. It is not directly attributable to the Rule and is thus insufficient to establish irreparable harm. *See Am. Meat Inst.*, 968 F. Supp. 2d at 80-81 (alleged harm not the direct result of the rule where "Plaintiffs' declarants appear[ed] most concerned that they w[ould] ultimately lose future business because others may respond to the new [rule] and react in a manner that may ultimately affect their companies negatively"). So too, whether an independent agent chooses to exit the business, rather than choosing the alternatives of affiliating with a broker-dealer, advisory firm, or captive agency, Pl.'s Br. 79, is the decision of that agent but cannot be said to be directly caused by the Rule, which does not prohibit the sale of FIAs but affects only the way in which they are sold. *See Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 32-33 (D.D.C. 2014) (economic harm from plaintiffs' decision to cancel hunts did not directly result from regulation not completely prohibiting hunting elephants overseas).

Third, NAFA has not shown that its alleged harms to businesses are "actual." While NAFA and its declarants provide ballpark estimates of alleged harms, they fail to provide details necessary to determine the accuracy of those estimates or any specificity as to the means for arriving at their estimates.[67] Such bare allegations are insufficient to establish irreparable harm. *See, e.g.*, *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 54 (D.D.C. 2011) (more than "conclusory projection[s]" needed to establish irreparable harm).

### 2. NAFA has not established that the alleged costs of compliance with the Rule and exemptions constitute irreparable harm

NAFA also attempts to allege irreparable harm on the basis that "[n]o matter what decisions are made, the costs of compliance prior to the April 10, 2017 applicability date will be enormous[.]" Pl.'s Br. 76-77. Recognizing that economic loss alone cannot constitute irreparable harm, NAFA contends that the alleged economic losses are "unrecoverable if the Rule is later vacated." *Id.* 77. But "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm." *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 53. Instead, NAFA must make the normal showing that the financial losses alleged are certain, actual, great, and imminent. *Id.*; *see also Sterling Commercial Credit—Michigan, LLC*, 762 F. Supp. 2d at 16 ("Even unrecoverable losses…must have a 'serious' effect on a plaintiff" to constitute irreparable harm.). NAFA fails to do so.

NAFA's theory of irreparable harm fails to take account of the well-established principle that the cost of compliance with a regulatory scheme does not constitute irreparable injury. *See, e.g.*, *Nat'l Med. Care, Inc. v. Shalala*, No. 95-0860 (WBB), 1995 WL 465650, at *3 (D.D.C. June

---

[67] *See, e.g.*, Marrion Aff. ¶ 42 (estimating the Rule will "eventually" reduce annual revenues to annuity IMOs from the current approximate level of $1,050,000,000 to $360,000,000."); Wong Aff. ¶ 9 (asserting that "based on our preliminary assessment of the new regulation," he expects a "drop of approximately 50% in sales of annuity products").

6, 1995) ("[A]s a general matter, the costs of compliance with a regulatory scheme do not constitute irreparable injury.") (citing *American Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980). As the Third Circuit explained in *A.O. Smith Corp. v. FTC*, "[a]ny time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction." 530 F.2d 515, 527 (1976). This is particularly so where companies "operate in a highly regulated sector of the economy" and "benefit from the existence of [government] program[s]." *Nat'l Med. Care*, 1995 WL 465650, at *3.

Here, the unrecoverable economic losses alleged by NAFA are compliance costs. *See* Pl.'s Br. 82-83 (attributing losses to the "creat[ion of] new distribution system[s] for FIAs that the Rule mandates"). Moreover, NAFA concedes that its members operate in a highly regulated sector of the economy, *see* Pl.'s Br. 6-7, 84, and they benefit from the public subsidies of the tax-favored products that they sell and plans that they advise. *See, e.g.*, RIA 107, 187, 288. Under those circumstances, "[s]pending money to comply with the law is simply a fact of doing business," *IMS Health Inc. v. Sorrell*, 631 F. Supp. 2d 429, 432 (D. Vt. 2009) (rejecting argument that compliance costs were irreparable harm where recovery of those costs would be barred); *accord Pennsy Supply, Inc. v. Susquehana River Basin Comm'n*, No. 1: 06-2454, 2007 WL 551573, at *3 (M.D. Pa. Feb. 20, 2007) (same), and NAFA's alleged compliance costs do not constitute irreparable harm.

Even assuming that compliance costs could ever constitute irreparable harm, NAFA has not demonstrated that the compliance costs alleged here constitute irreparable harm. NAFA alleges its members will be unable to recover the "hundreds of millions of dollars ... spent to create the new distribution system for FIAs," as well as the losses from being unable to sell FIAs

by the April 2017 applicability date.  Pl.'s Br. 82-83.  But these broad unsubstantiated statements suffer from all of the problems identified above.  Given the many alternatives available to carriers, IMOs, and agents to come into compliance with the Rule, as well as an applicability date that provided the industry a year in which to do so (and an additional eight months in the case of certain conditions of the BIC Exemption), NAFA has wholly failed to show that the losses it alleges are certain and imminent.

Specifically, with regard to IMOs, NAFA contends that they would need to reconfigure the way they do business, "taking on extensive compliance supervisory responsibilities, along with attendant liability and dramatic increases in insurance premiums."  Pl.'s Br. 78 (citing Marrion Aff. ¶ 45).  The Marrion declaration concedes, however, that "it is difficult to project new compliance costs for IMOs under this scenario," and posits only that this reconfiguration "would be extremely challenging and costly."  ¶¶ 45-46.  But "the fact that economic losses may be unrecoverable does not absolve the movant from its 'considerable burden' of *proving* that those losses are '*certain, great and actual*.'"  *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52 (emphasis added).  NAFA's unsupported and vague allegations do not meet this considerable burden.  As demonstrated above, NAFA itself identified approaches that could mitigate the burden, and there are several others as well.  *See supra* Arg. § I(E)(2)(a).

Moreover, the alleged harm to NAFA's members due to increased insurance premiums and exposure to liability is not sufficiently great or certain to qualify as irreparable harm.  The RIA estimates that insured representatives may see, at most, a ten percent increase in their insurance premiums, resulting in an estimated $300 increase per person.  *See* RIA 240.  While this may impose some burden, it is simply not "great enough to support a finding of irreparable harm."  *GEO Specialty Chemicals, Inc. v. Husisian*, 923 F. Supp. 2d 143, 151 (D.D.C. 2013).

And a mere likelihood of future lawsuits and potential liability for failing to act in customers' best interest is simply too uncertain and attenuated to constitute irreparable harm. *See, e.g.*, *Sterling Commercial Credit—Michigan, LLC*, 762 F. Supp. 2d at 17 (finding insufficient for irreparable harm potential for a "multiplicity of suits"). Though one of NAFA's declarants alleges that "one lawsuit could put [a firm] out of business," Engels Aff. ¶ 17, "[t]he threat of bankruptcy"—here, wholly unsubstantiated and at best highly attenuated—"is not the type of irreparable harm" sufficient for obtaining a stay. *Mamula v. Satralloy, Inc.*, 578 F. Supp. 563, 584 (S.D. Ohio 1983); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988) (exposure to liability was too speculative given that "[m]ultiple contingencies must occur before their injuries would ripen"; there was "no reason to believe suit [wa]s inevitable"; and there was no reason to assume that the plaintiffs would willfully violate the law).[68]

### 3. NAFA has not established that any alleged competitive harm constitutes irreparable harm

Finally, NAFA asserts the Rule inflicts "discriminatory competitive harm" on insurance-only agents, as compared to securities-licensed agents, and that under *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997), this constitutes irreparable harm. Pl.'s Br. 83. The D.C. Circuit has been skeptical that competitive disadvantage can constitute irreparable harm, *Mylan Pharms., Inc. v. Shalala,* 81 F. Supp. 2d 30, 42-43 (D.D.C. 2000) (citing cases), a skepticism especially justified here, where one of the agency's stated purposes is to create a level playing field so that competing products posing similar dangers (variable annuities, indexed annuities, mutual funds) are subject to the same standards. Moreover, NAFA's reliance on *Bracco* is misplaced for many reasons. In *Bracco*, the Court found the FDA had categorized the

---

[68] *See also Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell*, 77 F. Supp. 3d 103, 110 (D.D.C. 2015) ("[E]ven if the Court were to accept [plaintiff's] assertion that some of its members are likely to go bankrupt as a result of the ... requirement, even extreme financial difficulty does not necessarily satisfy the irreparable harm requirement.").

manufacturer-plaintiffs' product as a new drug, while categorizing another product, "identical in all material respects," as a device. 963 F. Supp. at 24. As a result, the manufacturers had to "undertake more difficult, time-consuming and expensive testing," costing the small-company-plaintiffs millions of dollars. *Id.* 28. The Court found such losses "significant" and unrecoverable. *Id.* 28-29. Further, because the FDA was about to act on the competitor product's application *that day*, potentially allowing it to be first on the market, the Court found irreparable the unrecoverable damage to the manufacturers that would be left behind. *Id.* 29.

The situation here is readily distinguishable. In contrast to *Bracco*, the Rule does not treat identical things differently; instead, it holds all investment advisers, including insurance agents and registered investment advisers, to the same fiduciary standard. Thus, the Rule does not, as NAFA suggests, inflict "discriminatory competitive harm." Pl.'s Br. 83. Further, the Rule does not require insurance agents to become registered advisers; it requires only that investment advisers, of whatever stripe, adhere to fiduciary standards. Thus, while insurance agents may decide to undertake the time and costs associated with becoming licensed and registered, those costs cannot be directly attributed to the Rule. Moreover, while there may be time and costs associated with individual advisers becoming registered, those costs do not come close to the millions of dollars found to be "substantial" in *Bracco*. And NAFA has not sufficiently shown how or why any of the costs that agents might expend to become registered investment advisers cannot ultimately be recovered through their investment advice when they begin working in that capacity. *See Nat'l Mining Ass'n*, 768 F. Supp. 2d at 53 (alleged harm not irreparable where plaintiff had not shown that monetary losses could not ultimately be recovered if and when the project received permits to proceed). Lastly, NAFA has not shown that any competitive disadvantage insurance agents might suffer is imminent. In contrast to *Bracco*,

where the plaintiffs were likely to be at a competitive disadvantage *that day*, here, insurance agents still have at least nine months (and will have had a full year from publication) to begin coming into compliance with the full conditions of the BIC Exemption.

For all of the aforementioned reasons, NAFA has fallen short of establishing "irreparable harm," which is grounds alone for the Court to deny its motion for a preliminary injunction.  *See Sterling Commercial Credit—Michigan, LLC*, 762 F. Supp. 2d at 12.

## C.  The Balance of Equities and the Public Interest Weigh Against Any Injunction in this Case

While NAFA's failure to demonstrate any irreparable harm or the likelihood that it will prevail on its claims provides more than a sufficient basis to deny its request for a preliminary injunction, the final two factors of the preliminary injunction analysis also militate against entering injunctive relief at this time.

In determining whether the balance of equities favors granting a preliminary injunction, courts consider whether an injunction would "substantially injure other interested parties." *Chaplaincy*, 454 F.3d at 297.  As noted above, "staying" the applicability date would have no practical, positive effect for NAFA's members, and, despite NAFA's request, Pl.'s Br. 88, the Court would have no basis for ordering a new applicability date if DOL were to prevail on the merits.  In the meantime, however, a preliminary injunction would lead to the very outcome the carefully considered deadlines were meant to avoid:  confusion about the legal status of the Rule for an entire industry seeking to come into compliance with it, *see* 81 Fed. Reg. 20993, and the potential delay of safeguards against conflicted investment advice that cumulatively costs retirement investors billions of dollars in lost retirement income, *id.*  This "untoward detriment" to the rest of the market and retirement investors is not outweighed by any positive impact on NAFA's members, which comprise only one segment of the large market for investment advice

and who are essentially asking for the competitive advantage of lower standards vis-à-vis other investment advisers. *Chaplaincy*, 454 F.3d at 304 ("[D]emands for preliminary relief that inflict untoward detriment on persons not party to the case will [not withstand scrutiny concerning the movant's burden to show that the balance of equities favors an injunction].").  Indeed, an injunction would arguably have a negative effect on NAFA's members as well, by giving the false impression that they may not need to reform their practices to come into compliance with the Rule and BIC Exemption by the applicability dates, and potentially delaying their efforts to do so, when, in fact, they are unlikely to prevail on the merits and will indeed be required to come into compliance by those dates.

NAFA argues that an injunction will not harm retirement investors because "annuities are already widely regulated" and, thus, investors "are and will remain protected." Pl.'s Br. 84.  But NAFA fails to refute the substantial evidence relied on by DOL in promulgating the Rule and exemptions that the current standards are *not* sufficient and could cost IRA investors between $95 billion and $189 billion over the next ten years—in the mutual fund market alone.  81 Fed. Reg. 20950; RIA 158.  Moreover, as explained above, the conflicts of interest causing these harms to investors are particularly acute in the annuity market.  *See* RIA 109, 111, 131-32, 168.

In contending that it would be "impossible" for the annuity industry to create the oversight mechanisms necessary to ensure that the investment advice it provides is in the best interest of investors, Pl.'s Br. 60-66, NAFA all but concedes that its members' products and distribution systems, as currently configured, are *not* necessarily in the best interest of retirement investors.  DOL, the agency with statutory authority to ensure that employees' retirement savings are protected, has determined that this is no longer good enough.  And the harms that NAFA alleges it will suffer as a result of having to meet the best interest standard are simply insufficient

to justify the continued harms to investors.

For related reasons, NAFA wholly fails to demonstrate that an injunction would be in the public interest. *See Winter*, 555 U.S. at 20. Not only would an injunction have a detrimental effect on other companies seeking to come into compliance with the Rule and investors relying on advisers with conflicts of interest, but it would also result in the public continuing to subsidize those who render investment advice, rather than the retirement investors whom tax-favored retirement plans were meant to benefit. *See* RIA 287-88. The protection afforded under ERISA and the Code to plan participants and IRA investors, and the tax subsidies that they enjoy, reflect Congress's recognition of the importance of plans and IRAs to retirement security. These subsidies are estimated to amount to $17 billion in 2016 alone. RIA 288. The Rule and exemptions seek to ensure that these tax preferences fulfill their purpose of helping consumers achieve retirement security, rather than unduly enriching conflicted investment advisers.

Until now, investment advisers have been able to operate under financial conflicts and retirement investors have been paying the price of their tainted advice. This is the problem the Rule and exemptions seek to ameliorate, and NAFA has not shown that it is entitled to enjoin the solution DOL crafted to do so. Instead, NAFA asks for relief that would prolong and sustain the ongoing harm to retirement investors. For all of these reasons, the Court should deny NAFA's motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment on all claims, and the Court should deny NAFA's motions for summary judgment and a preliminary injunction.

Dated:  July 8, 2016


Of Counsel:

M. PATRICIA SMITH
Solicitor of Labor

G. WILLIAM SCOTT
Associate Solicitor

EDWARD D. SIEGER
Senior Attorney

ELIZABETH HOPKINS
Counsel for Appellate and
Special Litigation

MEGAN HANSEN
Attorney for Regulations
United States Department of Labor
Office of the Solicitor

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JUDRY L. SUBAR
Assistant Director
Civil Division, Federal Programs Branch

*/s/ Galen N. Thorp*
GALEN N. THORP (VA Bar # 75517)
EMILY NEWTON (VA Bar #  80745)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Room 6140
Washington, D.C. 20530
Tel: (202) 514-4781 / Fax: (202) 616-8460
galen.thorp@usdoj.gov
emily.s.newton@usdoj.gov

*Counsel for Defendants*