**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

The National Association for Fixed Annuities,

Plaintiff,

vs.

Thomas E.  Perez, *et al.*,

Defendants.

**Civil Action No.  1:16-cv-1035 (RDM)**

**PLAINTIFF NAFA'S REPLY IN SUPPORT OF ITS APPLICATION FOR A
PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

I.    Overview ........................................................................................................... 1

II.   The Rule Should Be Vacated Under The APA .................................................. 4

    A.    The Department's New Definitions Of "Investment Advice" And "Fiduciary" Exceed Its Statutory Authority Under ERISA And The Code. ............................. 4

        1.    The Rule Fails At *Chevron* Step One, And The Department Is Not Entitled To Deference. ........................................................................... 5

        2.    The Phrase "Investment Advice" Must Be Read In Context. ...................... 7

        3.    Legislative History Belies The Department's Authority To Expand Fiduciary Duties To Insurance Salespersons. ............................... 9

        4.    Under Its Plain Meaning And The Common Law, The Term "Fiduciary" Does Not Apply To Insurance Salespersons. ............................ 10

        5.    The Advisers Act Further Undermines The Department's Position. .......... 13

        6.    The Department's Five-Part Test Was Faithful To Congressional Intent. ................................................................................. 15

        7.    Congress Has Ratified The Five-Part Test. ............................................... 16

        8.    The Department's Expansion Of Fiduciary Duties Defies Common Sense. ...................................................................... 20

    B.    The Department Has No Authority To Impose ERISA Fiduciary Duties On Parties To Transactions Involving IRAs. ................................................ 20

        1.    Congress Did Not Impose ERISA Fiduciary Duties In IRA Transactions. .................................................................. 21

        2.    PTE 84-24 And The BICE Incorporate ERISA Fiduciary Standards. ........ 24

        3.    The Department Is Not Entitled To Deference. ......................................... 26

        4.    The Department's Arguments Ignore History And Context. ...................... 27

    C.    The BICE Creates An Impermissible Private Right Of Action. ............................ 29

    D.    The Rulemaking Also Fails Under *Chevron* Step Two. ....................................... 35

E.     The Department's Placement Of FIAs In The BICE Was Arbitrary, Capricious And Contrary To Law. ...........................................................................................38

     1.     The Department Failed To Provide Any Analysis On How The BICE Can Work Within The FIA Distribution System...............................................38

     2.     Under Established Federal Law, FIAs Are Not Securities. ......................43

     3.     As A Result Of The Department's Decision To Contravene Federal Law, The BICE Is Irrational And Unworkable...................................................44

     4.     The Department Failed To Consider The Costs And Benefits Of "Grouping" FIAs With Securities Products Under The BICE..................50

III.     The Requirement Of "Reasonable Compensation" In The BICE Is Unduly Vague and Violates Due Process. ..................................................................................... 53

     A.     The Department Relies On Inapposite, Confused And Irrelevant Notions Of "Reasonable Compensation" For IRA Transactions..............................................55

     B.     The Department Failed To Describe And Identify Proscribed Conduct So As To Provide The Fair Notice Required To Satisfy Due Process...................................58

     C.     The BIC Is A Unique Regulation That Sabotages Regulated Entities' Ability To Negotiate And Clarify The Meaning Of Contractual Terms. ...............................60

     D.     The Consequences Of Being Wrong About "Reasonable Compensation" Are Extreme. ......................................................................................................62

IV.     The Department Failed To Comply With the Regulatory Flexibility Act. ...................... 63

V.     The Court Should Stay The Applicability Date To Preserve The Status Quo.................. 66

     A.     NAFA's Members Face Immediate And Irreparable Harm. ................................66

     1.     NAFA's Members Already Face Great, Certain, and Ongoing Harm. .........................................................................................67

     2.     NAFA's Members Are Suffering Actual And Unrecoverable Losses...............................................................................................69

     B.     The Balance Of Equities And The Public Interest Favor An Injunction. ..............73

VI.     Conclusion ....................................................................................................... 75

# TABLE OF AUTHORITIES

## Cases

*Abbit v. ING USA Annuity & Life Ins. Co.*,
  999 F. Supp. 2d 1189 (S.D. Cal. 2014) .................................................................................. 33

*Adams Fruit Co. v. Barrett*,
  494 U.S. 638 (1990) ................................................................................................................ 29

*AEP Tex. N. Co. v. Surface Transp. Bd.*,
  609 F.3d 432 (D.C. Cir. 2010) ................................................................................................ 40

*AFL-CIO v. Brock*,
  835 F.2d 912 (D.C. Cir. 1987) ................................................................................................ 19

*AFL-CIO v. Donovan*,
  757 F.2d 330 (D.C. Cir. 1985) .................................................................................... 26, 27, 46

*Alabama Educ. Ass'n v. Chao*,
  455 F.3d 386 (D.C. Cir. 2006) ................................................................................................ 35

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) .......................................................................................................... 31, 32

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) .............................................................................................. 46

*Am. Driver Serv., Inc. v. Truck Ins. Exch.*,
  631 N.W.2d 140 (Neb. Ct. App. 2001) ................................................................................... 11

*Am. Equity Inv. Life Ins. Co. v. SEC*,
  613 F.3d 166 (D.C. Cir. 2010) .......................................................................................... 44, 71

*Am. Library Ass'n v. FCC*,
  406 F.3d 689 (D.C. Cir. 2005) .............................................................................................. 5, 35

*Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assur. Soc'y*,
  841 F.2d 658 (5th Cir. 1988) ............................................................................................ 17, 18

*Asmoro v. Rigstaff Texas LLC*,
  2012 WL 12544554 (D.N.M. 2012) ....................................................................................... 54

*Batterton v. Francis*,
  432 U.S. 416 (1977) ................................................................................................................ 27

*Belland v. Pension Ben. Guar. Corp.*,
  726 F.2d 839 (D.C. Cir. 1984) ................................................................................................ 36

*Burlington N. & Santa Fe Ry. v. Surface Transp. Bd.,*
  403 F.3d 771 (D.C. Cir. 2005) ................................................................. 42

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962) ................................................................................ 41

*Burns v. Delaware Charter Guarantee & Tr. Co.,*
  805 F. Supp. 2d 12 (S.D.N.Y. 2011) ....................................................... 30

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) .............................................................. 40

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994) ........................................................................ 18, 19

*\*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ................................................................................ 27

*City of Arlington v. FCC,*
  133 S. Ct. 1863 (2013) .............................................................................. 6

*Clark v. Feder Semo & Bard, P.C.,*
  739 F.3d 28 (D.C. Cir. 2014) .................................................................. 11

*Clarke v. Office of Fed. Hous. Enter. Oversight,*
  355 F. Supp. 2d 56 (D.D.C. 2004) .......................................................... 69

*Coalition for Common Sense in Gov't Procurement v. United States,*
  576 F. Supp. 2d 162 (D.D.C. 2008) ........................................................ 69

*Custer v. Pan Am. Life Ins. Co.,*
  12 F.3d 410 (4th Cir. 1993) .................................................................... 12

*Dart v. United States,*
  848 F.2d 217 (D.C. Cir. 1988) ................................................................ 17

*DOJ v. Daniel Chapter One,*
  89 F. Supp. 3d 132 (D.D.C. 2015), *aff'd,* 2016 WL 3040815 (D.C. Cir. May, 18, 2016)......... 72

*Dolan v. United States Postal Serv.,*
  546 U.S. 481 (2006) .................................................................................. 7

*Dr. Pepper/Seven-Up Cos. v. FTC,*
  991 F.2d 859 (D.C. Cir. 1993) ................................................................ 40

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016) ...................................................................... 35, 40

*FAA v. Cooper,*
  132 S. Ct. 1441 (2012) ......................................................................... 13

*FCC v. Fox Television Stations, Inc.,*
  132 S. Ct. 2307 (2012) ......................................................................... 61

*FCC v. NextWave Pers. Commc'ns Inc.,*
  537 U.S. 293 (2003) ............................................................................. 15

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ......................................................................... 7, 20

*Fin. Planning Ass'n v. SEC,*
  482 F.3d 481 (D.C. Cir. 2007) ............................................................ 14

*Firestone Tire & Rubber Co. v. Bruch,*
  489 U.S. 101 (1989) ............................................................................. 11

*FTC v. Ross,*
  743 F.3d 886 (4th Cir.), *cert. denied*, 135 S. Ct. 92 (2014) ..................... 72

*Fund for Animals v. Williams,*
  391 F. Supp. 2d 191 (D.D.C. 2005) ..................................................... 47

*Gilliam* v. *Edwards,*
  492 F. Supp. 1255 (D.N.J. 1980) ......................................................... 56

*Goldstein v. SEC,*
  451 F.3d 873 (D.C. Cir. 2006) ......................................... 35, 36, 37, 38

*Goodyear Atomic Corp. v. Miller,*
  486 U.S. 174 (1988) ............................................................................. 13

*Grund v. Delaware Charter Guarantee & Trust Co.,*
  788 F. Supp. 2d 226 (S.D.N.Y. 2011) ................................................. 30

*Gulf Power Co. v. FERC,*
  983 F.2d 1095 (D.C. Cir. 1993) .......................................................... 35

*Hartline v. Sheet Metal Workers' Nat'l Pension Fund,*
  134 F. Supp. 2d 1 (D.D.C. 2000), *aff'd*, 286 F.3d 598 (D.C. Cir. 2002) ....... 12

*Hearth, Patio & Barbeque Ass'n v. United States Dep't of Energy,*
  706 F.3d 499 (D.C. Cir. 2013) ....................................................... 38, 41

*Home Care Ass'n of Am. v. Weil,*
  799 F.3d 1084 (D.C. Cir. 2015) .......................................................... 16

v

*Housing Study Group v. Kemp,*
736 F. Supp. 321 (D.D.C.), *order clarified,* 739 F. Supp. 633
(D.D.C. 1990) ................................................................................................69-70

*IMS, P.C. v. Alvarez,*
129 F.3d 618 (D.C. Cir. 1997) ......................................................................... 47

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,*
510 U.S. 86 (1993) ............................................................................................ 36

*Kansas-Nebraska Nat. Gas Co. v. Dep't of Energy,*
1979 WL 998 (D. Kan. July 31, 1979) ............................................................ 72

*King v. Burwell,*
135 S. Ct. 2480 (2015) ................................................................................. 8, 20

*Knox v. Vanguard Grp., Inc.,*
2016 WL 1735812 (D. Mass. May 2, 2016) .................................................... 33

*KPMG, LLP v. SEC,*
289 F.3d 109 (D.C. Cir. 2002) .................................................................. 6, 621

*Latson v. Holder,*
82 F. Supp. 3d 377 (D.D.C. 2015) .................................................................. 34

*Lindsey v. DC,*
879 F. Supp. 2d 87 (D.D.C. 2012) .................................................................. 35

*Lorillard v. Pons,*
434 U.S. 575 (1978) ......................................................................................... 17

*Louisville & N.R. Co. v. R.R. Comm'n,*
19 F. 679 (D. Tenn. 1884) ............................................................................... 54

*Loving v. IRS,*
742 F.3d 1013 (D.C. Cir. 2014) ................................................................*passim*

*M.R. v. Dreyfus,*
697 F.3d 706 (9th Cir. 2012) ........................................................................... 68

*Mandelbaum v. Fiserv, Inc.,*
787 F. Supp. 2d 1226 (D. Colo. 2011) ............................................................ 30

*Massachusetts Mut. Life Ins. Co. v. Russell,*
473 U.S. 134 (1985) ......................................................................................... 29

*Mertens v. Hewitt Assocs.,*
508 U.S. 248 (1993) ................................................................................... 12, 29

*Michigan v. EPA,
  135 S. Ct. 2699 (2015) ............................................................................ 51, 66, 67

*Motor Vehicle Mfrs. Ass'n  v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) ......................................................................................... 40, 41

Mova Pharm. Corp. v. Shalala,
  955 F. Supp. 128 (D.D.C. 1997), aff'd, 140 F.3d 1060 (D.C. Cir. 1998) ................................. 74

N. Dakota v.  EPA,
  127 F. Supp. 3d 1047 (D.N.D. 2015) ......................................................................... 68

National Soft Drink Ass'n v. Block,
  721 F.2d 1348 (D.C. Cir. 1983) ............................................................................. 17

Nat'l Treasury Employees Union v. United States Dep't of Treasury,
  838 F. Supp. 631 (D.D.C. 1993) ............................................................................. 73

Neighborhood Assistance Corp. v. CFPB,
  907 F. Supp. 2d 112 (D.D.C. 2012) .......................................................................... 46

Patriot, Inc. v. HUD,
  963 F. Supp. 1 (D.D.C. 1997) ............................................................................... 74

Persinger v. Islamic Republic of Iran,
  729 F.2d 835 (D.C. Cir. 1984) .............................................................................. 23

Pitts v. Jackson Nat'l Life Ins. Co.,
  574 S.E.2d 502 (S.C. Ct. App. 2002) ........................................................................ 11

*Porter v. Warner Holding Co.,
  328 U.S. 395 (1946) ......................................................................................... 72

Public Citizen v. Heckler,
  653 F. Supp. 1229 (D.D.C. 1986) ............................................................................ 47

Public Citizen, Inc. v. United States Dep't of Health & Human Servs.,
  332 F.3d 654 (D.C. Cir. 2003) .............................................................................. 19

Rishel v. Pac. Mut. Life Ins. Co.,
  78 F.2d 881 (10th Cir. 1935) ............................................................................... 11

*Russello v. United States,
  464 U.S. 16 (1983) ......................................................................................... 23

Safeco Ins. Co. v. Burr,
  551 U.S. 47 (2007) ......................................................................................... 61

*Scripps-Howard Radio v. F.C.C.,*
316 U.S. 4 (1942) ................................................................................................. 73

*SEC v. Capital Gains Research Bureau, Inc.,*
375 U.S. 180 (1963) ..................................................................................... 13, 14

*Slovak v. Adams,*
753 N.E.2d 910 (Ohio Ct. App. 2001) ................................................................ 10

*Smith v. Provident Bank,*
170 F.3d 609 (6th Cir. 1999) .............................................................................. 12

*Smoking Everywhere, Inc. v. FDA,*
680 F. Supp. 2d 62 (D.D.C.), *aff'd sub nom. Sottera, Inc. v. FDA,* 627 F.3d 891 (D.C. Cir.
2010). .................................................................................................................... 69

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,*
531 U.S. 159 (2001) ............................................................................................ 18

*Southern Offshore Fishing Ass'n v. Daley,*
995 F. Supp. 1411 (M.D. Fla. 1998) .............................................................. 63, 64

*Sterling Commercial Credit–Michigan, LLC v. Phoenix Indus. I, LLC,*
762 F. Supp. 2d 8 (D.D.C. 2011) ........................................................................ 69

*Stockett v. Penn Mut. Life Ins. Co.,*
106 A.2d 741 (R.I. 1954) .................................................................................... 11

*Stovic v. R.R. Ret. Bd.,*
--- F.3d ---, 2016 WL 3457645 (D.C. Cir. June 24, 2016) .................................. 23

*Sugar Cane Growers Co-op. v. Veneman,*
289 F.3d 89 (D.C. Cir. 2002) ............................................................................. 73

*Thomas v. Metro Life Ins. Co.,*
631 F.3d 1153 (10th Cir. 2011) .......................................................................... 14

*Timpinaro v. SEC,*
2 F.3d 453 (D.C. Cir. 1993) ............................................................................... 59

*U.S. Tel. Ass'n v. F.C.C.,*
--- F.3d ---, 2016 WL 3251234 (D.C. Cir. June 14, 2016) ........................ 58, 59, 60

*United States Ass'n of Reptile Keepers, Inc. v. Jewell,*
103 F. Supp. 3d 133 (D.D.C. 2015) .................................................................... 19

viii

*United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency,*
   530 F.3d 980 (D.C. Cir. 2008) ........................................................................ 61

*United States ex rel. Purcell v. MWI Corp.,*
   807 F.3d 281 (D.C. Cir. 2015) .................................................................. 60, 61

*United States v. Stevens,*
   559 U.S. 460 (2010) ...................................................................................... 61

*Util. Air Reg. Grp. v. EPA,*
   134 S. Ct. 2427 (2014) .................................................................................... 5

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
   559 F.2d 841 (D.C. Cir. 1977) ........................................................................ 69

*Westar Energy, Inc. v. FERC,*
   473 F.3d 1239 (D.C. Cir. 2007) ...................................................................... 42

*White Stallion Energy Ctr., LLC v. EPA,*
   748 F.3d 1222 (D.C. Cir. 2014), *rev'd sub nom. Michigan v. EPA,*
   135 S. Ct. 2699 (2015) .................................................................................... 67

*Williams Gas Processing–Gulf Coast Co. v. FERC,*
   475 F.3d 319 (D.C. Cir. 2006) ........................................................................ 41

*Wisconsin Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 69

## Statutes

5 U.S.C. App. 1 § 102 ........................................................................................ 23

5 U.S.C. § 604 .................................................................................................. 64

5 U.S.C. § 611 ............................................................................................ 63, 66

5 U.S.C. § 705 ............................................................................................ 72, 73

5 U.S.C. § 706 ............................................................................................ 27, 64

15 U.S.C. § 80b-2 ....................................................................................... 13, 14

26 U.S.C. § 4975 ....................................................................................... passim

29 U.S.C. § 1002 ....................................................................................... 2, 7, 15

29 U.S.C. § 1003 ............................................................................................. 15

29 U.S.C. § 1104 ....................................................................................... 21, 25

29 U.S.C. § 1108 .......................................................................................... 17, 19, 55

Pub. L. 111-203, 124 Stat. 1376 (2010) ...................................................................... 43

## Regulations

7 C.F.R. § 1493.70 ............................................................................................ 33

7 C.F.R. § 1499.11 ............................................................................................ 33

14 C.F.R. § 212.3 ............................................................................................. 33

26 C.F.R. § 54.4975.9 ........................................................................................ 16

29 C.F.R. § 2510.3-21 ...................................................................................... 1, 15

47 C.F.R. § 24.238 ........................................................................................... 33

58 Fed. Reg. 51,735 ........................................................................................... 51

71 Fed. Reg. 63,786 ........................................................................................... 34

75 Fed. Reg. 38,837 ........................................................................................... 34

77 Fed. Reg. 9,306 ............................................................................................ 67

77 Fed. Reg. 9,407 ............................................................................................ 67

77 Fed. Reg. 9,413 ............................................................................................ 67

80 Fed. Reg. 21,928 ........................................................................................... 43

80 Fed. Reg. 22,010 ...................................................................................... *passim*

81 Fed. Reg. 20,946 ...................................................................................... *passim*

81 Fed. Reg. 21,002 ..................................................................................... *passsim*

81 Fed. Reg. 21,147 ...................................................................................... *passim*

81 Fed. Reg. 44,774 ........................................................................................... 45

Treas. Reg. § 54.4975-6(e) ................................................................................... 55

## Other Authorities

H.R. Rep. No. 93-533 (1973), reprinted in 1974 U.S.C.C.A.N. 4639 ............................. 10, 11, 22

H.R. Rep. No. 93-1280 (1974), reprinted in 1974 U.S.C.C.A.N. 5038 ........................... 9, 22, 24

Restatement (Second) of Trusts § 242 ................................................................................... 57

Restatement (Third) of Trusts § 38 ........................................................................................ 57

Uniform Trust Code § 708 ...................................................................................................... 57

Executive Order 12866 ........................................................................................................... 51

Executive Order 13563 ........................................................................................................... 51

In the Matter of Protecting and Promoting the Open Internet, 30 FCC Rcd.
    5601 (2016) ...................................................................................................................... 59

SEC Form 13F, Masters Capital Management LLC (May 16, 2016) ............................................ 3

Brendan Bordelon, *Elizabeth Warren's Wall Street Double Standard*, The National Review (Oct.
    5, 2015) (available at http://www.nationalreview.com/article/425063/elizabeth-warrens-wall-
    street-double-standard-brendan-bordelon) ................................................................................ 3

Cass Business School, *The Impact of the RDR on the UK's Market for Financial Advice* (June
    2013) (available at http://www.cass.city.ac.uk/__data/assets/pdf_file/0016/202336/The-impact-
    of-RDR-Cass-version.pdf) ........................................................................................................ 50

DOL Website (https://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html (1996) ....... 16

Rich Heidorn, Jr., *MATS Challenge Too Late for Targeted Coal Plants*, RTO Online (Mar. 20,
    2015) (http://www.rtoinsider.com/epa-mats-coal-plants-14043/) ............................................ 67

Richard J. Kovach, *Bright Lines, Facts and Circumstances Tests, and Complexity in Federal
    Taxation,* 46 Syracuse L. Rev. 1287 (1996) ............................................................................ 56

Nick Thornton, *Who will enforce the DOL rule?*, Benefits Pro (June 1, 2016)
    (http://www.benefitspro.com/2016/06/01/who-will-enforce-the-dol-rule ..................................... 32

I.      **Overview**

The National Association for Fixed Annuities ("NAFA") respectfully submits this brief in further support of its application for a preliminary injunction (Dkt. 5), which also has been converted into a motion for summary judgment (June 7, 2016 Minute Order), and in opposition to the cross-motion for summary judgment (Dkt. 17) filed by the United States Department of Labor and Thomas E. Perez, Secretary of the Department of Labor (collectively "Defendants" or the "Department") on July 8, 2016.  For the reasons set forth in NAFA's opening brief ("NAFA Br.") (Dkt. 5-1) and below, the Court should vacate the "fiduciary rule" (the "Rule") recently promulgated by the Department of Labor (the "Department"), 81 Fed. Reg. 20,946-21,002 (April 8, 2016) (to be codified at 29 C.F.R. § 2510.3-21), and certain related exemptions, including Prohibited Transaction Exemption ("PTE") 84-24, *id.* at 21,147-21,180, and the Best Interest Contract Exemption (the "BICE"), *id.* at 21,002-21,088.

Much of the Department's brief is devoted to making broad policy arguments.  The Department explains how important it is to protect retirement investors, and how careful and thoughtful the Department was in promulgating the Rule and exemptions.  But this is not a policy debate, it is a lawsuit.  In an Administrative Procedure Act ("APA") case, as the Court knows, there are legal questions to be decided.

The fact is, the Department has not been particularly careful.  Not with respect to its statutory construction, the impact of the rule on the fixed annuity industry, or its legal analysis. It is evident that the Department hopes to prevail here through the "fog of rulemaking," *i.e.*, that the issues are so complicated and murky that the Court will throw up its hands and defer to the agency.  NAFA's intent with this brief is to cut through that fog.  NAFA respectfully submits that this Court clearly will see that the Department has misconstrued ERISA, exceeded its

statutory authority, failed to account for the impact of this Rule on the fixed annuity industry, and engaged in unreasoned and unreasonable decision-making.

While NAFA explains these points in detail below, it is helpful to highlight in this overview several egregious examples of the Department's efforts to obfuscate the issues.  For example, on the key statutory construction issue of the meaning of the term "investment advice" – which in turn triggers ERISA fiduciary obligations – the Department argues that NAFA insists that fiduciary status turns on "plan management and administration," disregarding "traditional tools of statutory construction" and rendering the "investment advice" provision of ERISA superfluous.  (Memorandum in Support of Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction and for Summary Judgment and Defendants' Cross-Motion for Summary Judgment ("Opp.") at 37 (Dkt. 17).)  Damning if it were true; but it is not.

The relevant language of ERISA at issue here provides, in full, that one can be a fiduciary when "render[ing] investment advice for a fee or other compensation."   29 U.S.C. § 1002(21)(A); 26 U.S.C. § 4975(e)(3).  NAFA does not contest that this language has meaning, but it cannot be distorted to include an insurance salesperson who sells a fixed annuity for a commission.  As has been recognized forever until now, the investor who buys the annuity is paying for a product, not investment advice, and the salesperson is not a fiduciary.   In its analysis, the Department overlooks the statutory language "for a fee or other compensation," and it ignores that Congress was defining the term "fiduciary."

Similarly, the Department (and *amici*) devote substantial time discussing supposed "conflicts of interest" in the fixed annuity industry, essentially arguing that retirement investors must be protected from insurance salespersons.  (Opp. at 12-14.)[1]  The Department opens its

---

[1]    The following *amici* have filed briefs in support of the Department's position: (1) the AARP and AARP Foundation (Dkt. 21-1); (2) the Public Investors Arbitration Bar Association

brief by asserting that "conflicts of interest are widespread and could cost investors in individual retirement accounts (in one segment of the market alone) between $95 billion and $189 billion over the next ten years."  (Opp. at 1.)  The Department further estimates that "investors could gain between $33 billion and $36 billion over 10 years" as a result of the Rule.  (*Id.* at 28.)

The segment of the market to which the Department refers, however, is the sale of <u>mutual funds</u>, and none of this has anything to do with <u>fixed annuities</u>.  Critically, the administrative record is completely devoid of any study quantifying any harm to consumers from "conflicted advice" in the sale of fixed annuities, which are the subject of this lawsuit.  The Department concedes that it "quantified estimated gains associated with only one subset of the market – front-end-load mutual funds."  Dept. of Labor, *Regulating Advice Markets, Definition of the Term "Fiduciary" Conflicts of Interest - Retirement Investment Advice, Regulatory Impact Analysis for Final Rule and Exemptions* (the "Regulatory Impact Analysis"), at 167-78 (Apr. 2016).  "With regard to annuities in particular," it "found the data insufficient to quantify the gains to investors."  (Opp. at 28.)  In a similar vein, the Department sets up a false comparison of

---

("PIABA") (Dkt. 22-1); (3) William Michael Cunningham (Dkt. 25); and (4) Better Markets, Inc., the Consumer Federation of America, and Americans for Financial Reform (Dkt. 24-2). Those briefs add little to what the Department has already argued and largely emphasize the same policy arguments the Department discusses at length in its brief.  Consequently, there is no need for NAFA to respond specifically to the points made in those briefs.  It should be noted, however, that some of the *amici* may not have purely altruistic motives.  For example, Better Markets, Inc. is endowed by Michael Masters, a hedge-fund manager who may stand to benefit personally from a decline in the stock prices of insurance carriers that sell fixed annuities.  *See* Brendan Bordelon, *Elizabeth Warren's Wall Street Double Standard*, The National Review (Oct. 5, 2015) (available at http://www.nationalreview.com/article/425063/elizabeth-warrens-wall-street-double-standard-brendan-bordelon); *see also* SEC Form 13F, Masters Capital Management LLC (May 16, 2016) (reporting call option positions in several insurance and financial services companies).  Moreover, the PIABA speaks on behalf of plaintiffs' attorneys who "represent investors in disputes with the securities industry" (Dkt. 22-1 at 1) and who may benefit immensely from the wave of private litigation the Department intends to unleash.

commissions paid on FIAs to commissions on mutual funds, knowing full well that annuity products are nothing like mutual funds and contain guarantees that warrant higher commissions.[2]

So it goes throughout the brief – arguments that are superficially appealing lose their efficacy upon granular analysis.  NAFA intends to clarify the Department's obfuscation here, so the Court will more readily see that the Department has exceeded its statutory authority in several important respects, its new regulatory framework falls outside the bounds of reasonableness, and it has acted in an arbitrary and capricious manner with respect to its last-minute decision to move FIAs to the BICE.

## II.    The Rule Should Be Vacated Under The APA.

### A.    The Department's New Definitions Of "Investment Advice" And "Fiduciary" Exceed Its Statutory Authority Under ERISA And The Code.

To begin, the Department has exceeded its statutory authority by altering its definition of "investment advice for a fee or other compensation" and expanding the meaning of "fiduciary" far beyond what Congress intended when it enacted ERISA.  Congress did not intend agents who sell insurance products for a commission – typically on a one-time basis – to be treated as ERISA fiduciaries merely for recommending that an IRA owner purchase a fixed annuity.

Under the Rule, the Department would impose fiduciary status on any insurance agent who makes a "recommendation" that may "be reasonably viewed as a <u>suggestion</u> to a retirement investor to take a particular course of action with regard to" an annuity.  (Opp. at 40 n.27 (emphasis added).)  According to the Department, the mere "suggestion" of an annuity product by a commissioned salesperson to an IRA owner is a fiduciary act under ERISA because it

---

[2]    Along similar lines, the Department contends that "contingent commissions" (*e.g.*, bonuses) create conflict of interest problems in the fixed annuity marketplace.  (Opp. at 12 (citing Regulatory Impact Analysis at 122 & 131-32.)  The Department cites several studies, but it concedes that "[t]hese studies examine the commercial property-casualty insurance market, <u>not the annuity insurance market.</u>"  Regulatory Impact Analysis at 122 (emphasis added).

amounts to "render[ing] investment advice for a fee or other compensation."  That interpretation, however, flies in the face of the relevant statutory language under ERISA and the Code.

Plain language and statutory context make clear that Congress never intended to impose fiduciary duties in such circumstances.  There is no relationship of trust and confidence in such a situation, and the insurance salesperson does not exercise discretion or control over the investments or assets of a plan.  Moreover, the plan or IRA owner pays for the annuity product – not for investment advice.  Given all this, there can be no fiduciary relationship under ERISA.

Indeed, the Department candidly acknowledges that its new Rule defines fiduciary obligations using a "broad test [that] could sweep in some relationships <u>that are not appropriately regarded as fiduciary in nature and that the Department does not believe Congress intended to cover as fiduciary relationships.</u>"  81 Fed. Reg. 20,948 (emphasis added).  But "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Util. Air Reg. Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014).

> **1.      The Rule Fails At *Chevron* Step One, And The Department Is Not Entitled To Deference.**

Before beginning the statutory construction exercise, it is important to clear out the underbrush the Department has laid down.  The Department claims it is entitled to deference in redefining who is a fiduciary, because Congress granted it "broad administrative and interpretive power" to promulgate regulations that are "necessary or appropriate" to carry out ERISA and the Code.  (Opp. at 33-34.)  Because "Congress did not specifically define 'investment advice,'" the Department reasons that it has "broad discretion to interpret that language."  (*Id.*)

But the Department's argument ignores the rule that if an agency has not "acted pursuant to delegated authority," its action is "*ultra vires*," and the agency is not entitled to deference.  *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698-99 (D.C. Cir. 2005).  "'No matter how it is

framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, <u>whether the agency has stayed within the bounds of its statutory authority</u>." *Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014) (quoting *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013)). "As the Supreme Court has directed in words that are right on point here, the 'fox-in-the-henhouse syndrome is to be avoided . . . by taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority." *Id.* (quoting *City of Arlington*, 133 S. Ct. at 1863).

In *Loving*, for example, the court analyzed an effort by the IRS to regulate tax-return preparers for the first time. 742 F.3d at 1016-22. After examining the "text, structure, purpose and legislative history" of the statute, as well as the IRS's own conduct, the D.C. Circuit struck down the regulation. *Id.* at 1016. Among other reasons, the court found that Congress was not concerned with tax-return preparers when it enacted the statute, and the agency's interpretation of the statute did not comport with the "broader statutory framework." *Id.* at 1019-20. In addition, "[t]he Supreme Court has stated that courts should not lightly presume congressional intent to implicitly delegate decisions of major economic or political significance to agencies." *Id.* at 1021. If the IRS were correct, it "would be empowered for the first time to regulate hundreds of thousands of individuals in the multi-billion dollar tax-preparation industry," but "nothing in the statute's text or legislative record contemplates that vast expansion of the IRS's authority." *Id.* The IRS exceeded its authority, and it was not entitled to deference.

As explained in NAFA's opening brief and below, the "text, purpose, and legislative history" of ERISA make clear that Congress never intended to impose fiduciary duties on insurance salespersons merely for recommending the purchase of insurance policies. As in *Loving*, there is no indication that Congress was concerned about such conduct when it enacted

ERISA, and this Court "should not lightly presume congressional intent to implicitly delegate" to the Department authority to enact a Rule of such enormous "economic or political significance." In short, as in *Loving*, the Department is entitled to no deference on its statutory construction.

### 2.    The Phrase "Investment Advice" Must Be Read In Context.

Turning to the statutory construction issue, in ERISA, Congress determined that one might qualify as a "<u>fiduciary</u> with respect to a plan" if "he renders <u>investment advice for a fee or other compensation</u>, direct or indirect, with respect to any moneys or property of such plan, or has any authority or responsibility to do so."   29 U.S.C. § 1002(21)(A)(ii) (emphasis added). The meaning of "fiduciary" is therefore critical in assessing when Congress intended "investment advice" to amount to fiduciary conduct, as are the other portions of the definition requiring that investment advice be rendered "for a fee or other compensation," or that an adviser have "authority or responsibility" over plan assets.

At the threshold, the Court should not accept the Department's invitation to focus only on the phrase "investment advice," ignoring the phrase "for a fee or other compensation" and the term "fiduciary."  (Opp. at 34-35.)  "In determining whether Congress has specifically addressed the question at issue [under *Chevron* Step One], a reviewing court should not confine itself to examining a particular statutory provision in isolation," because "[t]he meaning – or ambiguity – of certain words or phrases may only become evident when placed in context."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000).  Thus, the words in a statute should be considered "in their context and with a view to their place in the overall statutory scheme."  *Id.*[3]

---

[3]    Indeed, as the Department acknowledges, "[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute."  *Dolan v. United States Postal Serv.*, 546 U.S. 481, 486 (2006).  "The definition of words in isolation . . . is not necessarily controlling in statutory construction," because "[a] word in a statute may or may not extend to the outer limits of its definitional possibilities."  *Id.*

In applying *Chevron* Step One, it is the "duty" of the court "to construe statutes, not isolated provisions." *King v. Burwell*, 135 S. Ct. 2480, 2489-96 (2015).  It is a mistake to focus only on "investment advice," because "the meaning of that phrase may not be as clear as it appears when read out of context." *Id.* at 2490."[4]

Here, a myopic focus on "investment advice" alone ignores "the way different provisions in the statute interact." *Id.*  The most natural reading of the plain language "rendering investment advice for a fee or other compensation" is that compensation is being paid for the advice itself, not for the product being purchased.  As discussed below, the distinction between paying for investment advice, as opposed to an insurance product, has long been recognized under the law.

Of perhaps even greater importance, the Department fails to account for statutory context when it avoids considering the term "fiduciary" in its definition of "investment advice."  The entire purpose of defining "rendering investment advice for a fee or other compensation" is to determine who qualifies as a fiduciary under ERISA.  Here, the Department's new interpretation of "investment advice" leads to fiduciary status for people never thought to be fiduciaries.  In general, insurance salespersons are not paid for investment advice – they are paid for a product – and they are not in a special relationship of trust or confidence with clients to whom they sell fixed annuities.  Because such a relationship is the very essence of what it means to be a fiduciary under ERISA, the Department exceeded its statutory authority by issuing such a "sweeping definition" of "investment advisor."

---

[4]   In *Burwell*, the Supreme Court determined that the phrase "an Exchange established by the State" included "Federal Exchanges," because "the context and structure of the Act compel us to depart from what would otherwise be the most natural reading of the pertinent statutory phrase."  135 S. Ct. at 2489-96  The Court held it was inappropriate to read the term of "an Exchange established by the State" in isolation, because "[a] fair reading of legislation demands a fair understanding of the legislative plan." *Id.*  In context, Congress meant that language to apply to Federal Exchanges as well. *Id.*

### 3. Legislative History Belies The Department's Authority To Expand Fiduciary Duties To Insurance Salespersons.

The Department's attempt to impose fiduciary duties on insurance salespersons is further belied by the legislative history of ERISA.  The conference report the Department cites (at 35) does not "confirm" – as the Department suggests – that Congress intended to apply fiduciary duties to salespersons:

> The substitute defines 'fiduciary' as any person who exercises any <u>discretionary authority or control</u> respecting management of a plan, exercises any <u>authority or control</u> respecting the management or disposition of its assets or has any <u>discretionary authority or responsibility</u> in the administration of the plan.  Under this definition, fiduciaries include officers and directors of a plan, members of a plan's investment committee and persons who select these individuals.  Consequently, the definition includes persons who have authority and responsibility with respect to the matter in question, regardless of their formal title.  The term "fiduciary" also includes any person who renders investment advice <u>for a fee</u> and includes persons to whom "<u>discretionary</u>" duties have been delegated by named fiduciaries.

H.R. Rep. No. 93-1280 (1974) (the "Conference Report"), reprinted in 1974 U.S.C.C.A.N. 5038, 5103 (emphasis added).  Rather, the cited report makes clear that fiduciary status is to extend to individuals who are employed to render "investment advice" for a fee or who have "discretionary authority" or "control" over a plan or its assets (either directly or through delegation).

Importantly, the Department fails to cite the following passage, which appears earlier in the same Conference Report:

> [A] plan may provide that named fiduciaries (or fiduciaries to whom duties have been properly delegated) may <u>employ</u> investment and other advisers.  However, a fiduciary cannot be relieved of his own responsibilities merely because he follows the advice of such a person.  (Also, investment advisers would be fiduciaries under the substitute.)

*Id.* at 5083 (emphasis added).  Again, this shows that the adviser language is designed to include persons ERISA fiduciaries "employ" to render advice, not salespersons who sell a product.

Finally, the report of the House of Representatives, which the Department also does not

cite, provides further evidence that merely selling a product is not a fiduciary act:

> A fiduciary is one who occupies a position of confidence or trust. As defined by the Act, a fiduciary is a person who exercises any power of control, management or disposition with respect to monies or other property of an employee benefit fund, or who has authority or responsibility to do so.

H.R. Rep. No. 93-533 (1973) (the "House Report"), reprinted in 1974 U.S.C.C.A.N. 4639, 4649.

Plainly, an annuity salesperson does not fall within this understanding of fiduciary status.

In sum, the legislative history reinforces the plain language of ERISA and statutory context by showing that Congress intended to extend fiduciary status only to investment advisers "employed" by plans to render advice for a fee, or who otherwise exercise discretion or control over a plan's investments.  This is consistent with the notion that "[a] fiduciary is one who occupies a position of confidence or trust," such as the "power of control, management, or disposition" of plan assets.  Such fiduciaries bear no resemblance to an insurance salesperson who recommends the purchase of an insurance product for which he earns a commission.

### 4.   Under Its Plain Meaning And The Common Law, The Term "Fiduciary" Does Not Apply To Insurance Salespersons.

As explained in NAFA's opening brief (at 29-32), neither the plain meaning of the term "fiduciary" nor the common-law rules governing fiduciaries support extending fiduciary status to an insurance salesperson recommending the purchase of an insurance product for a commission. To the contrary, as a matter of common understanding, a fiduciary relationship is not a mere business relationship, but rather a special relationship of trust and confidence.

Thus, at common law, "the relationship between an insured and the agent that sells the insurance is, without proof of more, an ordinary business relationship, not a fiduciary one." *Slovak v. Adams*, 753 N.E.2d 910, 916-17 (Ohio Ct. App. 2001).  Something more is required. "ERISA adopted much of what the common law had, over time, come to require of fiduciaries," and "trust law principles developed at common law are a good 'starting point' for determining a

10

fiduciary's duties under ERISA, [although] Congress may not have adopted them all." *Clark v. Feder Semo & Bard, P.C.*, 739 F.3d 28, 31 (D.C. Cir. 2014).[5]

Further, the House Report states that "[t]he fiduciary responsibility section" of ERISA, "in essence, codifies and makes applicable to these fiduciaries certain principles developed in the evolution of the law of trusts." 1974 U.S.C.C.A.N. at 4649. Consistent with the common law, Congress intended the term "fiduciary" to apply to "a person who exercises any power of control, management or disposition with respect to monies or other property of an employee benefit fund, or who has authority or responsibility to do so." *Id.* Relying on this same report, the Supreme Court has observed that "ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, 'codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts.'" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (citations omitted).

Indeed, in its notice of proposed rulemaking ("NOPR"), the Department initially created "carve-outs" – renamed non-fiduciary communications in the Rule – because its "sweeping definition" of "investment advice" created fiduciary status in situations where there was no relationship of trust. The Department, when it suited its purposes, recognized that such an outcome was improper. *E.g.*, 81 Fed. Reg. 20,949 (Rule) ("In the Department's view, this

---

[5]   *See also Rishel v. Pac. Mut. Life Ins. Co.*, 78 F.2d 881, 886 (10th Cir. 1935) ("The law does not cast upon insurance companies the affirmative burden cast upon trustees who deal with the property of their cestuis"); *Stockett v. Penn Mut. Life Ins. Co.*, 106 A.2d 741, 744 (R.I. 1954) ("Ordinarily an insurance company stands in no fiduciary relationship to a legally competent applicant for an annuity"); *Pitts v. Jackson Nat'l Life Ins. Co.*, 574 S.E.2d 502, 508 (S.C. Ct. App. 2002) ("[T]he cases clearly establish the sale of insurance is an arm's length commercial transaction, which does not give rise to a fiduciary relationship."); *Am. Driver Serv., Inc. v. Truck Ins. Exch.*, 631 N.W.2d 140, 148 (Neb. Ct. App. 2001) ("the contractual nature of an insurance policy does not give rise to a presumption of a fiduciary relationship . . . . Neither are we persuaded by the argument that a fiduciary relationship existed because [the insurer] had superior knowledge or bargaining power.").

structure is faithful to the remedial purpose of the statute, but avoids burdening activities that do not implicate relationships of trust.") (emphasis added).   On some level, the Department understands that a relationship of trust is the *sine qua non* of fiduciary status.

The Department cites a number of cases to argue that "courts have roundly rejected the argument that fiduciary status is limited to that under the common law of trusts."  (Opp. at 37-38.)  But that is not NAFA's argument – ERISA is not limited to the common law of trusts, but it is derived from it and was intended to be largely consistent with it.  Thus, it is not surprising that the cases the Department cites for this argument make clear that ERISA fiduciary status is based on whether a person exercises "control and authority over the plan."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis added); *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 418 n.3 (4th  Cir. 1993) ("The Act provides that anyone exercising discretionary authority or control respecting the plan's management, administration, or assets is an ERISA fiduciary."); *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999) (same); *Hartline v. Sheet Metal Workers' Nat'l Pension Fund*, 134 F. Supp. 2d 1, 9-10 (D.D.C. 2000) (same), *aff'd*, 286 F.3d 598 (D.C. Cir. 2002).  Nothing here turns on some distinction between fiduciary status under the common law and fiduciary status under ERISA.

Bottom line, an insurance salesperson has never been a fiduciary, under the common law or under ERISA.  They do not have a special relationship of trust and confidence with their customers, they are not paid for investment advice, and they do not have power or control over plan assets.  The Department cites no authority even suggesting that Congress intended ERISA fiduciary duties to apply to insurance salespersons receiving commissions in such circumstances.

Finally, the Department claims it is "NAFA's position that 'investment advice' must be limited to those involved in plan management and administration" on an "ongoing" basis, and

"fiduciary status is limited to those involved in plan management and administration." (Opp. at 36-37 & 41-42.) That is not NAFA's position. NAFA's position is quite clear: fiduciary status flowing from the statutory language "rendering investment advice for a fee or other compensation" does not extend "to those who merely sell commission-generating products." (NAFA Br. at 29-31.) Considering all tools of statutory construction, it is clear that the term "rendering investment advice for a fee" was meant to include persons who were hired to help plan managers with investment duties and not persons who just sold a product. NAFA is not reading this statutory language out of ERISA, it is giving it the only meaning that makes sense.

### 5.    The Advisers Act Further Undermines The Department's Position.

As explained in NAFA's opening brief (at 31-32), the Investment Advisers Act of 1940 (the "Advisers Act") provides further support for the conclusion that Congress did not intend for insurance salespersons to be classified as fiduciaries.

When Congress used the phrase "renders investment advice for a fee or other compensation" in ERISA, it did so against the backdrop of the Advisers Act, which defined an "[i]nvestment adviser" as one who "for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11). "[W]hen Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *FAA v. Cooper*, 132 S. Ct. 1441, 1449 (2012); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").

"The Investment Advisers Act . . . reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 190-91 (1963). Investment advisers were deemed to be fiduciaries,

because they have a "relationship of 'trust and confidence'" with their clients, based on the "personalized character of the services" they provide. *Id.*

In stark contrast, however, the Advisers Act did not extend fiduciary status to "any broker or dealer" who provides advice that is "solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." 15 U.S.C. § 80b-2(a)(11)(C). This exemption "reflected [a] distinction" between the "two general forms of compensation" financial professionals receive for rendering investment advice: (1) "traditional commissions" and (2) "a separate advice fee." *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 485 (D.C. Cir. 2007). Thus, "[t]wo characteristics distinguished investment advisers from broker-dealers: the fact that investment advisers gave advice for its own sake; and the fact that investment advisers were compensated specifically for that advice." *Thomas v. Metro Life Ins. Co.*, 631 F.3d 1153, 1166 (10th Cir. 2011).

Accordingly, the Advisers Act "excludes a broker-dealer who provides advice that is attendant to, or given in connection with, the broker-dealer's conduct as a broker or dealer, so long as he does not receive compensation that is (1) received specifically in exchange for the investment advice, as opposed to for the sale of the product; and (2) distinct from a commission or analogous transaction-based form of compensation for the sale of a product." *Id.* As at common law, merely recommending a product for a commission was not deemed a fiduciary act.

Congress was well aware of these principles when it enacted ERISA in 1974. Like the broker-dealers exempted from fiduciary status under the Advisers Act, insurance salespersons earn commissions for selling products they recommend. They are paid for the products, not for investment advice. The Department cites no basis to conclude that, in enacting ERISA, Congress intended to depart from this well-known and settled understanding of fiduciary advice,

and it essentially rewrites ERISA legislative history with a backwards glance.[6]

### 6.    The Department's Five-Part Test Was Faithful To Congressional Intent.

When the Department issued its five-part test interpreting 29 U.S.C. § 1002(21)(A)(ii) in 1975, it crafted a regulation that was consistent with the plain meaning of "fiduciary," common law fiduciary rules, and the fiduciary advice concepts incorporated in the Advisers Act.  The D.C. Circuit has made clear that the Department's "past approach to this statute" is relevant to statutory construction issues under *Chevron*.  *Loving*, 742 F.3d at 1021.

Consistent with congressional intent, the five-part test extends fiduciary status only to advisers who render investment advice "on a regular basis" and pursuant to a "mutual" agreement or understanding that "the advice will serve as a primary basis for investment decisions" and is "individualized."  29 C.F.R. § 2510.3-21.  This test has long distinguished a true fiduciary from a salesperson who recommends and sells an annuity for a commission.

In addition to the five-part test itself, the Department issued a press release after ERISA was enacted, stating that "[a] fiduciary is a person who holds or controls property for the benefit of another person," *i.e.*, "[h]e is the man who handles the money."  (NAFA Br. at 33.)  The

---

[6]    The Department points out that the Advisers Act is referenced in ERISA, citing a provision in which the term "investment manager" is defined to mean "any fiduciary" who (1) "has the power to manage, acquire, or dispose of any assets of a plan," (2) "is registered as an investment adviser under the [Advisers Act]" (or meets another enumerated condition), and (3) "has acknowledged in writing that he is a fiduciary with respect to the plan."  29 U.S.C. § 1002(38).  ERISA permits a plan trustee to "delegate" the "exclusive authority to manage and control the assets of the plan" by giving "authority to manage, acquire, or dispose of assets of the plan" to "one or more investment advisers."  *Id.* § 1103(a)(2).  If anything, these provisions reinforce that Congress was aware of common law fiduciary rules and the Advisers Act when it enacted ERISA.  The Department also cites *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003), for the proposition that "[w]here Congress has intended to provide regulatory exceptions to provisions . . . it has done so clearly and expressly."  But the Department omits critical language from this quotation:  "[W]here Congress has intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly, rather than by a device so subtle as denominating a motive a cause."  *Id.* (emphasis added).

Department's own web site currently states that "[t]he key to determining whether an individual or an entity is a fiduciary is whether they are exercising discretion or control over the plan." (https://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html).   Thus, at some point, the Department understood that its new definition of fiduciary is not proper under ERISA.

The Department cites *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1094-95 (D.C. Cir. 2015), to defend its departure from the five-part test, arguing that it need only "show[] that there are good reasons for the new policy," and "the APA imposes no special burden when an agency elects to change course."   To be sure, the Department is "free to change (or refine) its interpretation of a statute it administers," "[b]ut the interpretation, whether old or new, must be consistent with the statute." *Loving*, 742 F.3d at 1021.

Here, the problem is not simply that the Department has changed its mind.   Rather, the Department lacks statutory authority to extend fiduciary duties to insurance salespersons, as shown by its own interpretation of the relevant statutory provision during the decades since it promulgated the five-part test in 1975.   The Department was faithful to congressional intent when it issued the five-part test, but it ignored congressional intent when it created the new Rule.

### 7.   Congress Has Ratified The Five-Part Test.

As explained in NAFA's opening brief (at 33-35), Congress has repeatedly ratified the five-part test, both by reenacting the Code and by amending relevant provisions of ERISA. Specifically, Congress reenacted the entire Code through the Tax Reform Act of 1986 (the "1986 Act"), with amendments to Section 4975.[7]   When it passed the Pension Protection Act of 2006

---

[7]   As set forth in NAFA's opening brief (at 11-12), Section 4975 imposes an excise tax when a fiduciary to a plan (including an IRA) engages in a "prohibited transaction," 26 U.S.C. § 4975(c)(1), and Section 4975 contains the same definition of "fiduciary" that appears in ERISA, *id.* § 4975(e)(3)(B).   In 1975, the Department of Treasury promulgated a regulation that contained the same five-part test used by the Department to interpret the analogous provision of ERISA.   26 C.F.R. § 54.4975.9.

(the "2006 Act"), Congress amended both ERISA and the Code to add a new definition of "fiduciary adviser" referring to "a person who is a fiduciary of the plan by reason of the provision of investment advice."  29 U.S.C. § 1108(g)(11)(A); 26 U.S.C. §§ 4975(f)(8)(J)(i).

These reenactments were not "isolated amendments" of ERISA and the Code, as the Department suggests in its brief (at 40) – they were at the core of the statutory authority the Department relies upon to scuttle the five-part test and adopt the Rule.  When a statute is fully reenacted, or new key provisions are enacted, it is axiomatic that "Congress is presumed to have been aware of the prior interpretation of the same language by the Secretary and to have intended a continued consistent interpretation."  *National Soft Drink Ass'n v. Block*, 721 F.2d 1348, 1353 (D.C. Cir. 1983); *Dart v. United States*, 848 F.2d 217, 229 (D.C. Cir. 1988) ("We are entitled to assume that in amending [a statute], Congress legislated with care.") (quotation omitted).

 In addition, as also explained in NAFA's opening brief (at 36), numerous courts have relied on the Department's five-part test to conclude that insurance carriers and agents do not face fiduciary duties when recommending their products to ERISA plan.  Congress also is presumed to have been aware of these judicial decisions as well when it reenacted the Code and the relevant portions of ERISA.  *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

To discuss one of many cases for purposes of illustration, in *American Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assur. Soc'y*, 841 F.2d 658, 664 (5th Cir. 1988), the court held that an insurance salesperson was not liable as a fiduciary because "[t]here [was] no evidence that [he] was paid a fee by the Fund for giving this investment advice." Instead, he merely received "commissions" from the insurance company.  Unlike a true ERISA

fiduciary, he was not employed by the plan to render advice.  *Id.*  Later in the same decision, citing the five-part test, the court concluded that the insurance carrier he represented also did not face ERISA fiduciary duties, because "[s]imply urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those products." *Id.* at 664.

The Department simply fails to acknowledge the reenactment of the entire Code in 1986, the amendments to relevant provisions of ERISA in 2006, or any of these judicial decisions. Instead, the Department blithely relies on cases involving "congressional acquiescence" to suggest that ratification is without import here.  (Opp. at 40 (citing *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)).)  That is simply misleading.

In *Solid Waste*, the Court held that an agency exceeded its statutory authority under the Clean Water Act by defining "navigable waters" to include "an abandoned sand and gravel pit" that "provides habitat for migratory birds." 531 U.S. at 162-74.  To defend its interpretation, the agency pointed out that it had long ago promulgated a regulation that contained a broad definition of "navigable waters," and Congress had tried but failed to pass legislation to impose a more narrow definition.  *Id.* at 168-69.   The Court declined to rely on "congressional acquiescence to administrative interpretations of a statute," because "[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Id.* at 169-70.

In *Central Bank*, the Court considered whether Section 10(b) of the Securities Exchange Act gives rise to aiding and abetting liability, and it rejected congressional acquiescence arguments.  The Court began by noting that "Congress has not reenacted the language of § 10(b) since 1934, . . . so we need not determine whether the conditions for applying the reenactment doctrine are present."  511 U.S. at 185.  The Court then declined to divine congressional intent

18

from Congress's supposed acquiescence to aiding and abetting liability when it amended the statute or failed to pass legislation prohibiting such liability, because "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute," and "[c]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction." *Id.* at 186-87 (quotations omitted).

Here, NAFA does not rely on acquiescence through "failed legislative proposals," but rather points out that Congress ratified the five-part test when it affirmatively reenacted the entire Code in 1986 and amended relevant provisions of both ERISA and the Code through the 2006 Act. These facts, which the Department does not dispute, make the situation here entirely different from *Solid Waste* and *Central Bank*. The facts here also distinguish the other cases upon which the Department relies, in which Congress did not reenact the entire statute or amend the salient portions of the statute. *E.g.*, *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 154 (D.D.C. 2015) ("Here, Congress did not re-enact the entire Lacey Act and did not amend the relevant language in any of the three subsequent enactments upon which Defendants rely."); *Public Citizen, Inc. v. United States Dep't of Health & Human Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003) ("Congress has neither re-enacted the entire PRO statute nor amended [the relevant provision] at all.").[8]

---

[8]   The Department cites *AFL-CIO v. Brock*, 835 F.2d 912, 916 n.6 (D.C. Cir. 1987), to argue both that "congressional silence cannot be equated with a clear statement that the agency's existing regulations represent the outer boundary of the agency's rulemaking authority," and Congress gave no "indication" that it approved of the five-part test. (Opp. at 40.) First, while *Brock* states in a footnote that "no case has rested on" congressional reenactment "alone," congressional ratification is but one of numerous reasons to conclude that Congress did not intend to extend fiduciary status to insurance salespersons. Second, when Congress passed the 2006 Act, it added a new definition of "fiduciary adviser" that expressly referred to "a person who is a fiduciary of the plan by reason of the provision of investment advice." 29 U.S.C. § 1108(g)(11)(A) (ERISA); 26 U.S.C. §§ 4975(f)(8)(J)(i) (the Code). This is a "discernable congressional approval" of the five-part test promulgated in 1975.

### 8.    The Department's Expansion Of Fiduciary Duties Defies Common Sense.

Finally, it makes no sense to suggest that Congress intended ERISA fiduciary duties to extend to insurance salespersons, particularly when such an interpretation of the statute would have enormous adverse consequences on the fixed annuity industry.  Courts "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."  *Brown & Williamson*, 529 U.S. at 133.  Further, courts "should not lightly presume congressional intent to implicitly delegate" the authority to enact a Rule of such enormous "economic or political significance."  *Loving*, 742 F.3d at 1021.  "[H]ad Congress wished to assign that question to an agency, it surely would have done so expressly."  *Burwell*, 135 S. Ct. at 2489.

Bottom line – and even if this were a close call, which it is not – given the significant and far-reaching impact of the Rule, the Court "should not lightly presume" that Congress intended to grant such authority to the Department.

### B.    The Department Has No Authority To Impose ERISA Fiduciary Duties On Parties To Transactions Involving IRAs.

As explained in NAFA's opening brief (at 41-46), even if the Department's new expansion of ERISA fiduciary duties were within the scope of its authority – which it is not – it still has no statutory authority to impose ERISA fiduciary duties on IRA transactions, as it seeks to do through the combination of the Rule, PTE 84-24, and the BICE.

Overall, the Department ignores that ERISA was enacted, in part, to regulate the individuals who manage employer-sponsored employee benefit plans in order to protect the beneficiaries of such plans, who lacked control over plan investments.  In contrast, IRAs are individual plans for which such protections are unnecessary, because IRA owners have the freedom to shop for the most appropriate financial product.  This obvious distinction seems to be

lost on the Department as it pursues its policy agenda to extend ERISA fiduciary duties to IRA transactions, contrary to congressional intent, through the new Rule and exemptions.

### 1.    Congress Did Not Impose ERISA Fiduciary Duties In IRA Transactions.

When Congress enacted Title I of ERISA, it elected to impose fiduciary duties on ERISA plan fiduciaries through ERISA Section 404.  29 U.S.C. § 1104.  At the same time, Congress created traditional IRAs and amended the tax code to establish prohibited transaction rules applicable to IRAs, but Congress deliberately chose not to impose key ERISA duties in IRA transactions through Sections 408(e) and 4975 of the Code.

Legislative history demonstrates that Congress drew clear distinctions between Title I of ERISA, which imposes fiduciary duties on ERISA plan fiduciaries, and Title II, which imposes no fiduciary duties in IRA transactions.  The Conference Report makes these distinctions clear:

> Fiduciary responsibility rules, in general
>
> The conference substitute establishes rules governing the conduct of plan fiduciaries under the labor laws (title I) and also establishes rules governing the conduct of disqualified persons (who are generally the same people as "parties in interest" under the labor provisions) with respect to the plan under the tax laws (title II).  This division corresponds to the basic difference in focus of the two departments.  The labor law provisions apply rules and remedies similar to those under traditional trust law to govern the conduct of fiduciaries.  The tax law provisions apply an excise tax on disqualified persons who violate the new prohibited transaction rules; this is similar to the approach taken under the present rules against self-dealing that apply to private foundations.
>
> The labor provisions deal with the structure of plan administration, provide general standards of conduct for fiduciaries, and make certain specific transactions "prohibited transactions" which plan fiduciaries are not to engage in. The tax provisions include only the prohibited transaction rules and apply only to disqualified persons, not fiduciaries (unless the fiduciary is otherwise a disqualified person and the transaction involved him, or the fiduciary benefited from the transaction). . . .

*      *      *

21

Basic fiduciary rules

Prudent man standard.-- The substitute requires that each fiduciary of a plan act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in conducting an enterprise of like character and with like aims. The conferees expect that the courts will interpret this prudent man rule (and the other fiduciary standards) <u>bearing in mind the special nature and purpose of employee benefit plans</u>.

\*       \*       \*

Prohibited transactions

In general – . . . Prohibited transaction rules are included both in the labor and tax provisions of the substitute.  <u>Under the labor provisions (title I), the fiduciary is the main focus of the prohibited transaction rules.</u>  This corresponds to the traditional focus of trust law and of civil enforcement of fiduciary responsibilities through the courts.  <u>On the other hand, the tax provisions (title II) focus on the disqualified person.</u>  This corresponds to the present prohibited transaction provisions relating to private foundations.

1974 U.S.C.C.A.N. at 5076-5088 (emphasis added).

In addition, the House Report explains that Congress did not intend the ERISA fiduciary

duties to apply to individual accounts like IRAs:

It is not the intent of the Committee, however, that where the sole power of control, management or disposition with respect to plan funds rests with the participants themselves, as may be the case with respect to certain plans where the <u>participant has the sole discretion over an individual account established in his name</u>, that such participants shall be regarded as fiduciaries. . . .

\*       \*       \*

The principles of fiduciary conduct are adopted from existing trust law, but with modifications appropriate for <u>employee benefit plans</u>.  These salient principles place a twofold duty on every fiduciary: to act in his relationship to the plan's fund as a prudent man in a similar situation and under like conditions would act, and to act consistently with the principles of administering the trust for the exclusive purposes previously enumerated, and in accordance with the documents and instruments covering the fund unless they are inconsistent with the fiduciary principles of the section.

1974 U.S.C.C.A.N. at 4649-4651 (emphasis added).

The differences between Title I and Title II of ERISA, which were enacted at the same

22

time, make clear that Congress did not intend to apply ERISA fiduciary duties in IRA transactions. It is well established "that, when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' *Stovic v. R.R. Ret. Bd.*, --- F.3d ---, 2016 WL 3457645, at *2 (D.C. Cir. June 24, 2016) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). "When Congress uses explicit language in one part of a statute to cover a particular situation and then uses different language in another part of the same statute, a strong inference arises that the two provisions do not mean the same thing." *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 843 (D.C. Cir. 1984).

So what does all this mean here? There is no dispute that ERISA is inapplicable to IRAs and provides no authority for the Department to regulate IRAs. The Department concedes that Title II of ERISA, which amended the Code and established the rules for assessing an excise tax for prohibited transactions, does "not subject fiduciaries of an IRA to the obligations of prudence and loyalty" that apply to plan fiduciaries under Title I of ERISA. (Opp. at 4.) The Department further concedes that "those who qualify as fiduciaries <u>with respect to IRAs</u> are not subject to fiduciary duties under ERISA," and it says it "did <u>not</u> rely on ERISA to apply the revised definition of fiduciary or the BIC Exemption to fiduciaries to IRAs." (*Id.* at 48-49.)

Instead, the Department points to its rulemaking authority with respect to IRAs, under the Code, 26 U.S.C. § 4975(c)(2), and the Reorganization Plan, 5 U.S.C. App. 1, § 102, as its authority to enact the Rule and related exemptions. Specifically, the Department relies "on its interpretive and rulemaking authority under the Code, including its authority to grant conditional exemptions" to the prohibited transactions rules in the Code, "transferred to it pursuant to the Reorganization Plan." (Opp. at 48.) It argues that its authority to "fashion appropriate

exemptions" to the prohibited transaction rules in Section 4975 allows it to "condition an exemption on adherence to the impartial conduct standards, including fiduciary standards of prudence and loyalty." (*Id.* at 49)

In other words, the Department claims that its limited authority to issue "conditional" exemptions to the prohibited transaction rules in Section 4975 of the Code gives it the authority to condition such exemptions on adherence to the very same fiduciary standards that Congress deliberately chose not to apply to IRA transactions. According to the Department, "all that can be inferred" from Congress's decision not to impose fiduciary duties in IRA transactions "is that Congress did not intend to <u>mandate</u> such obligations." (*Id.*) That is absurd. The Department's effort to use its narrow authority under the Code to trump an explicit congressional determination not to extend ERISA fiduciary duties to IRA transactions is manifestly an end run around congressional intent.[9]

## 2. PTE 84-24 And The BICE Incorporate ERISA Fiduciary Standards.

To see how badly the Department has ignored congressional intent, it is instructive to compare the fiduciary duties described in ERISA, which Congress did not apply to IRA

---

[9]  Indeed, the ERISA conference report further belies the Department's effort to rely on its authority to issue conditional exemptions to alter the basic fiduciary rules in ERISA:

> Under the substitute, variances may be conditional or unconditional and may exempt a transaction from all or part of the prohibited transaction rules. In addition, variances may be for a particular transaction or for a class of transactions, and may be allowed pursuant to rulings or regulations. <u>A variance from the prohibited transaction rules is to have no effect with respect to the basic fiduciary responsibility rules requiring prudent action, diversification of investments, actions exclusively for the benefit of participants and beneficiaries, etc.</u> (This is the case with respect to all statutory exemptions from the prohibited transaction rules as well.)

1974 U.S.C.C.A.N. at 5091 (emphasis added). Although Congress intended that any exemptions to the prohibited transactions rules in the Code were "<u>to have no effect</u> with respect to the basic fiduciary responsibility rules," the Department relies on its authority to issue exemptions to expand "fiduciary responsibility rules" to IRA transactions.

transactions, to those incorporated in the new PTE 84-24 and the BICE, which the Department seeks to apply to IRA transactions.  The Department simply copied the fiduciary standard from ERISA and pasted it into PTE 84-24 and the BICE.

Title I of ERISA imposes a "prudent man standard of care" requiring, *inter alia*, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" (*i.e.*, a duty of loyalty) and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" (*i.e.*, a duty of prudence).  29 U.S.C. § 1104(a)(1)(B).  As the Department concedes, Title II of the ERISA (*i.e.*, the Code provisions) imposes no such duties in IRA transactions.

Nevertheless, the Department seeks to use PTE 84-24 (applicable to sales of fixed declared rate annuities) and the BICE (applicable to FIAs) to impose the very same fiduciary duties in transactions involving IRAs.  PTE 84-24 provides as follows:

> The insurance agent or . . . insurance company . . . that is a fiduciary acts in the "Best Interest" of the Plan or IRA when the fiduciary acts <u>with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims,</u> based on the investment objectives, risk tolerance, financial circumstances and needs of the Plan or IRA, without regard to the financial or other interests of the fiduciary, any affiliate or other party.

81 Fed. Reg. 21,176 (emphasis added).  In addition, the BICE provides as follows:

> Investment advice is in the "Best Interest" of the Retirement Investor when the Adviser and Financial Institution providing the advice act <u>with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims,</u> based on the investment objectives, risk tolerance, financial circumstances, and needs of the Retirement Investor, without regard to the financial or other interests of the Adviser, Financial Institution or any Affiliate, Related Entity, or other party.

81 Fed. Reg. 21,083 (emphasis added).  The underlined portions of the "Best Interest" standard

contained in PTE 84-24 and the BICE are copied verbatim from Section 404 of ERISA.[10]

Bottom line, through its rulemaking, the Department has made applicable to IRA transactions the obligations of Section 404 of ERISA, which Congress explicitly did not make applicable to IRA transactions.  Thus, the Department has exceeded its statutory authority.

### 3.    The Department Is Not Entitled To Deference.

As explained above, the Department relies solely on what it describes as a "broad delegation of authority" to grant conditional exemptions to the prohibited transaction rules in the Code.  *See* 26 U.S.C. § 4975(c)(2).  The Department argues that an "arbitrary and capricious standard" applies to its decision, which is "entitled to great deference" under *AFL-CIO v. Donovan*, 757 F.2d 330, 341 (D.C. Cir. 1985).  (Opp. at 47-48.)  The Department misconstrues the basis for NAFA's challenge and misstates the governing legal standard.

The Department exceeded its statutory authority by subjecting all insurance agents to ERISA fiduciary duties when selling annuities to IRAs.  In other words, NAFA challenges "whether the agency has stayed within the bounds of its statutory authority."  *Loving*, 742 F.3d at 1016 (citation omitted).  "Put in *Chevron* parlance," the Department's "interpretation fails at *Chevron* step 1 because it is foreclosed by the statute."  *Id.* at 1022.

Perhaps recognizing how far it has strayed from congressional intent, the Department relies heavily on *Donovan* for the proposition that "[w]here Congress delegates, explicitly or implicitly, to an administrative agency the authority to give meaning to a statutory term or to promulgate standards or classifications, the regulations adopted in the exercise of that authority

---

[10]   In addition, the requirement that an Adviser act "without regard to the financial or other interests of the fiduciary, any affiliate or other party" was intended by the Department to serve as a "concise expression of ERISA's duty of loyalty, as expressed in section 404(a)(1)(A) of ERISA and applied in the context of advice."  81 Fed. Reg. 21,159 (PTE 84-24) & 21,026 (BICE).  *See also* 81 Fed. Reg. 21,161 (PTE 84-24) & 21,027 (BICE) (same).

enjoy 'legislative effect.'"  757 F.2d at 341 (quoting *Batterton v. Francis*, 432 U.S. 416, 425

(1977)).  In those limited circumstances, "legislative regulations are given controlling weight

unless they are arbitrary, capricious, or manifestly contrary to a statute."  *Id.* (quoting *Chevron,*

*USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).  The Department claims it is

entitled to that kind of latitude here.  (Opp. at 47-48.)  While it is understandable that the

Department is begging for deference, its reliance on *Donovan* is misplaced.

First, the Department's decision to impose ERISA fiduciary duties in IRA transactions is

not simply an effort to "give meaning to a statutory term or to promulgate standards or

classifications."  It is much more than that.  Second, and critically, as the Supreme Court made

clear in *Batterton* (the case quoted and relied upon in *Donovan*), a regulation that results from

delegated authority may be rejected if the agency "exceeded [its] statutory authority or if the

regulation is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law.'"  *Batterton*, 432 U.S. at 426 (quoting 5 U.S.C. § 706(2)(A) & (C)) (emphasis added).  The

Department fails to acknowledge the first part of this disjunctive standard in pleading for

deference.  But it is the first prong of the *Batterton* test that forms the basis for NAFA's

challenge.  Delegated authority to issue exemptions is not a license to exceed statutory authority,

as the Department suggests.

### 4.    The Department's Arguments Ignore History And Context.

The Department argues that "under the prohibited transaction provisions [of the Code],

the default is that transactions must be free from conflicted advice, or else the transaction cannot

proceed at all."  (Opp. at 49.)  It says that "Congress permitted such transactions by way of

exemptions only if the Secretary determined that protections could be put in place."  (*Id.* at 49-

50.)  The Department reasons that "[b]y giving [the Department] discretion to craft exemptions

as needed to protect participants and beneficiaries, Congress intended to delegate to [the

27

Department] the authority to determine what obligations should apply to fiduciaries to IRAs." (*Id.* at 50.)  That is not correct.

Again, this argument ignores the fact that Congress deliberately chose not to extend ERISA fiduciary obligations in IRA transactions.  The Department may believe that it is "in the interest of retirement investors" that "fiduciaries to IRAs agree in writing to adhere to fiduciary obligations that put investors' interest first," but it has no authority to make that judgment when Congress has not done so.  "[T]hat is a decision for Congress and the President to make if they wish by enacting new legislation."  *Loving*, 742 F.3d at 1022.[11]

Further, the Department advances the fiction that "nothing in the Rule or the related exemptions requires fiduciaries to IRAs to use exemptions," which "simply provide a means to engage in IRA transactions otherwise prohibited by § 4975 of the Code."  That is sophistry.  It is well aware that those who sell fixed annuities are "all" compensated by commission:

> Commissions are a common practice in the insurance market and reflect how distributors – insurance agents or broker-dealers – get compensated after a transaction is completed.   Annuities are sold through different types of distributors. Independent BDs, full service national BDs, independent agents, career agents, and banks collectively account for over 90 percent of annuity sales and all are paid by commissions.

(Regulatory Impact Analysis at 130-31 (§ 3.2.3.1) (emphasis added).)  When the Rule becomes applicable, fixed annuity sellers will all be subject to PTE 84-24 or the BICE.  (*Id.* at 68 (§ 2.9.2).)  As the Department recognized before this litigation, there is no smorgasbord of options for the fixed annuity industry to comply with the Rule.  The Department fully intended

---

[11]  The Department further undermines its position by arguing that "Congress took a similar approach when it created a new statutory exemption in the Pension Protection Act of 2006, that allows fiduciaries giving investment advice to individuals (pension plan participants, beneficiaries, and IRA owners) to receive compensation from investment vehicles that they recommend," subject to "constraints that are calibrated to limit the potential for abuse and self-dealing."  (Opp. at 50 n.31.)  Congress has the authority to enact legislation and is capable of doing so.  In contrast, the Department has only the authority granted by Congress.

the Rule, PTE 84-24, and the BICE, in combination, to extend ERISA fiduciary duties to all fixed annuity transactions involving IRAs.  The Department is talking out of both sides of its mouth when it suggests otherwise.

### C.    The BICE Creates An Impermissible Private Right Of Action.

The Department does not stop at simply extending ERISA fiduciary duties to IRA transactions.  Instead, it takes yet another giant leap beyond its statutory authority by effectively requiring that FIA sales to IRAs be made pursuant to a "Best Interest Contract" that incorporates the ERISA fiduciary duties copied and pasted into the BICE.  In that way, the Department has created a private right of action against IRA "fiduciaries" for breach of fiduciary duty, where Congress authorized no such action.  The Department has no statutory authority to do that.

"[I]t is fundamental that an agency may not bootstrap itself into an area in which it has no jurisdiction." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990) (quotation omitted).  When it enacted ERISA, Congress carefully crafted numerous, but limited, enforcement mechanisms. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146-47 (1985) ("The six carefully integrated civil enforcement provisions found in § 502(a) of [ERISA] as finally enacted . . . provide strong evidence that Congress did <u>not</u> intend to authorize other remedies that it simply forgot to incorporate expressly. . . . We are reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA."); *Mertens*, 508 U.S. at 254 (ERISA's "carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did <u>not</u> intend to authorize other remedies that it simply forgot to incorporate expressly.'")  Yet these carefully drawn enforcement provisions did not include a private right of action to enforce the prohibited transaction rules in Section 4975.

As the Department concedes, the prohibited transaction rules applicable to IRA transactions under the Code do not give rise to a private cause of action; instead, Congress

determined that "fiduciaries" would face an excise tax for engaging in prohibited transactions:

> Although ERISA's statutory fiduciary obligations of prudence and loyalty do not govern the fiduciaries of IRAs and other plans not covered by ERISA, these fiduciaries are subject to prohibited transaction rules under the Code. The statutory exemptions in the Code apply and the Department of Labor has been given the statutory authority to grant administrative exemptions under the Code. In this context, however, <u>the sole statutory sanction for engaging in the illegal transactions is the assessment of an excise tax enforced by the Internal Revenue Service (IRS).  Thus, unlike participants in plans covered by Title I of ERISA, IRA owners do not have a statutory right to bring suit against fiduciaries under ERISA for violation of the prohibited transaction rules.</u>

81 Fed. Reg. 20,953-20,954 (emphasis added).  Numerous courts have determined that neither Section 408 nor 4975 of the Code gives rise to a private cause of action for breach of fiduciary duty against "errant IRA fiduciaries."  *E.g.*, *Burns v. Delaware Charter Guarantee & Tr. Co.*, 805 F. Supp. 2d 12, 19-21 (S.D.N.Y. 2011) ("Section 408 does not give rise to any independent cause of action or actionable duties, and any claim that it does is 'frivolous.'"); *Grund v. Delaware Charter Guarantee & Trust Co.*, 788 F. Supp. 2d 226, 237 (S.D.N.Y. 2011) ("Title II [of ERISA] does not give rise to an enforceable fiduciary duty claim."); *Mandelbaum v. Fiserv, Inc.*, 787 F. Supp. 2d 1226, 1237 (D. Colo. 2011) ("[A]n implied cause of action is a matter of legislative intention and the tax code lacks any wording that creates a private right of action against errant fiduciaries of pension and individual retirement accounts.").

As the Supreme Court recognized in *Russell*, Congress intentionally designed the Code's prohibited transaction rules to limit remedial relief to correction of the prohibited transaction and payment of an excise tax modeled after the private foundation self-dealing rules of Code Section 4941.  Through the Rule and the BICE, however, the Department has created additional remedial litigation rights to enforce federal law, for the first time subjecting IRA "fiduciaries" to a risk of liability for breach of ERISA fiduciary duties that Congress never imposed on them.  Because all agents and IMOs in the annuity marketplace are compensated by commission, insurance carriers

that sell FIAs purchased with qualified IRA funds will have no choice but to enter into BICs that subject them to a new risk of liability for breach of fiduciary duties imposed by ERISA.[12]

The Department's imposition of new litigation exposure to ERISA fiduciary standards with respect to IRA transactions is a clear violation of the principles set forth in *Alexander v. Sandoval*, 532 U.S. 275 (2001). "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Id.* at 286. "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Id.* at 291. "[I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress." *Id.* But that is exactly what the Department has done here.

The Department seeks to distinguish *Sandoval* by arguing that it "neither 'created' a private right nor required an 'action to enforce federal law.'" (Opp. at 52.) Not true. This facile argument ignores that IRA owners will now be able to rely on fiduciary duties <u>imposed under</u> <u>ERISA</u> to bring litigation – including class action litigation – against "errant IRA fiduciaries." But for the Department creating the BICE, an IRA owner has no such private right of action.

In its commentary accompanying the Rule and the BICE, the Department contradicted its litigation position by stating its objective to expand enforcement mechanisms for IRA investors by creating a new cause of action for breach of ERISA fiduciary duties:

> The [BIC] creates a mechanism for IRA investors to enforce their rights and ensures that they will have a remedy for advice that does not honor their best interest. In this way, <u>the contract gives both the individual adviser and the</u>

---

[12] NAFA members that sell fixed declared rate annuities pursuant to PTE 84-24 face risk as well. PTE 84-24 requires that "the insurance agent or . . . insurance company . . . act[] in the Best Interest of the Plan or IRA at the time of the transaction" (PTE 84-24 § II(a)); as explained above, the "Best Interest" standard in PTE 84-24 incorporates ERISA fiduciary duties (*id.* § VI(b)). 81 Fed. Reg. 21,174-21,176. IRA owners may rely on this language to bring tort claims alleging that fixed annuity sellers violated ERISA fiduciary duties.

<u>financial institution a powerful incentive to ensure advice is provided in accordance with fiduciary norms, or risk litigation, including class litigation, and liability and associated reputational risk</u>.

81 Fed. Reg. 20,947 (Rule commentary) (emphasis added).

> In the final exemption, the Department retained the contract requirement with respect to IRAs and non-ERISA plans.  The contractual commitment provides an administrable means of ensuring fiduciary conduct, eliminating ambiguity about the fiduciary nature of the relationship, and enforcing the exemption's conditions, thereby assuring compliance. . . .  <u>The contract</u> effectively aligns the interests of Retirement Investor, Advisers, and the Financial Institution, and <u>gives the Retirement Investor the means to redress injury when violations occur</u>.

> <u>Without a contract, the possible imposition of an excise tax provides an additional, but inadequate, incentive to ensure compliance with the exemption's standards-based approach.</u>

81 Fed. Reg. 21,022 (BICE commentary) (emphasis added).  The senior agency official responsible for the Rule has stated that "[w]e had to be creative to find a way to make the responsibility for acting in your client's best interest – the fiduciary responsibility – enforceable in the IRA context."  Nick Thornton, *Who will enforce the DOL rule?*, Benefits Pro (June 1, 2016) (http://www.benefitspro.com/2016/06/01/who-will-enforce-the-dol-rule).

Accordingly, it is disingenuous for the Department to argue that it "has expressly disclaimed any new cause of action" and "has simply specified the minimum contract terms for a financial institution to qualify for the BICE Exemption for IRA transactions."  (Opp. at 53.)  In truth, the Department has given private parties a new right to sue based on federal law.  The rule set forth in *Sandoval* would be meaningless if agencies could simply "conjure up a private cause of action that has not been authorized by Congress" by grafting federal statutory rights into state-law claims. 532 U.S. at 291.  *Sandoval* is not an invitation deftly to evade congressional intent.

The Department also argues that "[a] contract executed under the exemption will only expose the adviser to whatever causes of action exist under the laws already in existence governing such contracts."  (Opp. at 52.)  The Department further contends that "IRA

customers" already may "bring breach of contract and breach of fiduciary duty claims under state law." (Opp. at 4; *see also id.* at 54 ("As long as there have been IRA transactions, there have been state law contract claims regarding those transactions.").) That is just nonsense. These arguments ignore the fact that the Department has created a new right by subjecting those who sell FIAs to IRA accounts to fiduciary duties set forth in Section 404 of ERISA.[13] Indeed, if the Department were correct in asserting that a BIC adds nothing to causes of action already available to the IRA investor, the BIC would be superfluous.

Finally, the Department cites other federal regulations that it claims "specify [the] terms for the private contracts of regulated entities" or otherwise require contracts. (Opp. at 53.) The Department relies principally on 14 C.F.R. § 212.3, which requires that foreign air carriers enter into written contracts to conduct charter flights and mandates that such agreements contain certain information about the manner in which advanced payments for charters are secured by surety bonds or held in escrow. But this regulation merely requires written contracts disclosing certain information – it does not dictate the terms of the contracts or create new rights.[14] The Department also cites to PTE 84-14 and PTE 2006-16 (Opp. at 55), but these exemptions merely

---

[13] The Department cites two district court opinions to support this argument, but neither suggests that the Code imposes actionable fiduciary duties in IRA transactions. (Opp. at 4, 54.) In *Knox v. Vanguard Grp., Inc.*, 2016 WL 1735812, at *5-6 (D. Mass. May 2, 2016), the court denied a motion to dismiss state-law negligence and breach of fiduciary duty claims against an IRA custodian (not an adviser or salesperson) under the "gist of the action" doctrine, without analysis of the fiduciary duty claim. In *Abbit v. ING USA Annuity & Life Ins. Co.*, 999 F. Supp. 2d 1189, 1198-99 (S.D. Cal. 2014), the court recognized that "the relationship 'between an insurer and a prospective insured is not a fiduciary relationship," but it declined to dismiss a breach of fiduciary duty claim based on California law, because there were allegations that "other acts or representations form[ed] a fiduciary relationship." Neither plaintiff asserted rights under ERISA or the Code.

[14] None of the other regulations the Department cites dictate the terms of contracts in this manner. *See* 47 C.F.R. § 24.238(c); 7 C.F.R. § 1499.11(g); 7 C.F.R. § 1493.70(a).

require parties who already qualify as fiduciaries to enter into written agreements.[15]

The other regulations cited by the Department are not remotely comparable to the BICE, which creates both a new federal right (applying ERISA fiduciary duties to IRA transactions for the first time) and a right of action (through an action to enforce a BIC). Here, the Department goes so far as to dictate the terms of the litigation and damage claims that may be asserted in such litigation. Specifically, the BICE prohibits (1) "[e]xculpatory provisions disclaiming or otherwise limiting liability," (2) class action waivers, (3) liquidated damage provisions, and (4) "[a]greements to arbitrate or mediate individual claims in venues that are distant or that otherwise unreasonably limit the ability of the Retirement Investors to assert the claims safeguarded by this exemption." 81 Fed. Reg. 21,078 (BICE § II(f)). The BICE also allows the parties to a BIC to "knowingly agree to waive the Retirement Investor's right to obtain punitive damages or rescission," at least "to the extent such a waiver is permissible under applicable state or federal law." (*Id.*)[16] These are exactly the types of detailed rules Congress might establish if it were to create a new private cause of action to enforce ERISA fiduciary duties with respect to IRA transactions. But the Department is not Congress.[17]

---

[15] *See* 75 Fed. Reg. 38,843 (PTE 84-14 defines a Qualified Professional Asset Manager as "an independent fiduciary," *i.e.*, a bank, savings and loan association, insurance company, or registered investment advisor that "has acknowledged in a written management agreement that it is a fiduciary with respect to each plans that has retained the QPAM"); 71 Fed. Reg. 63,795-63,796 (PTE 2006-16 is a conditional exemption allowing for "the lending of securities that are assets of an employee benefit plan" and "the payment to a fiduciary (the Lending Fiduciary) of compensation for services rendered in connection with loans of plan assets that are securities.").

[16] As already explained, it is doubtful that state regulators will permit insurance carriers to include such provisions in BICs. (NAFA Br. at 54 n.5 & 64.)

[17] The Department does not dispute that the BICE is an integral and non-severable component of the Rule that could not be vacated without vacating the Rule as well. (NAFA Br. at 47-48, 50-51) The Department waived any argument to the contrary and thus has conceded this point. *See Latson v. Holder*, 82 F. Supp. 3d 377, 388 n.4 (D.D.C. 2015) ("The Court treats these arguments as waived because they were raised for the first time in the defendant's reply

### D.    The Rulemaking Also Fails Under *Chevron* Step Two.

Even if the Department's rulemaking were not completely foreclosed by the language of the statute, it fails at *Chevron* Step Two in any event.  Congress never intended the relevant provisions of ERISA and the Code to be used to impose fiduciary status on insurance salespersons who earn commissions for selling annuities to IRAs.  *Goldstein v. SEC*, 451 F.3d 873, 880-81 (D.C. Cir. 2006) ("The 'reasonableness' of an agency's construction depends, in part, on the construction's 'fit' with the statutory language, as well as conformity to its statutory purposes.") (citations and quotations omitted).  Thus, for many of the same reasons set forth above, the new Rule and exemptions are not a "reasonable" exercise of the rulemaking authority granted to the Department by Congress.  *American Library*, 406 F.3d at 699 ("Our judgment is the same whether we analyze the FCC's action under the first or second step of *Chevron*.").

To begin, the Department "adopts a materially changed interpretation of a statute," but it does not offer a "reasoned analysis" to support this change of position.  *Alabama Educ. Ass'n v. Chao*, 455 F.3d 386, 392 (D.C. Cir. 2006); *Gulf Power Co. v. FERC*, 983 F.2d 1095, 1101 (D.C. Cir. 1993) ("[W]hen an agency takes inconsistent positions . . . it must explain its reasoning.").  The five-part test gave rise to "serious reliance interests" in a fixed annuity industry that has built a distribution system around it, and the "lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-27 (2016).

Under *Chevron* Step Two, it is not enough for the Department to simply state that "much has changed during the last 40 years."  *Chao*, 455 F.3d at 396.  There must be more, particularly given industry reliance on the five-part test.  To be sure, the Department can chart a new course;

---

brief."); *Lindsey v. DC*, 879 F. Supp. 2d 87, 95-96 (D.D.C. 2012) (same).

but it has not provided a reasoned analysis to show that its new position is justified by the statute.

As set forth in NAFA's opening brief (at 14, 37-38), and as the Department makes clear in its commentary accompanying the Rule, its principal justification for abandoning the five-part test is that it now sees a need to regulate IRAs. 81 Fed. Reg. at 20,946. IRA transactions have never been subject to ERISA fiduciary standards. Yet the purpose and effect of the new Rule, together with PTE 84-24 and the BICE, is to extend such duties to IRA transactions.

The Department simply ignores this issue in its opposition brief. Rather than seeking to justify its decision to regulate fiduciaries to protect <u>IRA owners</u>, the Department cites to various cases stating that ERISA was enacted to protect the <u>beneficiaries of employee benefit plans</u>. (Opp. at 42-44.) For example, the Department quotes from the syllabus of *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 86 (1993), to note ERISA's "broad purpose of protecting retirement benefits." In that case, however, the Court refers to "ERISA's broadly protective purposes" only with respect to "employee benefit plans." *Id.* at 96 & n.5.[18]

The cases the Department relies upon do not even begin to establish it is reasonable to impose ERISA fiduciary duties in IRA transactions. Indeed, as the Department concedes, ERISA fiduciary standards do not apply in IRA transactions. The Department cites no authority to justify its conclusion that the "broad remedial purposes of ERISA" to protect employee benefit plans will be served by abandoning the five-part test and adopting a new Rule to better protect "individual account-based plans" (*i.e.*, IRAs). (Opp. at 42-43.)[19]

---

[18] The Department also cites to the dissenting opinion in *Belland v. Pension Ben. Guar. Corp.*, 726 F.2d 839, 848 (D.C. Cir. 1984). But the dissent discusses "ERISA's broad remedial purpose" in the context of "the pension benefits of employees." *Id.*

[19] The Department also focuses on the "regular basis" requirement of the five-part test, citing its own commentary to explain its reasons for concluding that the "regular basis" requirement "no longer aligns with congressional intent." (Opp. at 43-44.) As explained above, however, this requirement is just one of several factors in the five-part test that helps distinguish

As in *Goldstein*, the Department has distorted statutory meaning to achieve a regulatory purpose that Congress did not intend.  In *Goldstein*, the D.C. Circuit struck down an SEC effort to regulate hedge fund advisers by redefining the term "client" to include not just the hedge fund itself, but also the "shareholders, limited partners, members, or beneficiaries" of a fund.  451 F.3d at 876-77.  The SEC attempted to justify its departure from a longstanding interpretation of the statute on the ground that hedge funds had become more significant, and the SEC believed that more regulation was appropriate.  *Id.*  Applying *Chevron*, the court concluded that "even if the Advisers Act does not foreclose the Commission's interpretation, the interpretation falls outside the bounds of reasonableness," because it "comes close to violating the plain language of the statute" and is "[a]t best . . . counterintuitive."  *Id.* at 880-81.

Here, the Rule also fails at *Chevron* Step Two, because the Department has adopted an unreasonable and "counterintuitive" new definition to achieve a regulatory purpose not intended by Congress.  An insurance salesperson has never been deemed an ERISA fiduciary for recommending an insurance product for which he receives commissions, and the Department has no authority to apply ERISA fiduciary duties to IRA transactions.  Thus, the Department's decision to abandon the five-part test and adopt a new Rule and exemptions that impose ERISA fiduciary duties on insurance salespersons falls "outside the bounds of reasonableness."

The Department's attempts to distinguish *Goldstein* have no merit.  The Department claims that, unlike the "advisory relationship between hedge fund advisers and investors," it bases its new rule on a "change in the investment adviser-advisee relationship."  (Opp. at 45.) Not true.  Retirement funds may have shifted from defined employee benefit plans to IRAs, as the Department repeatedly states, but there has been no change in the relationship between an

---

between a true fiduciary and a salesperson recommending a product.

IRA owner and an insurance salesperson.  That was precisely the case in *Goldstein*, where the D.C. Circuit concluded there had been no change in the relationship between hedge fund advisors and investors in the hedge fund, even though the significance of hedge funds had changed.  What changed in both situations were external factors and the agency's desire to regulate in new areas.  That is not enough.

The Department also fails meaningfully to distinguish *Hearth, Patio & Barbeque Ass'n v. United States Dep't of Energy*, 706 F.3d 499, 503-08 (D.C. Cir. 2013).  As in *Hearth, Patio*, the Department exceeded its authority by issuing a Rule that over-defines the term "fiduciary" beyond the bounds of congressional intent.  (NAFA Br. at 40-41.)  Because the Department's attempt to classify insurance salespersons as fiduciaries is "ultra vires" in the first instance, the Rule is not saved by exemptions that permit insurance salespersons to earn commissions for offering fixed annuity products to ERISA plans and IRAs, particularly where the exemptions themselves impose ERISA fiduciary duties in IRA transactions.  The Department may not use "safe harbor criterion" as a means for "backdoor regulation."  *Hearth, Patio*, 706 F.3d at 507-08.  The Department cannot explain the validity of its Rule in light of *Hearth, Patio*.

### E.    The Department's Placement Of FIAs In The BICE Was Arbitrary, Capricious And Contrary To Law.

As explained in NAFA's opening brief (at 53-73), the Department's decision to shift FIAs from PTE 84-24 to the BICE violated the APA for at least four reasons:  (1) the Department failed to provide a rational explanation for its decision when it ignored distribution issues identified in the NOPR; (2) the decision is contrary to federal law; (3) the decision is irrational and unworkable; and (4) the Department failed to weigh the costs and benefits.

#### 1.    The Department Failed To Provide Any Analysis On How The BICE Can Work Within The FIA Distribution System.

In its 2015 NOPR for amending PTE 84-24, the Department proposed that insurance and

annuity contracts that are not securities should be placed under PTE 84-24, while insurance and

annuity contracts that are securities should be placed under the BICE:

> The Department is not certain that the conditions of the [BICE], including some
> of the disclosure requirements, would be readily applicable to insurance and
> annuity contracts that are not securities, or that the distribution methods and
> channels of insurance products that are not securities would fit within the
> exemption's framework.

80 Fed. Reg. at 22,015 (Apr. 20, 2015).

As these words show, the Department recognized in the NOPR that those annuities that

are securities (*i.e.*, variable annuities) were an appropriate "fit" with other securities investments

covered by the BICE (*e.g.*, mutual funds, stocks, and bonds), because variable annuities are

largely sold through the same distribution channels (*e.g.*, broker-dealer representatives), subject

to similar disclosure requirements (*e.g.*, securities prospectuses), and subject to the same

compliance rules and regulations (*e.g.*, supervisory oversight mandated by the Financial Industry

Regulatory Authority, or FINRA).  *Id.*  By the same token, the Department recognized that other

types of annuities that are "not securities" – including fixed declared rate annuities and FIAs –

would be a poor fit for the BICE, because they fall outside the scope of securities laws, are sold

through a different distribution system, and are subject to different disclosure requirements,

compliance rules, and regulations.  *Id.*  Numerous comments confirmed that the BICE was a poor

fit for insurance products because of distribution issues.  (NAFA Br. at 57-58.)

In moving FIAs from PTE 84-24 to the BICE, however, the Department did not address

the distribution concerns identified in the NOPR and confirmed in comments, it simply ignored

them.  That is the epitome of arbitrary and capricious decision-making.  The agency identified a

key problem – that the FIA distribution system was not compatible with the BICE – then placed

FIAs in the BICE without addressing the distribution issue.

The decision to shift FIAs to the BICE is unreasoned and cannot survive judicial review,

because the Department "entirely failed to consider an important aspect of the problem" (*i.e.*, that the FIA distribution system does not fit within the BICE). *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars*, 136 S. Ct. at 2125.[20]

In its brief, the Department contends in a footnote that it addressed "how the distribution methods and channels relating to FIAs would fit within" the BICE. (Opp. at 76 n.53.)  That is simply not true, as the record materials cited in the footnote demonstrate.  Specifically, the Department cites only to conclusory statements that (1) allowing insurers to sell FIAs under PTE 84-24 rather than the BICE "would have reduced [the Department's] cost estimate by between $34.0 million to $37.8 million over ten years," Regulatory Impact Analysis at 285; (2) the BICE is "less burdensome and more readily complied with by . . . insurance companies and distributors of insurance products," 81 Fed. Reg. 21,018; and (3) the BICE will work for "marketing intermediaries" and "proprietary products," 81 Fed. Reg. 21,067 & 21,030.  None of these citations show that the Department actually addressed the distribution problem it identified in its NOPR, and "generalized conclusions" do not make the Department's actions any less arbitrary or capricious.  *See AEP Texas N. Co.*, 609 F.3d at 441.  Even if these conclusory statements were

---

[20] *See also Bus. Roundtable v. SEC*, 647 F.3d 1144, 1152 (D.C. Cir. 2011) ("By ducking serious evaluation of the costs that could be imposed upon companies from use of the rule by shareholders representing special interests, particularly union and government pension funds, we think the Commission acted arbitrarily."); *AEP Tex. N. Co. v. Surface Transp. Bd.*, 609 F.3d 432, 441 (D.C. Cir. 2010) (agency's decision was arbitrary and capricious where it "did not consider whether railroads and investors actually or reasonably could have relied on . . . [the agency's] 2005 [annual] cost of capital determination" and instead "rel[ied] only on generalized conclusions about how industry players rely on cost of capital determinations . . . .") *Dr. Pepper/Seven-Up Cos. v. FTC*, 991 F.2d 859, 865 (D.C. Cir. 1993) (where agency dismissed claim "without even a passing reference to most of the posited evidence," it "le[ft] too many questions unanswered to qualify as reasoned decisionmaking").

true, they do not substitute for analysis of <u>how</u> the "distribution methods and channels" in the FIA industry could be adapted to the requirements of the BICE.

Apparently recognizing that the Department ignored this key issue and that its footnote argument is wrong, the Department's counsel attempts in its brief to explain how FIAs might fit into the BICE, even though they are not securities products.  That effort – to which the Department devotes many pages – is deficient for two critical reasons.

First, "courts may not accept appellate counsel's *post hoc* rationalizations for agency action."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *Hearth, Patio*, 706 F.3d at 509 (rejecting as "unavailing *post hoc* rationalization" agency's position); *Williams Gas Processing–Gulf Coast Co. v. FERC*, 475 F.3d 319, 328-29 (D.C. Cir. 2006) ("Arbitrary and capricious review strictly prohibits us from upholding agency action based only on our best guess as to what reasoning truly motivated it.").  The analysis in the brief is irrelevant here, because it is not in the administrative record.

Second, the analysis in the brief is incorrect and, in fact, demonstrates that the Department itself does not understand how its own Rule impacts the fixed annuity industry. Even if the Court could consider these post-hoc explanations – which it cannot – they do not rationally explain the decision shift FIAs to the BICE.

For example, the Department attempts to justify its decision to transfer FIAs from PTE 84-24 to the BICE – while leaving other fixed rate annuities in PTE 84-24 – by asserting that FIAs pose additional "downside risk."  81 Fed. Reg. 21,154.  But the only "downside risk" that the Department identifies is the possibility that canceling a policy early will result in surrender charges or tax penalties that reduce principal.  *Id.* at 21,154, 21,157 n.32.  As the Department acknowledges, however, the same risk exists with fixed declared rate annuities it left in PTE 84-

24.  81 Fed. Reg. 21,179 ("If the owner of a [fixed declared rate annuity] withdraws all or part of the value out of the annuity within a specified period, surrender charges will be applied.").

The Department further contends that, with FIAs, "the contract holder is guaranteed 87.5% of premiums paid after any fees or other charges, and then is credited, not with a guaranteed rate of interest, but with a return based on the performance of a specified index or other external reference."   (Opp. at 8 (citing Regulatory Impact Analysis at 123-24).)   The Department does not seem to understand its observation about the 87.5% guarantee provides no basis to treat FIAs differently from fixed rate annuities.   The 87.5% guarantee is set by state standard non-forfeiture laws ("SNFL"), which apply to all annuities, including both fixed rate annuities and FIAs.  Regulatory Impact Analysis at 124-25, Figure 3-14; Marrion Aff. ¶ 15 & 18. By contrast, variable annuities are not subject to SNFL.  Regulatory Impact Analysis at 124.

Further, it is not accurate to lump FIAs with variable annuities on the ground that there is no "guaranteed rate of interest" for FIAs.  As the Department acknowledges, "insurers generally guarantee at least a zero return," Regulatory Impact Analysis at 123, and the "interest rate is guaranteed to never be less than zero during each index period," *id.* at 124, Figure 3-14.   In contrast, with a variable annuity, "[t]he insurance company does not guarantee investment performance," and "[i]nvestment risk is borne by the contract owner."  *Id.*

 Bottom line, even if it counted, this kind of post hoc analysis is unreasoned, because the exact same analysis applies to fixed rate annuities that it left in PTE 84-24 and FIAs that it moved to the BICE (with variable annuities).  It is well-settled that "[i]f the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).  *See also  Burlington N. & Santa Fe Ry. v. Surface Transp. Bd.*, 403 F.3d 771,

777 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.").

### 2. Under Established Federal Law, FIAs Are Not Securities.

While the Department makes much of its "significant concerns" about the purported "complexity" of FIAs (Opp. at 62), it essentially ignores the fact that, as a matter of federal law, FIAs are <u>not</u> securities.  Pub. L. 111-203, Title 9, Subtitle I, § 989J.  Put differently, Congress established a <u>legal</u> distinction between securities (*e.g.*, variable annuities) and non-securities (*e.g.*, FIAs).  The Department's position that the BICE does not effectively treat FIAs as securities is not only inconsistent with this congressional mandate, but it is also incoherent in light of the Department's own statements regarding FIAs.

In its NOPR for the BICE, the Department stated that "the proposed amendment would revoke PTE 84-24 in part so that investment advice fiduciaries to IRA owners would not be able to rely on PTE 84-24 with respect to . . . transactions involving variable annuity contracts and other annuity contracts that constitute securities <u>under federal securities laws</u> . . . ."  80 Fed. Reg. 21,965 (BICE notice) (emphasis added).[21]  The Department also stated:

> In this proposal, therefore, <u>the Department has distinguished between transactions that involve securities and those that involve insurance products that are not securities</u>.  The Department believes that <u>annuity contracts that are securities</u> and mutual fund shares are distributed through the same channels as many other investments covered by the Best Interest Contract Exemption, and such investment products all have similar disclosure requirements under existing regulations. In that respect, the conditions of the proposed Best Interest Contract Exemption are appropriately tailored for such transactions.

80 Fed. Reg. 22,015 (PTE 84-24 notice) (emphasis added).  The NOPR shows that the

---

[21]   *See also* 80 Fed. Reg. 21,937 ("[T]he Department has aimed to coordinate and minimize conflicting or duplicative provisions between ERISA, the Code and federal securities laws, to the extent possible.").

Department's proposed rule employed a dichotomy that categorized products based on whether they are treated as securities "under federal securities laws." That dichotomy is critical, because it goes to the very issue of how affected parties may be able to satisfy these requirements. Yet the Department, without warning, decided to ignore federal securities law in its rulemaking.[22]

At a minimum, the Department was required to explain why it rejected federal securities laws in placing FIAs under the BICE when it used that dichotomy in the NOPR. That FIAs look like securities to the Department in its lay opinion is simply not reasoned decision-making. To the contrary, for the Department to make its own judgment on the nature of FIAs as securities, in contravention of Congress, illustrates just how brazen this agency is in defying congressional intent. The Harkin Amendment is clear, and the Department is willfully ignoring Congress to further its own regulatory purposes.

**3. As A Result Of The Department's Decision To Contravene Federal Law, The BICE Is Irrational And Unworkable.**

As NAFA explained in its opening brief (at 60-66), it is a practical impossibility for insurance carriers, on the whole, to comply with the Rule and exemptions as issued, especially "in cases where the Financial Institution is an insurance company, and the Adviser is an independent insurance agent." (NAFA Br. at 61.) Again, the Department never considered this problem in the rulemaking, as is shown by the lack of any meaningful response in its brief.[23]

---

[22] The Department also notes in its brief (at 63) the D.C. Circuit's observation that FIAs have been considered "hybrid financial product[s]." *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 168 (D.C. Cir. 2010). But soon after *American Equity* was decided, Congress passed the Dodd-Frank Act and put the issue to rest. FIAs are not securities. The Department need not concern itself with the "complexity" of or "risk" associated with FIAs. Congress addressed that question, and the Department cannot overcome this clear congressional mandate by now claiming that FIAs are merely "grouped with" securities products for some limited purpose. (Opp. at 64.)

[23] The Department does not understand state insurance regulation. For example, one of the requirements in the "final" BICE published on June 8, 2016 was that the insurance carrier be

In its brief (at 64-67), the Department suggests that the solution for insurance carriers is to sell FIAs through securities brokers and essentially do away with independent insurance agents, who can simply sell other products or go out of business.  That argument misses the point of the APA, which requires that agencies engage in reasoned decision-making after taking account of important market realities during the rulemaking itself, not after the fact in a brief.

Perhaps most striking is the Department's argument that suitability standards are somehow equivalent to its new "Best Interest" standard.  (Opp. at 65.)  Suitability standards have nothing to do with the duty of loyalty the Department seeks to impose through the BICE (and PTE 84-24), which relates directly to compensation.  Insurers supervise independent agents for the purpose of ensuring that every sale is suitable (*i.e.*, that the recommended product fits the needs of the consumer), but carriers are not required to warrant that independent agents have made recommendations "without regard to the financial or other interests" of the agent or the other carriers.  There is no practical way for a carrier to supervise the compensation available to independent agents who represent multiple carriers.  The Department's misunderstanding of this critical point shows that the Department has strayed far outside of its area of expertise.

Moreover, the Department fails to acknowledge the implications of permitting the securities industry to avoid rescission or liability for punitive damages under the BIC.  As

"domiciled in a state whose law requires that actuarial review of reserves be conducted annually by an Independent firm of actuaries and reported to the appropriate regulatory authority." 81 Fed. Reg. 21,083.  Then, on July 11, 2016, after several lawsuits were filed challenging the Rule and Exemptions, the Department issued a "technical" correction to remove the phrase "by an Independent firm of actuaries," explaining that "[t]his condition inadvertently limited the availability of the exemption with respect to  insurance companies because, while state laws generally require annual actuarial reviews of insurance company reserves to be conducted by a qualified actuary appointed by the board of directors, they do not generally require that such reviews be performed by an "Independent firm of actuaries." 81 Fed. Reg. 44,774.  This substantial oversight – which the Department sees as a "technical" error – illustrates the Department's desultory approach to this rulemaking.

explained in NAFA's opening brief (at 62-66), insurers cannot include such limitations in annuity contracts without approval from state insurance departments, which most likely would not approve such restrictions.  The version of the BICE set forth in the NOPR "generally prohibited waivers of liability."  (Opp. at 68-69 (citing 80 Fed. Reg. 21,985 ("The written contract shall not contain . . . [e]xculpatory provisions disclaiming or otherwise limiting liability. . . .").  The option to limit punitive damages and rescission was added to the final BICE in response to comments from the securities industry, leaving the insurance industry without an opportunity to comment.

The Department altogether fails to acknowledge the competitive advantage it provided to the securities industry, and there is no dispute that it failed to take account of this issue.  The Department attempts to gloss over the notice problem by arguing that "[p]ublic comments requested clarification that these clauses were permitted, and NAFA was aware of those comments."  (Opp. at 69.)  In other words, the Department contends that NAFA was "aware" that it would reverse course from its initial decision to prohibit all "exculpatory provisions" because such a request was made in two of the thousands of comment letters submitted.  But "[i]t is both unreasonable and inconsistent with governing precedent to presume that these isolated comments would come to the notice of other parties."  *Donovan*, 757 F.2d at 340.  An agency "must *itself* provide notice of a regulatory proposal," and "[h]aving failed to do so, it cannot bootstrap notice from a comment."  *Id.*[24]

The Department likewise fails to understand the interplay between insurance sales and securities investment advice at the state level.  The Iowa Securities Bulletin NAFA cited

---

[24]  The cases the Department cites are not to the contrary.  *Neighborhood Assistance Corp. v. CFPB*, 907 F. Supp. 2d 112, 125 (D.D.C. 2012) ("[C]omments cannot be a substitute for adequate notice."); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107-09 (D.C. Cir. 2014) (rejecting harmless error argument and finding that agency failed to provide adequate notice).

demonstrates that the BICE's requirements could easily put agents at risk of violating state securities laws and regulations dealing with investment advice.[25]   The Department says that "there is no conflict between the[se] standards" and submits that agents will not be subjected to state securities regulations, because "[t]he Department does not . . . require the Adviser or Financial Institution to acknowledge fiduciary status under the securities laws, but rather under ERISA or the Code or both."  (Opp. at 70.)

But regardless of what the Department says in its brief for the first time, it is clear that the BICE requirements are irreconcilable with state investment advice standards.  The essence of the Department's argument in its brief is that the prudence requirement is attainable because an insurance salesperson need not identify the single best investment.  Thus, the Department contends (at 71) that "[a]n insurance agent remains free to advise about and sell only insurance [products], provided that professional standards of prudence are met."   The Department's reference to "professional standards of prudence," however, sets forth a very important caveat that swallows up the entire argument:

The prudence standard . . . is an objective standard of care that requires

---

[25]   The Department wrongly suggests that the court should disregard the Iowa Securities Bulletin because it is an "extra record" document.  This contention fails because (1) the Bulletin is properly in the record in a sworn affidavit in support of NAFA's application for preliminary injunction, Marrion Aff. ¶ 57; and (2) even if the Bulletin is "extra record," it is properly admissible because the Department failed to examine or consider any of the relevant factors pertaining to whether independent agents and insurers could comply with the BICE without becoming Investment Advisers subject to securities laws and failed to adequately explain the grounds for failing to reconcile these serious issues related to the rulemaking. *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997) (extra-record evidence is reviewable if it falls within one of four exceptions, including when "the agency failed to examine all relevant factors" or failed to explain adequately its grounds for its decision).  Supplementation may also be necessary when an agency excludes information adverse to its position from the administrative record.  *Public Citizen v. Heckler,* 653 F. Supp. 1229, 1237 (D.D.C. 1986) (citation omitted).  Therefore, it is appropriate for the Court to consider the Iowa Securities Bulletin.  *See e.g.*, *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 199 (D.D.C. 2005) (permitting extra-record evidence).

> investment advice fiduciaries to <u>investigate and evaluate investments</u>, make recommendations, and exercise sound judgement in the same way that knowledgeable and impartial professionals would.   This is not a search for subjective good faith - a pure heart and an empty head are not enough.   Whether or not the fiduciaries [sic] is actually familiar with the sound investment principles necessary to make particular recommendations, the fiduciary must adhere to an objective professional standard.   Additionally, fiduciaries are held to a particular stringent standard of prudence when they have a conflict of interest.

81 Fed. Reg. 21,028-21,029 (quotations omitted) (emphasis added).   The Department further states that "an insurance-only agent would need to be clear with the consumer about the restricted scope of the recommendation and make a prudent recommendation regarding an insurance product <u>in the context of the consumer's overall portfolio, investment needs and objectives</u>."   (Opp. at 72 (emphasis added).)   Left unexplained is how that can be done without the insurance salesperson investigating and evaluating the best overall option for the investor.

Despite the Department's attempts to downplay the import of these requirements to prevail in this litigation, the BICE itself offers no indication that insurance agents can meet the standards of prudence by satisfying some kind of lesser analysis if agents fail to:  (1) investigate the full financial circumstances of the client; (2) evaluate the client's investment objectives; (3) investigate and evaluate investments; and, (4) perform all of these required activities in a manner that meets professional standards as compared to other investment advisers.   In other words, the Department's litigation argument is not consistent with the BICE itself.

Moreover, the Department received a request that the prudence component be modified to that of "a prudent person serving clients with similar retirement needs and offering a similar array of products."  81 Fed. Reg. 21,028 n.51.   But the Department flatly rejected this proposal, stating it could be read as "qualifying the stringency of the prudence obligation based on the Financial Institution's or Adviser's independent decisions on which products to offer, rather than on the needs of the particular Retirement Investor."   *Id.*   In other words, the Department itself

makes clear in the Rule that it cuts no slack for insurance agents, and instead holds them to the same standards as any other adviser.  That necessarily requires consideration of the client's investment objectives and investigation of investment options in a manner that cannot escape investment adviser requirements under securities laws.  It is of no moment that the Department says something different in its brief.  Indeed, it merely shows why post-hoc explanations cannot be considered in an APA case.

The Department's brief selectively quotes from the BICE preamble, stating "the Department does not . . . require the Adviser or Financial Institution to acknowledge fiduciary status under the securities laws, but rather under ERISA or the Code or both."  (Opp. at 70 (citing 81 Fed. Reg. 21,026).)  What that particular paragraph from the BICE preamble goes on to explain, however, is that nothing in the rule forces <u>securities brokers</u> to go beyond their existing exemption under investment adviser laws for providing advice incidental to brokerage services, largely because the Rule does not require providing advice that is ongoing rather than transaction based.  That is fine for securities brokers but means nothing to insurance agents.

The Department also argues (at 65-66) that insurers "could adapt" to the Rule "by switching from independent agents to in-house or 'captive' agents, or by working with agents that are both licensed to handle securities and affiliated with a broker or registered investment adviser."  But such an approach will drive tens of thousands of independent agents from the business.  Marrion Aff. ¶¶ 48-49.  NAFA filed this lawsuit, in part, to protect the interests of its members who are independent agents.  *See id.* ¶¶ 11 & 14; Anderson Aff. ¶ 22.  The Department contends (at 66) that it "anticipated that some current market participants may exit the market," but it did not examine such dramatic "market effects" in connection with its decision to shift

FIAs to the BICE, which threatens to upend the distribution system for fixed annuities.[26]

Bottom line, it cannot be emphasized enough that the Department did nothing in its rulemaking to address these matters in a way that gives any guidance or comfort to insurance agents.  As with so many other aspects of this rulemaking, the Department focuses on the securities industry and pays no attention to the effect of these requirements on insurance agents.

In short, the Department is trying to have it both ways, on the one hand establishing new requirements clearly designed to impose very high standards on insurance agents with regard to investment advice, yet on the other hand arguing in litigation that such standards are actually illusory.  For insurance agents living in the real world, the only real choice to avoid the risks and penalties may be to go out of business or become investment advisers under the securities laws. The Department's failure to account for these concerns amounts to the very kind of arbitrary and capricious rulemaking that is prohibited under the APA.

### 4.     The Department Failed To Consider The Costs And Benefits Of "Grouping" FIAs With Securities Products Under The BICE.

The Department makes no attempt to explain its utter failure to consider the unique aspects of the FIA industry or to address how its last-minute decision to "group" FIAs together with securities products will affect the FIA industry.  Instead, the Department first points to a quote from its Regulatory Impact Analysis stating that "[a]dvisory firms' responses to the final rule and exemptions (and to related changes in consumer demand and competition) . . . may

---

[26]   The Department also states (at 66) that it "concluded based on evidence that most advisers will remain," because "reforms in the United Kingdom 'did not cause a large exit of advisers.'"   (*Id.* (citing Regulatory Impact Analysis at 77-78.))   In truth, when regulators banned commissions in the United Kingdom, the number of registered investment advisors fell from around 40,000 in 2011 to around 31,000 in 2013.  *See* Cass Business School, *The Impact of the RDR on the UK's Market for Financial Advice* at 7-9 (June 2013) (available at http://www.cass.city.ac.uk/__data/assets/pdf_file/0016/202336/The-impact-of-RDR-Cass-version.pdf).  A 25% decline in a two-year period qualifies as "a large exit of advisers."

involve frictional costs and have distributional effects."  (Opp. at 77 (citing Regulatory Impact Analysis at 311).)  This statement demonstrates the Department's poor understanding of the FIA industry and only validates NAFA's argument.

The Department gave limited consideration to the overall costs to insurance carriers, but conspicuously absent from that analysis is a single mention of the added cost of being required to rely on the BICE instead of PTE 84-24 in FIA transactions.  *See* Regulatory Impact Analysis at 237-38.   Indeed, such an analysis is completely absent from the administrative record.  Moreover, the idea that an agency decision with far-reaching effect on a $50 billion dollar per year industry is merely "frictional" is absurd.  Regulatory Impact Analysis at 132 (reporting $48.2 billion in fixed annuity sales in 2014).  That the Department would even make such a suggestion shows that the Department failed to perform any meaningful cost-benefit analysis.

Next, the Department acknowledges some deficiencies in its Regulatory Impact Analysis, but it then blames the industry for its failure:  "The DOL can hardly be faulted for failing to make precise calculations concerning the effect of various alternatives on FIAs."  (Opp. at 77.)  That is nonsense.  First, the lack of notice on the last minute switch of FIAs from PTE 84-24 to the BICE helps explain the reasons that the Department did not receive more data.  Second, the Department cannot pass the buck on this, as "each <u>agency</u> shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."  Executive Order 12866 (1993) (emphasis added).[27]

---

[27]   "[B]y virtue of a longstanding Executive Order applying to significant rules issued under the Clean Air Act (as well as other statutes), the Agency must systematically assess the regulation's costs and benefits. See Exec. Order No. 12866, 58 Fed. Reg. 51735, 51738, 51741 (1993) (applying to all rules with an annual economic effect of at least $100 million)." *Michigan*, 135 S. Ct. at 2715.  *See also* Exec. Order 13563 ("As stated in that Executive Order [12866] and to the extent permitted by law, each agency must . . .  propose or adopt a

Nevertheless, the Department moved FIAs from PTE 84-24 to the BICE with the stroke of a pen, making an unexplained decision that even by conservative estimates will cost the FIA industry hundreds of millions of dollars.  Marrion Aff. ¶ 46.  In its initial April 2015 Regulatory Impact Analysis (at 177), the Department stated as follows:

> The new [BICE] will result in <u>86 million disclosures</u> being distributed during the first year and <u>66.4 million disclosures</u> being distributed in subsequent years. These disclosures . . . will cost approximately $77.4 million during the first year and $29.2 million in subsequent years. . . .
>
> Relative to the current regulatory environment, this amendment reduces the number of disclosures required under PTE 84-24 by approximately 10 and <u>reduces the associated costs by $3,000 annually</u>.

Then, a year later in its final Regulatory Impact Analysis, the Department stated as follows:

> The new Best Interest Contract Exemption will result in <u>65.1 million contracts and disclosures</u> being distributed during the first year and <u>72.3 million contracts and disclosures</u> being distributed in subsequent years. These disclosures . . . will cost approximately $403.2 million during the first year and $404.7 million in subsequent years. . . .
>
> The amended PTE 84-24 will result in <u>3.3 million disclosures</u> being distributed annually. Producing and distributing the disclosures, including staff time to draft the disclosures, will cost approximately <u>$19.5 million annually</u>.

Regulatory Impact Analysis at 245-46.  These few sentences – which are not pellucid and appear to be mathematically inconsistent – are apparently the Department's attempt to describe the costs associated with the decision to lump FIAs together with securities products under the BICE. This is not reasoned decision-making.

The Department acknowledged that "all other annuities" (*i.e.*, variable annuities and FIAs) "would instead be required to rely on the Best Interest Contract Exemption," but no cost estimates are attributed to that stark departure from the proposed rule. *Id.*  Similarly, the

---

regulation only upon a reasoned determination that its benefits justify its costs (recognizing that some benefits and costs are difficult to quantify)).

Department failed to describe any additional benefit to consumers.  *See id.* at 167-82.[28]

In sum, nowhere does the Department make an attempt to describe the costs and benefits associated with its eleventh-hour decision to shift FIAs from PTE 84-24 to the BICE.  Thus, Court must vacate the decision to switch FIAs from PTE 84-24 to the BICE.

## III.    The Requirement Of "Reasonable Compensation" In The BICE Is Unduly Vague and Violates Due Process.

It is difficult for an agency to enact regulations that are so indeterminate as to be void for vagueness under the Due Process clause – especially in a civil context.  But the Department has managed to do it here.   While the Department's brief is replete with platitudes and generalizations about the "richness" of the concept of "reasonableness" under the law, the Department fails meaningfully to address the precise Due Process issue here.

To recap, a Financial Institution that is a party to a BIC must provide in the BIC a description of the "reasonable compensation" that it will charge the IRA owner.   If the compensation is not reasonable, the intended prohibited transaction exemption obtained through the BIC will not apply, resulting in significant adverse consequences.  A Financial Institution is entitled to know, as a matter of Due Process, that its compensation structure is reasonable so that it can comply with the exemption and avoid these consequences.  But the Department provides no meaningful guidance to explain its "reasonable compensation" requirement.

While the term "reasonable" may be meaningful in other contexts, the facts here are unique compared to any case or circumstance that the Department cites.  There is a dearth of

---

[28]   It is telling that the Department did, in fact, attribute costs to other far less significant changes to the rule.  For example, the Department explained that its decision to allow the BICE's mandatory "contract terms to occur in a standalone document . . . reduce[d] estimated costs by $13.2 billion to $24.8 billion of quantified costs over 10 years."  Regulatory Impact Analysis at 262.   The Department likewise calculated that change to initially proposed disclosure requirements reduced the cost of the final BICE to "between $3.8 billion and $9.3 billion over ten years."  Regulatory Impact Analysis at 274.

authority – the Department cites none – on whether it is lawful for the government to require an entire industry to incorporate terms into contracts with millions of consumers warranting that compensation paid in each transaction will not exceed "reasonable compensation."  Indeed, the courts have never directly examined whether an agency's use of the term "reasonable compensation" in a similar context is sufficiently definite to satisfy Due Process.

Because this is largely uncharted territory, the Department cites only a single case that dealt with the legitimacy of the term "reasonable compensation" in the face of a vagueness challenge.  *Asmoro v. Rigstaff Texas LLC*, No. 1:10-1235, 2012 WL 12544554 (D.N.M. 2012). *Asmoro* concerned a Wyoming statute permitting foreign workers to recover "reasonable compensation."  The court, however, recognized a critical distinction between a law that requires compliance and a law that merely permits recovery of damages, holding the Wyoming statute valid because it merely "presents a jury question" regarding reasonableness of compensation in labor disputes rather than mandating industry compliance standards.  In stark contrast, the reasonable compensation component of BICE is a quintessential compliance mandate designed as an industry-wide standard for insurers enforceable through a private right of action as well as federal tax penalties.  In short, *Asmoro* is inapposite here.

The only case NAFA has found dealing with the exact term "reasonable compensation" in this context is a 19th century decision, *Louisville & N.R. Co. v. R.R. Comm'n*, 19 F. 679, 690, 693 (D. Tenn. 1884), in which the court struck down a state statute prohibiting railroads from charging "more than a just and reasonable compensation," because "[n]o citizen . . . can be constitutionally subjected to penalties . . . by force or such indefinite legislation."  Plainly this case undermines the Department's position that the Rule is not void for vagueness.

In short, there appears to be no case upholding any law or regulation mandating industry-

wide compliance with such a naked "reasonable compensation" standard, most likely because no legislature or agency has seen fit to impose such a shapeless requirement.  Lacking any such authority, the Department suggests other forms of guidance in its brief, but none of it is of any use to understand the "reasonable compensation" requirement found in the BICE.

A.    The Department Relies On Inapposite, Confused And Irrelevant Notions Of "Reasonable Compensation" For IRA Transactions.

The Department states in its brief (at 59, 61) that the term "reasonable compensation" appears in many provisions of ERISA and the Code.  That is not really true.  The term appears in Section 408(b)(2) of ERISA, a statutory exemption dealing with "ancillary services" that fiduciaries may provide to ERISA plans.  The exemption reads, in relevant part, as follows:

> The prohibitions provided in section 1106 of this title [ERISA prohibited transactions] shall not apply to any of the following transactions: . . . (2) Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than <u>reasonable compensation</u> is paid therefor. . . . Such <u>ancillary services</u> shall not be provided at more than <u>reasonable compensation</u>.

29 U.S.C. § 1108(b) (emphasis added).  This section of ERISA and the regulations interpreting it are inapposite as to the meaning of "reasonable compensation" in IRA transactions.

The Code provision relevant to a "fiduciary" providing services to an IRA is 26 U.S.C. § 4975(d)(10), which provides a prohibited transaction exemption for "receipt by a disqualified person of any reasonable compensation for services rendered . . . ."  Reasonable compensation is then described in the Treasury Regulations § 54.4975-6(e) by reference to Treas. Reg. § 54.4975-6(e)(2), which states generally that "whether compensation is 'reasonable' under Section[] . . . 4975(d)(10) depends on the particular facts and circumstances of each case." *Id*.

The Department's representation that the concept of "reasonable compensation" is well ingrained in the vernacular of tax-advantaged plans generally fails to appreciate that Code

Section 4975 is a tax provision, not a benefits provision.  In fact, the concept of "reasonable compensation" does not even exist when it comes to violations of self-dealing prohibitions by ERISA plan fiduciaries.  *E.g.*, *Gilliam* v. *Edwards*, 492 F. Supp. 1255, 1264-65 (D.N.J. 1980).

As a tax provision, the use of Section 4975's facts and circumstances test is nebulous and vague.  The regulations that control "reasonable compensation" for these purposes also apply the nebulous and vague use of "facts and circumstances."  Crafting these tax concepts into the BICE leaves the fiduciary in the untenable position of translating a vague tax concept into precise monetary compensation in a contract.  In short, Section 4975 is of no help in solving the riddle of "reasonable compensation."[29]

The Department also points to the Uniform Trust Code ("UTC") and the Restatement (Third) of Trusts to support the notion that, because "a <u>trustee</u> is entitled to compensation that is reasonable under the circumstances" (Opp. at 58 (citing UTC § 708(a)) (emphasis added), an <u>insurance agent</u> (deemed an Adviser under the Rule) or Financial Institution selling products has fair notice as to what constitutes reasonable compensation in the context of an IRA transaction between the salesperson and a customer.  But there is no logical connection between compensation standards for trustees (who hold a legally recognized position of trust for the

---

[29] "The [Code] and its Treasury regulations contain a complex and curious blend of 'bright line' rules and vague standards known as 'facts and circumstances' tests. This daunting conglomeration of rules and standards evokes many different practice styles and degrees of competence among those who work with tax law. The practice of tax law is a particularly difficult professional endeavor because of both the sheer volume of statutory edicts and the variety of ways Congress and the Treasury Department have expressed and interpreted these edicts.  Along a continuum from very explicit rules to very vague standards, the practitioner faces an evaluation and selection process that requires a polished expertise.   The tax professional must exercise this expertise in making compliance and planning decisions under nebulous facts and circumstances tests and, in many instances, in choosing between bright line or 'safe harbor' rules and facts and circumstances standards that the tax law deliberately presents as alternatives."  Richard J. Kovach, *Bright Lines, Facts and Circumstances Tests, and Complexity in Federal Taxation,* 46 Syracuse L. Rev. 1287, 1288 (1996).

benefit of others) and salespersons (who sell different products to different customers).

Further, the UTC and the Restatement are affirmative expressions of the rights of a trustee rather than limitations. *See* UTC § 708(a) ("A trustee is <u>entitled</u> to compensation that is reasonable"); Restatement (Third) of Trusts § 38(1) (2003) (same). This rule is not intended to limit trustee compensation, but to recognize the trustee's affirmative right to compensation for services rendered. Importantly, the compensation standard for a trustee is based on the <u>trustee's</u> conduct, not on a subjective view of "what the investor receives," as contemplated here by the Department. (Opp. at 59 (citing 81 Fed. Reg. 21,030).) The comment to Section 708 explains:

> Relevant factors in determining this compensation, as specified in the Restatement, include the custom of the community; <u>the trustee's skill, experience, and facilities</u>; the <u>time devoted</u> to trust duties; the amount and character of the trust property; the <u>degree of difficulty, responsibility and risk assumed in administering the trust</u>, including in making discretionary distributions; the nature and costs of services rendered by others; and the <u>quality of the trustee's performance</u>.

UTC § 708, cmt (citing Restatement (Third) of Trusts Section 38 cmt. c (Tentative Draft No. 2, approved 1999); Restatement (Second) of Trusts Section 242 cmt. b (1959)). None of these factors are relevant to whether an insurance salesperson receives reasonable compensation.

Finally, the Department simply says that reasonable compensation is "measured by the market value of the particular services, rights, and benefits the Adviser and Financial Institution are delivering to the Retirement Investor." (Opp. at 59 (citing 81 Fed. Reg. 21,029-30).) The Department clearly contradicts itself, however, by indicating it is unwilling to acknowledge that "customary compensation" while at the same time stating that "the 'reasonable compensation' standard is a market based standard." 81 Fed. Reg. 21,031. The Department plainly rejects customary compensation (*i.e.*, market pricing). (Opp. at 60.) But having eschewed market pricing as reasonable, the Department cannot plausibly say that reasonable compensation is

"reasonably understood" as "measured by market value." (*Id.*)[30]

Moreover, as it applies to IRAs, the vague notion of determining compensation based on facts and circumstances would require a much broader evaluation taking all considerations into account in order to even begin to identify a "market" price.  In short, at this point in time, the Department plainly has no idea what constitutes reasonable compensation, which is why it provides no meaningful parameters at all on the concept.  At some future time, the Department and state courts will decide whether compensation was reasonable after the fact, but the insurance industry will be required to memorialize that term in BICs before the fact.  That runs counter to and is in direct violation of the requirements of the Due Process clause.

**B.     The Department Failed To Describe And Identify Proscribed Conduct So As To Provide The Fair Notice Required To Satisfy Due Process.**

Even if the foregoing analysis were not dispositive on this issue, at the very most the Department's reasonable compensation description boils down to this:

> Several factors inform whether compensation is reasonable including, inter alia, the market pricing of service(s) provided and the underlying asset(s), the scope of monitoring, and the complexity of the product.

81 Fed. Reg. at 21,030.  Recent cases in this Circuit show that such nebulous standards cannot survive a void for vagueness challenge.

For example, the D.C. Circuit recently considered a void-for-vagueness challenge to the Federal Communication Commission's ("FCC") "General Conduct Rule," which regulated conduct related to "the open Internet."  *U.S. Tel. Ass'n v. F.C.C.*, --- F.3d ---, 2016 WL 3251234,

---

[30]   The contradiction in the Department's position is illuminated by what the Department's brief says about the meaning of customary. The Department states that "not all existing compensation schemes will get a free pass," citing situations where compensation was paid for services that were "wholly unnecessary" or "obtained through fraud." (Opp. at 60.)  It goes without saying, however, that any market-based standard would exclude fraudulent and quasi-fraudulent transactions, which presumably are rare and hardly a substantial factor in determining market compensation.

at *1, *38 (D.C. Cir. June 14, 2016); 2015 Open Internet Order, 30 FCC Rcd. at 5660 ("Open

Internet Order").  The rule forbade conduct by broadband service providers that

> unreasonably interfere[s] with or unreasonably disadvantage[s] (i) end users'
> ability to select, access, and use broadband Internet access service or the lawful
> Internet content, applications, services, or devices of their choice, or (ii) edge
> providers' ability to make lawful content, applications, services, or devices
> available to end users.

*Id.* at *38 (quoting Open Internet Order, ¶ 136) (emphasis added).

Internet service providers challenged the Rule on the grounds that this

"unreasonableness" standard was unconstitutionally vague.  *Id.*  This challenge was rejected, in

part, because the FCC "set forth seven factors that will guide the determination of what

constitutes unreasonable interference with, or disadvantaging of, end-user or edge-provider

access: end-user control; competitive effects; consumer protection; effect on innovation,

investment, or broadband deployment; free expression; application agnosticism; and standard

practices." *Id.* at *39.  The D.C. Circuit elaborated:

> [T]he Commission did not merely set forth the [seven] factors; it also included a
> description of how each factor will be interpreted and applied.  For instance, when
> analyzing the competitive effects of a practice, the Commission instructs that it
> will "review the extent of an entity's vertical integration as well as its
> relationships with affiliated entities."  The Commission defines a practice as
> application-agnostic if it "does not differentiate in treatment of traffic, or if it
> differentiates in treatment of traffic without reference to the content, application,
> or device." . . .  Many of the paragraphs in that section of the Order also
> specifically identify the kind of conduct that would violate the Rule.

*Id.* at *39 (internal citations omitted).    The court understood, however, that even with that level

of detail, "a certain degree of uncertainty inheres in the structure" of the rule.  *Id.* at *40.  *See*

*also Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993) (requiring agency to "consider whether

[a] seven-part test for determining a 'professional trading pattern' could be made more definite

before it is subjected to scrutiny under the Due Process Clause.").

In other words, the void for vagueness question in *U.S. Tel. Ass'n* was a relatively close

call, notwithstanding the detailed seven-factor test the FCC delineated.  Here, in contrast, the Department's statements about "reasonableness" have no specificity at all.  Unlike the FCC, the Department here has not "provided descriptions," "identified practices," or "specifically identified the types of conduct that will violate the Rule."  The Department does not come close to meeting what was required in *U.S. Tel. Ass'n* for the FCC regulation to survive a challenge.

### C.     The BIC Is A Unique Regulation That Sabotages Regulated Entities' Ability To Negotiate And Clarify The Meaning Of Contractual Terms.

The Department's reliance on cases examining other regulatory settings involving the concept of reasonableness is misplaced for the reasons discussed above.  Again, contrary to the typical method of regulation (*e.g.,* publishing clear rules subject to agency enforcement), the Department here has required private contracting parties to include an inherently vague term in a binding contract, subject to enforcement in state court.  In order to obtain relief under the exemption, the BIC must provide that "[t]he recommended transaction will not cause the Financial Institution, Adviser or their Affiliates or Related Entities to receive, directly or indirectly, compensation for their services that is in excess of reasonable compensation within the meaning of ERISA section 408(b)(2) and Code section 4975(d)(2)."  81 Fed. Reg. 21,077.  In similar situations, the D.C. Circuit has declined to uphold this kind of vague terminology.

For example, in *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281 (D.C. Cir. 2015), the D.C. Circuit examined the meaning of "regular commissions" in the context of an agency action regulating foreign product sales and exports.  The Export-Import Bank ("Bank") required companies making certain foreign sales to certify that only "regular commissions" were paid to the sales agents responsible for those sales.  *Id.* at 283.  After the regulation took effect, water pump manufacturer MWI paid its longtime sales agent the same commission it had been paying for the previous twelve years in connection with the sale of water pumps to Nigeria.  *Id.*

60

The D.C. Circuit found that the agency had failed to show there was "guidance from the courts of appeals" or relevant agency (*i.e.*, the Bank) "that might have warned [MWI] away from the view it took" regarding its certification under the False Claims Act that MWI paid no more than "regular commissions." *Id.* at 289 (quoting *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 69-70 & n. 20 (2007) & *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008)). "At the time . . . , the government had yet to inform exporters that . . . the term refers to what is normally paid in the industry, and not what an exporter had historically paid to an individual sales agent." *Id.* at 283-84. Thus, "regular commissions" was too vague.

Likewise, in *KPMG, LLP v. SEC*, 289 F.3d 109 (D.C. Cir. 2002), the D.C. Circuit examined the SEC's decision that the plaintiff, an auditing firm, had violated the American Institute of Certified Public Accountants' ("AICPA") Rule 302, which prohibits members from receiving contingent fees "from a client for whom the member or the member's firm performs . . . an audit or review of a financial statement." *Id.* at 115. KPMG entered into a royalty and "success" fee agreement with a longstanding client facing financial difficulties. *Id.* at 113. In rejecting the agency's action, the D.C. Circuit found that "KPMG cannot be said to have had fair notice that the 'success' fee/royalty arrangement would be deemed a prohibited contingent fee under AICPA Rule 302." *Id.* at 115-17. "This determination . . . runs afoul of any interpretation the AICPA or the [SEC] has ever attached to Rule 302." *Id.* The Court further noted that "this due process principle applies when the rule carries only civil penalties." *Id.*[31]

Here, as in *MWI* and *KPMG*, the Department has not even tried to interpret the meaning of the term "reasonable compensation." As in *MWI*, FIA sellers lack any guidance as to what

---

[31] *See also FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2318 (2012) ("[T]he due process protection against vague regulations 'does not leave [regulated parties] . . . at the mercy of *noblesse oblige*.'") (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)).

compensation is reasonable, including what the Department expects vis-à-vis "what is normally paid in the industry" or what is "historically paid to an individual sales agent." As in *KPMG*, the Department utterly muddles the meaning of "reasonable compensation" by ripping it out of context from 408(b)(2)'s "ancillary services" exemption and Section 4975 of the Code in a supposed attempt to provide notice of what is reasonable compensation for an insurance salesperson. But the Department fails, and the term "reasonable compensation" in the BICE violates Due Process because it is unduly vague.

> **D.    The Consequences Of Being Wrong About "Reasonable Compensation" Are Extreme.**

If a fiduciary, acting in good faith, charges compensation later determined to be unreasonable, the proverbial sky will fall in on that fiduciary. The consequence is that there will be no exemption from the prohibited transaction rule against self-dealing. Using an insurance company as the hypothetical fiduciary, each policy that it has had approved under state law in order to comply with the Rule will contain unreasonable compensation features, notwithstanding the insurance company's well-intentioned effort to obtain only "reasonable compensation."

Because of the Department's vague definition of "reasonable compensation," an insurance company does not know whether the Department or a court would agree with its determination of reasonableness. Should the insurance company lose a challenge to the reasonableness of its compensation, irrespective of its good faith, every single transaction it has entered into, potentially for years, will be a prohibited transaction subject to the pyramiding excise tax under Code Section 4975. Further, each transaction will have to be "corrected," generally requiring that the insurance company refund the amount of compensation deemed unreasonable to the policy owner. Of course, the BICE also creates private litigation rights.

The impact is so substantial that the vague notion of "reasonable compensation" leaves

the insurance company (and other providers) unable to avoid unyielding litigation, excise tax, and cost-of-correction exposure.  As a result, the "reasonable compensation" aspect of the BIC violates the Due Process clause and is void for vagueness.

## IV.    The Department Failed To Comply With the Regulatory Flexibility Act.

The Department takes an exceedingly narrow view of the Regulatory Flexibility Act ("RFA"), which renders that statute effectively meaningless.  The RFA's requirements may be "procedural rather than substantive" (Opp. at 78), but that does not mean an agency gets a pass simply "[b]y addressing each aspect of the RFA criteria" (*id.* at 79), as the Department contends. While "the RFA does not require mechanical exactitude," "the statute compels the Secretary to make a 'reasonable, good-faith effort,' prior to the issuance of a final rule, to inform the public about potential adverse effects of his proposals and about less harmful alternatives."  *Southern Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1437 (M.D. Fla. 1998).

Here, the Department utterly failed to consider the impact of its rulemaking on small businesses in the fixed annuity industry, particularly the IMOs and independent insurance agents who will be most affected by its hasty and unreasoned decision to shift FIAs to the BICE.  The Department acknowledges that "almost all of the entities affected by the rule" qualify as "small entities" (Opp. at 79), but it then downplays the significance of the RFA's mandates at each turn. Tellingly, the Department ignores that the requirements of RFA Section 604 are to be reviewed by courts "in accordance with [the APA]."  5 U.S.C. § 611(a)(2) (incorporating APA's judicial standards of review into RFA).  Thus, even if the RFA's requirements are largely procedural in nature, it is clear that the Department cannot act in an arbitrary and capricious manner.

As discussed in NAFA's opening brief (at 72-73), the Department failed to offer "a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a

statement of any changes made in the proposed rule as a result of such comments[.]"  5 U.S.C. § 604(a)(2).   As explained above, the Department failed to provide any reasoned basis for its decision to subject FIAs to the BICE (rather than PTE 84-24).  This violates the RFA.

In response, the Department points to Regulatory Impact Analysis Section 2.9.2.1 (at 70-71), which provides a bulleted list of changes that were made to the BICE following the public comment period.  Notably absent from Section 2.9.2.1., however, is <u>any</u> discussion of the most significant change that was made to the BICE, *i.e.*, that FIAs would be subjected to treatment under the BICE rather than PTE 84-24, as originally provided in the 2015 NOPR.[32]

The significance of this omission is heightened because, unlike the APA, the RFA requires agencies to <u>specifically</u> consider the effects of regulations on small entities, whereas the APA itself codifies basic precepts of reasoned rulemaking.  RFA Section 604(a)(5) mandates that the agency consider and provide "an estimate of the <u>classes of small entities</u>" impacted by the rule, while section 604(a)(6) requires the agency to describe "the steps the agency has taken to minimize the significant economic impact <u>on small entities</u>[.]"   5 U.S.C. § 604(a)(5) & (6) (emphasis added).  But the Department did not consider the effects of <u>this</u> decision on the small entities it is most likely to affect.  *See Southern Offshore Fishing*, 995 F. Supp. at 1436 (agency's "refusal to recognize the economic impacts of its regulations on small businesses also raises serious questions about its efforts to minimize those impacts through less drastic alternatives").

The Department also claims in its brief (at 81) that it met the RFA's requirements, pointing generally to Chapter 7 of its Regulatory Impact Analysis, which only restates the

---

[32]   Section 2.9.2.5 of the Regulatory Impact Analysis, which covers PTE 84-24, merely repeats the Department's unreasoned – and incorrect – platitude that "investment advice transactions involving variable annuities, indexed annuities, and other similar annuities . . . should occur under the conditions of the [BICE] because that exemption provides more appropriate safeguard in connection with the transactions."  Regulatory Impact Analysis at 75.

Department's generalized concerns that FIAs are "complex products."   Regulatory Impact Analysis at 284.   In fact, Chapter 7 focuses almost exclusively on large insurance companies, rather than the IMOs and independent agents who will be most affected by the decision.   *See id.* at 285-86.   The Department acknowledges that insurance agents and certain unnamed "others" will be affected (Opp. at 80-81), but the Regulatory Impact Analysis sections upon which it relies in support of that contention are devoid of discussion on those classes of small entities and the significant economic impact they will suffer.

Section 5.2, for example, describes "affected entities" as broker-dealers, registered investment advisers, insurers, and banks – with, at best, passing mention of the classes of entities that will be most affected, such as IMOs and independent agents.   The Department also points to RFA section 6.6, entitled "Steps Agency Has Taken to Minimize Significant Economic Impact on Small Entities," which reads, in its entirety, as follows:

> Section 5.3.1 of the Regulatory Impact Analysis includes a discussion of changes to the proposed rulemaking that are intended to reduce costs affecting both large and small firms.

Regulatory Impact Analysis at 260.   But Section 5.3.1, entitled "Estimating [Broker-Dealer] Firm Costs for Complying With Final Rule and Exemptions," does not discuss the Rule's severe economic impact on FIA sellers.   In other words, the Department's entire attempt to comply with RFA section 604(a)(6) is a one-sentence cross-reference to a subsection of a different chapter that relates to broker-dealers.   The Department offers no explanation as to how that is supposed to provide any meaningful guidance to FIA sellers – or how it satisfies the RFA.

That the Department would rely on a section of the Regulatory Impact Analysis dealing with broker-dealers in purporting to consider the economic impact of its decisions on the small entities who sell FIAs, *i.e.*, the insurance agents and IMOs who are most impacted by the Rule, demonstrates the Department's haphazard approach to this decision in general and RFA

65

compliance in particular.  The Department's action therefore fails under both the RFA and the APA, and it should be vacated and set aside.  *See* 5 U.S.C. 611(a)(4) and 706(2).

## V.      The Court Should Stay The Applicability Date To Preserve The Status Quo.

### A.      NAFA's Members Face Immediate And Irreparable Harm.

The Department proffers nothing to refute facts established in NAFA's detailed affidavits concerning the injuries the Rule will cause throughout the fixed annuity industry.  Without contesting any of those facts, the Department argues at length that the injuries delineated in the affidavits are speculative, merely economic, and will not occur until sometime in the future. Based on those characterizations, the Department contends the Rule is not causing any irreparable harm to the fixed annuity industry.  That is simply wrong.

NAFA asks the Court to stay the applicability date of the Rule not because of what might happen on some future date, but because of what is happening to NAFA's members <u>right now</u>. In stating that "the Rule does not apply until April  2017" (Opp. at 85), the Department refuses to recognize the reality of the situation set out in the affidavits.   The Rule requires the fixed annuity industry to change its very business model and completely overhaul its distribution system.  Marrion Aff. ¶ 30-34.  Given the April 10, 2017 applicability date, the industry must begin that work immediately, absent an injunction.  Marrion Aff. ¶ 40.

This need to overhaul a multi-billion dollar industry in a matter of months is causing irreparable harm <u>now</u>.  As NAFA noted at the initial status hearing in this case, "once you start ripping up the train tracks and breaking things down, you can't put them back together right away[;] those costs are lost forever."  (Hr'g Tr. at 9:24-10:1 (June 6, 2016).)

A recent decision by the Supreme Court demonstrates this point.  In *Michigan v. EPA*, 135 S. Ct. 2699 (2015), the Supreme Court overturned the EPA's 2012 "Mercury and Air Toxic Standards" ("MATS") rule, which required coal-fired and oil-fired power plants to undertake

imminent and costly changes to reduce their emissions.  *See* 77 Fed. Reg. 9,306 & 9,413.  The agency gave the industry three years to comply, with the potential for a one-year extension.  *Id.* at 9,407.  Not surprisingly, and as is the case here, entities regulated under MATS immediately undertook efforts to comply with the rule as soon as it became effective.  Plaintiffs challenged the MATS rule in the D.C. Circuit, but they lost.  *See White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222 (D.C. Cir. 2014), *rev'd sub nom. Michigan v. EPA*, 135 S. Ct. 2699 (2015).

In June 2015, <u>after</u> the agency-mandated compliance period had run its course, the Supreme Court overturned the rule, because the EPA erroneously "deemed cost irrelevant to the decision to regulate power plants."  *Michigan*, 135 S. Ct. at 2712.  For the regulated entities that spent billions of dollars to comply with the MATS rule, this relief came too late.  As one source explained in an industry trade journal shortly after oral arguments in the Supreme Court:  "We're investing $370 million in upgrades to comply with MATS.  Most of [the investments] will have been made by the time the Supreme Court rules."  Rich Heidorn, Jr., *MATS Challenge Too Late for Targeted Coal Plants*, RTO Online (Mar. 20, 2015) (http://www.rtoinsider.com/epa-mats-coal-plants-14043/).  *See also Michigan v. EPA*, Oral Arg. Tr. at 82:10-21 (Mar. 25, 2015) ("90 percent of the capital cost, which is most of that 9.6 billion, has now already been spent.").

This case presents a similar problem, except that entire businesses and careers are at stake.  Without injunctive relief, the harm the Rule causes is immediate and cannot be reversed, because carriers, IMOs, and agents are already devoting unrecoverable resources to comply with dramatic new compliance requirements that alter the very essence of their businesses.  Thus, NAFA seeks to invoke the Court's equitable powers to prevent this inequitable outcome.

### 1.    NAFA's Members Already Face Great, Certain, and Ongoing Harm.

As the Department noted in its April 2016 Regulatory Impact Analysis, the Rule and Exemptions "are now officially part of the law and regulations governing . . . investment advice

providers."  Regulatory Impact Analysis at 292.   Accordingly, the Rule is "on the books" and

costly efforts to comply have begun already, as they must, given the magnitude of the impact of

these changes on the FIA industry.  As explained in NAFA's opening brief and affidavits, the

April 10, 2017 deadline establishes a compressed and unrealistic time period for the fixed

annuity industry to comply with the Rule.  Marrion Aff. ¶ 36.

The Department dismisses the irreparable harms that NAFA shows in its affidavits, on

the ground that affected parties can simply choose to alter their businesses or careers, so any

changes are "not directly attributable to the Rule."  (Opp. at 90.)  That is incorrect.  The

Department itself concedes that the Rule will put regulated entities out of business.  Regulatory

Impact Analysis at 258 ("[S]ome small service providers may find that the increased costs

associated with ERISA fiduciary status outweigh the benefit of continuing . . . service.")[33]

NAFA has amply demonstrated many other types of grave harm that will be caused

directly by the actions necessary to come into compliance with the Rule.  *See, e.g.*, Engels Aff.

¶¶ 8 (loss of customers), 13 (loss of market share), and 15 (abandoning line of business); James

Aff. ¶¶ 15 (loss of relationship with insurance carriers), 18 (new risk of civil liability), 20

(consumer loss of access to products; abandoning the market); 23 (loss of employees); White

Aff. ¶ 10 (catastrophic loss of business); Rafferty Aff. ¶ 12 (exiting the market; loss of market

share); Foguth Aff. ¶ 13 (going out of business); Wong Aff. ¶¶ 7 (diversion of substantial

resources), 8 (converting business to securities model), 9 (50% drop in sales; 40% net profit

---

[33] Even if the court were to agree that NAFA's members are not directly harmed by the Rule, where the challenged regulation "will exacerbate" the risk of harm, it "inflicts cognizable irreparable injury for purposes of a preliminary injunction."  *M.R. v. Dreyfus*, 697 F.3d 706, 729 (9th Cir. 2012) (granting injunction where medical patients faced increased risk of flowing from regulation limiting Medicaid in-home care services); *N. Dakota v. EPA*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015) (finding irreparable harm where plaintiffs showed both direct and indirect harms resulting from EPA rule).

loss); Perkins Aff. ¶¶ 13 (loss of affiliated agents), 23 (going out of business).

To be sure, it is difficult to measure on a day-by-day basis the injury that the industry will sustain between now and April 10, 2017.  As the D.C. Circuit has held, however, equitable relief is appropriate even when the movant has not shown a mathematical probability of success.  *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).  Put differently, although NAFA cannot with exactitude quantify its injury between now and April 10, 2017, it does not mean there is no irreparable injury.  The unrefuted NAFA affidavits clearly demonstrate otherwise.

### 2.    NAFA's Members Are Suffering Actual And Unrecoverable Losses.

Where the plaintiff shows actual "economic" harm, the question is "whether the claimed injury . . . is likely to be irreparable absent a preliminary injunction."  *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76 (D.D.C.), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The plaintiff satisfies this burden by showing that:  (1) "the harm is so severe as to cause extreme hardship to the business or threaten its very existence" or (2) the "plaintiff's alleged damages are unrecoverable."  *Sterling Commercial Credit–Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 15 (D.D.C. 2011) (quoting *Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008) and *Clarke v. Office of Fed. Hous. Enter. Oversight,* 355 F. Supp. 2d 56, 65 (D.D.C. 2004)).

Despite the Department's efforts to obfuscate these standards, the law on this point is quite clear.  Although "[b]are allegations of what is likely to occur are of no value," the movant may either "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future."  *Wis. Gas Co. v. FERC*, 758 F.2d at 674.  *See Hous. Study Grp. v. Kemp*, 736 F. Supp. 321, 330 (D.D.C.) (granting injunction

where movant "has been unable to generate new business and funds, has been forced to reduce its work force, and <u>expects</u> to lose further employees which will <u>eventually</u> force it out of business) (emphasis added), *order clarified*, 739 F. Supp. 633 (D.D.C. 1990).

The Department cherry-picks a handful of points from two of the nine NAFA affidavits to contend that "NAFA's allegations are riddled with uncertainties," while ignoring NAFA's clear "proof indicating that the harm is certain to occur in the near future."  *See* Engels Aff. ¶¶ 13 ("[M]y market share will be cut in half – and potentially more – and my ability to conduct client outreach and education will shrink to half the size it is today.") & 15 ("[C]utting transactions with retirement savers using qualified funds will result in a 75% loss to my annuity business and a 37.5% loss to my total business."); James Aff. ¶¶ 23 ("With an expected net loss of $4.8 million . . . I will be forced to lay off as much as 75% of FSA employees and independent contractors just to break even[.]") & 24 ("I anticipate that these changes will need to occur before the rule's 'applicability' date, so I will likely institute these severe organizational changes by no later than January 1, 2017."); White Aff. ¶ 9 ("[M]y business model will require significant and costly changes beginning as soon as the rule is on the books."); Rafferty Aff. ¶ 12 ("We will either have to leave the FIA market altogether or risk losing our market share to securities-licensed dealers who are readily equipped to comply with these kinds of regulations."); Foguth Aff. ¶ 13 ("Our current business model will be unsustainable without the revenue we bring in from IRA transactions."); Wong Aff. ¶ 9 ("[I]mmediate impacts resulting from the DOL Rule will cost Partners Advantage approximately 40% of net profits."); Perkins Aff. ¶ 16 ("Consolpro does not presently generate enough sales in our other product lines to ensure our survival, and we are unlikely to develop enough sales in our other product lines from now until April 2017 to sustain our business.").  Read in their entirety, the Department's characterization

of the NAFA affidavits is untrue – the harm is concrete and ongoing.

Moreover, the Department cannot plausibly maintain that "the entire industry of financial advisers is undergoing transition" (Opp. at 89), and at the same time contend that the Rule only impacts NAFA's members in the remote future.  Finally, because the Rule will require insurance carriers to overhaul their distribution systems and navigate a regulatory approval process for new products that is expected to last 18 months, the Department cannot plausibly contend that that the requirements of the Rule can easily be satisfied by April 2017.

To restate the requested relief, because the Department tries to obscure it, NAFA seeks two things.  First, the applicability dates need to be suspended so that the fixed annuity industry does not yet have to rebuild its distribution system.  The only way to avoid the irreparable harm that NAFA has shown is to stop the forced remaking of the current distribution system while this case is litigated.  Second, ending the foregoing problem will be meaningless unless the industry knows it will get adequate time to come into compliance with the Rule in the event the Rule is upheld in whole or in part in the future.  For example, if the applicability date is suspended, but then the Department prevails in the case on April 1, 2017, the industry cannot be expected to come into compliance with the Rule in nine days.  Thus, to preserve the status quo, the lead-in implementation period must be locked in for a period of at least 10 months, if not longer (NAFA continues to believe that a two-year implementation period is more realistic).  As explained in NAFA's opening brief, this is precisely what the D.C. Circuit did in *American Equity* to ensure that the FIA industry had two years to come into compliance with the SEC rules.[34]

---

[34]    In two separate footnotes, the Department shows it plainly misunderstands the outcome in *American Equity* and altogether misses its significance here.  In footnote 44, the Department states that "the D.C. Circuit upheld the reasonableness of the SEC's rationale" for subjecting FIAs to securities regulations.  (Opp. at 63.)  Then, in footnote 65, the Department acknowledges that the court vacated SEC Rule 151A "after holding that the agency's analysis . . . was arbitrary and capricious."  (*Id.* at 85.)  What the Department fails to

The Department suggests that the Court has no authority to grant the relief NAFA requests.  Opp. at 85 n.65 & 96.  Again, that is just wrong.  This Court has broad authority to issue the equitable relief that the situation requires.  *See Holiday Tours*, 559 F.2d at 844.  Here, the Department has created an unusual situation with an effective date, partial applicability date, and full applicability date.  Whatever the reason for the Department's odd approach, it cannot frustrate this Court's ability to issue appropriate equitable relief.

For purposes of a remedy under the APA, a court sits in equity, not at law.  A court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "[T]he comprehensiveness of [a court's] equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command.  Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).  As the Fourth Circuit recently observed, quoting *Porter*:

> Congress' invocation of the federal district court's equitable jurisdiction brings with it the full "power to decide all relevant matters in dispute and to award complete relief even though the decree includes that which might be conferred by a court of law."  Once invoked by Congress in one of its duly enacted statutes, the district court's inherent equitable powers cannot be "denied or limited in the absence of a clear and valid legislative command."

*FTC v. Ross*, 743 F.3d 886, 890 (4th Cir.), *cert. denied*, 135 S. Ct. 92 (2014).[35]

---

understand is that in *American Equity*, a remand would likely have resulted in at least some parts of Rule 151A surviving and taking effect on the original effective date, leaving the FIA industry in a scramble to comply.  To avoid this inequitable outcome, the court vacated the Rule <u>even though</u> it upheld the SEC's rationale in part.

[35]  *See also DOJ v. Daniel Chapter One*, 89 F. Supp. 3d 132, 147 (D.D.C. 2015) ("[T]he court has the power to decide all relevant matters in dispute and to award complete relief.") , *aff'd*, No. 15-5155, 2016 WL 3040815 (D.C. Cir. May 18, 2016); *Kansas-Nebraska Nat. Gas Co. v. Dep't of Energy*, No. 79-4055, 1979 WL 998, at *6 (D. Kan. July 31, 1979) ("If pre-

Accordingly, this Court should grant NAFA's request for equitable relief – together with a permanent order vacating the Rule on summary judgment.  In the unlikely event that the Rule is ultimately upheld in the future, equity requires that a compliance period be guaranteed from the date the Rule is upheld to ensure that the fixed annuity industry has adequate time to comply.

## B.      The Balance Of Equities And The Public Interest Favor An Injunction.

With regard to the two final elements for granting a preliminary injunction, the key consideration – entirely ignored by the Department in its brief – is to preserve the *status quo ante* during the pendency of the litigation, because the *status quo* cannot be restored after "the egg has been scrambled."  *Sugar Cane Growers Co-op. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002).

Even if the <u>deadline</u> for compliance is months away, the Rule and exemptions are on the books, and NAFA's members face the imminent need to restructure their business models and distributions channels in order to comply with a regulation that likely will not survive the mounting legal challenges against it.  Indeed, the Department states in its brief that participants in the fixed annuity industry should not labor under the "false impression that they may not need to reform their practices to come into compliance with the Rule and BIC Exemption by the applicability dates."  (Opp. at 97.)  Meanwhile, the Department speculates about generalized harm to consumers, ignoring that all fixed annuity sellers already must comply with state laws and suitability standards.  The Department offers no evidence to the contrary.

Moreover, it is well established that the public has a strong interest in ensuring that agencies act within the limits of statutory authority.  *Nat'l Treasury Employees Union v. United States Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) ("The preservation of the rights

---

enforcement review is sought, the court can stay administrative action either by specific statutory authorization, 5 U.S.C. § 705, or pursuant to the general equitable powers of the court, *see Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4 (1942).").

in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest.").[36]   Indeed, "the public interest is best served by having federal agencies comply with the requirements of federal law, particularly the notice and comment requirements of the APA, and the agency's own stated polices."  *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 6 (D.D.C. 1997).

The Department contends that a preliminary injunction will cause "untoward detriment" to other parties affected by the Rule, because NAFA's members "comprise only one segment of the large market for investment advice."  (Opp. at 96-97.)  This argument fails for two reasons.

First, the Department misstates NAFA's request.  NAFA's position is that the Rule, PTE 84-24, and the BICE must all be enjoined from becoming applicable, vacated, and otherwise invalidated.  Nothing short of that would afford complete relief to NAFA and its members, and an injunction staying the Rule altogether would avoid giving a "competitive advantage" to any market segment.  (Opp. at 97.)  If other parties benefit collaterally from the relief NAFA obtains, that is not a basis to deny relief to NAFA.

Second, NAFA's requested relief would obviate the Department's concern that an injunction might give "the false impression" that NAFA's members "may not need to reform their practices to come into compliance . . . by the applicability dates."  (Opp. at 97.)  The very purpose of the requested relief is to avoid irreparable harm to NAFA's members while ensuring that the Department provides an adequate and reasoned period of time for compliance.

On balance, these considerations strongly favor an order staying the applicability date of the Rule and exemptions until the claims in this lawsuit have been fully vetted by the courts.

---

[36]   *See also Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997) ("[F]aithful application of the statutes outweighs the public interest in what . . .  would be a marginal increase in the availability of low-cost generic drug products to American consumers."), *aff'd*, 140 F.3d 1060 (D.C. Cir. 1998).

Specifically, because the Rule wholly fails to achieve the aims of reasoned rulemaking within statutory bounds, the balance of the equities weighs in favor of granting injunctive relief.  The public will remain protected under both federal and state law, and NAFA's members will be spared the enormous, unrecoverable costs – including loss of market share and catastrophic loss of business – of complying with a Rule that cannot stand.

## VI.    Conclusion

For all the foregoing reasons, NAFA respectfully requests that the Court vacate the Rule and enter an injunction staying applicability of the Rule for at least 10 months after this litigation is concluded.

Respectfully submitted,

BRYAN CAVE LLP

/s/ Philip D. Bartz
Philip D. Bartz (D.C. Bar No.  379603)
Jacob A.  Kramer (D.C. Bar No.  494050)
1155 F Street, N.W., Suite 700
Washington, D.C. 20004
(202) 508-6000

Of Counsel:
Sheldon H.  Smith, Esq.
1700 Lincoln Street, Suite 4100,
Denver, CO  80203-4541

Adam L. Shaw, Esq.
1155 F Street, N.W., Suite 700
Washington, D.C. 20004

*Counsel for NAFA*

Dated:  June 22, 2016