**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

THE NATIONAL ASSOCIATION FOR
FIXED ANNUITIES,

      *Plaintiff*,

   v.

THOMAS E. PEREZ, Secretary of the United
States Department of Labor, *et al.*,

      *Defendants*.

Civil Action No. 16-1035 (RDM)

---

## <u>MEMORANDUM OPINION</u>

Plaintiff the National Association for Fixed Annuities ("NAFA") brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 604 *et seq.*, challenging three final rules promulgated by the Department of Labor on April 8, 2016.  Taken together, the three rules substantially modify the regulation of conflicts of interest in the market for retirement investment advice under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., and the Internal Revenue Code ("Code"), 26 U.S.C. §§ 408, 4975.  NAFA focuses its challenge on how the new rules will affect the market for the fixed annuities that its members sell.

Both ERISA and the Code define a "fiduciary" to include, among others, those who "render[] investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or [who] ha[ve] any authority or responsibility to do so."  29 U.S.C. § 1002(21)(A) (ERISA); 26 U.S.C. § 4975(e)(3) (Code).  Qualifying as a "fiduciary," in turn, triggers the "prohibited transaction" rules under both ERISA and the Code, which then prohibit conflicted transactions unless a statutory or regulatory exemption applies.

*See* 29 U.S.C. § 1106 (ERISA); 26 U.S.C. § 4975(c) (Code).  Significantly, under the prohibited

transaction rules, fiduciary advisers to ERISA employee benefit plans and individual retirement

accounts ("IRAs") may not receive compensation—including commissions—that varies based

on the fiduciary's investment advice.  *See Best Interest Contract Exemption*, 81 Fed. Reg.

21,002, 21,075–76 (Apr. 8, 2016).  Because insurance companies that sell fixed annuities

typically compensate their employees and agents through the payment of commissions, *see* Dkt.

5-3 at 6 (Marion decl. ¶ 24), they would be unable to operate (at least as currently structured) if

treated as fiduciaries and not granted an exemption from the prohibited transaction rules.

Prior to the promulgation of the new rules, most NAFA members were able to avoid this

difficulty because the governing regulations defined a "fiduciary," in relevant part, as someone

who renders investment advice "on a regular basis," 29 C.F.R. § 2510.3-21 (2015) (ERISA

regulation); 26 C.F.R. § 54.4975-9 (2015) (Code regulation), and fixed annuities are typically

acquired in a single transaction, *see Definition of the Term "Fiduciary"; Conflict of Interest

Rule—Retirement Investment Advice*, 81 Fed. Reg. 20,946, 20,955 (Apr. 8, 2016).  Moreover, in

those cases in which advice regarding the sale of a fixed annuity might have otherwise fallen

within the prohibited transaction rules, the relevant transactions were exempted under Prohibited

Transaction Exemption 84-24 ("PTE 84-24"), subject to certain conditions.  *See 1984

Amendment to PTE 84-24*, 49 Fed. Reg. 13,208, 13,211 (Apr. 3, 1984).  The three challenged

rules, however, change this arrangement in significant respects.

The first new rule—*Definition of the Term "Fiduciary"; Conflict of Interest Rule—

Retirement Investment Advice*, 81 Fed. Reg. 20,946 (Apr. 8, 2016) ("*Final Fiduciary

Definition*")—modifies the definition of "fiduciary" by, among other things, dropping the

condition that the relevant investment advice be provided on a "regular basis."  The second new

2

rule—*Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies, and Investment Company Principal Underwriters*, 81 Fed. Reg. 21,147 (Apr. 8, 2016) ("*Final PTE 84-24*")—removes variable and fixed indexed annuities (but not fixed rate annuities) from PTE 84-24.  And, recognizing the sweeping consequences of the first two rules, the third new rule—the *Best Interest Contract ("BIC") Exemption*, 81 Fed. Reg. 21,002 (Apr. 8, 2016) ("*Final BIC Exemption*")—creates a new exemption for variable and fixed indexed annuities (among other products) that permits financial institutions and advisers to receive compensation—including commissions—based on their provision of investment advice.

In order to qualify for the BIC Exemption, however, financial institutions and advisers must abide by certain conditions:  First, advisers to employee benefit plans and IRAs must abide by the Department's newly adopted "Impartial Conduct Standards," and "[f]inancial [i]nstitutions must adopt policies and procedures designed to ensure that their individual [a]dvisers adhere to" these standards.  *Final BIC Exemption*, 81 Fed. Reg. at 21,076.  The Impartial Conduct Standards, in turn, require that financial institutions and advisers "provide investment advice that is, at the time of the recommendation, in the [b]est [i]nterest of the [r]etirement [i]nvestor."  *Id.* at 21,077.  As explained in the rule, this means that qualifying financial institutions and advisers are subject to the same duties of loyalty and prudence applicable under title I of ERISA, even with respect to advice regarding IRAs and other plans that are not subject to title I (and thus not otherwise subject to the duties of prudence and loyalty).  *Id.*  In addition, financial institutions and advisers must ensure that they will not "receive, directly or indirectly, compensation for their services that is in excess of *reasonable compensation* within the meaning of" 29 U.S.C. § 1108(b)(2) (ERISA) and 26 U.S.C.

§ 4975(d)(2) (Code).  *Id.* (emphasis added).  And, finally, the Impartial Conduct Standards require that financial institutions and advisers ensure that "[s]tatements by the [f]inancial [i]nstitutions and [their] [a]dvisers . . . about the recommended transaction, fees, and compensation, [m]aterial [c]onflicts of [i]nterest, and any other matters relevant to a [r]etirement [i]nvestor's investment decisions, will not be materially misleading at the time they are made." *Id.*

Second, financial institutions seeking to rely on the BIC Exemption must also affirmatively represent in writing that they and their advisers are fiduciaries under ERISA and the Code and must warrant, among other things, that they have written policies in place "designed to ensure that [their] [a]dvisers adhere to the Impartial Conduct Standards."  *Id.*

Third, with respect to IRAs and other plans that are not subject to title I of ERISA, financial institutions seeking to rely on the BIC Exemption must go a step further and "agree that they and their [a]dvisers will adhere to the exemption's standards in a written contract that is enforceable by the [r]etirement [i]nvestors."  *Id*. at 21,076.  The contract, moreover, may not include a provision "disclaiming or otherwise limiting liability," waiving the "right to bring or participate in a class action," or agreeing "to arbitrate or mediate individual claims in venues that are distant or that otherwise unreasonably limit the ability of the [r]etirement [i]nvestors to assert the claims safeguarded by" the BIC Exemption.  *Id*. at 21,078.

NAFA challenges the new rules on numerous grounds.  It argues that the new definition of "fiduciary"—and, in particular, the Department's decision to drop the "on a regular basis" condition—fails at *Chevron* steps one and two.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  It contends that the Department acted beyond its authority in extending ERISA fiduciary duties to IRAs and other plans that are not subject to title I of

ERISA.  It contends that the BIC Exemption impermissibly creates a private cause of action and

that the condition contained in the BIC Exemption limiting compensation to a "reasonable" level

is void for vagueness.  It argues that Department's decision to move fixed indexed annuities from

PTE 84-24 to the BIC Exemption was arbitrary and capricious.  And finally, it maintains that the

Department's regulatory flexibility analysis was inadequate.

Based on these arguments, and its further contention that the new rules will have

catastrophic consequences for the fixed indexed annuities industry, NAFA seeks both a

preliminary injunction and summary judgment.  The Department opposes both motions and has

cross-moved for summary judgment.  For the reasons explained below, the Court will deny

NAFA's motions for a preliminary injunction and summary judgment and will grant the

Department's cross-motion for summary judgment.

## I. BACKGROUND

### A.     Annuities

Although the three rules that NAFA challenges apply to various segments of the market

for retirement investments, NAFA understandably focuses its challenge on how the rules affect

its members.  Those members include insurance companies, independent marketing

organizations, and insurance agents involved in the sale of fixed annuities.  Dkt. 5-2 at 2–3

(Anderson decl. ¶ 2).  Annuities fall into three general categories:  variable annuities, fixed

indexed annuities, and fixed rate annuities.  *See* Regulatory Impact Analysis 40, AR 356.

A "variable annuity" is "[a]n annuity that makes payments in varying amounts depending

on the success of the underlying investment strategy."  Annuity, BLACK'S LAW DICTIONARY

(10th ed. 2014).  For purposes of the Securities Act of 1933, a variable annuity is both an

insurance product and a security.  *See SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65,

69–71 (1959).  Because the "underlying assets are held in separate accounts . . . with a variety of underlying investment options such as mutual funds," the customer has the opportunity to benefit from "the realization of market returns."  Regulatory Impact Analysis 40, AR 356.  But, future income payments are "not guaranteed," and the customer "make[s] or lose[s] money depending on the performance of the chosen investment options and the contract value."  *Id.*

A "fixed rate annuity," in contrast, offers "a guaranteed level of return that will always provide a guaranteed and predictable level of income."  Dkt. 5-2 at 3 (Anderson decl. ¶ 6).  The annuity contract "may provide a guaranteed interest rate for the life of the annuity[,] or [it] may allow the insurance company to reset the interest rate periodically but no more than once every twelve months, protecting the annuity owner against loss due to investment or market risk."  *Id.*

Finally, a "fixed indexed annuity" bears attributes of both a variable annuity and a fixed rate annuity.  *See Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 168 (D.C. Cir. 2010).  Its rate of return is based on "an external market index, such as the S&P 500," but it also comes "with a guaranty that the rate will never fall below zero."  Dkt. 5-2 at 4 (Anderson decl. ¶ 7).  Although fixed indexed annuities do "not directly participate in any security investment," *id.*, "as [with] securities, there is a variability in the potential return that results in a [greater] risk to the purchaser" than posed by fixed rate annuities, *Am. Equity Inv.*, 613 F.3d at 174.  Fixed indexed annuities, accordingly, "give [the customer] more risk (but more potential return) than a fixed [rate] annuity but less risk (and less potential return) than a variable annuity."  *Final BIC Exemption*, 81 Fed. Reg. at 21,017 (internal citation and quotation marks omitted).

NAFA represents entities involved in sales of both fixed rate annuities and fixed indexed annuities.  As explained further below, the three challenged rules have significant implications for the sale of these products—and, in particular, for fixed indexed annuities—for three reasons.

First, both fixed rate and fixed indexed annuities "are often purchased as a funding vehicle for [IRAs]." Dkt. 5-3 at 4 (Marrion decl. ¶ 17). Purchases made in IRAs, in turn, receive significant tax benefits, *see* 26 U.S.C. § 408, and, more importantly, IRAs constitute "plans" for purposes of title II of ERISA. Second, "almost all annuities today are sold based on commission compensation." Dkt. 5-3 at 6 (Marrion decl. ¶ 24). This is significant because payment or receipt of a commission may trigger the prohibited transaction rules. Third, the new regulations subject fixed indexed annuities—but not fixed rate annuities—to certain more stringent regulatory requirements. These additional requirements are discussed at length below.

## B.     Statutory and Regulatory Background

### 1.     *The Employment Retirement Income Security Act of 1974*

When parties and courts refer to ERISA, more often than not, they mean title I of the Act. That is the portion of the law that regulates retirement plans established or maintained by employers, unions, or both. It contains detailed reporting and disclosure requirements, rules relating to vesting and funding, fiduciary responsibility requirements, various enforcement rules, a private cause of action, and a broad preemption rule. 29 U.S.C. § 1021 *et seq.* Title II, in contrast, principally addresses the requirements that plans must fulfill in order to qualify for certain tax advantages, *see* 26 U.S.C. § 4975, and it receives relatively less attention in the case law and commentary.[1] It does not include many of the detailed requirements found in title I of the Act. Like title I, however, title II does include a prohibited transaction rule and, for purpose of that provision, it contains a definition of "fiduciary" that parallels the definition found in title

---

[1] Title III of ERISA addresses certain jurisdictional issues and the coordination of enforcement activities between the Department and the IRS. *See* Pub. L. No. 93-406 §§ 3001–3043, 88 Stat. 995–1003. Title IV creates an insurance program for defined benefit pension plans, which is administered by the Pension Benefit Guaranty Corporation. *See* 29 U.S.C. § 1301 *et seq.*; *Davis v. Pension Ben. Guar. Corp.*, 734 F.3d 1161, 1164 (D.C. Cir. 2013).

I.  *See* 26 U.S.C. § 4975(e)(3).  In one important respect, moreover, title II sweeps more broadly than title I:  In addition to covering plans established and maintained by employers, title II applies to IRAs and other plans not subject to title I.  *Compare* 26 U.S.C. § 4975(e)(1)(C) *with* 29 U.S.C. § 1003(a).

Because this case turns, in part, on the overlap and interplay between titles I and II, the Court will briefly describe the relevant provisions of both titles of the Act.

a.  Title I of ERISA

Title I of ERISA applies to "any employee benefit plan if it is established or maintained" by an employer, by an employee organization, or by both.[2]  29 U.S.C. § 1003(a).  One of the principal ways title I protects the assets of employee benefit plans is by imposing "fiduciary" obligations on individuals who perform certain functions on behalf of a plan.  Of particular relevance here, a person is a "fiduciary" with respect to a plan if "he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so."  *Id.* § 1002(21)(A).

A fiduciary of an ERISA employee benefit plan must "discharge his duties with respect to [the] plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  *Id.* § 1104(a)(1).  And, a fiduciary must also act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a

---

[2]  An "employee benefit plan" means an employee welfare benefit plan, an employee pension benefit plan, or a plan which is both a welfare and a pension benefit plan.  29 U.S.C. § 1002(3).  An employee welfare benefit plan, in turn, is a "plan, fund, or program" that provides medical care, unemployment and disability benefits, as well as certain other specified categories of benefit.  *Id.* § 1002(1).  An employee pension benefit plan, in contrast, provides retirement income to its participants.  *Id.* § 1002(2).

prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims," including by "diversifying the investments of the plan so as to minimize the risk of large losses." *Id.* § 1104(a)(1)(B)–(C). These twin duties are referred to as the duties of loyalty and prudence. *See DeFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418–19 (4th Cir. 2007). A fiduciary who violates these duties is "personally liable" for any losses to the plan stemming from such a breach, and he may also be "subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a). Title I creates a private cause of action permitting plan participants and beneficiaries to enforce this right, to recover lost benefits, and to enforce the terms of the plan, and it also empowers the Secretary of Labor to bring suit "for appropriate relief" or "to collect any civil penalty" for violations of certain provisions of the Act. *Id.* § 1132(a). While creating these federal causes of action, title I also forecloses other remedies by preempting a broad range of state law claims "as they . . . relate to any *employee benefit plan*." *Id.* § 1144(a) (emphasis added).

Title I also "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorially barring certain transactions deemed 'likely to injure the pension plan.'" *Harris Trust Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000) (citation omitted); *see also Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996). Under this "prohibited transaction" rule, a fiduciary may not "deal with the assets of the plan in his own interest or for his own account," may not "in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries," and may not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b). In addition, a fiduciary

may not cause a plan to engage in certain transactions with a "party in interest"—a category which includes the fiduciary himself, the employer sponsoring the plan, and persons providing services to the plan. *Id.* § 1002(14); § 1106(a). The "prohibited transaction" rule, however, is subject to certain statutory exceptions, *see id.* § 1108(b), and, more importantly for present purposes, the statute authorizes the Secretary of Labor to grant additional exemptions—either "conditional[ly] or unconditional[ly]"—provided that the exemption is "administratively feasible," "in the interests of the plan and of its participants and beneficiaries," and "protective of the rights of participants and beneficiaries of such plan," *id.* § 1108(a).

  b.  <u>Title II of ERISA</u>

Rather than directly regulate the administration of covered plans, title II of ERISA establishes rules for the tax treatment of employee pension plans, IRAs, and certain other plans not subject to title I. Title II is broader in scope than title I. Unlike title I, it applies to IRAs and other plans that are not established or maintained by the beneficiary's employer or union. 26 U.S.C. § 4975(e)(1). But title II lacks much of the detailed regulation found in title I. Most notably, it does not subject fiduciaries of IRAs and other non-title I plans to the fiduciary duties of loyalty and prudence. *See generally id.* § 4975.

Title II does, however, contain the same definition of "fiduciary" found in title I. *Compare* 26 U.S.C. § 4975(e)(3) *with* 29 U.S.C. § 1002(21). Thus, as under title I, "any person who . . . renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of [a covered] plan," is a fiduciary. 26 U.S.C. § 4975(e)(3)(B). And it contains a prohibited transaction rule that, in relevant respects, parallels that found in title I. *Id.* § 4975(c). Like the title I prohibited transaction rule, moreover, the title II version of the rule both recognizes certain statutory exceptions, *see id.* § 4975(d), and

10

authorizes the Secretary of Labor to grant exemptions—with or without conditions—if "the

exemption is . . . administratively feasible, . . . in the interest of the plan and its participants and

beneficiaries, and . . . protective of the rights of participants and beneficiaries of the plan," *id.*

§ 4975(c)(2).[3]

Those who fail to comply with title II's prohibited transaction rule are subject to an

excise tax imposed "on each prohibited transaction."  *Id.* § 4975(a).  Under that rule, "any

disqualified person who participate[d] in the prohibited transaction"—"other than a fiduciary

acting only as such"—is subject to the tax.  *Id.*  Initial violations are taxable at a rate "equal to 15

percent of the amount involved with respect to the prohibited transaction for each year," *id.*, but,

if "the transaction is not corrected within the taxable period," the tax increases to a rate of "100

percent of the amount involved," *id.* § 4975(b).  Title II does not, however, create a private cause

of action and, correspondingly, does not preempt state law causes of action relating to IRAs and

other plans not subject to title I.

2.      *The 1975 Definition of "Fiduciary" and PTE 84-24*

The Secretary of Labor first issued regulations defining when a person "renders

investment advice" so as to fall within ERISA's definition of "fiduciary" in 1975.  That

regulation set out a five-part test, under which a person was deemed to "render investment

advice" only if he:  (1) "renders advice to the plan as to the value of securities or other property,

or makes recommendation[s] as to the advisability of investing in, purchasing, or selling

---

[3]  As originally enacted, ERISA provided the Secretary of the Treasury (in consultation with the
Secretary of Labor) exemption authority with respect to title II.  *See* 26 U.S.C. § 4975(c)(2); 29
U.S.C. § 1203.  In 1978, however, President Carter issued a reorganization plan, subsequently
ratified by Congress in 1984, giving "statutory authority for fiduciary obligations" and
responsibility for "overseeing fiduciary conduct" to the Secretary of Labor.  *See* Message of the
President, Apr. 10, 1978, 29 U.S.C. § 1001 note; *see also* 5 U.S.C. App'x 1, § 102.

securities or other property," and he does so (2) "on a regular basis" (3) "pursuant to a mutual agreement, arrangement, or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan," (4) that the advice given "will serve as a primary basis for investment decisions with respect to plan assets," and (5) that the advice will be "individualized . . . based on the particular needs of the plan."  29 C.F.R. § 2510.3-21(c)(1) (2015).[4]

Prior to the present rulemaking, this rule governed application of the prohibited transaction rules found in both title I and title II of ERISA.  With respect to title I, the prohibited transaction rule applies to a "fiduciary," 29 U.S.C. § 1106, and a "fiduciary" is defined to include a person who "renders investment advice for a fee," 29 U.S.C. § 1002(21)(A).  Because the governing regulation provided that a person "renders investment advice" only if the advice is provided "on a regular basis," 29 C.F.R. § 2510.3-21(c)(1) (2015), occasional or intermittent advice was not sufficient to trigger application of the prohibited transaction rule.  The same conclusion followed, although from a slightly different path, for purposes of title II.  There, the prohibited transaction rule applies to "disqualified person[s]," 26 U.S.C. § 4975(c), which are then defined to include "fiduciar[ies]," *id.* at § 4975(e)(2), which are defined to include those who "render[] investment advice for a fee," *id.* at § 4975(e)(3).  And because a person was deemed to "render[] 'investment advice'" only if the advice was provided "on a regular basis," 26 C.F.R. § 54.4975-9(c)(1)(ii), occasional and intermittent advice was, once again, excluded.

---

[4]  The 1975 regulation predated the 1978 reorganization plan giving all rulemaking authority over fiduciary status under ERISA to the Secretary of Labor.  The Secretary of the Treasury issued a materially identical regulation interpreting title II's definition of fiduciary.  *See Pension Excise Taxes*, 40 Fed. Reg. 50,840 (Oct. 31, 1975).

PTE 84-24 provides the other significant regulatory backdrop to the Department's most recent actions. Originally adopted in 1977 (as PTE 77-9) and "amended several times over the years," PTE 84-24 created a limited exemption to the prohibited transaction rules in order to permit "certain parties to receive commissions when plans and IRAs purchased recommended insurance and annuity contracts and investment company securities," such as "mutual fund shares." *Final PTE 84-24*, 81 Fed. Reg. at 21,148. The exemption applied to, among other things, "[t]he receipt, directly or indirectly, by an insurance agent or broker or a pension consultant of a sales commission from an insurance company in connection with the purchase, with plan assets[,] of an insurance or annuity contract." *1984 Amendment to PTE 84-24*, 49 Fed. Reg. at 13,211. The exemption, however, came with a number of conditions, including a requirement that the transaction be "on terms at least as favorable to the plan as an arm's-length transaction with an unrelated party" and that "[t]he combined total of all fees, commissions and other consideration received by the insurance agent or broker, pension consultant, insurance company, or investment company principal underwriter . . . not [be] in excess of 'reasonable compensation' within the contemplation of" 29 U.S.C. §§ 1108(b)(2) & (c)(2) (ERISA), and 26 U.S.C. §§ 4975(d)(2) & (d)(10) (Code). *Id.* PTE 84-24 did not distinguish between variable and fixed annuities.

Accordingly, prior to the present rulemaking, it was permissible for insurance companies to compensate their employees and agents on a commission basis for sales of variable and fixed annuity products held in ERISA employee benefit plans and IRAs, as long as either (1) the relevant investment advice was not provided "on a regular basis," or (2) the terms of the transaction were at least as favorable as those offered in arm's-length transactions and the relevant fees and commissions were reasonable.

13

3.       *The Current Rulemaking*

a.   The 2010 Proposed Rule

The current rulemaking process began six years ago, when the Department first proposed to amend the 1975 regulation.  *See 2010 Proposed Fiduciary Definition*, 75 Fed. Reg. 65,263 (Oct. 22, 2010).  At that time, the Department explained that it proposed to amend "a thirty-five year old rule that may inappropriately limit the types of investment advice relationships that give rise to fiduciary duties on the part of the investment advisor."  *Id.* at 65,263–64.  In proposing the amendments, the Department raised both legal and policy concerns about the existing rule.  As a legal matter, the Department asserted that the 1975 regulation had "significantly narrow[ed] the plain language of" the statutory definition of a "fiduciary."  *Id.* at 65,264.  And, as a policy matter, it stressed that significant changes had occurred "in both the financial industry and the expectations of plan officials and participants who receive investment advice."  *Id.*  In particular, according to the Department, "the retirement plan community ha[d] changed significantly, with a shift from defined benefit . . . plans to defined contribution . . . plans," while, at the same time, "the types and complexity of investment products and services available to plans [had] increased."[5]  *Id.* at 65,265.  This concern was borne out, moreover, by "recent Department enforcement initiatives," which, according to the Department, had brought to light "a variety of circumstances, outside those described in the [1975] regulation, under which plan fiduciaries

---

[5]  In a "defined benefit" plan, the member is "generally entitled to a fixed periodic payment from an unsegregated pool of assets," and "[t]he employer funding the plan typically bears the entire investment risk and must cover any underfunding."  *Hughes Aircraft v. Johnson*, 525 U.S. 432, 433 (1999).  In a "defined contribution" plan, in contrast, the member "is entitled to whatever assets are dedicated to his individual account," *id.*, and the member rather than the plan sponsor bears the investment risk.

seek out impartial assistance and expertise of persons such as consultants, advisers and appraisers," who have "a considerable impact on plan investments." *Id.*

To address these concerns, the Department proposed to amend its definition of "rendering investment advice for a fee" to include a broader range of activities, while also listing certain activities that would not result in fiduciary status. Most significantly, the proposal would have dropped the "on a regular basis" limitation. *Id.* at 65,267. The proposed amendments would have applied to both title I and title II fiduciaries, and thus would have covered advisers to IRAs as well as to ERISA-covered plans. *Id.* at 65,266. The proposal did not, however, include any new prohibited transaction exemptions under either title. *See id.* at 65,263–64.

In response to the 2010 proposal, the Department "received over 300 comment letters," held a public hearing "at which 38 speakers testified," and then received an additional 60 comment letters. *Final Fiduciary Definition*, 81 Fed. Reg. at 20,957. "A number of commenters urged the Department to undertake additional analysis of the expected costs and benefits particularly with regard to the 2010 [p]roposal's coverage of IRAs." *Id.* In light of these concerns and "the significance of the rulemaking to the retirement plan service provider industry, plan sponsors and participants, beneficiaries and IRA owners, the Department decided to take more time for review and issue a new proposed regulation for comment." *Id.* Accordingly, on September 19, 2011, the Department announced that it intended to withdraw the 2010 proposal and would propose a new rule defining "fiduciary" at a later date. *Id.*

      b.  <u>The 2015 Proposed Rules</u>

On April 20, 2015, the Department issued a new proposal, which substantially revised both the 1975 regulation and the proposed prohibited transaction exemptions. As the Department explained, the 1975 regulation "significantly narrowed the breadth of the statutory

definition of fiduciary investment advice by creating a five-part test," which included the "on a regular basis" limitation. *2015 Proposed Fiduciary Definition*, 80 Fed. Reg. 21,928, 21,928 (Apr. 20, 2015). That test, however, was created "prior to the existence of participant-directed 401(k) plans, widespread investments in IRAs, and the now commonplace rollover of plan assets from fiduciary-protected plans to IRAs." *Id.* As the Department further explained, in the current market for retirement advice, unlike in 1975, "[i]ndividuals, rather than large employers and professional money managers, have become increasingly responsible for managing retirement assets as IRAs and participant-directed plans, such as 401(k) plans, have supplanted defined benefit pensions." *Id.* at 21,932. "At the same time," moreover, "the variety and complexity of financial products have increased, widening the information gap between advisers and their clients," adding to the risk that "small retail investors" will obtain "lower returns to their retirement savings" based on input they receive from advisers with conflicts of interest. *Id.* Finally, the Department stressed that, "[a]s baby boomers retire, they are increasingly moving money from ERISA-covered plans, where their employer has both the incentive and the fiduciary duty to facilitate sound investment choices, to IRAs where good and bad investment choices are myriad and advice that is conflicted is commonplace." *Id.* According to the Department, "rollovers" of this type "will total more than $2 trillion over the next 5 years." *Id.*

In light of these changes in the marketplace for retirement advice, the Department proposed that it discard the five-part test, including the "on a regular basis" requirement, in favor of a new standard. Among other concerns, the Department focused on the fact that, as employees reach retirement age, they will rollover trillions of dollars into IRAs, and those "rollovers" will involve "one-time" transactions that will not satisfy the "on a regular basis" prong of the five-part test. *Id.* at 21,951. The decision about how to invest these "rollovers,"

moreover, "will be the most important financial decision that many consumers make in their lifetime." *Id.* Under the proposed test, a person would "render[] investment advice" by, among other things, providing investment recommendations to an employee benefit plan or an IRA owner while acting pursuant to an agreement or understanding that "the advice is individualized to, or specifically directed to, the recipient for consideration in making investment or management decisions regarding plan assets." *Id.* at 21,929.

At the same time, however, "[t]he Department . . . sought to preserve beneficial business models for delivery of investment advice by separately proposing new exemptions from the prohibited transaction rules that would broadly permit firms to continue common fee and compensation practices, so long as they are willing to adhere to basic standards aimed at ensuring that their advice is in the best interest of their customers." *Id.* at 21,929. Thus, in two additional proposals announced the same day as the new definition of "fiduciary," the Department proposed amendments to PTE 84-24 and proposed a new exemption, the Best Interest Contract Exemption, for those who do not qualify for PTE 84-24.[6]

Prior to the 2015 proposal, PTE 84-24 provided a broad exemption for the receipt of sales commissions by insurance agents and brokers "in connection with the purchase, with plan assets[,] of an insurance or annuity contract." *1984 Amendment to PTE 84-24*, 49 Fed. Reg. at

---

[6] The 2015 proposal also included a number of specific carve-outs from its definition of fiduciary advice because the Department concluded that the proposal "standing alone . . . could sweep in some relationships that are not appropriately regarded as fiduciary in nature and that the Department does not believe Congress intended to cover as fiduciary relationships." *2015 Proposed Fiduciary Definition*, 80 Fed. Reg. at 21,929. Specific carve-outs in the proposal related to, among other things, recommendations made to a "large plan investor with financial expertise"; offers or recommendations to enter into a swap or security-based swap regulated by the SEC; recommendations made by an employee of the plan sponsor, provided the employee received no fee for the advice other than her normal compensation; and information constituting "investment education" or "retirement education." *Id.* at 21,936.

13,211.  Under the proposed amendments, however, PTE 84-24 would no longer cover

transactions involving annuities that are regulated as securities—that is, variable annuities.  The

exemption would remain available, though, for annuities that are not regulated as securities—that

is, fixed rate and fixed indexed annuities.  *2015 Proposed PTE 84-24*, 80 Fed. Reg. 22,010,

22,012 (Apr. 20, 2015).  But, in making this proposal, the Department specifically requested

comment on whether "the proposal to revoke relief for securities transactions involving IRAs

(*i.e.*, annuities that are securities and mutual funds) but leave in place relief for IRA transactions

involving insurance and annuity contracts that are not securities strikes the appropriate balance

and is protective of the interests of the IRAs."  *Id.* at 22,015.

The Department also proposed to make substantive changes to PTE 84-24.  Most

importantly, the proposal provided that, in order to qualify for the exemption, insurance and

annuity agents must adhere to new "Impartial Conduct Standards."  *Id.* at 22,018.  Under those

standards, the insurance agent and insurance company would be required to act "in the best

interest of the plan[] [or] IRA" and to ensure that statements about investment fees, material

conflicts of interest, and other matters directly relevant to the investment decision are not

misleading.  *Id.*  The Department further proposed that an insurance agent or insurance company

would be deemed to "act[] in the '[b]est [i]nterest' of the plan or IRA" when "the fiduciary acts

with the care, skill, prudence, and diligence under the circumstances then prevailing that a

prudent person would exercise based on the investment objectives, risk tolerance, financial

circumstances and needs of the [p]lan or IRA, without regard to the financial or other interests of

the fiduciary, any affiliate or other party."  *Id.* at 22,020.  These conditions parallel the duties of

prudence and loyalty found in title I of ERISA.  *See* 29 U.S.C. § 1104(a)(1).  Although this

proposal was thus of little import to ERISA employee benefit plans, which were already subject

18

to those duties, it constituted a substantial change for IRAs and other plans not subject to title I, which were not otherwise subject to the duties of prudence and loyalty. *See generally* 26 U.S.C. § 4975.

The Department also proposed to create a new exemption for fiduciaries who do not qualify for PTE 84-24. This exemption—the Best Interest Contract Exemption or BIC Exemption—"was developed to promote the provision of investment advice that is in the best interest of retail investors such as plan participants and beneficiaries, IRA owners, and small plans." *2015 Proposed BIC Exemption*, 80 Fed. Reg. 21,960, 21,961 (Apr. 20, 2015). Although the prohibited transaction rules would otherwise preclude insurance companies and other financial institutions from compensating fiduciaries based on commissions or other financial incentives that could affect the substance of their investment advice, the Department proposed "[t]o facilitate continued provision of advice to such retail investors . . . under conditions designed to safeguard the interests of investors" by "allow[ing] certain advice fiduciaries . . . to receive these . . . forms of compensation that, in the absence of an exemption, would not be permitted under ERISA and the Code." *Id.* Rather than adopt "highly prescriptive transaction-specific exemptions," the Department proposed to take "a standards-based approach that [would] broadly permit firms to continue to rely on common fee practices, as long as they are willing to adhere to basic standards aimed at ensuring that their advice is in the best interest of their customers." *Id.*

Under the BIC Exemption, the Department proposed that advisers and financial institutions would be permitted to receive compensation that varies based on their investment recommendations, as well as compensation from third parties in connection with their advice, if they satisfied certain conditions. Like the proposed amendments to PTE 84-24, the proposed

19

BIC Exemption provided that qualified fiduciaries must abide by certain Impartial Conduct Standards. *Id.* at 21,962. But, unlike PTE 84-24, the proposed BIC Exemption added the requirement that "[a]dviser[s] and [f]inancial [i]nstitution[s] enter into a written contract with the [r]etirement [i]nvestor prior to recommending that the plan, participant or beneficiary account, or IRA, purchase, sell or hold an [a]sset." *Id.* at 21,969. As proposed, the contract would include an affirmative representation that the adviser and financial institution "are fiduciaries under ERISA or the Code, or both"; a promise to comply with the Impartial Conduct Standards (including the duties of loyalty and prudence, the obligation not to sell products yielding the advisor or financial institution more than "reasonable compensation" for their services, and the ban on misleading statements); various warranties; and certain disclosures. *Id.* at 21,984–85. The proposed BIC Exemption also prohibited financial institutions from including several terms in the contracts, including exculpatory or liability-limiting provisions, class-action waivers, and mandatory class-action arbitration provisions. *Id.* at 21,973.

In the Department's view, this contract would "create[] a mechanism by which" investors "can be alerted to" the obligations of the advisers and financial institutions and provide "a basis upon which" the corresponding "rights c[ould] be enforced." *Id.* at 21,969. Failure to comply with the Impartial Conduct Standards," accordingly, could result in both an action to enforce the written contract and a "loss of the [tax] exemption." *Id.* Finally, the Department emphasized that the conditions reflected in the proposed exemption—of which the written contract was the "cornerstone"—were "necessary for the Secretary to find that the exemption is administratively feasible, in the interest of plans . . . and IRA owners[,] and protective of the rights of the participants and beneficiaries of such plans and IRA owners," *id.*, as it was required to find in order to exercise its exemption authority under 29 U.S.C. § 1108(a) and 26 U.S.C. § 4975(c)(2).

As to all three proposed rules, the Department initially provided a seventy-five-day

comment period, which it subsequently extended for an additional two weeks.  *2015 Proposed*

*Fiduciary Definition*, 81 Fed. Reg. at 20,958.  It also held a four-day public hearing in August

2015, made the transcript available online, and then provided a further opportunity for public

comment on the proposed regulation, the proposed exemptions, and the hearing.  *Id.*  The

Department received over three thousand individual comment letters, and thirty petitions with

over three hundred thousand signatories relating to the proposal.  Regulatory Impact Analysis 7,

AR 323.

    c. <u>The Final Rule</u>

On April 8, 2016, the Department published the final rules.  *Final Fiduciary Definition*,

81 Fed. Reg. 20,946 (Apr. 8, 2016); *Final BIC Exemption*, 81 Fed. Reg. 21,002 (Apr. 8, 2016);

*Final PTE 84-24*, 81 Fed. Reg. 21,147 (Apr. 8, 2016).  Although the final rules include certain

modifications to the 2015 proposals, the Department remained convinced that developments in

the retirement investment advice market since 1975 required substantial changes in the

governing regulations, and, in particular, abandonment of the "on a regular basis" limitation on

the definition of a "fiduciary."  As the Department once again emphasized, since 1975

"individuals, rather than large employers and professional money managers, have become

increasingly responsible for managing retirement assets as IRAs and participant-directed

plans . . . have supplanted defined benefit pensions."  *Final Fiduciary Definition*, 81 Fed. Reg. at

20,954.  In 1975, for example, "private-sector defined-benefit pensions—mostly large,

professionally managed funds—covered over 27 million active participants and held assets

totaling almost $186 billion," as compared to "just 11 million active participants in individual

account defined contribution plans with assets of just $74 billion," most of which were

professionally managed. *Id.* At that time, the 401(k) did not yet exist, and IRAs had been authorized for the first time just the year before, when ERISA was enacted. *Id.* By 2013, however, the number of active participants in defined benefit plans had decreased by almost half, to just over 15 million, and the number of "individual account-based defined contribution plans" had grown by a factor of seven, to nearly 77 million active participants. *Id.* And, by 2015, "more than 40 million households owned IRAs." *Id.* This shift away from large, institutional investors to "small retail investors," moreover, was accompanied by an increase in the "variety and complexity of financial products," and by the surge in retirements of baby boomers, whom the Department projects will rollover almost $2.4 trillion "from ERISA-covered plans" to IRAs over the next five years. *Id.* at 20,954–55.

In that context, and after considering the comments it received in response to the 2015 proposed rules, the Department reaffirmed its conclusion that the requirement that investment advice be given on a "regular basis" under the 1975 rule no longer fits the needs of the modern marketplace. *Id.* at 20,955. The Department stressed that advice on rollovers can have a profound effect on a retirement investor's finances, yet this type of advice is rarely, if ever, provided on a "regular basis." *Id.* More generally, it expressed concern that under the 1975 regulations "advisers can steer customers"—and, in particular, small retail investors—"to investments based on their own self-interest (*e.g.*, products that generate higher fees for the adviser even if there are identical lower-fee products available), give imprudent advice, and engage in transactions that would be otherwise prohibited by ERISA and the Code." *Id.*

In addition to these policy concerns, the Department also suggested that the 1975 regulation did not reflect the best construction of the statutory language in ERISA and the Code, *id.* at 20,948, and, in particular, that the five-part test "narrowed the scope of the statutory

definition of fiduciary investment advice," *id.* at 20,954.  The Department, accordingly, replaced the five-part test with a new definition of investment advice.  Under the new definition, "a person shall be deemed to be rendering investment advice for a fee or other compensation," if:

(1)    *Such person provides* to a plan, plan fiduciary, plan participant or beneficiary, *IRA, or IRA* owner *the following types of advice for a fee or other compensation, direct or indirect*:

  (i)    *A recommendation as to the advisability of acquiring*, holding, disposing of, or exchanging, securities or other *investment property*, or a recommendation as to how securities or other investment property should be invested after the securities or other investment property are rolled over, transferred, or distributed from the plan or IRA;

  (ii)    A recommendation as to the management of securities or other investment property, including, among other things, recommendations on investment policies or strategies, portfolio composition, . . . or *recommendations with respect to rollovers, transfers, or distributions from a plan or IRA*, including whether, in what amount, in what form, and to what destination such a rollover, transfer, or distribution should be made; *and*

(2)    With respect to the investment advice described in paragraph (a)(1) of this section, the recommendation is made either directly or indirectly (*e.g.*, through or together with any affiliate) by a person who:

  (i)    Represents or acknowledges that it is acting as a fiduciary within the meaning of the Act or the Code;

  (ii)    *Renders the advice pursuant to a* written or verbal agreement, arrangement, or *understanding that the advice is based on the particular investment needs of the advice recipient*; *or*

  (iii)    *Directs the advice to a specific advice recipient* or recipients *regarding the advisability of a particular investment* or management decision *with respect to* securities or other *investment property of the* plan or *IRA*.

23

29 C.F.R. § 2510.3-21(a) (emphases added).  The final rule then defines a "recommendation" as "a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action."  *Id.* § 2510.3-21(b)(1).  Thus, under the new definition, a person who recommends or suggests that an individual purchase an annuity to hold in an IRA would, at least in most cases, be engaged in "rendering investment advice."[7]  And, if that individual was paid on a commission basis, she would likely be engaged in rendering the type of investment advice "for a fee" that would trigger the prohibited transaction rules.  *See Final BIC Exemption*, 81 Fed. Reg. at 21,002.

The Department also promulgated the final version of the revised PTE 84-24.  The most important change from the version of the exemption proposed in 2015, at least for purposes of this case, was that the final exemption applies only to "fixed rate annuity contracts," a term defined in the exemption to encompass annuities whose "benefits do not vary, in part on in whole, based on the investment experience of a separate account or accounts maintained by the insurer or the investment experience of an index or investment model."  *Final PTE 84-24*, 81 Fed. Reg. at 21,176–77.  The term specifically excludes "variable annuit[ies]," "indexed annuit[ies]," and other "similar annuit[ies]."  *Id.* at 21,177.

The Department justified its decision to reserve PTE 84-24 for fixed rate annuity contracts, and to exclude variable and fixed indexed annuities, on the ground that fixed rate

---

[7]  As NAFA stresses, the Department again noted that its new definition "could sweep in some relationships that are not properly regarded as fiduciary in nature and that the Department does not believe Congress intended to cover as fiduciary relationships."  *Final Fiduciary Definition*, 81 Fed. Reg. at 20,948.  The final rule thus included carve-outs for transactions with certain plan fiduciaries who are licensed financial professionals, swap transactions, and certain advice provided by plan-sponsor employees.  *Id.*

annuity contracts "provide payments that are . . . predictable" and have "lifetime income guarantees and terms that are more understandable to consumers." *Id.* at 21,152.  Other kinds of annuities, including fixed indexed annuities, are substantially more complicated, and "are susceptible to abuse." *Final BIC Exemption*, 81 Fed. Reg. at 21,018.  Investors in fixed indexed and variable annuities, the Department found, "would equally benefit . . . from the protections of [the BIC Exemption], including the conditions that clearly establish the enforceable standards of fiduciary conduct and fair dealing." *Id.*

Finally, the Department also promulgated a final, and slightly modified, version of the Best Interest Contract Exemption.  Most significantly, although the 2015 proposed BIC Exemption required that *both title I and title II* advisers and financial institutions enter into written contracts with their customers, the final rule distinguished between plans subject to title I and IRAs and other plans not subject to title I.  As a number of commenters explained, a written contract would have served little purpose with respect to title I plans and fiduciaries because title I already provides a private cause of action for those who violate, among other provisions, the prohibited transaction rule.  *Id.* at 21,021–22.  Given the sweeping preemption provisions contained in title I, moreover, it was far from clear that retirement investors would be able to pursue state law claims for breach of contract relating to advice provided to title I plans.  *Id.* at 21,022.  The Department agreed that, with respect to title I plans, it was sufficient to require that advisers and financial institutions acknowledge their fiduciary status and comply with the BIC Exemption requirements as a condition of the exemption.  *Id.*  The final rule, therefore, "eliminates the contract requirement altogether in the ERISA context," *id.* at 21,008, and requires that title I plans merely adhere to the substantive conditions specified in the exemption, *id.* at 21,021.

Thus, to qualify for the exemption, the financial institution must:

[1]     Acknowledge fiduciary status with respect to investment advice to the Retirement Investor

[2]     Adhere to Impartial Conduct Standards requiring [financial institutions and their advisors] to:

      [a]     Give advice that is in the Retirement Investor's Best Interest (*i.e.*, prudent advice that is based on the investment objectives, risk tolerance, financial circumstances, and needs of the Retirement Investor, without regard to financial or other interests of the Adviser, Financial Institution, or their Affiliates, Related Entities or other parties);

      [b]     Charge no more than reasonable compensation; and

      [c]     Make no misleading statements about investment transactions, compensation, and conflicts of interest;

[3]     Implement policies and procedures reasonably and prudently designed to prevent violations [by its advisers] of the Impartial Conduct Standards;

[4]     Refrain from giving or using incentives for Advisers to act contrary to the customer's best interest; and

[5]     Fairly disclose the fees, compensation, and Material Conflicts of Interest, associated with their recommendations.

*Id.* at 21,007.  For investment advice to IRAs and other non-title I plans, the exemption further requires that the financial institution enter into "an enforceable written contract" with the customer that includes the first four requirements listed above. *Id.* at 21,022.  That contract, moreover, may not include "[e]xculpatory provisions disclaiming or limiting liability," provisions waiving or qualifying the right to bring or to participate in class action or other representative lawsuits, or liquidated damages provisions. *Id.* at 21,078.  It may, however, include a knowing waiver of punitive damages, waiver of the right to rescission of recommended transactions, and reasonable agreements to arbitrate individual claims. *Id.*  Those waivers are allowed "to the extent . . . permissible under applicable state or federal law." *Id.*

26

In summary, the final rules together permit otherwise prohibited compensation arrangements—such as commissions to an agent based on the retirement investor's investment decisions—provided that the financial institution acknowledges its fiduciary status under ERISA and/or the Code; adheres to the Impartial Conduct Standards and ensures that its advisers do so as well; adopts policies and procedures to avoid material conflicts of interest and barring the use of sales quotas and incentives that are intended to or likely to cause advisers to make recommendations that are not in the best interest of the retirement investors; and makes certain disclosures. The final rule also requires that financial institutions that engage in otherwise-prohibited transactions with non-title I plans enter into a written contract with plan owners. And, the final rule includes a more in-depth discussion of the "reasonable compensation" requirement than was contained in the proposed rule. *Id.* at 21,029. Overall, the BIC Exemption is premised on the Department's view that, "[w]hen [a]dvisers choose to give advice to retail [r]etirement [i]nvestors pursuant to a conflicted compensation structure, they must protect their customers from the dangers posed by conflicts of interest." *Id.* at 21,007.

## C.    Procedural Background

Although all three final rules were promulgated on April 8, 2016, the Department provided a window for financial institutions and advisers to come into compliance. Three dates are relevant. First, the rules became "effective"—*i.e.*, locked in—on June 7, 2016.[8] *Final*

---

[8]  The regulation's "effective date" may have been delayed until June 22, 2016, pursuant to 5 U.S.C. § 801(a)(3)(B). That section provides that, if Congress passes a joint resolution disapproving of an agency's "major rule," and if the President vetoes that resolution, the rule's "effective date" becomes the earliest of (1) the date on which either chamber of Congress failed to override the veto, or (2) thirty session days after Congress received the President's veto and objections. *But see INS v. Chadha*, 462 U.S. 919, 955–58 (1983). Here, Congress did pass such a joint resolution, *see* H.J. Res. 88, 144th Cong. (2016), which the President then vetoed. The House received the President's veto on June 8, 2016, *see* 162 Cong. Rec. H3537–38 (daily ed. June 8, 2016), and failed to override it on June 22, 2016, *see* 162 Cong. Rec. H4125–26 (daily

*Fiduciary Definition*, 81 Fed. Reg. at 20,992–93.  The Department hoped that this early effective

date would "provide certainty" to market participants by assuring them that "the rule[s] [are]

final and not subject to further amendment or modification without additional public notice and

comment." *Id.* at 20,993.  But, to allow sufficient time for the regulated entities to make

necessary changes, the Department provided that the final rules would not become applicable

until April 10, 2017.  *Id.*  In addition, the Department further delayed the full applicability of

PTE 84-24 and the BIC Exemption until January 1, 2018.  *See Final BIC Exemption*, 81 Fed.

Reg. at 21,009; *see also* Regulatory Impact Analysis 292, AR 608.  Between April 10, 2017 and

January 1, 2018, financial institutions and advisors can obtain relief from the prohibited

transaction provisions of ERISA and the Code by complying with a set of "transitional"

conditions, which are somewhat less onerous than the PTE 84-24 and BIC Exemption.  *Final*

*BIC Exemption*, 81 Fed. Reg. at 21,069–71, 21,084–85; AR 608.  Thus, the regulations NAFA

challenges do not come into full effect until January 1, 2018.

NAFA filed this action on June 2, 2016, and, at the same time, filed a motion for a

preliminary injunction.  Dkts. 1 & 5.  After an early status conference, the Court ordered that

NAFA's motion be treated as a motion for a preliminary injunction and for summary judgment,

and the Court set a briefing schedule for those motions and the Department's cross-motion for

summary judgment.  On August 25, 2016, the Court held oral argument.  Since then, the parties

have filed various supplemental authorities.  Dkts. 42–44.  All told, the parties have filed briefs

---

ed. June 22, 2016).  As NAFA agrees, however, this process did not affect the dates on which the
rules are set to become *applicable*, which remain April 10, 2017, and January 1, 2018.  Dkt. 31 at
28.

in excess of 300 pages, *see* Dkts. 30–32 & 34, along with various exhibits and declarations, and excerpts from the administrative record in excess of 2,100 pages, *see* Dkt. 33.[9]

Because the Court concludes that the case can be resolved on the parties' competing motions for summary judgment, as explained below, the Court need not address NAFA's separate motion for a preliminary injunction.

## II.    ANALYSIS

NAFA challenges the new rules on multiple grounds.  First, it challenges the Department's decision to replace the five-part test set forth in the 1975 regulation with a new definition of "fiduciary," and, in particular, the Department's decision to discard the "on a regular basis" limitation.  Second, it challenges the Department's decision to require that financial institutions and advisers who are providing advice regarding investments held in IRAs and other non-title I plans comply with the duties of loyalty and prudence in order to qualify for the BIC Exemption and PTE 84-24.  Third, it challenges the written contract requirement contained in the BIC Exemption on the theory that it impermissibly creates a private cause of action.  Fourth, it challenges the BIC Exemption (but not PTE 84-24) on the ground that the "reasonable compensation" condition is void for vagueness.  Fifth, it challenges the Department's decision to move fixed indexed annuities from PTE 84-24 to the BIC Exemption as arbitrary and capricious.  Sixth, and finally, it challenges the rules on the ground that the Department's regulatory impact analysis was inadequate.

The Court will address each challenge in turn.

---

[9] The Court also granted leave for three amici to file briefs. *See* Dkts. 36, 38, & 39.  All three briefs were filed in support of the Department.

A.      **Revised Definition of "Rendering Investment Advice"**

NAFA first argues that the Department's interpretation of the phrase "renders investment advice" exceeds its authority under the statute.  This argument implicates the familiar two-step framework established in *Chevron, USA, Inc., v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Under the first step, the Court must determine whether "the intent of Congress is clear," and, if "Congress has spoken to the precise question at issue," the Court must give effect to Congress's clear intent.  *Id.* at 842–43.  Under the second step, the Court must defer to the agency's interpretation of ambiguous statutory language if it is "based on a permissible construction of the statute."  *Id.* at 843.  NAFA argues that the regulation fails at both steps.

1.      Chevron *Step One*

At the first step, the Court must employ the "traditional tools of statutory construction" to determine whether Congress has "unambiguously foreclosed the agency's statutory interpretation."  *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C. Cir. 2011) (citation omitted).  Congress can foreclose an agency's interpretation "either by prescribing a precise course of conduct other than the one chosen by the agency, or by granting the agency a range of interpretive discretion that the agency has clearly exceeded."  *Id.*  Because step one of the *Chevron* framework turns on congressional intent, the Court does not afford the agency any "special deference" at this stage.  *Id.* at 660.

The *Chevron* step one inquiry necessarily begins with the statutory text.  *See S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 22–23 (D.C. Cir. 1999).  Here, both title I of ERISA and the Code define the pivotal term "fiduciary" in nearly identical terms:  A person is a "fiduciary" of a plan for purposes of ERISA and the prohibited transaction provision of the Code if "(i) he exercises any discretionary authority or discretionary control respecting management of [the]

plan or exercises any authority or control respecting management or disposition of its assets, (ii) he *renders investment advice* for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of [the] plan." 29 U.S.C. § 1002(21)(A) (emphasis added); 26 U.S.C. § 4975(e)(3) (emphasis added). For present purposes, only the first half of the second prong of the statutory definition is in dispute; the dispute is limited to whether the Department's definition of the phrase "renders investment advice" with respect to moneys or other property of a plan or IRA passes muster.

As NAFA stresses, for over thirty years the Department used its five-part test to determine whether a person "renders investment advice" to a plan or IRA, and, critically, that test limited the reach of ERISA and the Code's prohibited transaction rules to those who render advice "on a regular basis." 29 C.F.R. § 2510.3-21(c)(1) (2015). The rule that NAFA now challenges, in contrast, abandons the five-part test and the "on a regular basis" limitation in favor of a definition that encompasses, among other activity, "[a] recommendation as to the advisability of acquiring . . . investment property" that is rendered "pursuant to [an] . . . understanding that the advice is based on the particular investment needs of the advice recipient." 29 C.F.R. § 2510.3-21(a) (2016). A "recommendation," in turn, includes a "communication that . . . would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action." *Id.* § 2510.3-21(b)(1).

Nothing in the statutory text forecloses the Department's current interpretation. The statute does not define the phrase "investment advice," and ERISA expressly authorizes the Secretary to adopt regulations defining "technical and trade terms used" in the statute. 29 U.S.C. § 1135. As a matter of ordinary usage, moreover, there can be no serious dispute that someone

who provides "[a] recommendation as to the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property," 29 C.F.R. 2510.3-21(a), is providing "investment advice." The dictionary defines "advice" as a "recommendation regarding a decision or course of conduct." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 32 (1993). And it defines "investment" as "an expenditure of money for income or profit or to purchase something of intrinsic value." *Id.* 1190. The Department's interpretation of "investment advice" all but replicates those definitions. Indeed, if anything, it is the five-part test—and not the current rule—that is difficult to reconcile with the statutory text. Nothing in the phrase "renders investment advice" suggests that the statute applies only to advice provided "on a regular basis."

NAFA objects that "Congress intended ERISA fiduciary duties to apply only to those who participate in ongoing management of a plan or its assets." Dkt. 31 at 42. As it explains, although the phrase "'rendering investment advice' occupies its own prong in the statutory definition of fiduciary, in context it is clear that [fiduciary] refers to individuals vested with responsibilities to manage and control the plan." *Id.* at 42–43. The fact that the other two prongs of the statutory definition of "fiduciary" describe those involved in managing a plan, *see* 29 U.S.C. § 1002(21)(A)(i); 26 U.S.C. § 4975(e)(3)(A), or administering a plan, *see* 29 U.S.C. § 1002(21)(A)(iii); 26 U.S.C. § 4975(e)(3)(C), however, suggests just the opposite conclusion: Because the other prongs of the statutory definition already address "the ongoing management of an ERISA plan," Dkt. 31 at 42, NAFA's reading of the "investment advice" prong would strip that prong of independent meaning, *see, e.g.*, *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute." (citation and internal quotation marks omitted)). And, even if it were possible to assign *some* meaning to the second prong under NAFA's construction, its argument still ignores the fact that Congress

expressly addressed the "management" and "administration" of ERISA plans and IRAs in the first and third prongs of the definition, but conspicuously omitted any such reference in the second prong. NAFA asks that the Court not only read such a limitation into the second prong, but to hold that the statutory text *unambiguously* addresses this "precise question" and forecloses the Department's interpretation. That argument is more than the statutory text can bear.

In its reply brief, NAFA disavows the argument that ongoing involvement in plan management is a necessary condition of fiduciary status under the statute. *See* Dkt. 32 at 24–25. Instead, it posits that only persons "who [are] hired to help plan managers with investment duties and not persons who just [sell] a product" can qualify as fiduciaries under the statute. *Id.* at 25. But it again points to no textual support for that interpretation. As a matter of ordinary usage, a person can provide investment advice without being hired to help managers with investment duties, and the statute does not limit itself to those "*employed* to render investment advice." More fundamentally, NAFA's suggestion that its members are merely engaged in the sale of "a product"—no different than a grocer or brick-and-mortar retailer—ignores the fact that the challenged rule applies only if the financial institution or adviser makes "[a] recommendation as to the advisability of acquiring, holding, disposing of, or exchanging" the "investment property." 29 C.F.R. § 2510.3-21(a)(1). The Department has concluded, moreover, that fixed indexed annuities are "complex products" demanding "sound advice that is untainted by the conflicts of interest posed by [a]dvisers' incentives to secure" sales. *Final BIC Exemption*, 81 Fed. Reg. at 21,018. And NAFA's own declarations leave little doubt that those engaged in the annuities business do not simply dispense products but, rather, provide individualized investment advice. *See* Dkt. 5-4 at 6 (Engels decl. ¶ 18) ("I know to diversify my clients' assets and teach them about risks, fees, 'safe' versus 'risky' money, and probate and non-probate issues."); Dkt. 5-5 at

9 (James decl. ¶ 28) ("All of our clients rely on [us] . . . to help them navigate the financial market, answer all of their questions, and benefit from affiliates."); Dkt. 5-7 at 3 (Rafferty decl. ¶ 8) ("We meet individually with our clients, and, after discussing our client's financial goals and needs, . . . we research the annuity market and recommend the best guaranteed fixed annuity plan available to meet each client's objectives."); Dkt. 5-8 at 4 (Foguth decl. ¶ 15) ("[We] meet with our existing clients on an ongoing basis to provide them with information they need, such as discussing the required minimum distributions that clients must withdraw from their IRAs each year.").

Beyond the statutory text, NAFA argues that the Department's new definition of "fiduciary" fails at *Chevron* step one for three additional reasons. But, as with NAFA's textual argument, none of these arguments shows that Congress "unambiguously foreclosed the agency's statutory interpretation." *Vill. of Barrington, Ill.*, 636 F.3d at 659 (citation omitted).

*First*, NAFA contends that the Department's new interpretation is inconsistent with the common law of fiduciary standards that Congress "built [up]on" in enacting ERISA. Dkt. 31 at 43. Under those common law standards, NAFA continues, a "fiduciary" is "[s]omeone who is required to act for the benefit of another person on all matters within the scope of their relationship," or "[s]omeone who must exercise a high standard of care in managing another's money or property." *Id*. at 44 (quoting Fiduciary, BLACK'S LAW DICTIONARY (10th ed. 2014)). It is not someone who "merely . . . sell[s] insurance products," or who does not engage in the type of "ongoing transactional relationships" that plan managers and administrators typify. *Id*. at 44–45.

NAFA is correct that the courts have, at times, looked to the common law of trusts in interpreting ERISA. The Supreme Court has thus "recognize[d] that the[] fiduciary duties [found

in ERISA] draw much of their content from the common law of trusts," which "governed most benefit plans before ERISA's enactment."  *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996).  But the Court has "also recognize[d] . . . that trust law does not tell the entire story" and that "ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trust did not offer completely satisfactory protection."  *Id.* at 497.  As a result, "trust law . . . offer[s] only a starting point, after which courts must go on to ask whether, or to what effect, the language of the statute, its structure, or its purposes require department from common-law trust requirements."  *Id.*

One area in which Congress departed from the common law of trusts was the definition of "fiduciary."  ERISA does not define "fiduciary" "in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, . . . thus *expanding the universe of persons subject to fiduciary duties . . . .*"  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (second emphasis added).  The relevant question is not how to understand an imprecise reference to a duty also recognized under the common law, but whether the detailed definition of "fiduciary" that Congress included in the statute should be given meaning.  That is, should the phrase "renders investment advice" be construed to include those who make recommendations to plans and IRAs about how best to invest their assets?  Or should the statutory text be narrowed, as NAFA urges, to add the condition that an investment adviser serves in a role akin to that of a plan manager or administrator?  As the Supreme Court has held, in cases in which the text of ERISA goes beyond the common law, and where the purpose of the statute does not compel a different result, the text controls.  *See Varity Corp.*, 516 U.S. at 496–97.

Moreover, even if the meaning of the "renders investment advice" prong of the statutory definition of "fiduciary" was informed by the common law, NAFA has failed to demonstrate that

the Department's interpretation is at odds with the common law.  NAFA cites two cases for the proposition that insurance agents who "merely . . . sell[] insurance products" are not fiduciaries under the common law.  Dkt. 31 at 44–45.  The first case, from an intermediate appellate court in Ohio, dealt with the sale of automobile and renters insurance.  *See Slovak v. Adams*, 753 N.E.2d 910, 912 (Ohio Ct. App. 2001).  The second case, from an intermediate appellate court in Mississippi, dealt with the sale of commercial property insurance.  *See Langston v. Bigelow*, 820 So. 2d 752, 754 (Miss. Ct. App. 2002).  The market for those products may not require the consumer to "repose[] special confidence and reliance" in the agent, to borrow a definition of "fiduciary" from NAFA's brief.  Dkt. 31 at 44 (quoting THE WOLTERS KLUWER BOUVIER LAW DICTIONARY).  But, here, the Department found that "[i]n the retail IRA marketplace, growing consumer demand for personalized advice . . . has pushed brokers to offer comprehensive guidance services rather than just transactional support."  *Final Fiduciary Definition*, 81 Fed. Reg. at 20,949.  NAFA's own declarations, as noted above, support that characterization.

*Second*, NAFA argues that the Investment Advisers Act of 1940, ch. 686, 54 Stat. 847, 15 U.S.C. § 80b *et seq.*, informed Congress's use of the phrase "renders investment advice for a fee or other compensation" in ERISA and the Code.  *See* Dkt. 31 at 45–46.  The Investment Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."  15 U.S.C. § 80b-2(a)(11).  The definition goes on to list a number of exclusions, including an exclusion for "any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no compensation therefor."  *Id.*  From this, NAFA argues that the distinction in the Investment Advisers Act between "investment advisers

compensated for rendering advisory services" and "salespersons compensated only for their sales" was "known to Congress in 1974 when it incorporated those very concepts into ERISA." Dkt. 31 at 46.

The first question, of course, is not what Congress intended "*when* it incorporated those very concepts into ERISA," but, rather, *whether* it did so. Again, NAFA has failed to demonstrate that Congress unambiguously foreclosed the Department's interpretation of the phrase "renders investment advice." 29 U.S.C. § 1002(21)(A). As the D.C. Circuit has explained, the distinction between advisers and brokers contained in the Investment Advisers Act was created when Congress "define[d] 'investment adviser' broadly" and then "create[d] . . . a precise exemption for broker-dealers." *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 489 (D.C. Cir. 2007). In defining a "fiduciary" in ERISA and the Code, however, Congress followed a very different path: In the second prong of the definition, Congress swept in any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of" the ERISA plan or IRA. 29 U.S.C. § 1002(21)(A); 26 U.S.C. § 4975(e)(3)(B). Unlike the Investment Advisers Act, ERISA and the Code do not exempt those who provide investment advice that "is solely incidental to the conduct of [their] business." Thus, to the extent Congress had the Investment Advisers Act in mind as a model when it enacted the statutory definition of "fiduciary," it is telling that it did not include the exemption that NAFA would have the Court read into ERISA and the Code. As a result, if anything, the definition of "investment adviser" contained in the Investment Advisers Act counsels against construing the definition of "fiduciary" to exclude those who recommend particular investments while seeking to make a sale.

*Finally*, NAFA argues that Congress implicitly ratified the five-part test for "render[ing] investment advice" when it reenacted the Code in 1986 and when it amended relevant portions of the Code and ERISA in 2006.  Dkt. 31 at 47–51.  In the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, Congress reenacted the entire internal revenue code, including title II of ERISA, but did not alter the five-part test.  And, similarly, when Congress enacted the Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780, it included provisions dealing with the excise tax on prohibited transactions in title II and added a new definition of "fiduciary adviser" for purposes of certain exemptions from the prohibited transaction rules in titles I and II. *See* 29 U.S.C. § 1108(g)(11)(A) (2006); 26 U.S.C. § 4975(f)(8)(J)(i)(2006).  Yet, again, Congress did not alter the five-part test.  Of these amendments, the one that is most relevant to the issues presented here created a new statutory exemption from the prohibited transaction rules for those who render investment advice for a fee, but only if any fees received by the adviser, including commissions, "do not vary depending on the basis of any investment option selected." 29 U.S.C. § 1108(g)(2)(A)(i)

NAFA does not press a traditional ratification argument, which would merely posit that congressional acquiescence in an administrative interpretation provides some evidence that the administrative interpretation is a permissible one.  *See, e.g.*, *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169–70 (2001).  Instead, it takes the doctrine a significant step further, arguing that Congress's failure to disavow the five-part test had the effect of *enshrining* that test in the statute, thereby precluding the Department from ever discarding or revising the test that it adopted in 1975.  The Court is unpersuaded.

As an initial matter, it is far from clear that even the traditional ratification argument would prevail in this context.  "Congress cannot by its silence ratify an administrative

interpretation that is contrary to the plain meaning of the Act," *Ashton v. Pierce*, 716 F.2d 56, 63

(D.C. Cir. 1983), or otherwise alter the plain meaning of a statute, *see U.S. Ass'n of Reptile*

*Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 155 (D.D.C. 2015).   And, as explained above, there

is considerable tension between the five-part test—and, in particular, the "on a regular basis"

requirement—and the statutory text.   But even if the 1975 construction of the statute was a

permissible one, there is a vast difference between accepting an existing interpretation of a

statute and treating that interpretation as the only permissible one.   NAFA's efforts to support the

latter approach prove too much:   If taken to its logical extreme, it would suggest that *every* pre-

1986 Treasury Department regulation interpreting the Internal Revenue Code was forever frozen

in place when Congress reenacted the Code in 1986.   That is not the law.   The D.C. Circuit

observed almost two decades ago that it has "consistently required *express* congressional

approval of an administrative interpretation if it is to be viewed as statutorily mandated," *AFL-*

*CIO v. Brock*, 835 F.2d 912, 915 (D.C. Cir. 1987) (emphasis added), and, unsurprisingly, NAFA

has failed to identify any more recent authority breaking with this "consistent" practice.   As the

Court of Appeals explained, the ratification doctrine "does not mean that a regulation

interpreting a provision . . . becomes frozen . . . merely by reenactment of that provision, so that

administrative interpretation cannot be changed prospectively through exercise of appropriate

rulemaking powers."   *Id.* at 916 (quoting *Helvering v. Wilshire Oil Co.*, 308 U.S. 90, 100–01

(1939)).   Here, there is no "affirmative indication" that Congress "wish[ed] the [prior]

interpretation to remain in place," *id.*, or that it intended, in effect, to withdraw its delegation of

authority to the Secretary to issue regulations defining the term "fiduciary" for purposes of

ERISA and the prohibited transaction provision of the Code, 29 U.S.C. § 1135; 29 U.S.C. § 1001

note.   Absent such evidence, NAFA's ratification argument must fail.

2.      Chevron *Step Two*

At *Chevron* step two, the Court "defer[s] to the agency's permissible interpretation, but only if the agency has offered a reasoned explanation for why it chose that interpretation." *Vill. of Barrington*, 636 F.3d at 660.  Analysis at this step is analogous to the "arbitrary or capricious" standard under the Administrative Procedure Act.  *See Judulang v. Holder*, 132 S. Ct. 476, 483 n.7 (2011).

The Department's interpretation of "renders investment advice" is reasonable, and it is reasonably explained.  As noted above, the new interpretation better comports with the text of the statute than the rule that NAFA embraces.  And it also fits comfortably with the purpose of ERISA.  ERISA was enacted with "broadly protective purposes," and it "commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive."  *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993).  Given changes in the retirement investment advice market since 1975, the Department reasonably concluded that limiting fiduciary status to those who render investment advice to a plan or IRA "on a regular basis" risked leaving retirement investors inadequately protected—particularly when one-time transactions like rollovers will involve *trillions* of dollars over the next five years and can be among the most significant financial decisions investors will ever make.  *See Final Fiduciary Definition*, 81 Fed. Reg. at 20,954–55.

NAFA points to two ways in which, it claims, the Department's new definition is unreasonable at *Chevron* step two:

*First*, NAFA argues that the Department has failed to provide a reasoned basis for discarding the five-part test because its analysis has focused on changes in the market for retirement investment advice and not on "deficiencies in the five-part test."  Dkt. 31 at 51.  That

assertion is only partially correct.  It is true that the focus of the Department's analysis was on

changes in the marketplace—but it is incorrect that the Department failed to identify

"deficiencies in the five part test."  The Department observed that the five-part test "significantly

narrowed the breadth of the statutory definition" of a "fiduciary," *Final Fiduciary Definition*, 81

Fed. Reg. at 20,946, and that "[t]he narrowness of the 1975 regulation allows advisers . . . to play

a central role in shaping plan and IRA investments, without ensuring the accountability that

Congress intended for persons having such influence and responsibility," *id*. at 20,955.

Furthermore, the Department determined that the new test "better reflects the broad scope of the

statutory text and its purposes."  *Id.* at 20,946; *see also id.* at 20,948 (noting that the new

definition "better comports with the statutory language").  But, even putting these considerations

aside, NAFA's contention that market changes alone are insufficient to justify a change in the

definition of "fiduciary" is unconvincing.

 In support of this contention, NAFA relies on the D.C. Circuit's decision in *Goldstein v.

SEC*, 451 F.3d 873 (D.C. Cir. 2006).  There, the Court of Appeals considered a modification to

the SEC's regulations defining a "client" for purposes of the Investment Advisers Act's "private

adviser exemption" from registration, 15 U.S.C. § 80b-3(b)(3) (2006).  *Goldstein*, 451 F.3d at

874.  Pursuant to that provision, an investment adviser with fewer than fifteen "clients" was

exempt from the registration requirement.  *Id.*  Previously, the SEC had construed the exemption

to treat a limited partnership as a single "client."  *Id.*  Because hedge funds are typically

organized as limited partnerships, with each investor serving as a limited partner, this

interpretation had the effect of exempting most hedge fund managers from the registration

requirement—regardless of the number of individual investors in a hedge fund, each hedge fund

counted as only a single "client."  *See id.* at 876.  Under the revised rule, however, the SEC

required that each limited partner in a hedge fund be counted as a client, which had the effect of requiring that most hedge fund managers register under the Act. *Id.* at 877.

At *Chevron* step one, the Court of Appeals held that the revised rule came "close to violating the plain language of the statute" and that the SEC's interpretation was, "[a]t best[,] . . . counterintuitive." *Id.* at 881. At *Chevron* step two, however, the rule crossed the line. Much of the Court's analysis turns on the lack of a reasonable "fit" between the statutory text and the purpose of the rule. *Id.* But, as NAFA stresses, the Court of Appeals also rejected the SEC's contention that evidence of market changes, including "a rise in the amount of hedge fund assets, indications that more pension funds and other institutions were investing in hedge funds, and an increase in fraud actions involving hedge funds," was sufficient to justify the amendment absent evidence that the relationship between the advisers and investors had also changed. *Id.* at 882. The SEC's reliance on these changes in the marketplace, in the Court's view, did not explain why the SEC believed that the each limited partner in a hedge fund should be treated as a separate client. That is, "without any evidence that the role of fund advisers with respect to investors had undergone a transformation, there [was] a disconnect between the factors the [SEC] cited and the rule it promulgated." *Id.*

Here, in contrast, the Department's interpretation of the phrase "renders investment advice" does not, as NAFA argues, "distort statutory meaning simply to achieve [a] regulatory end[]." Dkt. 31 at 53. It is not "counterintuitive." And it is not disconnected from the factors the Department cites in support of the new definition. To the contrary, the Department explained at length how the relationship between advisers and investors has changed. It found that the increased complexity and variety of financial products in the marketplace has sown "confusion," "increase[d] the potential for very costly mistakes," left retail investors more dependent on

expert advice, and exposed plan participants and IRA owners to unknown conflicts of interest.

*See, e.g.*, *Final Fiduciary Definition*, 81 Fed. Reg. at 20,949.  In particular:

> Retail investors now confront myriad choices of how and where to invest, many of which did not exist or were uncommon in 1975. These include, for example, market-tracking, passively managed and so-called ''target-date'' mutual funds; exchange traded funds (ETFs) (which may be leveraged to multiply market exposure); hedge funds; private equity funds; real estate investment trusts (both traded and nontraded); various structured debt instruments; insurance products that offer menus of direct or formulaic market exposures and guarantees from which consumers can choose; and an extensive array of derivatives and other alternative investments. These choices vary widely with respect to return potential, risk characteristics, liquidity, degree of diversification, contractual guarantees and/or restrictions, degree of transparency, regulatory oversight, and available consumer protections.

*Id.*  In short, both the statutory fit and the Department's detailed explanation for its decision readily distinguish this case from *Goldstein*.

Moreover, to the extent NAFA suggests that *Goldstein*—or any other precedent— requires a heightened justification for agencies to depart from long-established interpretations, that contention was rejected by the Supreme Court in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).  As the Supreme Court explained, there is "no basis in the Administrative Procedure Act" or in Supreme Court precedent "for a requirement that all agency change be subjected to more searching review."  *Id.* at 514. Certainly, the APA "mentions no such heightened standard," and the Supreme Court's decision in *Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), "neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance."  *Fox*, 556 U.S. at 514.  All that the APA requires is that the Department's current interpretation comport with the text

and purpose of ERISA and the Code and that it has offered a reasoned explanation for its

decision.  As explained above, this standard is satisfied on the facts of this case.

Second, NAFA argues that the Department's acknowledgement that its broad definition

of "rendering investment advice" may have swept in some "relationships that are not

appropriately regarded as fiduciary in nature and that the Department does not believe Congress

intended to cover as fiduciary relationships," Final Fiduciary Definition, 81 Fed. Reg. at 20,948,

puts it on the wrong side of the D.C. Circuit's decision in Hearth, Patio & Barbecue Ass'n v.

Department of Energy, 706 F.3d 499 (D.C. Cir. 2013).  In that case, the Department of Energy

issued a regulation interpreting the statutory phrase "[d]irect heating equipment" to include

"purely decorative fireplaces" designed to emit as little heat as possible.  Id. at 503.  Not

surprisingly, the Court of Appeals held that the definition failed at Chevron step one.  Id. at 507.

The Department of Energy and dissent, however, argued that the Department did not actually

treat decorative fireplaces as direct heating equipment because, after including them in the

regulatory definition, it exempted them from the relevant energy conservation standards.  Id. at

507; see also id. at 510–12 (Randolph, J., dissenting).  The majority "strongly disagree[d]."  Id.

at 507 (majority opinion).  It its view, there was a fundamental difference between treating a

product as beyond an agency's authority to regulate and treating it as within that authority, but

exempted from the relevant regulation.  Id. at 508.  Under the latter approach, the specter of

regulation remains, despite the reprieve of an exemption, and the agency can "at any time

manipulate the safe harbor criterion to compel different or broader compliance."  Id.

According to NAFA, this is what the Department has done here.  Dkt. 31 at 55.  The

Court is, again, unpersuaded.  NAFA is correct that the commentary accompanying the final rule

acknowledged that the rule's "broad" definition of "investment advice" "could sweep in some

relationships that are not appropriately regarded as fiduciary in nature and that the Department

does not believe Congress intended to cover as fiduciary relationships." *Id.* at 40–41 (quoting

*Final Fiduciary Definition*, 81 Fed. Reg. at 20,948).  NAFA's argument, however, loses its force

with the very next sentence of the commentary, which explains that this potential overbreadth

relates solely to activities unrelated to the sale of annuities.  *Final Fiduciary Definition*, 81 Fed.

Reg. at 20,948.  NAFA does not dispute this, and, indeed, it candidly acknowledges that the

Department's reference to overbreadth "is directed at activities and relationships other than fixed

annuities and insurance agents."  Dkt. 31 at 41 n.9.  Thus, even if NAFA were correct that an

agency may not define a term and provide exceptions or carve-outs to better tailor its definition

to congressional intent, *but see Decker v. Nw. Envt'l Def. Ctr.*, 133 S. Ct. 1326, 1338 (2013)

(upholding agency construction of "Industrial Stormwater Rule" that "exempts discharges of

channeled stormwater runoff from logging roads from [an agency] permitting scheme"), it has no

standing to complain about whatever overbreadth that might affect the interests of *others*.  Here,

unlike in *Hearth, Patio*, NAFA cannot complain that it or any of its members live under a sword

of Damocles because the Department might someday revoke or modify the scope of the relevant

exemption; unlike in *Hearth, Patio*, the asserted overbreadth and corresponding exemption have

no bearing on the plaintiff or its members.

**B.**      **Imposition of Fiduciary Duties as a Condition of PTE 84-24 and the BIC Exemption**

NAFA also challenges the Department's decision to require that fiduciaries who advise

IRAs agree to be bound by the duties of loyalty and prudence as a condition of PTE 84-24 and

the BIC Exemption.  This argument focuses on the Department's authority to impose such duties

as a condition of its exemption power, rather than on its particular choice of enforcement scheme

for those duties, which NAFA challenges in a separate argument.  Title I of ERISA subjects

fiduciaries to the duties of "loyalty" and "prudence." *See Ctr. States, Se. & Sw. Areas Pension Fund v. Ctr. Transp., Inc.*, 472 U.S. 559, 570 (1985).  Under the former duty, the trustee must act "solely in the interest of the participants and beneficiaries" of the plan, while under the latter, the trustee must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matter would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a).  These provisions, however, apply only to title I employee benefit plans.  *Id.* § 1003(a).  They do not apply to IRAs or other non-title I plans.  *See generally* 26 U.S.C. § 4975.

The prohibited transaction rules, in contrast, apply with only minor variations both to employee benefit plans (under title I) and to IRAs (under title II).  *Compare* 26 U.S.C. § 4975(c) *with* 29 U.S.C. § 1106.  Those rules "supplement[] the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by . . . barring certain transactions deemed 'likely to injure the pension plan.'"  *Harris Tr. & Sav. Bank*, 530 U.S. at 241–42.  But the statute also authorizes the Department to "grant a conditional or unconditional exemption of any disqualified person or transaction" if it concludes that the exemption is "administratively feasible," "in the interest of the plan and its participants and beneficiaries," and "protective of the rights of [plan] participants and beneficiaries."  29 U.S.C. § 1108(a); 26 U.S.C. § 4975(c)(2).  Here, as explained above, the Department granted exemptions for otherwise prohibited transactions in PTE 84-24 and the BIC Exemption, but conditioned those exemptions on, among other things, a requirement that the fiduciary "act with the care, skill, prudence, and diligence [of] a prudent person acting in a like capacity," and "without regard to the financial or other interests of the [a]dviser . . . or any . . . other party," *see Final BIC Exemption*, 81 Fed. Reg. at 21,077; *Final PTE 84-24*, 81 Fed. Reg. at 21,176.  That is, in order to take advantage of the BIC Exemption, the fiduciary must satisfy the

same duties of "prudence" and "loyalty" that title I imposes.  For those rendering advice to title I plans, this makes little difference because they are already subject to those duties.  For those advising IRAs and other non-title I plans, however, this condition adds substantial new duties.  NAFA argues that the Department exceeded its statutory authority by extending fiduciary duties found only in title I to those who advise IRAs and other non-title I plans.  Dkt. 31 at 41–46.

In its opening brief, NAFA makes four arguments, none of which is persuasive.  It first argues that title I of ERISA does not authorize the Department to impose fiduciary duties on those who advise IRAs.  *Id.* at 55–57.  That is undisputed.  But, as explained above, it has no bearing on what the Department did here; rather, when they regulate IRA advisers, PTE 84-24 and the BIC exemption rely on the Department's authority under title II.  Second, NAFA argues that title II does not impose fiduciary duties on those who advise IRAs and that "[t]he Department's limited [exemption] authority does not extend beyond the ability to issue regulations clarifying the circumstances under which an excise tax may be imposed on . . . disqualified persons under Section 4975."  *Id*. at 58–59.  But that contention ignores the plain language of the statute, which grants the Department authority to do far more than "clarify" the scope of section 4975.  To the contrary, the statute grants the Department broad authority to adopt non-statutory exemptions and to impose conditions on any such exemptions.  *See* 26 U.S.C. § 4975(c)(2).  Third, NAFA argues that the Department's use of its exemption authority will lead to "an absurd and irrational result" because it will subject those IRA advisers who are paid on a commission basis (and who must, accordingly, rely on the exemption) to ERISA fiduciary duties, but will not extend those same duties to those who are paid an asset management fee (and who, accordingly, need not rely on the exemption).  *Id.* at 59 n.22.  But, far from irrational, that is precisely the point; in the Department's view, those who are paid on a

commission basis may be tempted to make investment recommendations that maximize *their* compensation while disserving the interests of plan *participants and beneficiaries*.  Advisers paid an asset management fee generally will not face this conflict.  Finally, NAFA argues that ERISA's "preemption provisions frown upon interference by federal agencies with state insurance regulation" and that the fiduciary standards incorporated in PTE 84-24 and the BIC Exemption would override state insurance law suitability standards.  *Id*. at 60 n.24.  That is not what ERISA's preemption provisions mean.  But, even if they were susceptible to NAFA's construction, NAFA ignores the fact that the preemption provisions apply only to title I of ERISA, and thus have no bearing on the scope of the Department's title II authority, *see* 29 U.S.C. § 1144(b)(2)(A), and the fact that the Department made clear that it had no intention of superseding state insurance laws, *see Final BIC Exemption*, 81 Fed. Reg. at 21,019; *Final PTE 84-24*, 81 Fed. Reg. at 21,161.

It is not until its reply brief that NAFA comes to the crux of its challenge to the extension of fiduciary duties to those who advise IRAs and other non-title I plans.  There, NAFA argues that the statutory structure and legislative history of ERISA demonstrate that "Congress deliberately chose not to impose key ERISA duties in IRA transactions through section[] . . . 4975 of the Code."  Dkt. 32 at 33.  In NAFA's view, "Congress drew clear distinctions between [t]itle I of ERISA, which imposes fiduciary duties on ERISA plan fiduciaries, and [t]itle II, which imposes no fiduciary duties in IRA transactions."  *Id.*  From this premise, NAFA argues that ERISA implicitly precludes the Department from requiring that title II advisers adhere to the duties of loyalty and prudence as a condition of receiving an exemption from the title II prohibited transaction rule.  *See id*. at 34–35.

Although this argument comes closer to the mark, the Court is, again, unpersuaded.  As

NAFA emphasizes, its argument is premised on *Chevron* step one.  Dkt. 32 at 38.  NAFA must,

accordingly, show that Congress "unambiguously foreclosed the agency's statutory

interpretation."  *Vill. of Barrington*, 636 F.3d at 659.  In making this determination, courts

typically "begin[] with the most traditional tool of statutory construction[:]  reading the text

itself," *Wolf Run Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 659 F.3d 1197,

1200 (D.C. Cir. 2011) (citation, internal quotation marks, and alteration omitted), but also look to

all of the "traditional tools of statutory construction," *INS v. Cardoza-Fonseca*, 480 U.S. 421,

446 (1987).  Of particular relevance here, these tools include consideration of the "design of the

statute as a whole," *Wolf Run Mining Co.*, 659 F.3d at 1200 (citation and internal quotation

marks omitted), and how disputed terms fit within the "context" of "the overall statutory

scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) (citation

and internal quotation marks omitted).  Although "the presence of a difficult question of

statutory construction does not necessarily render that provision ambiguous," *Meredith v. Fed.*

*Mine Safety & Health Review Comm'n*, 177 F.3d 1042, 1053 (D.C. Cir. 1999), it is not the role

of the courts to fill in the "interstices created by statutory silence," *Util. Air Regulatory Grp. v.*

*EPA*, 134 S. Ct. 2427, 2445 (2014).

Starting with the text, Congress unambiguously granted the Department broad authority

to adopt "conditional . . . exemption[s]," including under title II.  26 U.S.C. § 4975(c)(2).  Since

the earliest days of ERISA's implementation, moreover, the Department (and previously the

Secretary of the Treasury) has used this authority to impose substantive conditions governing the

relationship between advisers and plans.  *See, e.g.*, *PTE 77-9*, 42 Fed. Reg. 32,395, 32,398 (June

24, 1977) (conditioning exemption on the "transaction [being] on terms at least as favorable to

the plan as an arm's-length transaction with an unrelated party" would be).  NAFA offers no

basis to dispute this long-standing interpretation of the plain terms of ERISA and the Code.  The

relevant question, then, is not whether the Department has affirmative authority to impose

substantive conditions on prohibited transaction exemptions, but whether anything in ERISA

"unambiguously" precludes the Department from imposing the particular condition at issue

here—adherence to the duties of loyalty and prudence.

Only two limitations on the Department's exemption authority appear on the face of the

statute:  First, the Department must comply with procedures it has previously established, 26

U.S.C. § 4975(c)(2), and, second, it must conclude that the exemption is "administratively

feasible," "in the interest of the plan and its participants and beneficiaries," and "protective of the

rights of participants and beneficiaries of the plan," *id.*  Neither express limitation supports

NAFA's argument.  There is no dispute that the Department complied with the applicable

procedures, and, at least for purposes of this argument, NAFA does not challenge the

administrative feasibility or advantages to plan participants and beneficiaries of the fiduciary-

duty condition.  Instead, NAFA's argument turns on the contention that the overall structure of

ERISA—and, in particular, the congressional decision to impose fiduciary duties on plans under

title I, but not title II—gives rise to an *implicit* limitation on the Department's authority to

require adherence to those same fiduciary duties as a condition of an exemption of non-title I

plans from the prohibited transaction rule.  The Court cannot conclude that title II

"unambiguously" creates such an implicit limitation.

NAFA first relies on the *expressio unius* canon.  As NAFA explains, when "Congress

includes particular language in one section of a statute but omits it in another section of the same

Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

inclusion or exclusion." Dkt. 32 at 35 (quoting *Stovic v. R.R. Ret. Bd.*, 826 F.3d 500, 503 (D.C.

Cir. 2016) (citation and internal quotation marks omitted)).  That argument, however, mixes

apples and oranges.  NAFA is undoubtedly correct that the duties imposed under titles I and II of

the Act differ in fundamental respects; title I creates intricate and detailed duties, including the

duties of prudence and loyalty, while title II is far more limited and only prohibits conflicted

transactions for purposes of the tax laws.  *Compare* 29 U.S.C. § 1104(a) *with* 26 U.S.C.

§ 4975(c).  But the question is not whether title II should be construed to impose duties that

Congress imposed only under title I.  Rather, it is whether the Department may require adherence

to those duties as a condition of an exemption from the tax laws that apply to entities that

participate in otherwise prohibited transactions.

      With respect to that question, the fact that Congress required that all title I plans adhere to

the duties of a fiduciary says little, if anything, about whether it intended to foreclose the

Department from requiring adherence to those duties as a condition of granting an exemption

from the prohibited transaction rule.  Indeed, by the logic of NAFA's argument, the Department

would be barred from imposing any condition on a title II exemption that relies on a duty or

obligation that Congress imposed categorically on title I plans.  It would mean, for example, that

the Department could not grant an exemption from the title II prohibited transaction rule on the

condition that the adviser refrain from recommending transactions that benefit third parties at the

expense of the plan participant, merely because ERISA title I—but not title II—includes a

general duty of loyalty.  *Compare* 26 U.S.C. § 4975(c) *with* 29 U.S.C. § 1104(a).  It would mean

that the Department could not condition an exemption on the disclosure of the same type of

information that title I requires plan administrators to disclose.  *See* 29 U.S.C. § 1021.  And it

would foreclose the Department from requiring as a condition of a title II prohibited transaction

exemption that a covered financial institution not employ individuals convicted of embezzlement or fraud, because title I includes a similar prohibition.  *See* 29 U.S.C. § 1111(a).  In short, the mere fact that title I imposes certain duties or obligations on employee benefit plans does not, as a matter of logic or the rules of statutory interpretation, mean that Congress intended to preclude the Department from imposing a similar duty or obligation as a condition of granting an exemption under 26 U.S.C. § 4975(c)(2).

NAFA seeks to bolster its structural argument with reference to the legislative history, but none of the passages on which NAFA relies adds to its argument.  Most of that legislative history merely supports the undisputed premise that Congress imposed specific fiduciary duties on those who manage or advise title I plans, but not on those who advise IRAs and other non-title I plans.  *See, e.g.*, 1974 U.S.C.C.A.N. at 5076–88; *id.* at 4649–51.  With only one exception, none of the legislative history NAFA proffers includes any discussion of *limitations* on the Department's discretion to grant prohibited transaction exemptions.  That one exception is a single line in the conference report that notes that the exemptions "[are] to have no effect with respect to the basic fiduciary responsibility rules requiring prudent action, diversification of investments, actions exclusively for the benefit of participants and beneficiaries, etc."  1974 U.S.C.C.A.N. at 5091.  All that means, however, is that the Department's authority to grant exemptions from the prohibited transaction rules does not carry with it the authority to grant exemptions from the fiduciary duties that Congress expressly mandated under title I.

According to NAFA, the Department has done more than require adherence to the duties of a fiduciary as a condition of an exemption from the prohibited transaction rule.  Rather, because "those who sell fixed annuities are 'all' compensated by commission," and must thus rely on the BIC Exemption, the rule is, in NAFA's view, a "mandate."  Dkt. 32 at 36, 40.  The

fact that those who sell annuities are currently paid on a commission basis, however, cannot alter

the meaning of a statute that Congress enacted in 1974, and NAFA points to no evidence of

Congress's understanding of relevant compensation practices in 1974.  Nor is the predominance

of commission-based compensation inescapably fixed for all time.  Although the Court

recognizes that it may be difficult and costly for financial institutions to move away from that

model of compensation, *see* Dkt. 5-3 (Marrion decl.); Dkt. 5-4 (Engels decl.); Dkt. 5-5 (James

decl.); Dkt. 5-6 (White decl.); Dkt. 5-7 (Rafferty decl.); Dkt. 5-8 (Foguth decl.); Dkt. 5-9 (Wong

decl.); Dkt. 5-10 (Perkins decl.), the prospect of alternative compensation methods is not

illusory.  The choice may not be pleasant one, but it is real.

  Importantly, there is also a clear nexus between the risk that commission-based

compensation will skew investment advice and the condition that advisers paid on a commission

basis must provide advice that satisfies the duties of loyalty and prudence.  As early as 1977, the

Department concluded that commission-based compensation would trigger the prohibited

transaction rules in the absence of an exemption.  *See PTE 77-9*, 42 Fed. Reg. 32,395 (June 24,

1977).  And, in the most recent rulemaking, it explained how what is "presented . . . as trusted

advice" can often be influenced, to the detriment of IRA owners, by the conflicting incentives

that advisers have to maximize their own commissions.  *See, e.g.*, *Final Fiduciary Definition*, 81

Fed. Reg. at 20,949–50.  "In today's marketplace," commissions "give[] . . . advisers a strong

reason, conscious or unconscious, to favor investments that provide them greater compensation

rather than those that may be most appropriate for the [plan] participants."  *Id.* at 20,956.  Small

differences in investment performance, moreover, can have substantial, cumulative consequences

for the investor's retirement income:  "An ERISA plan investor who rolls her retirement savings

into an IRA could lose 6 to 12 and possibly as much as 23 percent of the value of her savings

over 30 years of retirement by accepting advice from a conflicted financial adviser." *Id.* at

20,949 & n.8.  It was against this backdrop that the Department determined that each of the

conditions contained in the Impartial Conduct Standards, including adherence to the duties of

loyalty and prudence, was "necessary" for it to find—as required by the statutes—that the

exemptions were in the interests of plan participants and beneficiaries and protective of their

rights. *Final BIC Exemption*, 81 Fed. Reg. at 21003.  That is, without the challenged conditions,

it is far from clear that the Department would have been able to allow advisers paid on a

commission basis to advise IRAs and other plans at all.

Finally, although not framed as such, NAFA's argument might be viewed in less

formalistic terms as positing that the imposition of fiduciary duties on non-title I plans (even if

only conditionally) is such a momentous step, with such enormous consequences, "that Congress

could not have intended to delegate a decision of such economic and political significant to an

agency in so cryptic a fashion." *Brown & Williamson*, 529 U.S. at 160.  That rule of

construction does not apply here, however, for at least two reasons.  First, the statutory authority

upon which the Department relies is far from "cryptic."  To the contrary, it is NAFA's argument

that would bend or supplement the statutory text.  Second, this case is a "far cry from . . . *Brown

& Williamson*." *Verizon v. FCC*, 740 F.3d 623, 638 (D.C. Cir. 2014).  Although a step "of great

'economic and political significance,'" *Verizon*, 740 F.3d at 639, the Department's decision to

condition availability of the BIC Exemption on adherence to the duties of loyalty and prudence

cannot be reasonably compared to the FDA's decision, at issue in *Brown & Williamson*, to depart

from "its representations to Congress since 1914" and to assert jurisdiction for the first time over

an "industry constituting a significant portion of the American economy," 529 U.S. at 159.  Here,

the Department has long exercised jurisdiction over those who provide investment advice to

IRAs and other plans. It has long asserted that variable compensation gives rise to a conflict of interest. And it has long imposed conditions on the exercise of its exemption authority. The fact that the conditions imposed by the current rule cover more advisers and institutions, and are more onerous than past conditions, does not bring this case within the orbit of *Brown & Williamson*.

## C.   Written Contract Requirement of the BIC Exemption

NAFA further argues that the BIC Exemption exceeds the Department's authority in a second respect as well; according to NAFA, the BIC Exemption impermissibly creates a private cause of action. The major premises of this argument are unassailable. NAFA is correct that, unlike title I of ERISA, title II does not create a private right of action. *See generally* 26 U.S.C. § 4975. And, it is correct that, as the Supreme Court held in *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), "private rights of action to enforce federal law must be created by Congress," and not by federal agencies. The problem with NAFA's argument, however, is that the BIC Exemption does not create a private cause of action; it merely dictates terms that otherwise-conflicted financial institutions must include in written contracts with IRA and other non-title I owners in order to qualify for the exemption.

According to NAFA, the distinction between creating a private right of action on the one hand and conditioning the grant of an exemption on an enforceable written contract on the other amounts to nothing more than "sophistry." Dkt. 31 at 63. It asserts that "[n]othing in *Sandoval* turns on the precise nature of the private cause of action created" and that "the Department created a private litigation right that Congress did not authorize." Dkt. 31 at 63–64. That, however, is incorrect. The Department did not create a "cause of action" or a "private litigation right." Rather, any action brought to enforce the terms of the written contract would be brought

under state law, and, as both parties acknowledged at oral argument, state law would ultimately control the enforceability of any of the required contractual terms. *See, e.g.*, Tr. Oral Arg., Dkt. 41 at 44 (counsel for NAFA acknowledging that "if state law says you can't include those provisions, you can't include those provisions"; state law "does trump it"); *id.* at 110–11 (counsel for the Department noting that "if state law says something's not enforceable, then the fact that the federal regulation required it to be included in the contract to satisfy an exemption wouldn't control enforcement of the contract under state law," and explaining that "[b]ecause . . . it's a state law cause of action, state law provisions for the enforceability of contracts control"). Indeed, one of the grievances that NAFA raises in a separate argument is that, because the BIC Exemption permits financial institutions to waive punitive damages and rescission as remedies, *Final BIC Exemption*, 81 Fed. Reg. at 21,020; *see also infra* at 75–76, but state insurance regulators typically do not permit similar waivers, NAFA members may be disadvantaged vis-à-vis other financial institutions. *Id.* at 44. As that concern highlights, although the BIC Exemption dictates what must be included in the contract, the cause of action and right to recover are dictated by state law. Federal law merely requires the inclusion of specific contractual terms as a condition of the prohibited transaction exemption.

The written contract condition, moreover, was adopted against the backdrop of *common law enforcement* of IRA contracts. *See, e.g.*, *Jacobs v. Mazzei*, 977 N.Y.S.2d 123 (N.Y. App. Div. 2013); *McGrogan v. First Commonwealth Bank*, 74 A.3d 1063 (Pa. Super. Ct. 2013); *Azbill v. UMB Scout Brokerage Servs., Inc.*, 129 S.W.3d 480 (Mo. Ct. App. 2004). As explained above, the rules governing title I and title II plans differ in significant respects, including with respect to preemption. Thus, if the written contract condition applied to title I plans, it would likely be preempted under 29 U.S.C. § 1144(a). That provision states that title I "shall supersede

any and all State laws insofar as they may now or hereafter relate to any [nonexempt] employee benefit plan described in [title I]." *Id.* But ERISA's preemption provisions do not apply to title II, *see id.*; 26 U.S.C. § 4975, and courts, accordingly, have permitted IRA participants and beneficiaries to bring state law claims for breach of contract, *see, e.g.*, *Grund v. Del. Charter Guar. & Tr. Co.*, 788 F. Supp. 2d 226, 243–44 (S.D.N.Y. 2011). In addition, as NAFA itself explains, "fixed annuities *are* insurance *contracts*"—the insurance company guarantees a "predictable income [stream] the owner cannot outlive" in return for deposits made by the participant or beneficiary. NAFA Comment at 3, AR 42,358 (emphases added). Accordingly, even prior to adoption of the BIC Exemption, financial institutions selling annuities already entered into contracts with their customers and, at least with respect to annuities held in IRAs, they were already subject to suit for breaches of those contracts. The BIC Exemption does not change any of this but only requires financial institutions to include a number of specific terms in their contracts if they want to qualify for the exemption.

As the Department emphasizes, moreover, rules requiring that regulated entities include particular terms in written contracts are far from novel. In implementing ERISA itself, the Department has previously imposed similar conditions. PTE 84-14, for example, has long required "Qualified Professional Asset Managers" to acknowledge that they are fiduciaries in a "written management agreement." *PTE 84-14*, 49 Fed. Reg. 9494, 9503 (Mar. 13, 1984). And PTE 06-16, which governs compensation to fiduciaries in securities lending transactions, requires that "[t]he compensation [be] reasonable and [be] paid in accordance with the terms of a written instrument." *PTE 06-16*, 71 Fed. Reg. 63,786, 63,797 (Oct. 31, 2006). Other agencies have done the same in implementing their governing statutes. The Department of Transportation, for one, requires foreign air carriers providing charter flights in the United States

to include a contractual term providing that "unless the charterer files a claim . . . within 60 days after the cancellation of a charter trip[,] the surety [whose bond secures advance charter payments received by the carrier] shall be released from all liability." 14 C.F.R. § 212.3(c). The FCC allows broadband licensees to establish an "out of band emissions" limit different from that specified by regulation, but requires that they do so "pursuant to a private contractual arrangement of all affected licensees and applicants." 47 C.F.R. § 24.238(c). The Department of Agriculture's Food for Progress program requires participants to "enter into a written contract with each provider of goods, services, or construction work," and mandates that "[e]ach such contract must require the provider to maintain adequate records." 7 C.F.R. § 1499.11(k). And the Department of Agriculture's export credit guarantee program requires each exporter to enter into a written sales contract with the importer, with nine mandatory terms, including "quantity, quality specifications, [and] delivery terms." 7 C.F.R. § 1493.20.

NAFA seeks to distinguish these examples on the ground that they do not "dictate the terms of contracts" or, at least, do not do so in the same "manner" as the BIC Exemption. Dkt. 32 at 45–46 & n.14. That is incorrect. The two ERISA precedents cited above, for example, condition the grant of an exemption on written contracts that contain significant terms. PTE 84-14 applies to the prohibited transaction rules under both title I and title II of ERISA, and it requires—even for title II purposes—that a "Qualified Professional Asset Manager" acknowledge "in a written . . . agreement that it is a fiduciary with respect to each" plan at issue. *PTE 84-14*, 49 Fed. Reg. at 9506. PTE 06-16, likewise, requires a "written loan agreement," which must include terms "at least as favorable to the plan as an arm's-length transaction with an unrelated party" and a "security interest in, title to, or the rights of a secured creditor with respect to the collateral." *PTE 06-16*, 71 Fed. Reg. at 63,796.

Even more to the point, there is no evident connection between the rationales that NAFA offers for distinguishing these precedents and the substance of NAFA's argument.  If requiring that financial institutions enter into written contracts in order to avail themselves of the BIC Exemption "create[s] a private cause of action" in violation of *Sandoval*, then the importance of the contractual term ought not matter.  Whether significant or minor, the agency-mandated contractual term is potentially enforceable in a state law breach of contract action.  The same is true, moreover, regardless of whether the relevant contractual term replicates a preexisting right or one introduced through the same regulation that requires the written contract.  Regardless of the nature of the right at issue, it is the *remedy* that NAFA contends is unauthorized.

NAFA would also distinguish the BIC Exemption from other agency-mandated contractual undertakings because it "dictate[s] the terms of the litigation and damage claims that may be asserted in such litigation" by, for example, limiting exculpatory provisions, class-action waivers, and certain arbitration clauses.  Dkt. 32 at 46.  Those restrictions, NAFA posits, "are exactly the kind of detailed rules Congress might establish if it were to create a new private cause of action to enforce ERISA fiduciary duties with respect to IRA transactions."  *Id.*  But these details do not transform state law breach of contract claims into federal causes of action.  The states may decide whether and how to enforce these provisions, as NAFA acknowledged at oral argument.  Tr. Oral Arg., Dkt. 41 at 44.  Financial institutions, moreover, may rely on the BIC Exemption even if their contracts require arbitration of all non-class-action claims, thus reducing the prospect that even the state courts will need to enforce agreements.  All that the exemption requires is that financial institutions that opt to take advantage of it include the relevant terms in their contracts with IRA and other non-title I plan owners.

This is not to say that the authority of an agency to mandate that regulated parties include particular terms in their contracts is without limit.  One might reasonably ask, for example, whether the Department of Justice could have responded to *Sandoval* by requiring that grant recipients enter into contracts guaranteeing third parties that they will abide by the Department of Justice's disparate impact rule.  *See Sandoval*, 532 U.S. at 278; *Astra USA, Inc. v. Santa Clara County*, 563 U.S. at 119 n.4.  But that would not be a *Sandoval* challenge, and it is not the challenge that NAFA has brought.[10]  Accordingly, all that the Court needs to address for present

---

[10]  In response to a question from the Court at oral argument, NAFA submitted three additional cases that it claims bear on the question "whether an agency . . . exceed[s] its authority . . . by imposing contractual obligations . . . knowing that the enforcement will then come through state contract suits."  Dkt. 44 at 1 (quoting Tr. Oral Arg., Dkt. 41 at 87).  None of those cases supports the *Sandoval* argument that NAFA made in its briefs, which is all that is properly before the Court.

In the first case, *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), the Supreme Court held that permitting medical facilities to bring suit as third-party beneficiaries of pharmaceutical pricing agreements ("PPAs") between the federal government and drug manufacturers was "incompatible with the statutory regime."  *Id.* at 113.  Although the Court observed that permitting such third-party suits would, in effect, circumvent Congress's decision not to create "a private right to enforce the statutory ceiling price obligations," it did so because the statute required that the government enter into the PPAs, 42 U.S.C. § 256b(a)(1), and the PPAs "simply incorporate[d] [the relevant] statutory obligations," 563 U.S. at 119 & n.4.  Under those unique circumstances, which are not present here, a third-party beneficiary suit was, "in essence[,] a suit to enforce the statute itself."  *Id.* at 119.  The Court, moreover, did not premise its decision on this factor alone, but engaged in a broader statutory analysis of whether Congress would have intended to permit third-party actions to enforce the PPAs, and thereby the statute.  Nothing in *Astra USA* suggests that *Sandoval* or its progeny can be read, standing alone, to preclude agencies from conditioning the grant of a regulatory exemption on the execution of written agreements that are enforceable under state law.  Indeed, the Supreme Court expressly declined to reach the closer—but still inapposite—question "[w]hether a contracting agency may authorize third-party suits to enforce a Government contact."  *Id.* at 119 n.4.

The second and third cases, *Umland v. PLANCO Financial Services, Inc.*, 542 F.3d 59 (3d Cir. 2008), and *MM&S Financial, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 364 F.3d 908 (8th Cir. 2004), likewise, add no support to NAFA's *Sandoval* argument.  *Umland* merely held that *implying* "FICA's provisions into every employment contract . . . would contradict Congress's decision not to include . . . a private right of action."  542 F.3d at 67.  And *MM&S Financial* merely held that a claim for breach of contract against the NASD for failing to follow its own

purposes is the question whether the Department has run afoul of *Sandoval* and the principle that only Congress may create federal causes of action. For the reasons explained above, the answer to that question is "no."

## D.     Reasonable Compensation Requirement and Due Process

Next, NAFA argues that the "reasonable compensation" condition of the BIC Exemption is void for vagueness under the Due Process Clause of the Constitution. Dkt. 31 at 65–67; Dkt. 32 at 65–70. Under that condition, a financial institution must agree in writing that "[t]he recommended transaction will not cause [it], [the] [a]dviser or their [a]ffiliates or [r]elated [e]ntites to receive, directly or indirectly, compensation for their services that is in excess of *reasonable compensation* within the meaning of [29 U.S.C. § 1108(b)(2)] and [26 U.S.C. §] 4975(d)(2)." *Final BIC Exemption*, 81 Fed. Reg. at 21,077 (emphasis added). A similar provision appeared in the version of the BIC Exemption proposed in 2015, but without the cross-references to ERISA and the Code. *2015 Proposed BIC Exemption*, 80 Fed. Reg. at 21,984. As the Department explained, the change was made "[i]n response to comments," and the condition "was clarified to adopt the well-established reasonable compensation standard, as set out in" the cited sections of ERISA and the Code "and the regulations thereunder." *Final BIC Exemption*, 81 Fed. Reg. at 21,030. The commentary further explained:

> The reasonableness of the fees depends on the particular facts and circumstances at the time of the recommendation. Several factors inform whether compensation is reasonable, including, *inter alia*, the market pricing of service(s) provided and the underlying asset(s), the scope of monitoring, and the complexity of the product. No single factor is dispositive in determining whether compensation is reasonable; the essential question is whether the charges are reasonable in relation to what the

rules was barred by a provision of the Securities Exchange Act of 1934, which grants "exclusive jurisdiction to federal courts to hear all claims for breach of duties created under the Exchange Act." 364 F.3d at 911–12. Again, nothing in either decision suggests that a federal agency lacks authority to condition a regulatory exemption on execution of a written contract enforceable under state law.

> investor receives.  Consistent with the Department's prior interpretations of this standard, the Department confirms that an [a]dviser and [f]inancial [i]nstitution do not have to recommend the transaction that is the lowest cost or that generates the lowest fees without regard to other relevant factors.  In this regard, the Department declines to specifically reference FINRA's standard in the exemption, but rather relies on ERISA's own longstanding reasonable compensation formulation.

*Id.* According to NAFA, the rule's lack of "meaningful guidance on what is considered reasonable . . . violates fundamental tenets of constitutionally required fair notice, rendering [the condition] void for vagueness."  Dkt. 31 at 65.

As an initial matter, the Court notes that NAFA brings a facial challenge to the "reasonable compensation" condition.  Until recently, that would have likely required that NAFA demonstrate that the condition is "impermissibly vague in all of its applications."  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).  In *Johnson v. United States*, 135 S. Ct. 2552, 2561 (2015), however, the Supreme Court held that the clarity of some applications will not save an otherwise vague rule from facial challenge.  The "supposed requirement of vagueness in *all* applications," according to the Court, "is not a requirement at all, but a tautology:  If . . . a statute [is] vague, it is vague in all its applications."  *Id.* (emphasis added).  Earlier this year, in a case similar to this one, the D.C. Circuit declined to "decide the full implications of *Johnson*," concluding that the rule challenged in that case "satisfie[d] due process requirements even" without applying the "elevated bar for facial challenges."  *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 735–36 (D.C. Cir. 2016).  The Court will take the same approach here.

A law is void for vagueness if it fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "[P]erfect clarity and precise guidance," however, "have never been required."  *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).  "The

degree of vagueness tolerable in a given statutory [or regulatory] provision," moreover, "varies based on 'the nature of the enactment.'" *U.S. Telecom Ass'n*, 825 F.3d at 736 (quoting *Hoffman Estates*, 455 U.S. at 498). Rules that "threaten[] to inhibit the exercise of constitutionally protected rights" or that include criminal penalties are subject to "a more stringent vagueness test." *Hoffman Estates*, 455 U.S. at 499. "[E]conomic regulation," in contrast, "is subject to a less strict . . . test because its subject matter is often more narrow," "because businesses . . . can be expected to consult relevant [rules] in advance of action," and because "the consequences of imprecision are qualitatively less severe." *Id.* at 498–99. As a result, economic regulations "will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require." *Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997).

The BIC Exemption's "reasonable compensation" condition satisfies this standard. To start, the regulatory purpose is clear: Recall that the need for the BIC Exemption in the first place was triggered by the Department's conclusion that compensation that varies based on investment advice—including commissions—creates a conflict of interest between the investment adviser and the IRA participant or beneficiary. *Final BIC Exemption*, 81 Fed. Reg. at 21,076–77. As a condition of waiving this conflict, the BIC Exemption requires that financial institutions and advisors "adhere to conditions *designed to mitigate the harmful impact of conflicts of interest*." *Id.* at 21,002 (emphasis added). The "reasonable compensation" requirement is one of these conditions. The Department, accordingly, "has articulated 'the objectives the [condition] is meant to achieve.'" *U.S. Telecom. Ass'n*, 825 F.3d at 736.

Read in context, moreover, the phrase "reasonable compensation" is sufficiently clear to provide financial institutions with "fair warning of what the regulations require." *Freeman United Coal Mining Co*., 108 F.3d at 362. Taking the phrase one step at a time, the adjective "reasonable" is, of course, ubiquitous in the law. Indeed, the very constitutional test that NAFA invokes asks whether the challenged term provides a "person of ordinary intelligence a *reasonable* opportunity to know what is prohibited," *Grayned*, 408 U.S. at 108 (emphasis added), or whether "a *reasonably* prudent person" would have fair notice of what is required, *Freeman United Coal Mining Co.*, 108 F.3d at 362 (emphasis added). It is thus unsurprising that the case law is replete with decisions rejecting vagueness challenges, like that raised here, to the words "reasonable," "reasonably," and "unreasonably." *See, e.g.*, *Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 796 F.3d 18, 28 (D.C. Cir. 2015) (interpretation of mine safety regulation to cover material that "reasonably" might ignite not unconstitutionally vague); *U.S. Telecom Ass'n*, 825 F.3d at 734–739 (regulation prohibiting conduct that "unreasonably interfere[s] with or unreasonably disadvantage[s]" consumer internet access not unconstitutionally vague); *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*, 613 F.3d 206, 218–19 (D.C. Cir. 2010) (use of term "reasonable" in regulation did not violate statutory obligation to provide "standards or guidelines" to regulated airports); *U.S. v. Krumrei*, 258 F.3d 535, 538 (6th Cir. 2001) ("[A] statute is not void for vagueness merely because it uses the word 'reasonable' or 'unreasonable.'") (quoting *United States v. Hsu*, 40 F. Supp. 2d 623, 628 (E.D. Pa. 1999)); *Groome Res. Ltd., LLC v. Parish of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000) ("reasonable accommodations" requirement not unconstitutionally vague); *Karlin v. Foust*, 188 F.3d 446, 468 (7th Cir. 1999) ("reasonable medical judgment" provision in a statute not unconstitutionally vague); *Bristol-Myers Co. v. FTC*, 738 F.2d 554, 560 (2d Cir. 1984) (order

requiring regulated entity to cease making claims without a "reasonable basis" not unconstitutionally vague).

More specifically, the concept of "reasonable compensation" is a common one that appears throughout the U.S. Code. *See, e.g.*, 42 U.S.C. § 4018(b)(1)(B) (authorizing the Administrator of the National Flood Insurance Program to pay "reasonable compensation . . . for selling and servicing flood insurance coverage"); 49 U.S.C. § 44308(c)(2) (authorizing the Secretary of Transportation to pay "reasonable compensation to an underwriting agent for servicing insurance the agent writes for the Secretary"); 11 U.S.C. § 330(a)(1)(A) (authorizing "reasonable compensation" for bankruptcy trustees); 26 U.S.C. § 280G(b)(4) (prohibition on deductions for "golden parachutes" not applicable to "reasonable compensation"); 48 U.S.C. § 2176(a)(1) (authorizing "reasonable compensation" for professional services rendered to the Financial Oversight and Management Board for Puerto Rico); 42 U.S.C. § 1395xx(a)(2)(B) (authorizing "reasonable compensation" for medical services under Medicare); 49 U.S.C. § 24308(a)(2)(B) (allowing the Surface Transportation Board to determine "reasonable compensation" for use by Amtrak of rail carrier or regional transportation authority services and facilities); 43 U.S.C. § 1752(g) (requiring "reasonable compensation" for cancellation of grazing permit on federal lands); 36 U.S.C. § 130507(c) (allowing "reasonable compensation" for an officer of Little League Baseball, Inc., a federally chartered corporation).  Indeed, that phrase appears in well over a hundred provisions of the U.S. Code.

It also appears repeatedly in ERISA—and has done so since ERISA was enacted over forty years ago. *See* Pub. L. No. 93-406, § 408 (enacting 29 U.S.C. § 1108(b)(2)); *id.* at title II, § 2003(a) (enacting 26 U.S.C. § 4975(d)(2)).  Drawing on that history, the BIC Exemption expressly provides that the phrase "reasonable compensation," as used in the exemption, has the

same meaning as the identical phrase long-contained in 29 U.S.C. § 1108(b)(2) and 26 U.S.C.

§ 4975(d)(2).  That cross-referenced language, in turn, is further defined in regulations, which

have also existed for decades.  *See* 29 C.F.R. § 2550.408c-2 (ERISA regulation); 26 C.F.R.

§ 54.4975-6 (Code regulation).  Under those regulations—and, by incorporation, under the BIC

Exemption—"whether compensation is 'reasonable' . . . depends on the particular facts and

circumstances of each case."  26 C.F.R. § 54.4975-6(e).  But certain extremes mark the

boundaries.  Thus, for example, compensation that is in excess of the amount that someone

"would ordinarily be paid for like services by like enterprises under like circumstances" is

categorically excessive.  26 C.F.R. § 1.162-7; *see also* 29 C.F.R. § 2550.408c-2(b)(5)

(incorporating 26 C.F.R. § 1.162-7); 26 C.F.R. § 54.4975-6(e)(6) (same).  Lesser compensation

may also be excessive, but the regulations make clear that the relevant inquiry must focus on the

time of contracting, and must not consider the question in light of subsequent events.  *Id.*  And

the regulations make clear that certain payments, such as "reimbursement of direct expenses,"

should not be included in the measure of compensation.

  This guidance is, admittedly, imprecise.  But that is as much a product of the endeavor as

the standard; assessing whether a fiduciary is charging more than the relevant services demand is

an inherently imprecise undertaking.  A more precise standard would, in all likelihood, either

preclude legitimate payments or invite evasion.  "A regulation," however, "is not impermissibly

vague because it is 'marked by flexibility and reasonable breadth, rather than meticulous

specificity.'"  *U.S. Telecom Ass'n*, 825 F.3d at 737 (citation omitted).  Nor does due process

require that agencies "open[] large loopholes allowing conduct which should be regulated to

escape regulation."  *Freeman United Coal Mining Co.*, 108 F.3d at 362 (internal quotation mark

omitted).  This is particularly so in cases like this one, in which the relevant statutory language

has been subject to "common law" development.  *See, e.g.*, *In re Iron Workers Local 25 Pension Fund*, 811 F. Supp. 2d 1295, 1320–22 (E.D. Mich. 2011) (after bench trial, finding that compensation for "legal . . . services" was not "more than reasonable"; court considered reasonableness of fee at the outset and compared compensation to amounts "ordinarily . . . paid for like services by like enterprises under like circumstances"); *Chao v. Current Dev. Corp.*, No. 03-cv-1792, 2007 WL 2746596, at *2–3 (N.D. Ill. Sep. 14, 2007) (finding that defendants failed to show that hourly rate for services as trustee was reasonable); *Guardsmark, Inc. v. BlueCross & Blue Shield*, 169 F. Supp. 2d 794, 803 (W.D. Tenn. 2003) (denying motion to dismiss claim that fiduciary overcharged for administrative and "run-out" fees).

Finally, NAFA's argument is particularly misplaced in the unique context of ERISA.  As NAFA recognizes in framing a separate argument, *see* Dkt. 31 at 43–44; Dkt. 32 at 24, although "trust law [may] not tell the entire story," the ERISA "fiduciary duties draw much of their content from the common law of trusts."  *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996).  That common law includes requirements of "reasonable compensation" for trustees, which provides further guidance.  *See, e.g.*, Unif. Trust Code § 708(a) (Unif. Law Comm'n 2000) ("[A] trustee is entitled to compensation that is reasonable under the circumstances."); Restatement (Third) of Trusts § 38(1) (2003) ("A trustee is entitled to reasonable compensation out of the trust estate for services as trustee . . . .").  NAFA does not challenge the sufficiency of this common law guidance, but objects that it is typically framed in terms of what a trustee is affirmatively entitled to, rather than in terms of limiting trustee compensation.  Dkt. 32 at 68–69.  That is a distinction without a difference; the clarity of the phrase "reasonable compensation" is unaffected by whether trustees—like those at common law—are entitled to "reasonable compensation," or

whether fiduciaries—like those involved here—are not entitled to more than "reasonable compensation."

According to NAFA, the lack of clarity regarding the meaning of "reasonable compensation" is not merely the product of imprecise language, but also a product of conflicting statements contained in the Department's commentary.  *See* Dkt. 31 at 66; Dkt. 32 at 69–70.  It points, in particular, to two purportedly conflicting statements found in the commentary:  first, that "ultimately, the 'reasonable compensation' standard is a market based standard"; and second, that the Department "is unwilling to condone all 'customary' compensation arrangements and declines to adopt a standard that turns on whether the agreement is 'customary.'"  Dkt. 31 at 66 (quoting *Final BIC Exemption*, 81 Fed. Reg. at 21,031).  What is "market based," however, is not the same thing as what is "customary."  A price or payment is "market based" if it is a product of competition; it is "customary" if it occurs with some frequency.  Accordingly, there is nothing contradictory about embracing "market-based standards" while declining to create a safe harbor for all "customary" compensation.  By declining to exempt all "customary" compensation, the Department merely recognized the risk that such an exemption would "open[] [a] loophole[] allowing conduct which should be regulated to escape regulation."  *Freeman United Coal Mining Co.*, 108 F.3d at 362.

NAFA also argues that the "extreme" "consequences of being wrong about 'reasonable compensation'" counsel in favor of requiring greater certainty.  Dkt. 32 at 74.  Although much of NAFA's vagueness argument centers on the risk associated with leaving the determination of whether certain compensation is "reasonable" to private litigation brought under BIC Exemption contracts, for this argument NAFA switches gears and focuses on the government's enforcement authority.  In private contract litigation, it is unclear what remedy a retirement plan would have

against an insurance company that pays its own agent too large a commission.  But, as NAFA

notes, in a government enforcement action, an insurance company would run the risk that an

adverse finding could render "every single transaction it has entered into" a "prohibited

transaction," triggering potentially massive excise tax liability under 26 U.S.C. § 4975.  Dkt. 32

at 74.  That concern, however, is not merely speculative—it is at odds with almost forty years of

history.  Since 1977, PTE 84-24 and its predecessor exemption, PTE 77-9, have permitted

insurance companies to pay agents engaged in sales to ERISA plans and IRAs on a commission

basis, provided that any "commissions and other consideration received" are "reasonable," *PTE

77-9*, 42 Fed. Reg. at 32,398, or "not in excess of 'reasonable compensation,'" *1984 Amendment

to PTE 84-24*, 49 Fed. Reg. at 13,211.  Yet, despite this long-standing rule, NAFA fails to

identify a single instance in which an insurance company was caught by surprise and required to

pay a large excise tax.

Finally, NAFA relies on three D.C. Circuit decisions that it claims mark the outer limits

of permissible regulatory vagueness.  In *U.S. Telecom Ass'n v. FCC*, the Court *upheld* a

regulation prohibiting broadband service providers from "unreasonably interfer[ing] with or

unreasonably disadvantag[ing]" open internet competition.  825 F.3d at 734–36.  As NAFA

correctly observes, the agency in that case acted prospectively rather than retrospectively, it set

forth seven factors that would guide its application of the rule and provided a description of how

it would interpret and apply each factor, and it provided a mechanism for regulated entities to

seek advisory opinions on the rule's operations.  *U.S. Telecom*, 825 F.3d at 736–38.  But NAFA

incorrectly characterizes the *U.S. Telecom* case as a "relatively close call."  Dkt. 32 at 71–72.  To

the contrary, the Court emphasized that "any ambiguity in [the rule] is . . . a far cry from the kind

of vagueness this court [has] considered problematic" enough to invalidate a regulation.  825

F.3d at 737 (citing *Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993)).  Thus, even if the reasonable

compensation condition at issue here were less certain than the rule at issue in *U.S. Telecom*,

little would follow from that premise.

The D.C. Circuit's decisions in *KPMG, LLP v. SEC*, 289 F.3d 109 (D.C. Cir. 2002), and

*United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281 (D.C. Cir. 2015), are no more helpful

to NAFA's position.  In *KPMG*, the Court held that KPMG lacked fair notice of the SEC's

interpretation of an accounting rule that precluded public accountants from receiving "contingent

fee[s]" from their audit clients.  289 F.3d at 126.  But the Court's conclusion that KPMG lacked

"fair notice" that a "success fee" or "royalty arrangement would be deemed a prohibited

contingent fee," *id.* at 116, says nothing about whether the "reasonable compensation" condition

is sufficiently clear.  And in *Purcell*, the Court of Appeals merely held that the defendant lacked

fair notice of the government's interpretation of an undefined term in a letter of credit—"regular

commission"—and thus could not have "knowingly" violated that interpretation of the letter of

credit for purposes of the False Claims Act.  *Purcell*, 807 F.3d at 287, 289.  That, again, says

nothing about the constitutionality of the "reasonable compensation" standard.

There will undoubtedly be cases in which reasonable minds may differ on whether a large

commission rises to the level of "unreasonable compensation."  That, however, is not the

standard for striking down a regulation as unconstitutionally vague.  NAFA and its financial

institution members are sophisticated entities that will be required merely to apply a phrase that

is common in trust law; that has existed in ERISA since it was enacted; that has existed in PTE

84-24 and its predecessor since 1977; that is (at least partially) explicated in regulations; and that

has been discussed and applied in the case law.  Under these circumstances "a reasonably

prudent person, familiar with the conditions the [BIC Exemption is] meant to address and the

objectives the [exemption and conditions] are meant to achieve, would have fair warning of what the regulations require." *Freeman United Coal Mining Co.*, 108 F.3d at 362.

E.   **Placement of Fixed Indexed Annuities in the BIC Exemption**

NAFA raises five challenges to the Department's decision to require that fixed indexed annuities proceed under the BIC Exemption rather than under PTE 84-24. Those challenges all assert that the Department's treatment of fixed indexed annuities was "arbitrary and capricious" within the meaning of the APA. 5 U.S.C. § 706(2)(A). The scope of judicial review under that standard is narrow. *See State Farm*, 463 U.S. at 43; *see also, e.g.*, *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010). The Court must satisfy itself that the agency has "examine[d] the relevant data and [has] articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation and internal quotation marks omitted). It must assess whether "the agency has relied on factors which Congress has not intended it to consider"; whether the agency "entirely failed to consider an important aspect of the problem"; and whether the agency "offered an explanation for its decision that runs counter to the evidence before the agency[] or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* In conducting this analysis, the Court must not, however, substitute its judgment for that of the agency. Rather, the critical question for the Court is whether the agency has provided the "minimal level of analysis" necessary to ensure that "its 'path may reasonably be discerned.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

With these principles in mind, the Court will consider each of NAFA's five "arbitrary and capricious" challenges.

1.      *Treatment of Fixed Income Annuities as "Securities"*

NAFA first argues that the Department's decision to treat fixed indexed annuities "as securities" was "arbitrary and capricious because [that decision] conflicts with another federal statute," namely the Harkin Amendment to the Dodd-Frank Act, Pub. L. No. 111-203, Title 9, subtitle 1, § 989J. Dkt. 31 at 68–69. In framing this argument, NAFA starts with how the Department characterized its 2015 notice of proposed rulemaking. In the notice of proposed rulemaking, the Department proposed to subject only "variable annuity contracts and other annuity contracts *that are securities* under federal securities laws" to the BIC Exemption, while leaving fixed indexed annuities and other "annuity contracts *that are not securities*" to regulation under PTE 84-24. *2015 Proposed PTE 84-24*, 80 Fed. Reg. at 22,014–15 (emphases added). In the final rule, in contrast, the Department decided to subject both variable annuities and fixed indexed annuities to the BIC Exemption. *Final PTE 84-24*, 81 Fed. Reg. at 21,152–53. From this, NAFA infers that the Department decided to treat fixed indexed annuities as "securities" in the final rule. Dkt. 31 at 68–69. Finally, it argues that this treatment of fixed indexed annuities as "securities" conflicts with the Harkin Amendment, which requires the SEC to treat certain annuities contracts, "the value of which does not vary according to the performance of a separate account," as "exempt" from the federal securities laws. Harkin Amendment, Pub. L. No. 111-203, Title 9, subtitle 1, § 989J.

The logic of this argument fails on at least two levels. First, the fact that the notice of proposed rulemaking assigned only those annuities that are treated as "securities" to the BIC Exemption does not mean that, when the Department *subsequently* assigned fixed indexed annuities to the BIC Exemption, it necessarily treated those annuities as "securities." To the contrary, the Department simply decided that—notwithstanding the fact that fixed indexed

annuities are not treated as "securities" for purposes of the federal securities laws—the "risks and complexities of these investments" warranted the more "protective conditions" contained in the BIC Exemption. *Final BIC Exemption*, 81 Fed. Reg. at 21,018. Second, the Harkin Amendment speaks only to the treatment of certain annuities for purposes of the federal securities laws. Neither ERISA nor the Code, however, is a securities law, and neither the BIC Exemption nor PTE 84-24 purports to regulate annuities as "securities." Accordingly, there is no tension between the Harkin Amendment and the final BIC Exemption. Nor can the Department be faulted for failing to "offer [an] explanation as to why it effectively classified" fixed indexed annuities "as securities for purposes of" the BIC Exemption. Dkt. 31 at 69. It did not, in fact, treat fixed income annuities as "securities," and thus no explanation was necessary.

2.     *Notice and Opportunity to Comment*

NAFA further argues that it was denied a reasonable opportunity to comment on the Department's final decisions to shift fixed indexed annuities from treatment under PTE 84-24 to the BIC Exemption, Dkt. 31 at 71–72, and to permit financial institutions to include waivers of punitive damages and rescission in their contracts with IRA owners, Dkt. 31 at 78–79. The Court disagrees.

The APA requires that a notice of proposed rulemaking "provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *U.S. Telecom Ass'n*, 825 F.3d at 700 (internal quotation marks and citation omitted). "The final rule, however, 'need not be the one proposed in the'" notice of proposed rulemaking. *Id.* (citation and quotation marks omitted). Rather, it is enough that the final rule constitute a "logical outgrowth" of the notice. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). This standard is met if the notice of proposed rulemaking "expressly ask[s] for comments on a particular issue or

otherwise ma[kes] clear that the agency [is] contemplating a particular change." *U.S. Telecom Ass'n*, 825 F.3d at 700 (quotation marks and citation omitted; alterations in original).  Ultimately, however, the test is simply "one of fair notice."  *Long Island Care at Home*, 551 U.S. at 174. The Department's notice of proposed rulemaking meets this test.

*First*, with respect to the Department's decision to move fixed indexed annuities to the BIC Exemption, the 2015 notices of proposed rulemaking for both the amendments to PTE 84-24 and the creation of the BIC Exemption explicitly sought comment on the appropriate placement of annuities.  Thus, in both notices, the Department explained that it was proposing that it subject annuities that are "securities"—that is, variable annuities—to the "uniquely protective" provisions of the BIC Exemption, while subjecting annuities that are not securities— including fixed indexed annuities—to PTE 84-24.  *2015 Proposed BIC Exemption*, 80 Fed. Reg. at 21,975; *see also 2015 Proposed PTE 84-24*, 80 Fed. Reg. at 22,015.  The Department then "request[ed] comment on this approach," and, "[i]n particular," on

> whether we have drawn the correct lines between insurance and annuity products that are securities and those that are not, in terms of our decision to continue to allow IRA transactions involving non-security insurance and annuity contracts to occur under the conditions of PTE 84-24 while requiring IRA transactions involving securities to occur under the conditions of this proposed Best Interest Contract Exemption.

*2015 Proposed BIC Exemption*, 80 Fed. Reg. at 21,975; *see also 2015 Proposed PTE 84-24*, 80 Fed. Reg. at 22,015 (requesting comment "on whether the proposal to revoke relief for securities transactions involving IRAs . . . but leave in place relief for IRA transactions involving . . . annuity contracts that are not securities strikes the appropriate balance and is protective of the interests of the IRAs").

NAFA reads these requests for comment as providing "no inkling whatsoever that [the Department] was considering moving [fixed indexed annuities] from PTE 84-24 to the BIC

[Exemption]." Dkt. 31 at 71. That reading is not tenable. The Department expressly requested

comment on its decision to "continue to allow IRA transactions involving" fixed indexed

annuities "to occur under the conditions of PTE 84-24," while requiring that similar transactions

involving variable annuities occur under the conditions contained in the proposed BIC

Exemption. *2015 Proposed BIC Exemption*, 80 Fed. Reg. at 21,975. That is, it asked whether

fixed indexed annuities should be grouped under PTE 84-24 or not. And, if there were any doubt

on this, it would be put to rest by the fact that NAFA, along with other industry groups, provided

comments on that very issue. *See* AR 42,359 (Because "fixed annuities have no downside

market risk and provide state-mandated guarantees to the consumer, . . . NAFA agrees the

Department has appropriately categorized fixed annuities as covered transaction[s] eligible for an

exemption under PTE-84-24."); AR 47,030–41 (NAFA submits that "the Department's inclusion

of all non-security fixed annuity products under PTE 84-24 was correct in the proposed rule and

should remain that way under the final rule"); AR 41,633–38 (comment of Allianz Life Ins. Co.

of N. Am.); AR 42,430–31 (comment of Guardian Life Ins. Co.); AR 42,540–41 (comment of

Indexed Annuity Leadership Council); AR 47,074–78 (further comment of Indexed Annuity

Leadership Council). Indeed, NAFA prefaced its comments by acknowledging that the notice of

proposed rulemaking posed the question "whether the line between insurance and annuity

products that are securities and those that are not has been correctly drawn," AR 42,357, and

then cited the page of the notice that expressly "request[ed] comment on this approach," *id.*

(citing *2015 Proposed BIC Exemption*, 80 Fed. Reg. at 21,975).

  *Second*, the Department's decision to permit financial institutions to include contractual

terms waiving claims for punitive damages and rescission constituted a logical outgrowth of the

BIC Exemption in the notice of proposed rulemaking. In the 2015 notice, the Department

proposed a provision prohibiting "[e]xculpatory provisions disclaiming or otherwise limiting liability." *2015 Proposed BIC Exemption*, 80 Fed. Reg. at 21,985.  As NAFA acknowledges, the securities industry responded by submitting comments on July 15 and 17, 2015, in which it requested that the Department clarify that this prohibition would not extend to waivers of punitive damages and rescission.  *See* Dkt. 31 at 78 n.32.  Those comments were available for review online and at the Department of Labor, *see 2015 Proposed BIC Exemption*, 80 Fed. Reg. at 21,960, and NAFA had ample opportunity to object.  The initial comment period was open until July 21, 2015, followed by four days of public hearings in August 2015, and a further comment period extending until September 24, 2015.  *See Final BIC Exemption*, 81 Fed. Reg. at 21,007.  In fact, NAFA submitted supplemental comments addressing other issues on September 24, 2015.  AR 47,030–41.  Thus, based on both the notices of proposed rulemaking and public comments that were subsequently submitted, NAFA was on "fair notice" that the meaning and scope of the proposed bar on "exculpatory provisions" was subject to further refinement.  *See Long Island Care at Home*, 551 U.S. at 174

### 3.  *Reasoned Explanation*

Relatedly, NAFA contends that the Department failed to provide a reasoned explanation for its decision to move the treatment of fixed indexed annuities from PTE 84-24 to the BIC Exemption.  Dkt. 31 at 72–73.  As NAFA observes, in the notice of proposed rulemaking for the PTE 84-24 amendments, the Department explained that it was "not certain that the conditions of the" BIC Exemption relating to required disclosures were "readily applicable" to fixed indexed annuities "or that the distribution methods and channels" for fixed indexed annuities "would fit within the exemption's framework."  *Proposed PTE 84-24*, 80 Fed. Reg. 22,015.  According to NAFA, having "raised [these] important questions in the" notice of proposed rulemaking, the

Department "provided no analysis about those very concerns when it placed" fixed indexed annuities in the BIC Exemption "at the last minute." Dkt. 31 at 73. That contention is not supported by the administrative record.

As an initial matter, the administrative record provides a detailed explanation for the Department's conclusion that fixed indexed annuities should be subject to the more rigorous conditions contained in the BIC Exemption. The commentary observes that both the SEC and FINRA cautioned that fixed indexed annuities are complex products that pose greater risks than fixed annuities. *See Final BIC Exemption*, 81 Fed. Reg. at 21,017–18. In the words of the SEC staff, "[y]ou can lose money buying an indexed annuity," and, in the words of FINRA, indexed annuities are "anything but easy to understand," *id.* at 21,017. "Given the risks and complexities of these investments, the Department . . . determined that indexed annuities are appropriately subject to the same protective conditions of the [BIC Exemption] that apply to variable annuities." *Id.* at 20,018. As the Department explained:

> These are complex products requiring careful consideration of their terms and risks. Assessing the prudence of a particular indexed annuity requires an understanding, *inter alia*, of surrender terms and charges; interest rate caps; the particular market index or indexes to which the annuity is linked; the scope of any downside risk; associated administrative and other charges; the insurer's authority to revise terms and charges over the life of the investment; the specific methodology used to compute the index-linked interest rate; and any optional benefits that may be offered, such as living benefits and death benefits. In operation, the index-linked interest rate can be affected by participation rates; spread, margin or asset fees; interest rate caps; the particular method for determining the change in the relevant index over the annuity's period (annual, high water mark, or point-to-point); and the method for calculating interest earned during the annuity's term (*e.g.*, simple or compounded interest). Investors can all too easily overestimate the value of these contracts, misunderstand the linkage between the contract value and the index performance, underestimate the costs of the contract, and overestimate the scope of their protection from downside risk (or wrongly believe they have no risk of loss). As a result, [r]etirement [i]nvestors are acutely dependent on sound advice that is untainted by the conflicts of interest posed by [a]dvisers' incentives to secure the annuity purchase, which can be quite substantial. Both categories of annuities, variable and indexed annuities, are susceptible to abuse, and [r]etirement

> [i]nvestors would equally benefit in both cases from the protections of this exemption, including the conditions that clearly establish the enforceable standards of fiduciary conduct and fair dealing as applicable to [a]dvisers and [f]inancial [i]nstitutions.

*Id.*

The Department further concluded that subjecting fixed indexed annuities to the conditions contained in the BIC Exemption, as opposed to PTE 84-24, would cost the industry an additional amount between "$34.0 million and $37.8 million over ten years," of which "$14.1 million [would be incurred] during the first year." Regulatory Impact Analysis at 285–86, AR 601–02. The Department also considered the risks posed by annuities, as compared to other insurance products and explained that "[i]f anything, the potential harm from conflicts of interest would be larger in the annuity market because purchasers of annuities are often older individuals who are less sophisticated in financial matters than the purchasers of commercial property-casualty insurance." Regulatory Impact Analysis 122, AR 438. NAFA is thus incorrect that "the commentary is devoid of any specifics to support" the conclusion regarding the complexity and risks associated with fixed indexed annuities, and incorrect that the Department failed to address how inclusion of fixed indexed annuities would affect the industry. Dkt. 31 at 72.

NAFA is also incorrect that the Department ignored the concerns regarding disclosures and distribution methods raised in the notice of proposed rulemaking. To the contrary, as the commentary notes, "the final exemption [was] revised so that the conditions identified by commenters are less burdensome and more readily complied with by," among others, "distributors of insurance products." *Final BIC Exemption*, 81 Fed. Reg. at 21,018. The Department, for example, "revised the pre-transaction disclosure [condition] so that it [no longer] require[s] a projection of the total cost of the recommended investment, which commenters indicated would be difficult to provide in the insurance context." *Id.* The Department also made

adjustments to the "reasonable compensation" condition and provided additional guidance to address concerns raised by "the insurance industry regarding the application of the standard to insurance transactions." *Id.* And, more generally, it explained that it "crafted the [BIC Exemption] so that it will work with, and compliment, state insurance regulations." *Id*. at 21,019. Some commenters did ask "about marketing or distribution affiliates and intermediaries that would not meet the definition of [f]inancial [i]nstitution" for purposes of the BIC Exemption, and "[o]ne commenter specifically requested that the definition . . . be revised to include all entities within an insurance group that arrange for the marketing of financial products." *Id.* at 21,047. The Department declined to adopt this recommendation, noting that the operative definition relied on "well-established regulatory conditions and oversight." *Id.* It did, however, revise the final rule to allow insurance marketing organizations—or "IMOs"—and others to petition for an individual exemption by showing, among other things, that they have the "ability to effectively supervise individual [a]dvisers' compliance with the terms of th[e] exemption." *Id.* The Court, accordingly, concludes that the Department adequately addressed the questions that it itself posed in the notice of proposed rulemaking.

4.   *Workability and Rationality*

In a series of arguments, NAFA further contends that subjecting fixed indexed annuities to the BIC Exemptions is unworkable and irrational.

*First*, NAFA argues that the BIC Exemption cannot sensibly apply to sales of IRAs by independent insurance agents, who are not subject to the control of the insurance companies who will be required to execute the BIC Exemption contracts. To qualify for the BIC Exemption, an insurance company engaged in the sale of fixed indexed annuities to IRAs must enter a contract with the IRA owner stating that "it and its [a]dviser(s) act as fiduciaries"; agreeing that "it and its

[a]dvisers will adhere to the" Impartial Conduct Standards; and warranting that it "has adopted and will comply with anti-conflict policies and procedures reasonably and prudently designed to ensure that [its] [a]dvisers adhere to the Impartial Conduct standards." *Final BIC Exemption*, 81 Fed. Reg. at 21,020, 21,025. According to NAFA, "roughly 60% of all" fixed indexed annuity sales are made by independent agents, and, in those cases, it is "impossible" for insurance companies to comply with the BIC Exemption requirements. Dkt. 31 at 75. To support this contention, NAFA relies on the declaration of Jack Marrion, the association's director of research. *Id*. Marrion explains:

> The average independent insurance agent who sells fixed annuities represents multiple insurance carriers. The BIC [E]xemption unrealistically requires the insurer to police all of the agents' activities, including presentation of competitors' products, and compensation paid to the agent by competitors, to ensure that the "best interests" of the consumer are being met, without regard to the "financial or other interests" of the agent or all the other insurers represented by that agent. This is simply not possible. Because independent agents almost always sell for more than one carrier, there is no practical way to establish a set commission across all sales. The end result will be many insurers exiting the independent agent channel, creating enormous compliance costs for insurers, and reducing the number of independent agents.

Dkt. 5-3 at 8 (Marrion decl. ¶ 30).

The initial problem with this argument is that the Marrion declaration is not part of the administrative record, and NAFA fails to identify where in the record it (or any other commenter) raised these concerns. NAFA and others were given ample opportunity to comment and the comments submitted to the Court as part of the administrative record reflect a handful of concerns—but not this one—regarding the workability of assigning fixed indexed annuities to the BIC Exemption, rather than PTE 84-24.[11]  AR 42,376 & n.15. As a general rule, a party

---

[11] *See, e.g.*, AR 39,749, 39,756 (Comment of the Am. Council of Life Insurers) (July 21, 2015) (asserting generally that the BIC Exemption "is incompatible with standard business practices in the financial service industry" and describing the "broad spectrum of distribution channels" for

"seeking judicial review of agency action [must] raise [its] issues before the agency during the administrative process in order to preserve those issues for judicial review." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005). This rule follows from the nature of judicial review of agency action: "[T]he courts are not authorized to second-guess agency rulemaking decisions," and, instead, play the limited role of evaluating "whether the agency's decision is arbitrary and capricious for want of reasoned decisionmaking." *Id.* at 1150. Concerns raised in a declaration filed after the rulemaking was completed fall outside the administrative record and, in the usual course, have no bearing on whether the agency's decision—made without the benefit of the declaration—was arbitrary and capricious.[12]

Yet, even if the Court were to reach this issue, NAFA's argument is unconvincing. As the Department explains in its reply brief, the BIC Exemption does not require that "an insurer supervising an agent . . . supervise the sale of *other companies'* products"; it need "ensure only that recommendations and sales concern *its own* products meet the standards." Dkt. 30 at 44. This contention, moreover, finds support in the commentary accompanying the final rule. There,

---

annuity products, but nowhere arguing that insurance companies are unable to police their independent agents); *id.* at 40,619, 40,623 (Comment of the Comm. of Annuity Insurers) (July 21, 2015) (arguing that the BIC Exemption "is not workable" in part because of the difficulty in determining "the reasonableness of one's own compensation," but again, not addressing insurance companies' ability to police agents); *id.* at 47,077 (Comment of the Index Annuity Leadership Council) (Sep. 24, 2015) (arguing that "extending a fiduciary duty to an insurance company for the advice offered to a particular consumer by an independent is simply not feasible" because "the insurance company does not have the detailed knowledge of the particular consumer to act as a co-fiduciary") (emphasis removed).

[12] For similar reasons, the Department can hardly be faulted for failing to address comments that were not raised. *See, e.g.*, *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) ("It is well established that issues not raised in comments before the agency are waived and [courts] will not consider them."); *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 874 (D.C. Cir. 2002).

the Department explained that the Impartial Conduct Standards do "not impose an unattainable

obligation on [a]dvisers and [f]inancial [i]nstitutions to somehow identify the single 'best'

investment for the [r]etirement [i]nvestor out of all the investments in the national or

international marketplace, assuming such advice were even possible." *Final BIC Exemption*, 81

Fed. Reg. at 21,029.  It further explained that the requirement that financial institutions adopt

"anti-conflict policies and procedures" was left intentionally imprecise to leave sufficient

"*flexibility*" for "[f]inancial [i]nstitutions to develop policies and procedures that are effective for

their particular business models, while *prudently* ensuring compliance with their and their

[a]dvisers' fiduciary obligations and the Impartial Conduct Standards." *Id.* at 21,034 (emphasis

added).  And the BIC Exemption itself requires only that the financial institution adopt "policies

and procedures *reasonably* and *prudently* designed to ensure that its [a]dvisers adhere to the

Impartial Conduct Standards." *Id.* at 21,077 (emphasis added).  The requirement that the

financial institution act reasonably does not demand the impossible.

  *Second*, NAFA argues that the BIC Exemption cannot sensibly be applied to annuities,

because annuities are insurance contracts, and changes made to insurance contracts "ordinarily

require prior approval from the insurance department in each state where the annuity is sold."

Dkt. 31 at 77.  This troubles NAFA because the BIC Exemption *permits* financial institutions to

include contractual terms waiving claims for punitive damages or rescission.  *See Final BIC*

*Exemption*, 81 Fed. Reg. at 21,020.  As NAFA explains, this *absence of regulation* may cause it

competitive injury because state insurance regulators are unlikely to permit insurance companies

to include these provisions, thus providing a competitive advantage to the securities industry,

which will be able to take advantage of the contractual provisions the BIC exemption allows.

Dkt. 31 at 77–79.  The Court has already rejected NAFA's procedural argument that it was

denied fair notice and an opportunity to comment on this clarification of the scope of the proposed rule.  *See supra* at 75–76.  Beyond that, the Court is also unpersuaded that the exceptions for punitive damages and rescission waivers are irrational.  *See State Farm*, 463 U.S. at 52.  To the extent any disparity in treatment exists, it is a product of state law, and the Department reasonably concluded that the BIC Exemption conditions should not preempt state law.

*Third*, NAFA posits that "it will be impossible for independent agents and insurers to comply with the" BIC Exception "without becoming investment advisers under [the federal] securities laws."  Dkt. 31 at 80.  According to NAFA, this dilemma arises from the condition that advisers comply with the duties of loyalty and prudence; the notion that these duties create an obligation to recommend *any* and *all* preferable retirement investments, which may include securities; and the legal requirement that those who provide advice regarding the purchase of securities register under the Investment Advisors Act of 1940, 54 Stat. 847, 15 U.S.C. § 80b *et seq.*, or "comparable state laws."  Dkt. 31 at 81.  In support, NAFA relies on the Marrion declaration, which asserts that "insurance agents who are not currently dually licensed under securities laws will be forced to register as investment advisers in order to provide the kind of investment advice required under the BIC [E]xemption," Dkt. 5-3 at 16 (Marrion decl. ¶ 55), and a "Securities Bulletin" from the State of Iowa, which provides guidance regarding the advice that an insurance-only agent may provide without obtaining an investment adviser or securities agent license under Iowa law.[13]

Although observing that the "Securities Bulletin" is not part of the administrative record,

---

[13]  *See* Susan E. Voss, Insurance Commissioner of Iowa, *Securities Bulletin 11-S-1* (June 24, 2011), available at http://www.iid.state.ia.us/sites/default/files/commissioners_bulletins/2011/06/24/bulletin_11_s_1_re_securities_licensed_persons_jun_13615.pdf.

the Department does not object to the Court's consideration of it "as a matter of judicial notice." Dkt. 30 at 46 & n.47.  Moreover, although NAFA did not raise this argument in comments responding to the notice of proposed rulemaking, at least one commenter briefly raised the issue. *See* Comment of The Committee of Annuity Insurers, AR 40,622–23.  The Court will, accordingly, consider NAFA's argument on the merits.

NAFA's concern is based on a false premise:  Nothing in the BIC Exemption—or PTE 84-24— requires that insurance-only agents provide IRAs or other plans with advice regarding the purchase of securities.  To the contrary, the final rule expressly disclaims any requirement that a fiduciary "somehow identify the single 'best' investment for the retirement investor out of all the investments in the national or international marketplace, assuming such advice were even possible." *Final BIC Exemption*, 81 Fed. Reg. at 21,029.  The fiduciary's obligation is "to give advice that adheres to professional standards of prudence, and to put the [r]etirement [i]nvestor's financial interests in the driver's seat, rather than the competing interests of the [a]dviser or other parties." *Id.*  It would hardly be prudent, however, to provide advice in violation of federal or state laws, or outside the scope of the adviser's acknowledged area of expertise.  Nor can the rule reasonably be construed to require advisers to violate federal or state law.  Any doubt on this was put to rest by the Department's representation to the Court at oral argument that the duty of prudence does not, in the Department's view, require insurance-only agents to do so; to the contrary, "[p]rudence would actually forbid them from recommending things outside their expertise." Tr. of Oral Arg., Dkt. 41 at 109.

*Finally*, NAFA's reliance on *American Equity Investment Life Insurance Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2009), is misplaced.  In that case, the D.C. Circuit considered an SEC rule that had the effect of subjecting fixed indexed annuities, as opposed to traditional fixed annuities,

to regulation as securities under the Securities Act of 1933.  Although the Court of Appeals struck down the regulation for failing adequately to consider the "efficiency, competition, and capital formation effects" of the regulation, as required by the securities laws, it held that the rule satisfied both steps of the *Chevron* analysis.  613 F.3d at 176.  As the Court explained, a fixed indexed annuity is a "hybrid financial product that combines some of the benefits of fixed annuities with the added earning potential of a security."  *Id.* at 168.  Fixed indexed annuities thus "appeal to the purchaser not on the usual insurance basis of stability and security but on the prospect of 'growth' through sound investment management," and, as with securities, "there is a variability in the potential return that results in a risk to the purchaser."  *Id.* at 174.  Because fixed indexed annuities, accordingly, "involve considerations of investment not present in the conventional contract of insurance," the Court of Appeals held that the SEC's conclusion that fixed indexed annuities should not be treated as annuity contracts exempt from the 1933 Act "was reasonable."  *Id.*  For similar reasons, the same conclusion follows here:  It was not unreasonable for the Department to conclude that fixed indexed annuities are more appropriately subject to the exemption conditions applicable to variable annuities than to the less demanding conditions applicable to fixed rate annuities.

       5.     *Cost/Benefit Analysis*

NAFA also argues that the Department failed to consider the marginal costs and marginal benefits of regulating fixed indexed annuities through the BIC Exemption, rather than through PTE 84-24.  NAFA is incorrect on both counts.  First, the Department did, in fact, calculate the additional cost that the fixed indexed annuities industry would likely incur by complying with the BIC Exemption conditions, as opposed to the conditions contained in PTE 84-24.  Regulatory Impact Analysis 285–86, AR 601–02.  Second, it also assessed the marginal benefits, concluding

that the BIC Exemption provides greater protection than PTE 84-24 and that the complexity and risks posed by fixed indexed annuities warranted that greater protection. *Final BIC Exemption*, 81 Fed. Reg. at 21,017–18. As the Department explained, both variable and indexed annuities "are susceptible to abuse, and [r]etirement [i]nvestors would equally benefit in both cases from the protections of this exemption, including the conditions that clearly establish the enforceable standards of fiduciary conduct and fair dealing as applied to [a]dvisers and [f]inancial [i]nstitutions." *Id.* at 21,018.

Although NAFA is correct that ERISA regulations must be "necessary or appropriate," 29 U.S.C. § 1135, which demands "at least some attention to cost," *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015), this does not mean that the agency must "conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value," *id.* at 2711; *see also Vill. of Barrington*, 636 F.3d at 670–71 (APA's arbitrary and capricious standard, standing alone, does not "require[] an agency to engage in cost-benefit analysis.") Here, the Department actually quantified the marginal cost of compliance and concluded that the benefits of including fixed indexed annuities in the BIC Exemption justify that cost. Nothing more is required under ERISA or the APA.

NAFA's alternative argument fares no better. Relying on Executive Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993), NAFA asserts that the Department failed to "assess both the costs and the benefits of the intended regulation" and to "propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." Dkt. 32 at 63. That contention, however, ignores other language in the Executive Order that expressly disclaims any intention to "create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States." 58 Fed. Reg. at 51,735.

*   *   *

Apart from each of the specific arguments addressed above, a common theme underlies much of NAFA's brief:  The conditions required to qualify for the BIC Exemption make commission-based compensation sufficiently unattractive that insurance companies may decline to take advantage of the exemption.  According to NAFA, this would mean that insurance companies would need to restructure their distribution systems at enormous cost; it would mean that independent agents would suffer as insurance companies opt to sell annuities through captive agents or other mechanisms; and it would mean that the rules would cause substantial market inefficiency.  But those concerns were not lost on the Department, which concluded that the risk that retirement investors would suffer significant losses due to conflicted investment advice raised even greater concerns.  The Department recognized, for example, that some businesses "may need to undertake major changes to adviser incentive structures and loyalties, and/or lose market shares to businesses more prepared or willing to align adviser and investor interests and honor fiduciary norms."  Regulatory Impact Analysis 309, AR 625.  It also concluded, however, that retirement investors "could lose 6 to 12 and as much as 23 percent of the value of" their savings "by accepting conflicted advice."  *Final Fiduciary Definition*, 81 Fed. Reg. at 21,949.  Moreover, in light of the United Kingdom's experience with similar reforms, the Department determined that it is unlikely that most advisers will leave the market, and that consumer access to investment advice would not be adversely affected by any departures from the market.  *See* AR 393–94.  This is not an easy balance to strike.  The only question for the Court, however, is whether the Department's decision was a reasonable one.  It is not the role of the Court to substitute its judgment for that of the Department regarding matters of policy and

not law.  *See, e.g.*, *Judulang*, 132 S. Ct. at 483; *Brand X*, 545 U.S. at 1003; *State Farm*, 463 U.S. at 43.  Applying this standard, the Court concludes that the Department acted lawfully.

## F.     Regulatory Flexibility Act

Finally, NAFA challenges the rule under the Regulatory Flexibility Act ("RFA"), codified in relevant part at 5 U.S.C. § 604.  *See* Dkt. 31 at 86–87.  The RFA "obliges federal agencies to assess the impact of their regulations on small businesses."  *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001).  In particular, it requires agencies to accompany each final rule with a "final regulatory flexibility analysis."  5 U.S.C. § 604.  This analysis may be performed "in conjunction with or as part of" any other regulatory analysis—for example, a final Regulatory Impact Analysis ("RIA").  *Id.* § 605(a).  The analysis must also address certain subject matter areas prescribed by § 604.   In this case, NAFA contends that the Department's analysis violated § 604 by failing to include:

> (2) a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, [and] a statement of the assessment of the agency of such issues . . . ;
>
> (5) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which would be subject to the requirement . . . ; [and]
>
> (6) a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . , including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule . . . .

§ 604(a); *see* Dkt. 31 at 86 (identifying these portions of § 604(a) as the basis for the challenge).

The requirements of § 604, however, are "[p]urely procedural."  *U.S. Cellular Corp.*, 254 F.3d at 88.  Although the RFA "directs agencies to state, summarize, and describe" their findings, it does not "in and of itself" impose "substantive constraint[s] on agency decisionmaking."  *Nat'l Tel. Co-op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009).  The only

question upon judicial review, therefore, is whether the agency's analysis "addressed all of the legally mandated subject areas." *Id.*; *see also, e.g.*, *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007) ("[A] court reviewing a[n] RFA-based challenge does not evaluate whether the agency got the required analysis right, but instead examines whether the agency has followed the procedural steps laid out in the statute."). To survive judicial review, an agency need only put forth a "reasonable, good-faith effort" to comply with the Act. *U.S. Cellular Corp.*, 254 F.3d at 88.

Here, the Department made at least a "reasonable, good-faith effort" to address the three subject areas described above, as can be seen in the Department's 382-page final Regulatory Impact Analysis.

*First*, the RIA satisfies the relevant portions of § 604(a)(2). It contains a "statement of the significant issues" raised by small businesses in public comments in response to the initial RIA. 5 U.S.C. § 604(a)(2). It identifies three such issues: the advisability of the "education carve-out," the "seller's carve-out," and the "best-interest contract." *See* Regulatory Impact Analysis 256, AR 572. In addition, the RIA describes the Department's "assessment" of these issues, including the Department's analysis of and responses to public comments. *See* 5 U.S.C. § 604(a)(2). Just some examples include RIA section 2.9.1 (pp. 59–65, AR 375–81) (assessing comments regarding the "education" and "seller's" carve-outs); RIA section 2.9.2.1 (pp. 68–72, AR 384–88) (describing the best-interest contract); and RIA sections 7.4–7.10, 7.12 (pp. 268–86, 288–90, AR 584–602, 604–06) (assessing proposed alternatives to the final BIC exemption and explaining why the Department declined to adopt them). Although only some of this analysis appears under the RIA's "Regulatory Flexibility Act" heading, that fact is immaterial. *See* 5 U.S.C. § 605(a). What matters is that the Department published the analysis at all—not whether

the analysis appeared in any "particular mode of presentation." *Nat'l Ass'n of Mortg. Brokers v. Bd. of Govs.*, 773 F. Supp. 2d 151, 178 (D.D.C. 2011).

NAFA's argument to the contrary is unpersuasive. Its opening brief provides no argument at all as to why the RIA is insufficient to satisfy § 604(a)(2). *See* Dkt. 31 at 86. It then clarifies in its reply brief that it believes the Department violated § 604(a)(2) by "fail[ing] to provide any reasoned basis for its decision to subject [fixed indexed annuities] to the [best-interest contract] (rather than PTE 84-24)." Dkt. 32 at 76. That is not correct. The Department expressly considered NAFA's proposed alternative in section 7.10 of the RIA, which is labeled "Allowing Fixed-Indexed Annuities to be Covered under PTE 84-24." *See* Regulatory Impact Analysis 282–86, AR 598–602. That section details the comments the Department received regarding that decision, and explains how the agency changed the final rule in response. *See id.* Although NAFA may disagree with the *substance* of the Department's analysis, that argument is not cognizable under the "purely procedural" RFA. *Nat'l Tel. Co-op. Ass'n*, 563 F.3d at 540.

*Second*, the RIA satisfies the relevant portions of § 604(a)(5). It provides an extensive "description of the projected reporting, recordkeeping and other compliance requirements of the rule." 5 U.S.C. § 604(a)(5). Section 5 of the RIA describes the "compliance cost[s] associated with the final rule and exemptions" in detail for many types of affected entities, including insurance agents. *See* Regulatory Impact Analysis 206–52, AR 522–68. Section 6.5 summarizes those findings. *See id.* at 257–60, AR 573–76. In addition, the RIA includes "an estimate of the classes of small entities which will be subject to the requirement." 5 U.S.C. § 604(a)(5). Section 5.2 catalogues the types of all firms the Department believed would be affected, *see* Regulatory Impact Analysis 211–18, AR 527–34, and section 6.2 revisits that analysis for the specific

purpose of estimating which of those firms are "small entities" under the Act, *id.* at 254–56, AR 570–72.

NAFA's objection appears to be that, while the RIA does describe compliance requirements for "insurance agents" in general, it never describes the compliance requirements for the subset of those agents that sell fixed indexed annuities. *See* Dkt. 31 at 72. That is incorrect. The Department sets forth the compliance requirements applicable to NAFA's members in section 6.5. *See* Regulatory Impact Analysis 257, AR 573–75. And the Department did in fact consider the compliance costs specific to fixed indexed annuity sellers. *See id.* at 285, AR 601 ("The Department estimates that providing relief for fixed-index annuities under PTE 84-24 instead of under the [BIC Exemption] would have reduced compliance costs by between $34.0 million and $37.8 million over ten years."). More importantly, NAFA cites no authority requiring that the RFA analysis describe compliance *costs* at all, let alone costs for such a granular subset of affected entities. *See* Dkt. 31 at 72; *see also* Dkt. 32 at 86. Indeed, the statute requires only a "description of the projected . . . compliance requirements of the rule" and "an *estimate* of the classes of small entities which will be affected." 5 U.S.C. § 604(a)(5) (emphasis added). The Department has made a good-faith effort to provide both.

*Finally*, the RIA satisfies the relevant portions of § 604(a)(6). It describes "the steps the agency has taken to minimize the significant impact on small entities." 5 U.S.C. § 604(a)(6). For example, part of RIA section 5.3.1 identifies the changes made to the final rule intended to reduce the cost of compliance. *See* Regulatory Impact Analysis 224–31, AR 540–47. And section 7 of the RIA describes at length the "factual, policy, and legal reasons for selecting the alternative adopted in the final rule," 5 U.S.C. § 604(a)(6), including analysis of fifteen proposed regulatory alternatives and the Department's reasons for rejecting them, *see* Regulatory Impact

Analysis 262–98, AR 578–614.  One of those regulatory alternatives considered was the possibility of regulating fixed indexed annuity sellers under PTE 84-24 rather than the BIC Exemption, *see* Regulatory Impact Analysis 282–86, AR 598–602, which NAFA calls "the most significant change" to the BIC Exemption, Dkt. 32 at 76.

At bottom, NAFA's arguments conflate the RFA with substantive arbitrary-and-capricious analysis.  They are different.  *See Nat'l Tel. Co-op. Ass'n*, 563 F.3d at 540.  And an RFA challenge requires "more than a redressing of [a plaintiff's] earlier *Chevron* and APA claims."  *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000).  Whether or not NAFA agrees with the Department's analysis, there is little question that NAFA put forth at least a "reasonable, good-faith effort" to perform it.  "The RFA requires no more." *Id.*

## CONCLUSION

For the reasons discussed above, the Court will deny NAFA's motions for a preliminary injunction and for summary judgment and will grant the Department's cross-motion for summary judgment.  A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  November 4, 2016