**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

The National Association for Fixed Annuities,

          Plaintiff,

    vs.

Thomas E. Perez, *et al.*,

          Defendants.

Civil Action No.  1:16-cv-1035 (RDM)

## PLAINTIFF NAFA'S MOTION FOR STAY AND INJUNCTION PENDING APPEAL

Pursuant to Fed. R. Civ. P. 62(c), Plaintiff the National Association for Fixed Annuities ("NAFA") hereby moves for an injunction staying the April 10, 2017 applicability date of the United States Department of Labor's (the "Department") "fiduciary rule" (the "Rule") in order to maintain the status quo pending appeal of the Court's order dated November 4, 2016.  As explained below and in the accompanying Memorandum of Points and Authorities (the "Memorandum"), NAFA and its members will effectively be deprived of appellate review if a stay is not granted.  Absent equitable relief, NAFA's members have less than five months remaining to make irreversible changes to an entire distribution system for fixed annuities, at great cost that will be unrecoverable if NAFA prevails on appeal.

NAFA hereby incorporates by reference the arguments made in the briefs supporting its application for a preliminary injunction and motion for summary judgment (Dkts. 5 & 43) and its arguments made at the August 25, 2016 hearing (Dkt. 41).  NAFA further supports its demonstration of irreparable harm by submitting with this Motion the Second Affidavits of Jack Marrion, James Wong, and Michael Foguth.  NAFA also submits several declarations filed in the related case of *Market Synergy Group, Inc. v. DOL*, Case No. 5:16-cv-04083-DDC-KGS (D.

Kan.).  These declarations provide additional evidence of the irreparable harm that will befall the fixed indexed annuity ("FIA") industry absent a stay and injunction pending appeal.

As explained more fully in NAFA's Memorandum, NAFA has satisfied the requirements for a stay and injunction pending appeal.  Specifically, NAFA has (1) raised serious legal questions pertaining to the validity of the Rule, including important questions of congressional intent, statutory construction, agency authority, and due process; (2) demonstrated irreparable harm if the impending applicability date of the Rule is not stayed pending appeal; and (3) demonstrated that the balance of harms and the public interest both favor staying the impending applicability date of the Rule pending appeal.

NAFA's appeal to the United States Court of Appeals for the District of Columbia Circuit raises a number of serious legal questions about the validity of the Rule.  That is evidenced by the fact that such questions already have consumed hundreds of pages of briefing before this Court, took this Court over five months to resolve, and resulted in a 92-page opinion.

Without injunctive relief, NAFA's members face great harm.  Critically, NAFA effectively will lose its right to a meaningful appeal, because steps must be taken in advance of the applicability date to ensure compliance with the Rule, and any appellate decision might therefore come too late.  Moreover, NAFA's members have expended enormous resources on irreversible business and compliance decisions, and they will continue to do so in the few months remaining before the April 10, 2017 applicability date.  If the Rule is invalidated on appeal, irreversible damage will already have been done.  As shown in the additional affidavits submitted in support of this Motion, the harm to the fixed annuity industry is not speculative, as the Department has argued – it is real and it is accelerating.

On the other hand, no significant harm will result from delaying the applicability date.

After taking six years to draft and adopt the Rule, the Department cannot credibly contend that significant harm will be caused by a delay to accommodate the appellate process.  Fixed annuities have been competently regulated at the state level for many years, and consumers remain protected by state regulations.

Accordingly, NAFA respectfully requests a stay and an injunction pending appeal in order to preserve the status quo, and a further order that the Rule will not become applicable for a period of at least ten months after this lawsuit is finally resolved.  Due to the radical impact the Rule already is having on the FIA industry, NAFA believes a stay of two years following resolution of this lawsuit is appropriate.

Pursuant to Local Rule 7(m), undersigned counsel has conferred with counsel for Defendants, who represented that Defendants do not consent to the relief sought.  In accordance with Local Rule 7(c), a proposed order is attached to this Motion.

WHEREFORE, for the reasons set forth herein and in the accompanying Memorandum of Points and Authorities, NAFA respectfully requests that this Court grant NAFA's Motion and enter an injunction staying the April 10, 2017 applicability date until at least ten months (or as much as two years) following the final disposition of this litigation.

November 14, 2016

Respectfully submitted,

BRYAN CAVE LLP

/s/ Philip D. Bartz
Philip D. Bartz (D.C. Bar No. 379603)
Jacob A. Kramer (D.C. Bar No. 494050)
1155 F Street, NW, Suite 700
Washington, DC  20004
(202) 508-6000

Of Counsel:

Adam L. Shaw
1155 F Street, NW, Suite 700
Washington, DC  20004

*Counsel for NAFA*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

The National Association for Fixed Annuities,

              Plaintiff,

   vs.

Thomas E. Perez, *et al.*,

              Defendants.

Civil Action No.  1:16-cv-1035 (RDM)

**PLAINTIFF NAFA'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF ITS MOTION FOR STAY AND INJUNCTION PENDING APPEAL**

Plaintiff, the National Association for Fixed Annuities ("NAFA") states as follows in support of its Motion for a Stay and Injunction Pending Appeal pursuant to Fed. R. Civ. P. 62(c) (the "Motion"):

## I.  INTRODUCTION

The United States Department of Labor (the "Department") issued its final "fiduciary rule" (the "Rule") in April 2016.[1]  The Rule did not go into effect until June 22, 2106.  *See* Dkt. 46 at 27 n.8.  On June 2, 2016, before the Rule became effective, NAFA filed suit seeking a preliminary injunction and challenging the Rule.  Dkts. 1 & 5.  Five months later, on November 4, 2016, the Court denied NAFA's request for an injunction and entered summary judgment for the Department in a Memorandum Opinion (Dkt. 46) and Order (Dkt. 47).

The April 10, 2017 applicability date now looms larger.  Given the lapse of time since this case was filed, less than five months remain before the Rule becomes applicable.  NAFA and

---

[1]   *See* AR1-57 (April 9, 2016) (to be codified at 29 C.F.R. § 2510.3-21), and certain related exemptions, *id.* at 58-144 & 785-95.

its members will be deprived of meaningful appellate review if a stay of the April 10, 2017 applicability date is not granted pending appellate review.

In support of its application for a preliminary injunction, NAFA submitted uncontroverted affidavits from representatives of the fixed indexed annuity ("FIA") industry, including experts, persons associated with independent marketing organizations ("IMOs"), and independent insurance agents.   NAFA submits three additional affidavits with this motion. Exhibit A, Second Affidavit of Jack Marrion ("Second Marrion Aff."); Exhibit B, Second Affidavit of James Wong ("Second Wong Aff."); Exhibit C, Second Affidavit of Michael Foguth ("Second Foguth Aff.").

Collectively, these affidavits detail the massive changes and restructuring within the FIA industry compelled by the Rule in the period leading up to the April 10, 2017 applicability date. The changes that must be made are irreversible, and they will have a profound impact on the FIA industry and its distribution system.   While this restructuring is already in motion, without a stay of the applicability date, the FIA industry will be irreversibly transformed by the time NAFA's appeal is decided.

NAFA's uncontroverted affidavits also demonstrate the tremendous costs (already incurred and to be incurred) of complying with the Rule, all of which will be completely unrecoverable if the Rule is invalidated on appeal.   In addition, the affidavits demonstrate that compliance with the Rule puts at risk the viability of hundreds of small businesses, including IMOs and insurance agencies, jeopardizing the livelihoods of thousands of independent insurance agents who sell FIAs.   The affidavits show that the Rule's harm also extends to consumers, primarily low and middle-income individuals whose retirement needs will go underserved or unserved due to the Rule's application of fiduciary standards to fixed annuities

2

held in IRAs.

The balance of hardships also tips in favor of equitable relief.  Unless the applicability date is stayed, NAFA's members will continue to suffer irreparable harm and hardship while the appeal is pending, as they scramble to reshape their product distribution systems, expending enormous resources to comply with a Rule that may be invalidated by the D.C. Circuit.  On the other hand, no significant harm will result from delaying the applicability of the Rule.  The Department took six years to draft and adopt the Rule, and there is no credible reason that a delay to accommodate the appellate review of serious legal questions would cause undue harm.  Moreover, fixed annuities, including FIAs, have been competently regulated at the state level for years, and consumers remain protected by state-level regulation.  *See* Affidavit of Charles R. Anderson (NAFA Executive Director), Dkt. 5-2 ¶ 14 ("Fixed annuities are regulated closely by state insurance departments.").[2]

Overall, NAFA merely seeks to maintain the status quo while the important questions it raises are heard on appeal by the D.C. Circuit, to ensure a meaningful opportunity for appellate review.  Thus, NAFA respectfully seeks an injunction to stay the April 10, 2017 applicability date during the pendency of the appeal and until further order of this Court – extending the compliance period for at least 10 months (and up to two years) after resolution of this lawsuit.

---

[2]     As further support, NAFA submits Exhibit D, the Declaration of Ken Selzer ("Selzer Decl."), Commissioner of the Kansas Insurance Department, which was filed in the related case *Market Synergy Group, Inc. v. DOL*, Case No. 5:16-cv-04083-DDC-KGS (D. Kan.) ("MSG Litigation").  Commissioner Selzer explains state regulation of annuities and concludes that "[i]n light of the well-established track record of Kansas in protecting consumers' interests in the fixed annuity marketplace, I am having some difficulty in understanding the rationale behind the U.S. Department of Labor's recent rule change regarding sales of fixed indexed annuities in Individual Retirement Accounts. . . ."  Selzer Decl. ¶ 16.

## II.     PROCEDURAL BACKGROUND

When NAFA filed this action ten months prior to the applicability date, it also requested preliminary injunctive relief staying the Rule during the pendency of NAFA's challenge.  After the Court ordered that NAFA's application for preliminary injunction (Dkt. 31) also would be treated as a motion for summary judgment (June 7, 2016 Minute Order), the Department filed an opposition and cross-motion for summary judgment (Dkt. 34), NAFA filed a second brief (Dkt. 32), and the Department filed a reply (Dkt. 30).  Oral argument took place on August 25, 2016.

On November 4, 2016, the Court denied NAFA's application for a preliminary injunction and motion for summary judgment, and it granted the Department's cross-motion for summary judgment.  Dkt. 47.  In its memorandum opinion, the Court concluded that the "case can be resolved on the parties' competing motions for summary judgment" and therefore did not "address NAFA's separate motion for a preliminary injunction."  Dkt. 46 at 29.  NAFA filed a Notice of Appeal on November 14, 2016, contemporaneously with this filing.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 62(c) provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."  As the Supreme Court has noted, a "stay pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one.  Both can have the practical effect of preventing some action before the legality of that action has been conclusively determined."  *Nken v. Holder*, 556 U.S. 418, 428 (2009).  A stay "simply suspend[s] judicial alteration of the status quo, while injunctive relief grants judicial intervention that has been withheld."  *Id.* at 428-29 (citations omitted).  Given this overlap, the standard for a stay or injunction pending appeal is the same. *Wash. Met. Area Transit Comm'n v. Holiday Tours, Inc.,*

4

559 F.2d 841, 842, n.1 (D.C. Cir. 1977) ("[T]he factors . . . apply to motions for preliminary injunctions and motions for stays of district court orders pending appeal."); *see also Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 12 (D.D.C. 2014).

A "court assesses four factors when considering a motion to stay and injunction pending appeal:  (1) the moving party's likelihood of success on the merits of its appeal, (2) whether the moving party will suffer irreparable injury, (3) whether issuance of the stay would substantially harm other parties in the proceeding, and (4) the public interest." *Akiachak*, 995 F. Supp. 2d at 11–12  (citing *Wash. Met. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d at 843).  These factors are typically evaluated on a sliding scale, and a "strong showing on one factor could make up for a weaker showing on another." *Akiachak*, 995 F. Supp. 2d at 12 (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).  This test is "a flexible one." *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986).[3]

The D.C. Circuit has recognized that a Rule 62(c) movant "need not establish an absolute certainty of success" to justify a motion to stay or injunction pending appeal. *Population Inst.*, 797 F.2d at 1078.  It "will ordinarily be enough that the plaintiff has raised serious legal questions going to the merits, so serious, substantial, [and] difficult as to make them a fair ground of litigation and thus for more deliberative investigation." *Id.* (quoting *Holiday Tours*, 559 F.2d at 844) (quotation omitted).  Courts in this District have granted stays or injunctions pending appeal, even after ruling against the movant, because "close" decisions often involve "difficult and substantial legal questions." *E.g.*, *Akiachak*, 995 F. Supp. 2d at 14 (finding that

---

[3]    Following the Supreme Court's decision in *Winter v. NRDC*, 555 U.S. 7 (2008), it remains unsettled in the D.C. Circuit whether the "sliding scale" is still controlling, or whether a more stringent test applies. *See, e.g.*, *Sherley*, 644 F.3d at 393.  "Given the uncertainty, courts in this jurisdiction have continued to analyze motions for preliminary injunctions under the sliding scale approach." *Akiachak*, 995 F. Supp. 2d at 12 (citation omitted).  The Court need not decide the issue, because NAFA can satisfy each of the four factors.

"low likelihood of success on the merits is not fatal to [the] motion for a stay and injunction" and granting injunction pending appeal even after ruling against the movant).

## IV.    ARGUMENT

### A.    NAFA Has Raised Serious Legal Questions.

Even though the Court denied NAFA's motions, NAFA's lawsuit raises several "difficult and substantial legal questions" requiring "deliberative investigation" by the D.C. Circuit. *See Holiday Tours*, 559 F.2d at 884.   Such issues include (1) whether the Rule's definition of "investment advice" and "fiduciary" exceeds congressional intent and statutory authority; (2) whether the Department has the authority to extend ERISA fiduciary duties to transactions involving IRAs; (3) whether the Department exceeded its authority in crafting the BICE by creating a new right of action for IRA owners to sue for breach of ERISA fiduciary duties; (4) whether the Rule's mandate that compensation be "reasonable" is void for vagueness; and (5) whether the Department's last-minute decision to switch FIAs from PTE 84-24 to the BICE was arbitrary and capricious.   There are additional issues as well, such as whether the Department exceeded the limits of its authority by creating the enforcement regime within BICE.   The Court is now fully versed on the merits of NAFA's arguments, which will be presented to the D.C. Circuit for *de novo* review.   *Am. Bioscience v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001).   Thus, NAFA will not strain the Court's patience by restating them here.

The important question now before this Court is whether the issues NAFA raised rise to the level of "difficult and substantial legal questions."   On this, NAFA respectfully submits there can be no doubt.   It seems almost self-evident, given the history of this case, that NAFA has raised difficult and substantial legal questions of the highest order, including essential questions around Congressional intent, administrative law, and due process, among others.   Many of the legal issues NAFA raises are novel and without precedent.

These issues impact a multi-billion dollar industry and have spawned five other related cases.   As the Court well knows, these issues have resulted in an administrative record containing thousands of pages, over 300 pages of briefing, over 3 hours of intense oral argument, and in the end the Court's own 92-page opinion following over two months of deliberation.

Thus, NAFA submits that the issues raised in this case are the epitome of difficult and substantial legal issues, which together with the irreparable harm and other factors explained in greater detail below, justify a stay pending appeal.   NAFA seeks a fair opportunity to obtain appellate review of these substantial legal questions before its members must incur further harm and experience a transformation of their product distribution system in ways that will be both irreversible and costly.

### B.      An Injunction Is Needed To Prevent Irreparable Harm.

As detailed in NAFA's application for a preliminary injunction and below, the Rule has caused, and is continuing to cause, irreparable harm to insurance carriers, IMOs, independent insurance agents, and consumers.   Dkt. 5-1 at 75-81.   This harm is ongoing and accelerating, as NAFA's members continue to make substantial and irreversible changes to their distribution methods and structures as the April 10, 2017 applicability date draws ever nearer.   Absent a stay, the dramatic and irreversible changes underway in the industry will take place well before the applicability date and likely prior to the resolution of this case on appeal.

### 1.      NAFA's Uncontroverted Affidavits

In support of its application for a preliminary injunction, NAFA submitted a number of uncontroverted affidavits describing the harms that are being caused and will continue to be caused directly by the actions necessary to come into compliance with the Rule.   *See, e.g.*, Engels Aff. (Independent Insurance Agent), Dkt. 5-4 ¶¶ 8 (loss of customers), 13 (loss of market share), and 15 (abandoning annuity business or selling only to non-qualified funds); James Aff.

(IMO President and Owner), Dkt. 5-5 ¶¶ 15 (loss of relationships with insurance carriers), 18 (risk of civil liability), 20 (consumer loss of access to products), 22 (loss of sales), 23 (loss of employees); White Aff. (Insurance-only Agent), Dkt. 5-6 ¶¶ 7 (sells almost exclusively to qualified funds, i.e., IRAs), 10 (catastrophic loss of business), 11 (errors and omissions insurance costs will increase greatly); Rafferty Aff. (Agency Owner and Insurance-only Agent), Dkt. 5-7 ¶¶ 10 (92% of business is sales to qualified funds, i.e., IRAs), 11 (will not be able to afford errors and omissions insurance), 12 (exiting the market and loss of market share), 13 (Rule will devastate business), 15 (consumers will be harmed by lack of access to products); Foguth Aff. (Agency Owner and Insurance-only Agent), Dkt. 5-8, ¶¶ 10 (more than 70% of business involves IRAs), 11 (errors and omissions insurance will be unaffordable), 13 (going out of business) 15 (clients will be adversely affected by Rule); Wong Aff. (IMO President), Dkt. 5-9 ¶¶ 5 (more than 70% of annuity business is to IRAs), 7 (diversion of substantial resources), 8 (converting business to securities model), 9 (drop in sales and profits); Perkins Aff. (Insurance Agency Owner), Dkt. 5-10 ¶¶ 7 (more than 85% of revenues is from annuity business, 90% of which is sales to IRAs), 14 (there is insufficient time to re-engineer business), 20 (consumers will be harmed by lack of access), 23 (going out of business).

As demonstrated by these affidavits, which stand uncontested, the Rule requires the FIA industry to change its very business model and completely overhaul its distribution system, all of which must happen well before the April 10, 2017 applicability date.

### 2.   The Marrion Affidavits

Dr. Jack Marrion, the Director of Research for NAFA, submitted an uncontroverted affidavit in support of NAFA's motion for preliminary injunction.  Marrion Aff., Dkt. 5-3 ¶¶ 30 ("The end result will be many insurers exiting the independent agent channel, creating enormous compliance costs for insurers, and reducing the number of independent agents."), 33

(eliminating independent agents and creating captive agent distribution systems will cost insurers over $160 million), 34 ("[T]he costs of compliance under the BIC exemption will be enormous and independent insurance agents offering fixed indexed annuities will substantially decrease in number."), 39-46 (IMOs will have to drastically change their business model, greatly increase their overhead, accept significant liability, and incur substantial compliance costs), and 47-57 (many independent insurance agents will stop selling FIAs, thousands of independent agents will leave the business, agents who remain will have to obtain securities licenses and associate with a securities firm, and errors and omissions insurance costs will rise significantly).

According to Dr. Marrion, "[t]he DOL's April 2017 deadline is unworkable."  Marrion Aff. ¶ 58.  Given the compliance obstacles and all of the issues that must be resolved by April 10, 2017, Dr. Marrion further opined that "it will be impossible for the FIA industry to meet this deadline, causing serious damage if the applicability date is not postponed."  *Id.* ¶ 65.  The Department has yet to refute any of these detailed facts concerning the injuries the Rule will cause throughout the fixed annuity industry.

To support this Motion, NAFA now offers a second affidavit from Dr. Marrion, in which he provides an updated opinion on the adverse impact the Rule is having on the FIA industry. Specifically, "[b]y the time the Rule becomes applicable on April 10, 2017, the entire distribution system through which fixed annuities are sold will be irreversibly changed."  Second Marrion Aff. ¶ 4.  Dr. Marrion explains that "[t]hese changes have already begun and will accelerate between now and the applicability date as the fixed annuity industry races to comply with the Rule," thereby "causing many industry participants to change their business practices, change business relationships, expend considerable time and resources," "threatening the livelihoods of IMO employees and independent agents, and ultimately reducing the availability

and value of guaranteed retirement income products for millions of consumers." *Id.*

Insurance Carriers. Dr. Marrion explains that insurance carriers are at a "fork in the road" and are "being forced to make difficult decisions on how they will reshape their distribution systems to comply with the Rule." *Id.* ¶ 7. "Each carrier must devise its own strategy for redesigning its distribution system and implementing that strategy as best as possible prior to April 10, 2017, including deciding on the right general approach to distributing its products, dismantling existing business relationships, creating new business relationships, developing appropriate contracts, developing appropriate contracting and licensure requirements, and establishing appropriate compensation." *Id.*

Specifically, "insurance carriers have begun moving away from the independent agent distribution model that has prevailed in this industry for decades, and that process will accelerate in the weeks and months ahead." *Id.* ¶ 6. Carriers that choose to serve as a "Financial Institution" under the BICE will "work more closely with fewer agents offering fewer products." *Id.* ¶ 8. Other carriers "will sell FIAs only through securities registered broker-dealers," causing them to "end existing relationships with IMOs and independent agents." *Id.* ¶ 9.

As the Court recognized, IMOs are not included among the entities that can serve as a Financial Institution under the BICE, but the Department allowed for IMOs "to petition for an individual exemption" to serve as a Financial Institution. Dkt. 46 at 79. NAFA understands that 18 IMOs have applied for approval to serve as a Financial Institution. Second Marrion Aff. ¶ 10. Carriers may sell FIAs through one of 18 IMOs that has applied to the Department for an exemption to serve as a Financial Institution, but those applications have not yet been decided, "introduc[ing] a significant degree of uncertainty, complexity, cost, and delay to the compliance process for carriers as the April 10, 2017 applicability date draws near." *Id.* ¶¶ 10-11. With less

10

than five months remaining before the applicability date, it is not yet clear whether or how carriers will be able to rely on IMOs to serve as the Financial Institution under the BICE. *Id.*

Regardless of how compliance issues related to Financial Institution status are resolved, "insurance carriers will distribute their annuity products largely through quasi-captive agents (i.e., captive agents who sell for only one company or IMO or, alternatively, agents who are forced to sell fixed annuity products through only broker-dealers or other financial institutions)." *Id.* ¶ 12. This is because "[a]llowing agents to sell FIAs from sources outside of the Financial Institution's supervisory control would leave the Financial Institution unable to warrant in a BIC that the agent's recommendation was in the 'best interest' of the consumer and was made without regard for the agent's own financial interests." *Id.* ¶ 13. "Thus, Financial Institutions will affiliate with fewer agents and distribute fewer annuity products through those agents." *Id.*

Carriers have already begun to implement these changes and will continue to do so at an accelerated pace in the months leading up to April 10, 2017. *Id.* ¶ 15. And of course, this compliance work is costly. After a survey of the eight insurance carriers offering FIAs, Dr. Marrion found that the "average cost to comply with the Rule thus far totals roughly $8-10 million, as well as thousands of personnel hours," and those costs will continue. *Id.* ¶¶ 17-18.

<u>IMOs.</u> If the Rule becomes applicable, "many IMOs will go out of business, and there will be massive layoffs at other IMOs that are able to remain open." *Id.* ¶ 27. Dr. Marrion estimates that only 10 of 100 IMOs have affiliated entities that could presently qualify as a "Financial Institution" under the rule, "because those 10 IMOs already own a securities-registered broker-dealer or investment advisor" – although even those entities would need their agents to obtain securities registrations in order to sell through their affiliated broker-dealer or investment adviser, which may not be possible for many agents and would be very costly unto

itself.  *Id.* ¶ 20.   In addition, as stated above, 18 IMOs have applied for an exemption to serve as

a Financial Institution.  *Id.* ¶ 21.   Dr. Marrion estimates that, even if it is allowed to serve as a

Financial Institution, a typical IMO will lose 25% of its current revenue as a result of the Rule,

and its costs for errors and omissions insurance premiums are likely to increase by 100% to

300% or more.  *Id.* ¶¶ 22, 25.   As to the IMOs unable to qualify as a financial institution, Dr.

Marrion estimates that their annual revenue will drop by up to 60%, forcing them out of

business.  *Id.* ¶ 23.   Of those IMOs that could stay in business, all but two were planning staff

layoffs beginning in January 2017 as a result of the Rule.  *Id.* ¶ 26.

  Insurance Agents.  As a result of the Rule, "independent agents offering a wide range of

fixed annuity products from many different insurance carriers will cease to exist in the IRA

market."  *Id.* ¶ 29.   As many as 25% of the 80,000 independent agents that sell FIAs may leave

the fixed annuity business as a result of the Rule.  *Id.* ¶ 28.   Those independent agents who

remain in the fixed annuity business face a choice to stop offering FIAs to IRAs (and suffer a

significant decline in earnings) or become "quasi-captive agents offering a far more limited set of

products to their customers."  *Id.* ¶ 30.   Moreover, many insurance-only agents will invest time

and money to take the Series 65 exam to become Investment Advisor Representatives, or they

will simply retire and exit the marketplace.  *Id.* ¶¶ 31-32.

  To summarize, "[t]he April 10, 2017 applicability date is now less than five months

away," and "the DOL has yet to inform insurance carriers, IMOs, and agents how to comply with

its new regulations."  *Id.* ¶ 33.   "Tens of thousands of hours have been and are being spent to

understand what the DOL requires," and "[e]ven if the DOL were to clarify these issues

tomorrow in an actionable manner, there is not enough time left to create the needed compliance

infrastructure and procedures prior to the Rule's April 10, 2017 applicability date."  *Id.*   Dr.

Marrion continues to believe that the "April 10, 2017 deadline remains unworkable," and "NAFA members will be [un]able to achieve compliance by then." *Id.* ¶¶ 34-35. Nevertheless, "efforts to comply are ongoing, and the fixed annuity distribution system is in the process of irreparable and dramatic change and disruption, at great expense to all industry participants." *Id.*

### 3. Second Wong Affidavit

As noted above, Exhibit B is a second affidavit from James Wong, the President of Partners Advantage Insurance Services, LLC ("Partners Advantage"), a national IMO with 70 associates located in offices across the United States. Second Wong Aff. ¶ 2. Partners Advantage works "with annuity carriers to recruit, train, and educate agents to distribute their annuities, and we support agents in selling and servicing annuities through technology services, continuing education and training, and growth opportunities." *Id.* Annuities account for 90% of the total annual sales by Partners Advantage, and approximately 70% of these annuities are purchased in "qualified transactions" using tax-deferred retirement savings funds, usually IRAs. *Id.* ¶¶ 4-5. Of these qualified funds transactions, over 85% involve FIAs. *Id.* ¶ 5.

Thus, its "business thrives and survives on the ability of our agents to sell FIAs in transactions where the purchase is made using IRA funds." *Id.* Mr. Wong reports that "Partners Advantage has suffered and will continue to suffer immediate, unrecoverable, and irreparable harm in three specific ways since the rule became effective on June 22, 2016, and continuing through and beyond the fast-approaching April 10, 2017 applicability date." *Id.* ¶ 6.

First, "Partners Advantage has already been forced [to] spend more than $400,000 to implement the Rule's onerous, confusing, and unworkable mandates," an expense that "has been exacerbated by our need, as a result of the Rule, to understand and comply with certain securities regulations that presently do not apply to most of our business." *Id.* ¶ 7. "Accordingly, we reasonably anticipate that we will expend $1.5 million before April 10, 2017 – none of which

will be recovered in the event that a court later finds that the DOL's regulation is unlawful." *Id.*

"Second, although agents can continue selling FIAs though IMOs under the existing regulatory structure prior to April 10, 2017, Partners Advantage has had to engage industry consultants at a cost of over $200,000 to analyze the effect the DOL Conflict of Interest rule will have on our business and whether compliance is feasible." *Id.* ¶ 8. At this point, "[i]t is still unknown whether compliance is feasible." *Id.*

Third, "Partners Advantage has initially invested over $400,000 in new technology platforms in order to begin to satisfy the document retention requirements of the rule which were not previously required under state law." *Id.* ¶ 9. Because of "the very narrow time frame IMOs have to comply while we await further guidance from the DOL," Partners Advantage has already begun "to start investing in technology solutions." *Id.*

### 4. Second Foguth Affidavit

As noted above, Exhibit C is a second affidavit from Michael Foguth, the President of Foguth Financial Group, an "insurance-only" agency that sells fixed annuities. Second Foguth Aff. ¶¶ 3-6. Specifically, "[a]nnuities account for 90% of my total annual sales," and "90% of the annuities I sell are FIAs." *Id.* ¶ 6. In addition, "70% of the annuities we sell (approximately $22 million of our total annual revenue) are to [IRAs] using 'qualified' or tax-deferred retirement savings funds." *Id.* ¶ 7. As a result of the Rule, Mr. Foguth has "determined that I am unable to remain in business as an insurance-only agent." *Id.* ¶ 8. Instead, he has decided to "obtain a 'Series 65' securities license by the end of 2016 to ensure compliance with the Rule." *Id.* ¶ 9. Thus, Mr. Foguth will need to "comply with an added layer of regulatory requirements for securities that I never had to deal with as an insurance-only agent." *Id.* ¶ 10. "For example, the marketing materials I have spent years developing – including two books I have already published and a third I am preparing to publish – will no longer be of use to my business as I

14

must now meet the disclosure requirements applicable to securities products." *Id.* In other words, the marketing materials he ordinarily uses "are compliant with insurance rules but will not work under the securities regulation with which I must also now comply." *Id.*

### 5. Declarations Submitted in the MSG Litigation

The declarations submitted in the MSG Litigation further illustrate and establish the irreparable harm the Rule is causing to the FIA industry. While the legal issues in that related case are different in some ways, the issue of irreparable harm is the same, and NAFA believes the affidavits from that case are worthy of attention here.

Plaintiff Market Synergy Group ("MSG") is an agency that works with insurance carriers and IMOs to distribute FIAs. Exhibit E, Declaration of MSG President Lance Sparks ("Sparks Decl.") ¶¶ 4, 14-19. MSG is affiliated with 11 different IMOs, which are in turn affiliated with roughly 20,000 independent insurance agents. *Id.* ¶ 15. MSG, IMOs, independent agents, and even the Commissioner of the Kansas Insurance Department submitted declarations describing the irreparable harm facing the FIA industry if the April 10, 2017 applicability date is not stayed.

Kansas Commissioner Selzer's declaration outlines the extensive state-level regulation of fixed annuity sales. Selzer Decl. ¶¶ 6-15. Commissioner Selzer also expressed his dismay that the Department chose, without warning, to treat fixed indexed annuities within the Rule while leaving other fixed annuities subject to regulation at the state level. Selzer Decl. ¶¶ 17-18.

MSG also submitted the Declaration of Michael Tripses ("Tripses Decl."), the president of an IMO named CreativeOne, and an equity owner of MSG. *See* Exhibit F. In his declaration, Mr. Tripses explained the reasons for the massive and irreversible restructuring of the FIA distribution system required by the Rule and the BICE:

> The largest effect of the abrupt government rule change is the impact on the distribution function of IMOs and the tens of thousands of independent agents who we, as an industry, support. The new rule requires that the sales activities of

> agents selling fixed indexed annuities be directly supervised and regulated only by certain types of financial institutions: namely, registered broker-dealers, registered investment advisors, banks, or insurance companies. IMOs have never been financial institutions, and we are not set up to assume that type of supervisory responsibility even if the Labor Department might allow us to, which is doubtful. Moreover, our insurance-only agents are not licensed to work through those registered entities, so they have nowhere to go either, unless they make significant changes to their own careers, or one of the designated financial institutions decides to accept the financial institution responsibility for them.

Tripses Decl. ¶ 20. Mr. Tripses further stated:

> From our perspective, the entire independent insurance agent-based fixed indexed annuity distribution channel is at imminent risk. With the operative effective date approaching, other institutions in the industry are making business decisions and starting to invest substantial resources in their implementation plans to deal with massive operational, supervisory, and product delivery changes needed to comply with the [Department's] new rules. But neither IMOs nor, more importantly, the tens of thousands of independent insurance-only agents they support have a readily ascertainable and economically viable choice. . . .

*Id.* ¶ 22.

> As a result of all this uncertainty, agents are frightened – both for themselves and their families. Many thousands of independent agents are at risk of losing their current careers and livelihoods and being forced into making costly career changes just to survive.

*Id.* ¶ 24.

> We could be forced to sell off what remains of our business, close our doors and put 143 people out of work. . . . I foresee no scenario that does not result in significantly reduced revenue, increased cost per agent and sale and dozens of layoffs in the near term, even under the best scenario following the rule's implementation.

*Id.* ¶ 25.

NAFA also highlights the following statements from other declarations submitted in the

MSG Litigation:

- "Even with an April 10, 2017 'applicability date' . . . IMOs and independent insurance agents are at imminent risk of being irretrievably left behind by their product suppliers which will, in turn, result in the loss of the IMOs' and agents' livelihoods. Money alone cannot compensate for the loss of these many businesses run by thousands of hard-working individuals. . . ." Sparks Decl. ¶ 56.

- "If I am faced with the reality of a revenue drop of as much as 80% which is anticipated as a result of this rule, I will have no other choice but to lay off a substantial percentage of my employees, potentially all of them.  This will cause irreversible harm to these employees and my business even if it is later determined that the Department was wrong with its rulemaking."  *Id.* ¶ 57.

- "[T]he rule change therefore clearly poses a serious problem for the several thousands of independent agents who, as noted above, are the predominant source for distribution of fixed indexed annuities to the market, and whose livelihoods and businesses depend on the sales of these products."  Exhibit G, Decl. of Sheryl Moore ¶ 20.

- "[T]he entire independent insurance agent-based fixed index annuity distribution channel is at imminent risk of collapse."  Exhibit H, Decl. of Bryon E. Rice ¶ 22.

- "Many thousands of independent agents are at risk of losing their current careers and livelihoods and being forced into making costly career changes just to survive."  *Id.* ¶ 24.

- "As a small business, we estimate it to be impossible to comply with this rule, change our entire business model and maintain the ability to employ the great people we currently employ not to mention greatly limit our ability to create new jobs in the future."  *Id.*

- "I do not think that I would be able to obtain the necessary training and licensing to sell securities through a new broker-dealer firm by April 2017, which I understand to be the effective date of the rule, and as a result, I will lose clients, income, and potentially even my livelihood."  Exhibit I, Decl. of Francois Cousinet ¶ 21; *see also* Exhibit J, Decl. of Chris Shreves ¶ 23 (same).

- "The Department's final regulatory actions will be detrimental to my and [my company's] ability to sell fixed indexed annuities and, consequently, threatens the very survival of my business."  Exhibit K, Decl. of Donald E. Wales ¶ 18.

The declarations submitted in the MSG case confirm the information NAFA submitted to the Court in its uncontroverted affidavits and accentuate that the need to overhaul a multi-billion dollar industry distribution system in a matter of months is already causing irreparable harm. Those harms will grow exponentially if the applicability date is not stayed pending appeal.

## C.    An Injunction Will Prevent Harm And Serve The Public Interest.

The balance of harms tips decidedly in favor of granting NAFA's request for injunctive relief pending appeal.  On one hand, the FIA industry faces enormous and irreparable harm if an injunction is not granted, as it engages in herculean efforts to meet the impossible task of

complying by the April 10, 2017 applicability date.  In turn, investors will be denied access to beneficial retirement services and products.  And, if the Rule is ultimately invalidated, all the adverse consequences need not have been suffered.

On the other hand, no real harm will result from delaying the applicability of the Rule. FIAs, like all fixed annuities, have been competently regulated at the state level for years, and consumers remain protected by that state level regulation.  After taking six years to draft and adopt the Rule, the Department cannot credibly contend that significant harm will be caused by a delay of the applicability date pending appeal.

An injunction pending appeal also will serve the public interest.  The public has a strong interest in ensuring that agencies act within the limits of statutory authority.  *Nat'l Treasury Employees Union v. United States Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) ("The preservation of the rights in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest.").[4]  Indeed, "the public interest is best served by having federal agencies comply with the requirements of federal law, particularly the notice and comment requirements of the APA, and the agency's own stated polices."  *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 6 (D.D.C. 1997).

Most significantly, an injunction pending appeal is necessary to ensure that NAFA's right to effective appellate review is not impaired.  There are a number of substantial questions about whether the Department's action is *ultra vires*, any one of which could result in a decision to invalidate the Rule.  Only with an injunction pending appeal will NAFA members be given a meaningful opportunity to obtain appellate review before they are forced to complete the process

---

[4]  *See also Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997) ("[F]aithful application of the statutes outweighs the public interest in what . . . would be a marginal increase in the availability of low-cost generic drug products to American consumers."), *aff'd*, 140 F.3d 1060 (D.C. Cir. 1998).

18

of making irreversible and costly changes to the FIA distribution system to comply with the Rule.  It is plainly in the public interest that NAFA's right to appeal not effectively be denied.

## V.   CONCLUSION

Although the Court granted the Department's cross-motion for summary judgment, NAFA respectfully requests an injunction pending appeal in order to preserve the status quo by staying the April 10, 2017 applicability date, and a further order that the Rule will not become applicable for a period of at least 10 months after this lawsuit is finally resolved.  Due to the radical impact the Rule already is having on the FIA industry, NAFA believes a stay of two years following resolution of this lawsuit is appropriate.

November 14, 2016                                    Respectfully submitted,

                                                     BRYAN CAVE LLP

                                                     /s/ Philip D. Bartz
                                                     Philip D. Bartz (D.C. Bar No. 379603)
                                                     Jacob A. Kramer (D.C. Bar No. 494050)
                                                     1155 F Street, NW, Suite 700
                                                     Washington, DC  20004
                                                     (202) 508-6000

                                                     Of Counsel:

                                                     Adam L. Shaw
                                                     1155 F Street, NW, Suite 700
                                                     Washington, DC  20004

                                                     *Counsel for NAFA*